Roy A. Katriel (SBN 265463)
**THE KATRIEL LAW FIRM**
4225 Executive Square, Suite 600
La Jolla, CA 92037
Tel:   (858) 242-5642
Fax:   (858) 430-3719
E-mail: rak@katriellaw.com

Ralph B. Kalfayan (SBN 133464)
Lynne M. Brennan (SBN 149131)
**KRAUSE, KALFAYAN, BENINK & SLAVENS, LLP**
550 West C Street, Suite 530
San Diego, California 92101
Telephone:  619-232-0331
Facsimile:  619-232-4019
Email: ralph@kkbs-law.com
Email: lbrennan@kkbs-law.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADEL TAWFILIS, DDS d/b/a CARMEL VALLEY CENTER FOR ORAL AND MAXILLOFACIAL SURGERY, individually and on behalf of all others similarly situated,<br><br>              Plaintiff,<br><br>       vs.<br><br>ALLERGAN, INC.,<br><br>              Defendant. | CASE NO.<br><br>**COMPLAINT -- CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## NATURE OF THE ACTION

1.    Plaintiff Adel Tawfilis, DDS d/b/a Carmel Valley Center for Oral and Maxillofacial Surgery brings this action on behalf of himself and all other similarly situated direct purchasers within the United States of Defendant Allergan, Inc.'s Botox® neuromodulator product during the Class Period defined herein.  As detailed more fully below, Defendant Allergan, Inc., through its Botox® product, is the overwhelming U.S. market leader for sales of an injectable neuromodulator for use in cosmetic applications. On or about September 25, 2013, Allergan announced an agreement with Medytox, Inc., a Korean company that developed and marketed a rival, arguably superior, and less expensive botulinum toxin-based neuromodulator that competes with Botox® in other countries.[1]  The announced agreement was consummated and closed in January 2014. Medytox had plans to enter the U.S. market and thereby challenge Botox® and Allergan's entrenched monopoly market power in this country—competition that it has pursued against Allergan's Botox® in other countries, including Medytox's native Korea. The Allergan-Medytox anticompetitive agreement, however, ensures that that will not happen.  In exchange for a total payment from Allergan to Medytox of more than $300 million (subject to certain sales and commercial thresholds) plus a future royalty stream, Allergan obtained exclusive rights worldwide (other than in Korea) to commercialize Medytox's neurotoxin products.  Thus, the agreement prevents competition from taking place between these two otherwise actual or potential competitors in the U.S. market for injectable neuromodulators for use in cosmetic applications.  By thwarting this competition, Allergan has been able to cement its monopoly market power in the U.S. market free from any pricing constraints that would be posed by potential competition in the U.S. by Medytox's entry.   Plaintiff, who purchased Botox® directly from Allergan

---

[1] Being a translation from Korean, the company name "Medytox" is sometimes also represented in the literature as "Medy-tox" or "Medy-Tox."  For consistency, the entity is referred to as "Medytox" throughout this pleading.

during the Class Period, brings this action to seek redress under the federal antitrust laws and applicable California laws for this unlawful agreement in restraint of trade and Allergan's monopolization of the relevant market.

## PARTIES

2.      Plaintiff Adel Tawfilis, DDS, a resident of California, is a licensed dentist and oral and maxillofacial surgeon and the principal of the Carmel Valley Center for Oral and Maxillofacial Surgery located in San Diego, California.  During the Class Period, Plaintiff has repeatedly purchased Botox® directly from Allergan, which Plaintiff stocks and uses as part of his practice.  Attached hereto as Exhibit 1 are true and correct copies of just a sampling of invoices during the Class Period from Allergan to Plaintiff, evidencing Plaintiff's purchases of Botox® from Allergan during the Class Period.  In fact, there were many more such purchases of Botox® by Plaintiff from Allergan during the Class Period.

3.      Defendant Allergan, Inc. is a corporation organized under the laws of the State of Delaware, and having its principal place of business at 2525 Dupont Drive in Irvine, California 92612.  Allergan is a U.S. based multinational pharmaceutical company focusing on ophthalmic pharmaceuticals, dermatology, neuroscience, urology, and cosmetics.   It is the producer of Botox®, an injectable neuromodulator derived from the botulinum toxin, for treatment of, *inter alia*, facial wrinkles.

## JURISDICTION & VENUE

4.      This Court has subject-matter jurisdiction over Counts I-III of this Class Action Complaint pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1337 because these counts raise a federal question under the federal antitrust laws.  This Court also has supplemental subject-matter jurisdiction over Counts IV and V of this Class Action Complaint pursuant to 28 U.S.C. § 1367 because these counts allege claims under the California Cartwright Act and California Unfair Competition Law, respectively, that

1    arise from the same nucleus of operative facts as Counts I-III over which this Court has

2    original federal question and antitrust subject-matter jurisdiction.

3         5.      In addition, this Court also independently has subject-matter jurisdiction

4    over all the claims asserted in this Class Action Complaint pursuant to the Class Action

5    Fairness Act, 28 U.S.C 1332(d) because the matter in controversy exceeds the sum or

6    value of $5 million, exclusive of interest and costs, and is a class action in which

7    members of a putative class are of a diverse citizenship (all states) from Defendant's

8    citizenship (California).

9         6.      This Court has personal jurisdiction over Defendant Allergan, Inc. because

10   Defendant is a corporation doing business within this State and judicial district, and is

11   headquartered within this judicial district.

12        7.      Venue in this judicial district is also proper as Defendant is a resident of this

13   judicial district, and has its principal place of business within this judicial district.

14   Defendant distributes and injects its Botox® products within the stream of commerce into

15   this district.    Venue in this judicial district is, therefore, proper under 28 U.S.C. § 1391.

16

17   **BOTOX® AND THE MARKET FOR NEUROTOXINS FOR COSMETIC USE**

18        8.      For purposes of this Class Action Complaint, the relevant antitrust product

19   market is the market for injectable neurotoxins for cosmetic use.    Allergan's Botox® is

20   such an injectable neurotoxin derived from the botulinum toxin, and is the overwhelming

21   leader in the U.S. market for such neurotoxins, possessing in excess of 85 percent share

22   of the U.S. relevant market.   By contrast, in Korea, where Botox® is also sold but faces

23   competition from, *inter alia*, Medytox's rival injectable neurotoxin for cosmetic

24   applications, Botox® has only approximately 35 percent share of the Korean market and

25   lags behind Medytox's near 40 percent or greater share of the Korean market.

26

27   / / /

28

**The Botox Product and Other Injectable Botulinum Toxin-Based Neuromodulators**

9.     Botulinum toxin is a protein and neurotoxin produced by the bacterium *Clostridium botulinum*.  It is the most acutely lethal toxin known, with an estimated human median lethal dose of 1.3–2.1 ng/kg intravenously or intramuscularly and 10–13 ng/kg when inhaled.  Botulinum toxin can cause botulism, a serious and life-threatening illness in humans and animals.

10.     Despite the lethal nature of botulinum toxin, the toxin can be purified and have some of its strains fermented in order to yield a neurotoxin suitable for clinical use, such as for the treatment of facial wrinkles.  Botox,® Allergan's leading product in this market, is a sterile, vacuum-dried purified botulinum toxin A that is produced from the fermentation of the Hall strain of *Clostridium botulinum* and is intended for intramuscular use.  It is purified from the culture solution by dialysis and a series of acid precipitations to a complex consisting of the neurotoxin and several accessory proteins.  The complex is dissolved in sterile sodium chloride solution containing the protein human albumin and is sterile filtered prior to filling and vacuum-drying.

11.     The end result is a neurotoxin that, when applied by properly trained personnel, is an effective neuromodulator injectable in humans.   The Botox® product that is purified from the botulinum toxin A works upon injection by entering into the tiny nerve ending at the junction between the nerve and the muscle, the so-called neuromuscular junction.  At the nerve ending, Botox® is phagocytosed (engulfed) into the cell.  In the nerve ending, the neuromodulator's effect is to block the release of acetylcholine into the neuromuscular junction.  When acetylcholine is released into the neuromuscular junction, it binds to special receptors on the muscle-side of the junction and causes the muscle to contract.   But when a neurotoxin such as Botox® has been administered, it blocks the release of acetylcholine.  Thus when one attempts to, for example, frown, one can try but cannot make the muscles contract or can only do so minimally depending on the dose given.

12. The presence of the protein human albumin in Botox® (as described in paragraph 10 *supra*) and, until recently, all other competing injectable neurotoxins for cosmetic use is significant for several clinical and regulatory reasons. Human albumin is a protein prevalent in human blood plasma. From a clinical perspective, in Botox® and other neurotoxins human albumin acts as a necessary bonding agent so that the Botox® sticks to the nerve ending. From a regulatory perspective, the inclusion of human albumin in the neurotoxin product for human use triggers certain regulatory requirements. Specifically, under Food and Drug Administration regulations, human albumin found in any injectable neurotoxin for sale in the United States can only come from FDA-approved blood establishments. As detailed in paragraphs 30-31 below, this means that foreign neurotoxin manufacturers like Medytox whose products rely on human albumin obtained overseas will not be able to obtain FDA approval for sale of those products within the United States because the albumin found in those foreign manufactured products is not supplied by the required FDA-approved blood establishments.

13. Neurotoxins for use in cosmetic applications have no reasonable substitutes. Cosmetic surgery, the closest means of achieving the same results on facial wrinkles as are achieved by application of Botox®, is not viewed by consumers as a ready substitute. Surgery is significantly more expensive, time-consuming, carries greater risk, requires differently trained personnel than the personnel required to inject Botox or other neurotoxins, and involves a longer recovery time with swelling and scarring affecting the patient following the procedure. For this and other reasons, consumers do not view cosmetic surgery as posing price-constraining competition to neurotoxin injections for cosmetic applications.

14. Similarly, other creams or fillers, including collagen, are not viewed as ready and reasonable substitutes to injectable neurotoxins for cosmetic application, such as Botox®. Whereas neurotoxins like Botox® work by disrupting the muscle contraction,

fillers like collagen and other creams fill in wrinkled areas so as to plump up and give the skin a more lifted appearance.  Neurotoxins, therefore, are indicated for the treatment of so-called dynamic wrinkles, i.e., those wrinkles caused by the movement (contraction) of facial muscles, as is the case in eye frowning.  By contrast, collagen and other fillers are indicated for the treatment of so-called static wrinkles, those wrinkles that are visible when a person's face is relaxed and making no expression.  Because the two different products work differently and have different indications, collagen and other fillers are not viewed as reasonable substitutes for those consumers seeking treatment by way of an injectable neurotoxin like Botox®.

15.    Given the lack of reasonable substitutes for the use that these products are demanded, the relevant antitrust product market for purposes of this action is the market for injectable neurotoxins for cosmetic use.

16.    The relevant antitrust geographic market for purposes of this action is the United States.  Due to various regulations and treaties, medical and other personnel purchasing Botox or any other injectable neurotoxin for cosmetic use must make these purchases from providers within the United States.  In addition, the sale of Botox®, the leading product in the relevant market, is made by Allergan directly from its website to qualified consumers nationwide, thereby further evidencing the nationwide scope of the geographic relevant market.

**Botox's Overwhelming Market Power In The United States**

17.    As stated, within the U.S. relevant market, Allergan's Botox® product line is the overwhelming dominant player, possessing at all times a relevant market share of at least 85 percent.  Indeed, the brand name Botox® has essentially become so synonymous in consumers' minds with the concept of neurotoxins for cosmetic use that Botox® is often used interchangeably to describe the injectable neurotoxin for cosmetic use product.   Many commentators, therefore, have pointed out that Botox® has become

the "Scotch Tape® of the injectable neurotoxin market."

18.    Botox's® high market share, coupled with the significant barriers to entry into the relevant antitrust market, mean that Allergan possesses monopoly market power in this relevant antitrust market and has the ability, which it has exercised, to raise prices or reduce output.

19.    In the United States, Botox's® competing injectable neurotoxins for cosmetic use are limited to two other products, Dysport® and Ximeon®, both of which are botulinum toxin-based neuromodulators.  These two products' combined market share, however, makes up only about 15 percent of the U.S. market (i.e. one fifth to one sixth the share of Botox®), such that their small presence, both individually and even if combined, is insufficient to pose price-constraining competition to Allergan's Botox®.

20.    The market for injectable neurotoxins for cosmetic use is characterized by high barriers to entry.  Due to the high lethal effect of the botulinum toxin forming the basis of the injectable neuromodulators on the market, the manufacturing facilities are subject to heavy regulation and control.  This is because botulinum toxin is classified as Class A (highest level) bio-terror threat by the United States government.   As such, not even the American Type Culture Collection (the world's largest and most diverse bio-resource center) is permitted to distribute botulinum toxin.  Manufacturing of neurotoxins for cosmetic use, therefore, requires specialized facilities and equipment (in accordance with Biosafety Level 3).

21.    Because of the high barriers to entry into this relevant market in the United States, and the low market share of the two existing players in the United States other than Allergan, there was no reasonable prospect that Allergan's Botox® product for cosmetic use would face price-constraining competition from any existing U.S. market player.

/ / /

1
2

**Medytox's Presence Outside The United States And Its Planned Entry Into The U.S. Market Through A Superior, Albumin-Free, Less Expensive Neurotoxin.**

3
4
5
6
7

    22.    Instead, price-constraining competition to Allegan's Botox® cosmetic product offering was most likely to take place only from the planned entry into the U.S. market from already existing participants in the injectable neurotoxin market outside the United States.  Such players already had the supply chain, know-how, experience, and track record for the sale of rival injectable neurotoxin products for cosmetic use.

8
9
10
11
12
13
14

    23.    One such notable existing participant in the injectable neurotoxin market outside the United States was Medytox, Inc., a Korean company that, like Allergan, manufactured and distributed an injectable neurotoxin for cosmetic use.  Medytox's primary product is known as Meditoxin, and is sold not only in Korea, but also in approximately 40 countries with additional countries planned for the product's registration.  In different countries, Medytox employed different brand names for its product, including Meditoxin, Siax, Cunox, Botulift, and Neuronox.

15
16
17
18
19

    24.    Though a Korean company, Medytox's product offering of its injectable neurotoxin was not regionally limited to that country or the Asia Pacific Rim.  Instead, Medytox's product was approved and sold across the globe not only in Korea, Japan, Thailand, India, and other countries in Asia, but also in Eastern Europe and Latin America.

20
21
22
23
24
25
26
27

    25.    Medytox's expansion of its injectable neurotoxin product offering continued apace.  It planned and was poised to enter at least six other national markets, including additional countries in Europe as well as planned entry into the United States market.  To facilitate entry into these added markets, Medytox undertook considerable investment and preparation.  In this regard, whereas Medytox's injectable neurotoxin product commercialized in Asia, Eastern Europe, and Latin America contained Korean albumin, the company recognized that the presence of Korean albumin would impede the licensure and approval process for the product into the U.S. market.  As a result,

28

1   Medytox reformulated a bio-better version of its product that was manufactured without

2   using animal-derived fermentation medium or human albumin—a significant advance in

3   the industry, as it represented the only and first neurotoxin that did not require the

4   presence of albumin.  Moreover, the company implemented and invested in clinical trials

5   in Australia with this reformulated product.  This investment proved fruitful because in

6   mid-2013, Medytox received regulatory approval in Korea for its reformulated albumin-

7   free botulinum toxin-based neurotoxin, and it began marketing this new generation

8   neurotoxin under the brand name Innotox.®

9   **Medytox's Competitive Threat To Botox® Was Documented And Real.**

10       26.    The competitive threat posed to Allergan by Medytox's planned entry into

11   the U.S. market was real and significant.  Unlike the competitive situation in the U.S.

12   market currently, where the two existing competitors to Botox® (Dysport® and Ximeon®)

13   had managed to attain a combined market share of only about 15 percent to Botox's® 85

14   percent U.S. market share, the landscape was different where Medytox's product was

15   available.  Thus, in Korea, for example, where Medytox's neurotoxin and Botox® were

16   both available as competing alternative injectable neurotoxin products, Botox® sales

17   accounted for approximately 40 percent of neurotoxin sales and Medytox's sales

18   accounted for approximately 35 percent of all injectable neurotoxin sales (i.e, including

19   sales for both cosmetic as well as therapeutic uses).   Moreover, if one limited the

20   analysis to sales of these injectable neurotoxins that were used for cosmetic applications

21   (as opposed to therapeutic uses like treatment for cerebral palsy spasticity, dystonia,

22   etc.), Medytox had a greater market share than Allergan's Botox®.

23       27.    Medytox's remarkable market share growth when it competed head-to-

24   head with Allergan's Botox® was documented in a recent J.P. Morgan Asia Pacific

25   Equity Research Paper, which touted that:

26          Medy-Tox launched its biosimilar Botox, branded Neuronox (Meditoxin) in
            2006.  The domestic [i.e., Korean] market share of Meditoxin of total botox
27          market has risen from 8% in 2006, the year of launch to 38% in 2014E.  It has

28

become the first choice of botulinum type A in Korea.

J.P. Morgan, Asia Pacific Equity Research (13 August 2014), at 6.

28.    The concern to Allergan was well-founded.  A series of double-blinded, peer-reviewed, and published medical studies had already found that Medytox's injectable neurotoxin was as effective and yielded essentially indistinguishable results in cosmetic use than those resulting from the use of Botox®.   But, as a medical researcher noted, there was one key advantage to the consumer's selection of Medytox's product over Botox®:

> To many, the main advantage Neuronox has over its primary competitor is price. 'In Korea, Neuronox is more cost-effective than BOTOX Cosmetic,' said Dr. Huh. 'This is a significant difference, and is part of what makes it the most popular neurotoxin injectable among Korean women.'

Kevin A. Wilson, "*Asian Neurotoxin Alternative Compares Favorably With Competitor*," Medytox Supplement (Spring 2011) available at http://digital.miinews.com/article/Asian+Neurotoxin+Alternative+Compares+Favorably+With+Competitor/728686/69901/article.html (last visited Feb. 4, 2015).

29.    This stated price advantage was also well founded, as Medytox's injectable neurotoxin for cosmetic use is consistently priced 30 to 50 percent less than the price of Allergan's Botox® sold in that same country.  Moreover, a marketing report conducted in 2010 on behalf of Medytox by Team High Five, an independent marketing firm, documented a consumer survey of 72 female respondents, which included both those who had experience with Botox® as well as those who did not.  The survey responses indicated that the respondents would "get Medytox over Botox if it provides the same function with cheaper price."

30.    Until recently, Allergan could remain relatively secure that despite these market realities abroad, Allergan's Botox® would not face a competitive threat from Medytox in the United States.  This was because until recently Medytox's neurotoxin product contained Korean human albumin, which meant that the product was unlikely to get approval and licensure to be sold in the United States, as FDA regulations required

that all human albumin found in injectable neurotoxins sold in the United States
originate only from FDA-approved human blood supply establishments.

**Medytox Receives Regulatory Approval For Its New Generation, Albumin-Free
Injectable Neurotoxin, Thereby Paving The Way For Entry Into The U.S. Market.**

31.     The competitive threat from Medytox, however, changed in mid-2013
when Medytox received regulatory approval in Korea for its new generation
reformulated neurotoxin (marketed in Korea under the name Innotox®) that did not
require and did not include human albumin as an ingredient.  The approval of Medytox's
reformulated albumin-free neurotoxin not only meant that entry into the U.S. market was
now imminent, but the reformulated product also presented a significant product advance
and improvement over Botox® and other competing neurotoxins, all of which contained
albumin.   The lack of albumin in Medytox's reformulated product meant that, unlike
Botox®, the product would not need to be freeze-dried in a high vacuum for storage in
order to be preserved—a process that then requires the treating physician to rehydrate
and dilute the product prior to use.  Dispensing with the need for rehydration and
dilution of the product has the clinical advantage of reducing the risk of bacterial
infection during treatment.

32.     The planned and impending entry by Medytox into the United States market
posed a direct and significant threat to Allergan's pricing of its Botox® product for
cosmetic use.  With published medical studies documenting that the two products'
effectiveness was indistinguishable, and with Medytox's pricing being a fraction of
Allergan's pricing of Botox®, Allergan was rightfully concerned that Medytox's entry
into the United States would adversely affect Allergan's market power and ability to
continue to price Botox® in the manner in which it had been doing prior to Medytox's
entry when Botox® held an 85 percent or so U.S. market share.

33.     That concern was only cemented by review of the Asian market where
Medytox had a longstanding presence, and managed to obtain the same or greater market

1  share than Allergan's Botox®.

2      34.    Aware that the impending entry of Medytox into the U.S. market would

3  adversely affect Botox's® monopoly market power and pricing ability, Allergan devised

4  a plan to thwart the consequences of this competitive reality.  The plan took the form of

5  an anticompetitive agreement whereby, instead of having Medytox's product compete

6  against Allergan's Botox® in the United States, Allergan would act as Medytox's

7  exclusive licensee in the United States (and in all regions other than Korea).

8

9  **THE ANTICOMPETITIVE AGREEMENT ENTERED INTO BY ALLERGAN**
**AND MEDYTOX TO THWART COMPETITION FROM MEDYTOX IN THE**
10  **UNITED STATES**

11      35.    Thus, upon information and belief, in 2013 Allergan personnel met with

12  personnel of its competitor Medytox.  By September 2013, the parties announced an

13  agreement pursuant to which the parties agreed that Allergan would now act as

14  Medytox's exclusive licensee in, *inter alia*, the United States for the commercialization

15  of Medytox's reformulated neurotoxin product line.  Under the same announced

16  agreement, Allergan also received these same exclusive rights in all regions other than

17  Korea, where Medytox and Allergan continued to compete, and in Japan, where Allergan

18  was granted co-exclusive rights to Medytox's reformulated neurotoxin product line.   In

19  exchange for this grant from Medytox, Allergan agreed to pay Medytox payments

20  estimated to be in excess of $300 million plus royalties on sales made by Allergan of

21  products encompassing the licensed Medytox product line.

22      36.    Thus, the monetary payments due from Allergan to Medytox under the

23  agreement plus the anticipated royalty payments that would be due on any sales

24  accounted for an agreement reasonably valued at close to half a billion dollars.   This is a

25  remarkable consideration when one realizes that as of mid-2014, J.P Morgan and

26  Bloomberg had reported Medytox's entire market capitalization to be approximately

27  $857 million for the whole company.   The size of the consideration that Allergan agreed

28

1   to pay Medytox, its competitor, for Medytox's reformulated neurotoxin product line,

2   therefore evidences Allergan's own assessment of the competitive threat and

3   significance of Medytox's reformulated product offering.

4         37.   The Allergan-Medytox agreement is a horizontal agreement between actual

5   and potential competitors.  It has a direct anticompetitive consequence in that it assures

6   Allergan that Medytox will not enter and compete against it in the U.S. market for

7   injectable neurotoxins for cosmetic use.  This is because under the agreement Allergan

8   has acquired the exclusive rights to Medytox's reformulated neurotoxin product line,

9   thereby ensuring that neither Medytox nor anyone else other than Allergan could

10  commercialize this product line within the United States in competition with Botox.®

11  The pre-existing Medytox product line (i.e., the non-reformulated version of the

12  Medytox neurotoxin), though not part of the Medytox-Allergan agreement, poses no

13  competitive threat in its existing form to Allergan in the United States because its use of

14  Korean albumin as an ingredient means that that pre-existing product does not qualify

15  for regulatory approval necessary for entry into the United States market.  Thus, the net

16  result is that, as between the contracting parties, the Allergan-Medytox agreement

17  allocates the United States market for injectable neurotoxins solely to Allergan with the

18  assurance that in exchange for Allergan's payments Medytox will not enter the United

19  States market during the agreement's duration.

20        38.   The Allergan-Medytox agreement also serves to cement and maintain

21  Allergan's existing monopoly market power in the United States market for injectable

22  neurotoxins for cosmetic use.  The agreement removes Medytox's ability to challenge

23  Allergan's market power in the United States.  Absent the agreement, Medytox's

24  reformulated neurotoxin product line could and would have competed against Allergan's

25  Botox® offerings, and would have posed price-constraining competition to Botox®.  This

26  is, in fact, what has transpired in markets like Korea where Allergan's Botox® is free to

27  and does compete against Medytox's neurotoxin.

28

39.     Indeed, given Medytox's lower price point and the more advanced, albumin-free technology of its reformulated product (which presents real advantages to physicians who use the product), the mere impending entry of Medytox into the U.S. market would have sufficed to constrain Allergan's pricing of its Botox® product line during the Class Period.

40.     The net result of the Allergan-Medytox agreement is that it thwarted actual and/or potential competition, allocated markets, unlawfully maintained Allergan's monopoly market power, and as a direct result caused those, like Plaintiff, who purchased Botox® directly from Defendant during the Class Period, to pay a supra-competitive overcharge for their Botox® purchases that would not have existed but for the agreement.

## CLASS PERIOD

41.    For purposes of this Class Action Complaint, the Class Period corresponds to the period between September 25, 2013 until such date as the Court enters an Order certifying any Count of this Class Action Complaint as a class action.

## CLASS ACTION ALLEGATIONS

42.     Pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings this action as a class action on behalf of himself and all other similarly situated direct purchasers within the United States of Defendant Allergan's Botox® product line during the Class Period.   Specifically excluded from all of the class definition are all federal, state, and local government officials, as well as all judicial officers assigned to this case and their staff.  Likewise, excluded from the class definition are all employees, officers and directors of Defendant.  Plaintiff reserves the right to amend this class definition upon the attainment of discovery.

43.     Although the exact number of class members is presently unknown,

1   Plaintiff is informed and believes, based on the millions of Botox® units sold within the

2   United States that the class size, as defined, readily satisfies the numerosity requirement

3   for class certification.  The members of the class are so numerous that joinder of all

4   members is impracticable.

5       44.   Class certification is also appropriate because there is an identifiable class

6   on whose behalf this class action would be prosecuted.  Specifically, Plaintiff seeks to

7   represent a class of all direct purchasers of Botox® within the United States during the

8   Class Period.  This class is ascertainable and identifiable based on the records of invoices

9   of such purchases from Allergan.  As evidenced in Exhibit 1 hereto, Allergan generates

10  records and invoices documenting such direct purchases of Botox® that show the

11  purchase and its price and quantity details, as well as the identity of the direct purchaser.

12      45.   Class certification is also appropriate because there are questions of fact

13  and/or law that are common to the Class Members, and that predominate over any issues

14  that may affect only individual members of the class.  Among these predominating

15  common questions of fact and/or law are:

16          a.  Whether Defendant entered into an agreement with Medytox that

17              affected the relevant market;

18          b.  Whether the agreement had anticompetitive effects, including, but not

19              limited to: thwarting competition between Botox® and Medytox

20              neurotoxins; allocating the U.S. market to Allergan; and, cementing

21              Allergan's monopoly market power;

22          c.  Whether Plaintiff has defined a legally and factually supported

23              relevant antitrust market (to the extent such a market definition is

24              necessary);

25          d.  Whether Defendant possesses the requisite market power;

26          e.  Whether Defendant's conduct injured class members in their business

27              or property within the meaning of the antitrust laws;

28

f.   Whether class members are entitled to the relief sought, and if so, the proper scope of such relief.

46.     Plaintiff's claims are typical of the claims of the absent class members in that Plaintiff, like all the absent class members, claims that he was direct purchaser of Defendant's Botox® product line for cosmetic use during the Class Period and further alleges that, as a result of the conduct alleged in this Class Action Complaint, competition was thwarted and he was subject to a supra-competitive overcharge on his purchases.  Plaintiff is a member of the class he seeks to represent. The claims Plaintiff advances on his own behalf are identical to the claims asserted on behalf of the members of the class that Plaintiff seeks to represent.

47.     Plaintiff is an adequate class representative in that, as a member of the class Plaintiff seeks to represent and as a direct purchaser of Botox® during the Class Period, Plaintiff's interests are entirely aligned with those of the class.  There are no individual conflicts that prevent Plaintiff from adequately representing the class.  Plaintiff has also retained competent counsel experienced in class action litigation.

48.     A class action presents a superior form of adjudication over individual litigation.  The costs of litigating this action against a large and sophisticated defendant like Allergan in comparison to the recovery or relief sought would make individual litigation impracticable.  In addition, forcing individual litigation would risk the result of inconsistent rulings with respect to Allergan's duties owed to the members of the putative class.

49.     A class action is manageable.  The proposed class represents an identifiable community that can be readily identified, and the relief sought is one that can be overseen by the Court.

## <u>COUNT I</u>
## (UNLAWFUL MARKET ALLOCATION IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1)

50.     Plaintiff hereby incorporates by reference paragraphs 1-49 of this Class Action Complaint with the same force and effect as if they had been fully restated herein.

51.     During the Class Period, Defendant has had and continues to have monopoly market power in the United States market for injectable neurotoxins for cosmetic use.

52.     Defendant's market power would face price-constraining competition from the impending and projected entry into the U.S. market by rival Medytox.  Indeed, in markets like Korea, where Medytox competes head-to-head with Allergan in the injectable neurotoxin market, Medytox has constrained Allergan's market share and pricing power, and actually is the market share leader.

53.     Medytox's reformulated new generation neurotoxin not only provides a significant price advantage over Allergan's Botox®, but also presents significant technological advances and advantages, as it is the first and only albumin-free botulin-toxin-based neurotoxin.

54.     Rather than compete on the merits in the U.S. market, Allergan embarked on a different course by which it agreed with Medytox to thwart competition in the U.S. market by way of a so-called licensing agreement that gave Allergan exclusive rights in the United States to Medytox's reformulated neurotoxin product line in exchange for a significant multi-million dollar payment from Allergan to Medytox.

55.     The agreement, therefore, ensures that, as between the two contracting parties, the U.S. market will be allocated solely to Allergan during the term of the agreement in exchange for Allergan's payments to Medytox.

56.     This market allocation is *per se* unlawful under the federal antitrust laws.

Alternatively, even if the Court were to find the alleged market allocation agreement to not be subject to *per se* condemnation, this same conduct is still unlawful and violates the antitrust Rule of Reason because its anticompetitive effects outweigh any procompetitive justifications that could be proffered and, in any event, any such procompetitive effects could be achieved by less restrictive means.

57.     The market allocation agreement has the anticompetitive effect of foreclosing competition between Allergan and Medytox in the U.S., and thereby cementing Allergan's monopoly market power within the United States.  As a result, Allergan continues to be able to and has throughout the Class Period charged a supra-competitive price for its sales of Botox® products for cosmetic use.

58.     During the Class Period, Plaintiff made repeated purchases directly from Defendant of Allergan's Botox® for cosmetic use.  Plaintiff was injured in his business or property within the meaning of the federal antitrust laws because, as a direct, proximate, and foreseeable result of Defendant's conduct, including the market allocation alleged in this Count, Plaintiff was subjected to a supra-competitive overcharge for his Botox® purchases during the Class Period.  This overcharge would not have existed but for the market allocation agreement because the potential or actual entry of Medytox into the U.S. market, which the agreement prevents from occurring, would have a price-constraining effect on Allergan sales of its Botox® product line.

59.     As a direct purchaser within the alleged relevant market who has been injured in his business or property, Plaintiff has standing to and does bring this suit seeking to recover on behalf of himself and the absent class members, *inter alia*, treble damages for the supra-competitive overcharges he was subjected to during the Class Period, as well as an award of attorneys' fees and costs of suit, and any other relief this Court deems proper.

## COUNT II
## (AGREEMENT IN RESTRAINT OF TRADE IN VIOLATION OF 15 U.S.C. § 1)

60.    Plaintiff hereby incorporates by reference paragraphs 1-59 of this Class Action Complaint with the same force and effect as if they had been fully restated herein.

61.    During the Class Period, Defendant has had and continues to have monopoly market power in the United States market for injectable neurotoxins for cosmetic use.

62.    Medytox was an actual and potential competitor of Defendant that was poised and planned to enter the United States market for injectable neurotoxins for cosmetic use.

63.    Defendant's market power would face price-constraining competition from the impending and projected entry into the U.S. market by rival Medytox.  Indeed, in markets like Korea, where Medytox competes head-to-head with Allergan in the injectable neurotoxin market, Medytox has constrained Allergan's market share and pricing power, and actually is the market share leader.

64.    Rather than facing competition on the merits from its rival Medytox in the U.S., Defendant decided to and did enter into an agreement with Medytox, as is alleged herein, pursuant to which it thwarted and foreclosed the prospects for any such competition from taking place in the United States.  Instead, the agreement provided that Allergan was to be the sole party with rights to commercialize Medytox's new generation of injectable neurotoxins.

65.    The agreement between Allergan and Medytox is a classic and naked horizontal agreement between actual and/or potential competitors.  As such, it is *per se* unlawful under the antitrust laws.  Alternatively, even if the Court were to find the agreement to not be subject to *per se* condemnation, this same conduct is still unlawful and violates the antitrust Rule of Reason because its anticompetitive effects outweigh any procompetitive justifications that could be proffered and, in any event, any such

Case No.                                                                                    COMPLAINT

1    procompetitive effects could be achieved by less restrictive means.

2        66.    The agreement has the anticompetitive effect of foreclosing competition

3    between Allergan and Medytox in the U.S., and thereby cementing Allergan's monopoly

4    market power within the United States.  As a result, Allergan continues to be able to and

5    has throughout the Class Period charged a supra-competitive price for its sales of Botox®

6    products for cosmetic use.

7        67.    During the Class Period, Plaintiff made repeated purchases directly from

8    Defendant of Allergan's Botox® for cosmetic use.  Plaintiff was injured in his business

9    or property within the meaning of the federal antitrust laws because, as a direct,

10   proximate, and foreseeable result of Defendant's conduct, including the horizontal

11   agreement alleged in this Count, Plaintiff was subjected to a supra-competitive

12   overcharge for his Botox® purchases during the Class Period.  This overcharge would

13   not have existed but for the agreement because the potential or actual entry of Medytox

14   into the U.S. market, which the agreement prevents from occurring, would have a price-

15   constraining effect on Allergan sales of its Botox® product line.

16       68.    As a direct purchaser within the alleged relevant market who has been

17   injured in his business or property, Plaintiff has standing to and does bring this suit

18   seeking to recover on behalf of himself and the absent class members, *inter alia*, treble

19   damages for the supra-competitive overcharges he was subjected to during the Class

20   Period, as well as an award of attorneys' fees and costs of suit, and any other relief this

21   Court deems proper.

22

23                                        **COUNT III**
24   **(UNLAWFUL MAINTENANCE OF MONOPOLY MARKET POWER IN
     VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. §2).**

25       69.    Plaintiff hereby incorporates by reference paragraphs 1-68 of this Class

26   Action Complaint with the same force and effect as if it had been fully restated herein.

27       70.    During the Class Period, Defendant has had and continues to have

28

monopoly market power in the United States market for injectable neurotoxins for cosmetic use.

71.     Medytox was an actual and potential competitor of Defendant that was poised and planned to enter the United States market for injectable neurotoxins for cosmetic use.

72.     Defendant's monopoly market power would face price-constraining competition from the impending and projected entry into the U.S. market by rival Medytox.  Indeed, in markets like Korea, where Medytox competes head-to-head with Allergan in the injectable neurotoxin market, Medytox has constrained Allergan's market share and pricing power, and actually is the market share leader.

73.     Rather than facing completion from Medytox in the United States based on price, the merits, superior business acumen, or industry, Allergan entered into the agreement with Medytox that is alleged and described herein.

74.     The Allergan-Medytox agreement ensures that during the agreement's term Allergan's injectable neurotoxins for cosmetic use (of which Botox® is the market leader) will not face either actual or even the prospect of competition from Medytox, thereby insulating Allergan's monopoly market power in the United States.   The agreement is, therefore, an unlawful and anticompetitive means of maintaining Allergan's monopoly market power in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

75.     During the Class Period, Plaintiff made repeated purchases directly from Defendant of Allergan's Botox® for cosmetic use.  Plaintiff was injured in his business or property within the meaning of the federal antitrust laws because, as a direct, proximate, and foreseeable result of Defendant's conduct, Plaintiff was subjected to a supra-competitive overcharge for his Botox® purchases during the Class Period.  This overcharge would not have existed but for the Allergan-Medytox agreement because the potential or actual entry of Medytox into the U.S. market, which the agreement prevents

from occurring, would have a price-constraining effect on Allergan sales of its Botox® product line.

76.     As a direct purchaser within the alleged relevant market who has been injured in his business or property, Plaintiff has standing to and does bring this suit seeking to recover on behalf of himself and the absent class members, *inter alia*, treble damages for the supra-competitive overcharges he was subjected to during the Class Period, as well as an award of attorneys' fees and costs of suit, and any other relief this Court deems proper.

## COUNT IV

## (VIOLATIONS OF CALIFORNIA'S CARTWRIGHT ACT, SECTION 16700 ET. SEQ. OF CALIF. BUS. AND PROF. CODE)

77.     Plaintiff hereby incorporates by reference paragraphs 1-76 of this Class Action Complaint with the same force and effect as if they had been fully restated herein.

78.     The same agreement and conduct alleged in Counts I-III *supra* that give rise to Defendant's alleged violations of the federal Sherman Act, also amount to violations of California's Cartwright Act, Section 16700 et. seq. of the California Business and Professions Code that are *per se* unlawful or, alternatively, unlawful and actionable under the Rule of Reason.

79.     Because Defendant is headquartered in California and, upon information and belief, all material decisions relating to the agreement with Medytox that gives rise to this suit were planned, originated, and ratified from within California, and because the purchase transactions and pricing of Botox® were orchestrated from within California, it is fair and appropriate to apply California's Cartwright Act to the transactions of the nationwide Class.

80.     During the Class Period, Plaintiff made repeated purchases directly

from Defendant of Allergan's Botox® for cosmetic use. Plaintiff was injured in his business or property within the meaning of the Cartwright Act because, as a direct, proximate, and foreseeable result of Defendant's conduct Plaintiff was subjected to a supra-competitive overcharge for his Botox® purchases during the Class Period. This overcharge would not have existed but for the market allocation agreement because the potential or actual entry of Medytox into the U.S. market, which the agreement prevents from occurring, would have a price-constraining effect on Allergan sales of its Botox® product line.

81.     As a direct purchaser within the alleged relevant market who has been injured in his business or property, Plaintiff has standing to and does bring this suit seeking to recover on behalf of himself and the absent class members, *inter alia*, treble damages for the supra-competitive overcharges he was subjected to during the Class Period, as well as for an award of attorneys' fees and costs of suit, and any other relief this Court deems proper.

## COUNT V

## (VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW, SECTION 17200 ET. SEQ. OF CALIF. BUS. AND PROF. CODE)

82.     Plaintiff hereby incorporates by reference paragraphs 1-81 of this Class Action Complaint with the same force and effect as if they had been fully restated herein.

83.     The same conduct alleged in Counts I-IV *supra* that gives rise to Defendant's alleged violations of the federal Sherman Act and California's Cartwright Act, also amounts to unlawful and/or unfair business practices within the meaning of California's Unfair Competition Law, Section 17200 et. seq. of the California Business and Professions Code.

84.     The conduct is an unlawful business practice in that it violates the federal Sherman Act and the California Cartwright Act, as has been alleged in Counts I-IV.

85.    The conduct is also an unfair business practice because the agreement threatens to thwart competition at its incipiency by preventing even the prospect of any potential competition from occurring within the United States between Medytox's injectable neurotoxins for cosmetic use and Allergan's Botox.®

86.    Because Defendant is headquartered in California and, upon information and belief, all material decisions relating to the agreement with Medytox that gives rise to this suit were planned, originated, and ratified from within California, and because the purchase transactions and pricing of Botox® were orchestrated from within California, it is fair and appropriate to apply California's Unfair Competition Law to the transactions of the nationwide Class.

87.    Plaintiff and the class members, as direct purchasers of Botox® from Defendant, conveyed money and other benefits on Defendant, and have an interest in that conveyance.  Plaintiff and the class members, therefore, have standing, are entitled to seek, and do seek all available equitable remedies under the California Unfair Competition Law, including but not limited to restitution, declaratory and injunctive relief, an award of fees and costs, and all other relief that this Court deems proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the class members pray for judgment against Defendant as follows:

A.     That the Court determine that this action may be litigated as a class action, and that Plaintiff and his counsel be appointed class representatives and class counsel, respectively;

B.     That notice be disseminated to the Class members at Defendant's expense, informing them of the pendency of this action and their legal rights regarding the same;

C.     That judgment be entered against Defendant and in favor of Plaintiff and the class members on all counts;

D.     That Defendant be ordered to bear the cost of notifying the absent class members of this class action, and of the class members' rights respecting the same;

E.     That, with respect to Counts I-IV, Defendant be ordered to pay treble the actual damages and losses sustained by Plaintiffs and the class members, and that Defendant be Ordered to pay Plaintiff's counsel's attorneys' fees and costs of suit, as awarded by the Court;

F.     That the Court order the creation of a common fund from which Plaintiff and his counsel shall be awarded their reasonable costs of suit, including reasonable attorneys' fees and expenses incurred in prosecuting this class action and in conferring a common benefit upon the class

Case No.

1    members;

3    G.    That, with respect to Count V, Defendant be ordered to restore to

4    Plaintiff Class members all monies and/or benefits conveyed onto

5    Defendant by members of the class;

7    H.    That Plaintiffs and the class members be awarded all such other relief

8    as this Court deems just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all claims and causes of action properly triable before a jury.

DATED: February 24, 2015                    Respectfully Submitted,

**/s/ Roy A. Katriel**
Roy A. Katriel (SBN 265463)
**THE KATRIEL LAW FIRM**
4225 Executive Square, Suite 600
La Jolla, CA 92037
Tel:   (858) 242-5642
Fax:   (858) 430-3719
E-mail: rak@katriellaw.com

Ralph B. Kalfayan (SBN 133464)
Lynne M. Brennan (SBN 149131)
**KRAUSE, KALFAYAN, BENINK &
SLAVENS, LLP**
550 West C Street, Suite 530
San Diego, California 92101
Telephone:  (619) 232-0331
Facsimile:   (619) 232-4019
Email: ralph@kkbs-law.com
Email: lbrennan@kkbs-law.com

*Counsel for Plaintiff*

Case No.