Roy A. Katriel (SBN 265463)
**THE KATRIEL LAW FIRM**
4225 Executive Square, Suite 600
La Jolla, CA 92037
Tel:   (858) 242-5642
Fax:   (858) 430-3719
E-mail: rak@katriellaw.com

Ralph B. Kalfayan (SBN 133464)
**KRAUSE, KALFAYAN, BENINK & SLAVENS, LLP**
550 West C Street, Suite 530
San Diego, California 92101
Telephone:  619-232-0331
Facsimile:  619-232-4019
Email: ralph@kkbs-law.com

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| ADEL TAWFILIS, DDS d/b/a CARMEL VALLEY CENTER FOR ORAL AND MAXILLOFACIAL SURGERY and HAMID A. TOWHIDIAN, M.D., individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>   vs.<br><br>ALLERGAN, INC.,<br><br>        Defendant. | **CASE NO.  15-CV-307-JLS (JCGx)**<br><br>**FIRST AMENDED COMPLAINT -- CLASS ACTION**<br><br>**JURY TRIAL DEMANDED**<br><br>**Courtroom: 10A**<br>**Judge: Hon. Josephine L. Staton** |

Pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), Plaintiffs Adel Tawfilis DDS d/b/a Carmel Valley Center for Oral and Maxillofacial Surgery and Hamid A. Towhidian, M.D., by and through their undersigned counsel, hereby file this First Amended Complaint.

## NATURE OF THE ACTION

1.     Plaintiffs Adel Tawfilis, DDS d/b/a Carmel Valley Center for Oral and Maxillofacial Surgery, and Hamid A. Towhidian, M.D. bring this action on behalf of themselves and all other similarly situated direct purchasers within the United States of Defendant Allergan, Inc.'s Botox® neuromodulator product for cosmetic use during the Class Period defined herein.  As detailed more fully below, Defendant Allergan, Inc., through its Botox® product, is the overwhelming U.S. market leader for sales of an injectable neuromodulator for use in cosmetic applications.  On or about September 25, 2013, Allergan announced an agreement with Medytox, Inc., a Korean company that developed and marketed a rival, arguably superior, and less expensive botulinum toxin-based neuromodulator that competes with Botox® in other countries.[1]  The announced agreement was consummated and closed in January 2014.  Medytox had plans to enter the U.S. market and thereby challenge Botox® and Allergan's entrenched monopoly market power in this country—competition that it has pursued against Allergan's Botox® in other countries, including Medytox's native Korea.  The Allergan-Medytox anticompetitive agreement, however, ensures that that will not happen, and has resulted in the delay of the availability of Medytox's superior product in the U.S. market.  In exchange for a total payment from Allergan to Medytox of more than $300 million (subject to certain sales and commercial thresholds) plus a future royalty stream, Allergan obtained exclusive rights worldwide (other than in Korea) to commercialize

---

[1] Being a translation from Korean, the company name "Medytox" is sometimes also represented in the literature as "Medy-tox" or "Medy-Tox."  For consistency, the entity is referred to as "Medytox" throughout this pleading.

Medytox's neurotoxin products.  Thus, the agreement prevents competition from taking place between these two otherwise actual or potential competitors in the U.S. market for injectable neuromodulators for use in cosmetic applications.  By thwarting this competition, Allergan has been able to cement its monopoly market power in the U.S., free from any pricing constraints that would be posed by potential competition in the U.S. by Medytox's entry.   Plaintiff Tawfilis, an oral and maxillofacial surgeon, and Plaintiff Towhidian, a cosmetic surgeon, both purchased Botox® directly from Allergan during the Class Period for use in cosmetic procedures they perform routinely within their respective practices.  Plaintiffs now bring this action to seek redress under the federal antitrust laws and applicable California laws for this unlawful agreement in restraint of trade and for Allergan's monopolization of the relevant market.

## PARTIES

2.     Plaintiff Adel Tawfilis, DDS, a resident of California, is a licensed dentist and oral and maxillofacial surgeon and the principal of the Carmel Valley Center for Oral and Maxillofacial Surgery located in San Diego, California.  During the Class Period and continuing to date, Plaintiff Tawfilis has repeatedly purchased Botox® for cosmetic use directly from Allergan, which Plaintiff stocks and uses as part of his practice.

3.     Plaintiff Hamid A. Towhidian, M.D. is a cosmetic surgeon and head of Total Cosmetix, an entity located in Irvine, California providing cosmetic procedures.  During the Class Period, Plaintiff Towhidian repeatedly purchased Botox® directly from Allergan for use in cosmetic procedures as part of Plaintiff's practice.

4.     Defendant Allergan, Inc. is a corporation organized under the laws of the State of Delaware, and having its principal place of business at 2525 Dupont Drive in Irvine, California 92612.  Allergan is a U.S. based multinational pharmaceutical company focusing on ophthalmic pharmaceuticals, dermatology, neuroscience, urology, and cosmetics.   It is the producer of Botox®, an injectable neuromodulator derived from

the botulinum toxin, for treatment of, *inter alia*, facial wrinkles.

## JURISDICTION & VENUE

5.    This Court has subject-matter jurisdiction over Counts I-III of this First Amended Complaint pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1337 because these counts raise a federal question under the federal antitrust laws.  This Court also has supplemental subject-matter jurisdiction over Counts IV and V of this First Amended Complaint pursuant to 28 U.S.C. § 1367 because these counts allege claims under the California Cartwright Act and California Unfair Competition Law, respectively, that arise from the same nucleus of operative facts as Counts I-III over which this Court has original federal question and antitrust subject-matter jurisdiction.

6.    In addition, this Court also independently has subject-matter jurisdiction over all the claims asserted in this First Amended Complaint pursuant to the Class Action Fairness Act, 28 U.S.C 1332(d) because the matter in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, and is a class action in which members of a putative class are of a diverse citizenship (all states) from Defendant's citizenship (California).

7.    This Court has personal jurisdiction over Defendant Allergan, Inc. because Defendant is a corporation doing business within this State and judicial district, and is headquartered within this judicial district.

8.    Venue in this judicial district is also proper as Defendant is a resident of this judicial district, and has its principal place of business within this judicial district. Defendant distributes and injects its Botox® products within the stream of commerce into this district.   Venue in this judicial district is, therefore, proper under 28 U.S.C. § 1391.

## BOTOX® AND THE MARKET FOR NEUROTOXINS FOR COSMETIC USE

9.    For purposes of this First Amended Complaint, the relevant antitrust

product   market is the market for injectable neurotoxins for cosmetic use.   Allergan's

Botox® is such an injectable neurotoxin derived from the botulinum toxin, and is the

overwhelming leader in the U.S. market for such neurotoxins, possessing in excess of 85

percent share of the U.S. relevant market.  By contrast, in Korea, where Botox® is also

sold but faces competition from, *inter alia*, Medytox's rival injectable neurotoxin for

cosmetic applications, Botox® has only approximately 35 percent share of the Korean

market and lags behind Medytox's near 40 percent or greater share of the Korean

market.

/ / /

**The Botox Product and Other Injectable Botulinum Toxin-Based Neuromodulators**

10.    Botulinum toxin is a protein and neurotoxin produced by the bacterium

*Clostridium botulinum*.  It is the most acutely lethal toxin known, with an estimated

human median lethal dose of 1.3–2.1 ng/kg intravenously or intramuscularly and 10–

13 ng/kg when inhaled.  Botulinum toxin can cause botulism, a serious and life-

threatening illness in humans and animals.

11.    Despite the lethal nature of botulinum toxin, the toxin can be purified and

have some of its strains fermented in order to yield a neurotoxin suitable for clinical use,

such as for the treatment of facial wrinkles.  Botox,® Allergan's leading product in this

market, is a sterile, vacuum-dried purified botulinum toxin A that is produced from the

fermentation of the Hall strain of *Clostridium botulinum* and is intended for

intramuscular use.  It is purified from the culture solution by dialysis and a series of acid

precipitations to a complex consisting of the neurotoxin and several accessory proteins.

The complex is dissolved in sterile sodium chloride solution containing the protein

human albumin and is sterile filtered prior to filling and vacuum-drying.

12.    The end result is a neurotoxin that, when applied by properly trained

personnel, is an effective neuromodulator injectable in humans.  The Botox® product

1    that is purified from the botulinum toxin A works upon injection by entering into the tiny

2    nerve ending at the junction between the nerve and the muscle, the so-called

3    neuromuscular junction.  At the nerve ending, Botox® is phagocytosed (engulfed) into

4    the cell.  In the nerve ending, the neuromodulator's effect is to block the release of

5    acetylcholine into the neuromuscular junction.  When acetylcholine is released into the

6    neuromuscular junction, it binds to special receptors on the muscle-side of the junction

7    and causes the muscle to contract.   But when a neurotoxin such as Botox® has been

8    administered, it blocks the release of acetylcholine.  Thus when one attempts to, for

9    example, frown, one can try but cannot make the muscles contract or can only do so

10   minimally depending on the dose given.

11        13.    The presence of the protein human albumin in Botox® (as described in

12   paragraph 11 *supra*)  and, until recently, all other competing injectable neurotoxins for

13   cosmetic use, is significant for several clinical and regulatory reasons.  Human albumin

14   is a protein prevalent in human blood plasma.  From a clinical perspective, in Botox® and

15   other neurotoxins, human albumin acts as a necessary bonding agent so that the Botox®

16   sticks to the nerve ending.  From a regulatory perspective, the inclusion of human

17   albumin in the neurotoxin product for human use triggers certain regulatory

18   requirements.  Specifically, under Food and Drug Administration ("FDA") regulations,

19   human albumin found in any injectable neurotoxin for sale in the United States can only

20   come from FDA-approved blood establishments.  As detailed in paragraphs 31-32

21   below, this means that foreign neurotoxin manufacturers like Medytox whose products

22   rely on human albumin obtained overseas will not be able to obtain FDA approval for

23   sale of those products within the United States because the albumin found in those

24   foreign manufactured products is not supplied by the required FDA-approved blood

25   establishments.

26        14.    Neurotoxins for use in cosmetic applications have no reasonable substitutes.

27   Cosmetic surgery, the closest means of achieving the same results on facial wrinkles as

28

are achieved by application of Botox®, is not viewed by consumers as a ready substitute. Surgery is significantly more expensive, time-consuming, carries greater risk, requires differently trained personnel than the personnel required to inject Botox® or other neurotoxins, and involves a longer recovery time with swelling and scarring affecting the patient following the procedure.  For this and other reasons, consumers do not view cosmetic surgery as posing price-constraining competition to neurotoxin injections for cosmetic applications.

15.     Similarly, other creams or fillers, including collagen, are not viewed as ready and reasonable substitutes to injectable neurotoxins for cosmetic application, such as Botox®.  Whereas neurotoxins like Botox® work by disrupting the muscle contraction, fillers like collagen and other creams fill in wrinkled areas so as to plump up and give the skin a more lifted appearance.  Neurotoxins, therefore, are indicated for the treatment of so-called dynamic wrinkles, i.e., those wrinkles caused by the movement (contraction) of facial muscles, as is the case in eye frowning.  By contrast, collagen and other fillers are indicated for the treatment of so-called static wrinkles, those wrinkles that are visible when a person's face is relaxed and making no expression.  Because the two different products work differently and have different indications, collagen and other fillers are not viewed as reasonable substitutes for those consumers seeking treatment by way of an injectable neurotoxin like Botox®.

16.     Given the lack of reasonable substitutes for the use that these products are demanded, the relevant antitrust product market for purposes of this action is the market for injectable neurotoxins for cosmetic use.

17.     The relevant antitrust geographic market for purposes of this action is the United States.  Due to various regulations and treaties, medical and other personnel purchasing Botox® or any other injectable neurotoxin for cosmetic use must make these purchases from providers within the United States.  U.S. providers of such injectable neurotoxins for cosmetic use, however, may and do have these neurotoxins

manufactured abroad at foreign plants that meet the FDA's cGMP standards.   In addition, the sale of Botox®, the leading product in the relevant market, is made by Allergan directly from its website to qualified consumers nationwide, thereby further evidencing the nationwide scope of the geographic relevant market.

**Botox's Overwhelming Market Power In The United States**

18.     As stated, within the U.S. relevant market, Allergan's Botox® product line is the overwhelming dominant player, possessing at all times a relevant market share of at least 85 percent.  Indeed, the brand name Botox® has essentially become so synonymous in consumers' minds with the concept of neurotoxins for cosmetic use that Botox® is often used interchangeably to describe the injectable neurotoxin for cosmetic use product.   Many commentators, therefore, have pointed out that Botox® has become the "Scotch Tape® of the injectable neurotoxin market."

19.     Botox's® high market share, coupled with the significant barriers to entry into the relevant antitrust market, mean that Allergan possesses monopoly market power in this relevant antitrust market and has the ability, which it has exercised, to raise prices or reduce output.

20.     In the United States, Botox's® competing injectable neurotoxins for cosmetic use are limited to two other products, Dysport® and Ximeon®, both of which are botulinum toxin-based neuromodulators.  These two products' combined market share, however, makes up only about 15 percent of the U.S. market (i.e. one fifth to one sixth the share of Botox®), such that their small presence, both individually and even if combined, is insufficient to pose meaningful price-constraining competition to Allergan's Botox®.

21.     The market for injectable neurotoxins for cosmetic use is characterized by high barriers to entry.  Due to the high lethal effect of the botulinum toxin forming the basis of the injectable neuromodulators on the market, the manufacturing facilities are

subject to heavy regulation and control.  This is because botulinum toxin is classified as Class A (highest level) bio-terror threat by the United States government.   As such, not even the American Type Culture Collection (the world's largest and most diverse bio-resource center) is permitted to distribute botulinum toxin.  Manufacturing of neurotoxins for cosmetic use, therefore, requires specialized facilities and equipment (in accordance with Biosafety Level 3), but these manufacturing facilities may, and often are, located outside the United States.  Thus, for example, Dysport,® one of the products competing with Botox® in the United States, is actually manufactured by Ipsen Pharmceuticals in the United Kingdom.  So too, Xeomin®, the other competing product to Botox® sold in the United States, is manufactured by Merz Pharmaceuticals in Germany.  Botulinum toxin-derived neuromodulator manufacturing plants also exist in Asia and elsewhere.

22.    Because of the high barriers to entry into this relevant market in the United States, and the low market share of the two existing players in the United States other than Allergan, there was no reasonable prospect that Allergan's Botox® product for cosmetic use would face any further price-constraining competition from any existing U.S. market player.

**Medytox's Presence Outside The United States And Its Planned Entry Into The U.S. Market Through A Superior, Albumin-Free, Less Expensive Neurotoxin.**

23.    Instead, price-constraining competition to Allergan's Botox® cosmetic product offering was most likely to take place only from the planned entry into the U.S. market from already existing participants in the injectable neurotoxin market outside the United States.  Such players already had the supply chain, know-how, experience, and track record for the sale of rival injectable neurotoxin products for cosmetic use.

24.    One such notable existing participant in the injectable neurotoxin market

outside the United States was Medytox, Inc., a Korean company that, like Allergan, manufactured and distributed an injectable neurotoxin for cosmetic use. Medytox's primary product is known as Meditoxin, and is sold not only in Korea, but also in approximately 40 countries with additional countries planned for the product's registration. In different countries, Medytox employed different brand names for its product, including Meditoxin, Siax, Cunox, Botulift, and Neuronox.

25.    Though a Korean company, Medytox's product offering of its injectable neurotoxin was not regionally limited to that country or the Asia Pacific Rim. Instead, Medytox's product was approved and sold across the globe not only in Korea, Japan, Thailand, India, and other countries in Asia, but also in Eastern Europe and Latin America.

26.    Medytox's expansion of its injectable neurotoxin product offering continued apace. It planned and was poised to enter at least six other national markets, including additional countries in Europe as well as planned entry into the United States market. To facilitate entry into these added markets, Medytox undertook considerable investment and preparation. In this regard, whereas Medytox's injectable neurotoxin product commercialized in Asia, Eastern Europe, and Latin America contained Korean albumin, the company recognized that the presence of Korean albumin would impede the licensure and approval process for the product into the U.S. market. As a result, Medytox reformulated a bio-better version of its product that was manufactured without using animal-derived fermentation medium or human albumin—a significant advance in the industry, as it represented the only and first neurotoxin that did not require the presence of albumin. Moreover, the company implemented and invested in clinical trials in Australia with this reformulated product. This investment proved fruitful because in mid-2013, Medytox received regulatory approval in Korea for its reformulated albumin-free botulinum toxin-based neurotoxin, and it began marketing this new generation neurotoxin under the brand name Innotox.®

**Medytox's Competitive Threat To Botox® Was Documented And Real.**

27. The competitive threat posed to Allergan by Medytox's planned entry into the U.S. market was real and significant. Unlike the competitive situation in the U.S. market currently, where the two existing competitors to Botox® (Dysport® and Xeomin®) had managed to attain a combined market share of only about 15 percent to Botox's® 85 percent U.S. market share, the landscape was different where Medytox's product was available. Thus, in Korea, for example, where Medytox's neurotoxin and Botox® were both available as competing alternative injectable neurotoxin products, Botox® sales accounted for approximately 40 percent of neurotoxin sales and Medytox's sales accounted for approximately 35 percent of all injectable neurotoxin sales (i.e., including sales for both cosmetic as well as therapeutic uses). Moreover, if one limited the analysis to sales of these injectable neurotoxins that were used for cosmetic applications (as opposed to therapeutic uses like treatment for cerebral palsy spasticity, dystonia, etc.), Medytox had a greater market share than Allergan's Botox®.

28. Medytox's remarkable market share growth when it competed head-to head with Allergan's Botox® was documented in a recent J.P. Morgan Asia Pacific Equity Research Paper, which touted that:

> Medy-Tox launched its biosimilar Botox, branded Neuronox (Meditoxin) in 2006. The domestic [i.e., Korean] market share of Meditoxin of total botox market has risen from 8% in 2006, the year of launch to 38% in 2014E. It has become the first choice of botulinum type A in Korea.

J.P. Morgan, Asia Pacific Equity Research (13 August 2014), at 6.

29. The concern to Allergan was well-founded. A series of double-blinded, peer-reviewed, and published medical studies had already found that Medytox's injectable neurotoxin was as effective and yielded essentially indistinguishable results in cosmetic use than those resulting from the use of Botox®. But, as a medical researcher noted, there was one key advantage to the consumer's selection of Medytox's product over Botox®:

To many, the main advantage Neuronox has over its primary competitor is price. 'In Korea, Neuronox is more cost-effective than BOTOX Cosmetic,' said Dr. Huh. 'This is a significant difference, and is part of what makes it the most popular neurotoxin injectable among Korean women.'

Kevin A. Wilson, "*Asian Neurotoxin Alternative Compares Favorably With Competitor*," Medytox Supplement (Spring 2011) available at http://digital.miinews.com/article/Asian+Neurotoxin+Alternative+Compares+Favorably+With+Competitor/728686/69901/article.html (last visited Feb. 4, 2015).

30.     This stated price advantage was also well founded, as Medytox's injectable neurotoxin for cosmetic use is consistently priced 30 to 50 percent less than the price of Allergan's Botox® sold in that same country.  Moreover, a marketing report conducted in 2010 on behalf of Medytox by Team High Five, an independent marketing firm, documented a consumer survey of 72 female respondents, which included both those who had experience with Botox® as well as those who did not.  The survey responses indicated that the respondents would "get Medytox over Botox if it provides the same function with cheaper price."  Innotox, which was Medytox's most recent injectable neurotoxin product, promised and provided even superior performance to that already being offered by Medytox's Neuronox product.

31.     Until recently, Allergan could remain relatively secure that despite these market realities abroad, Allergan's Botox® would not face a competitive threat from Medytox in the United States.  This was because until recently Medytox's neurotoxin product contained Korean human albumin, which meant that the product was unlikely to get approval and licensure to be sold in the United States, as FDA regulations required that all human albumin found in injectable neurotoxins sold in the United States originate only from FDA-approved human blood supply establishments.

**Medytox Receives Regulatory Approval For Its New Generation, Albumin-Free Injectable Neurotoxin, Thereby Paving The Way For Entry Into The U.S. Market.**

32.     The competitive threat from Medytox, however, changed in mid-2013 when Medytox received regulatory approval in Korea for its new generation

reformulated neurotoxin (marketed in Korea under the name Innotox) that did not require and did not include human albumin as an ingredient.  The approval of Medytox's reformulated albumin-free neurotoxin not only meant that entry into the U.S. market was now in reach, but the reformulated product also presented a significant product advance and improvement over Botox® and other competing neurotoxins, all of which contained albumin.   The lack of albumin in Medytox's reformulated product meant that, unlike Botox®, the product would not need to be freeze-dried in a high vacuum for storage in order to be preserved—a process that then requires the treating physician to rehydrate and dilute the product prior to use.  Dispensing with the need for rehydration and dilution of the product has the clinical advantage of reducing the risk of bacterial infection during treatment.

33.    In furtherance of its plans to enter the U.S. market with its new albumin-free neurotoxin, Medytox undertook considerable and significant steps evidencing its intent and commitment to enter the U.S. market.  Thus, for example, as early as July 27, 2010, Medytox filed a U.S. Patent Application for an invention entitled, "Pharmaceutical liquid composition of botulinum toxin with improved stability."  This application covered the invention embodied in Medytox's albumin-free Innotox product.   The United States Patent Office granted the application on December 31, 2013, causing U.S. Patent No. 8,617,568 to issue on that date.   At least two other U.S. patents were applied for and obtained by Medytox during this same time frame.  *See, e.g.*, U.S. Pat. No. 8,920,795 ("Lyophilized preparation of botulinum toxin ") (U.S. application filed Dec. 10, 2013; Patent Issued Dec. 30, 2014); U.S. Pat. No. 8,993.268 ("Method of producing Clostridium botulinum toxin using media containing plant-derived components and flexible closed container")  (U.S. application filed Nov. 18, 2010; U.S. Patent issued Mar. 31, 2015)[2].

---

[2] These patents list the actual Medytox employees as the inventors, and Medytox as the assignee of the patents.

34.    The planned and impending entry by Medytox into the United States market posed a direct and significant threat to Allergan's pricing of its Botox® product for cosmetic use.  With published medical studies documenting that the two companies' products' effectiveness was indistinguishable, and with Medytox's pricing being a fraction of Allergan's pricing of Botox®, Allergan was rightfully concerned that Medytox's entry into the United States would adversely affect Allergan's market power and ability to continue to price Botox® in the manner in which it had been doing prior to Medytox's entry when Botox® held an 85 percent or so U.S. market share.

35.    That concern was only cemented by review of the Asian market where Medytox had a longstanding presence, and managed to obtain the same or greater market share than Allergan's Botox®.

36.    Aware that the impending entry of Medytox into the U.S. market would adversely affect Botox's® monopoly market power and pricing ability, Allergan devised a plan to thwart the consequences of this competitive reality.  The plan took the form of an anticompetitive agreement whereby, instead of having Medytox's product compete against Allergan's Botox® in the United States, Allergan would act as Medytox's exclusive licensee in the entire world (including, of course, the U.S.) with the exception of Korea and Japan.

## THE ANTICOMPETITIVE AGREEMENT ENTERED INTO BY ALLERGAN AND MEDYTOX TO THWART COMPETITION FROM MEDYTOX IN THE UNITED STATES

37.    Thus, upon information and belief, in 2013 Allergan personnel met with personnel of its competitor Medytox.  By September 2013, the parties announced an agreement pursuant to which the parties agreed that Allergan would now act as Medytox's exclusive licensee in, *inter alia*, the United States for the commercialization of Medytox's reformulated neurotoxin product line.  Under the same announced agreement, Allergan also received these same exclusive rights worldwide other than in

Korea, where Medytox and Allergan continued to compete, and in Japan, where Allergan was granted co-exclusive rights to Medytox's reformulated neurotoxin product line.   In exchange for this grant from Medytox, Allergan agreed to pay Medytox payments estimated to be in excess of $300 million plus royalties on sales made by Allergan of products encompassing the licensed Medytox product line.

38.    Thus, the monetary payments due from Allergan to Medytox under the agreement plus the anticipated royalty payments that would be due on any sales accounted for an agreement reasonably valued at close to half a billion dollars.   This is a remarkable consideration when one realizes that as of mid-2014, J.P Morgan and Bloomberg had reported Medytox's entire market capitalization to be approximately $857 million for the whole company.   The size of the consideration that Allergan agreed to pay Medytox, its competitor, for Medytox's reformulated neurotoxin product line therefore evidences Allergan's own assessment of the competitive threat and significance of Medytox's reformulated product offering.

39.    The Allergan-Medytox agreement is a horizontal agreement between actual and potential competitors.  It has a direct anticompetitive consequence in that it assures Allergan that Medytox will not enter and compete against it in the U.S. market for injectable neurotoxins for cosmetic use.  This is because under the agreement Allergan has acquired the exclusive rights to Medytox's reformulated neurotoxin product line, thereby ensuring that neither Medytox nor anyone else other than Allergan could commercialize this product line within the United States in competition with Botox.®  The pre-existing Medytox product line (i.e., the non-reformulated version of the Medytox neurotoxin), though not part of the Medytox-Allergan agreement, poses no competitive threat in its existing form to Allergan in the United States because its use of Korean albumin as an ingredient means that that pre-existing product does not qualify for regulatory approval necessary for entry into the United States market.  Thus, the net result is that, as between the contracting parties, the Allergan-Medytox agreement

allocates the United States market for injectable neurotoxins solely to Allergan with the assurance that in exchange for Allergan's payments, Medytox will not enter the United States market during the agreement's duration.

40.    The Allergan-Medytox agreement also serves to cement and maintain Allergan's existing monopoly market power in the United States market for injectable neurotoxins for cosmetic use.  The agreement removes Medytox's ability to challenge Allergan's market power in the United States.  Absent the agreement, Medytox's reformulated neurotoxin product line could and would have competed against Allergan's Botox® offerings, and would have posed price-constraining competition to Botox®.  This is, in fact, what has transpired in markets like Korea where Allergan's Botox® is free to and does compete against Medytox's neurotoxin.

41.    Indeed, given Medytox's lower price point and the more advanced, albumin-free technology of its reformulated product (which presents real advantages to physicians who use the product), the mere impending entry of Medytox into the U.S. market would have sufficed to constrain Allergan's pricing of its Botox® product line during the Class Period, even before the actual date of Medytox's entry into the U.S. market.

42.    The net result of the Allergan-Medytox agreement is that it thwarted actual and/or potential competition, allocated markets, unlawfully maintained Allergan's monopoly market power, and as a direct result caused those, like Plaintiffs, who purchased Botox® directly from Defendant during the Class Period, to pay a supra-competitive overcharge for their Botox®  purchases that would not have existed but for the agreement.

**ALLERGAN'S PLANS TO THWART MEDYTOX'S ENTRY INTO THE U.S MAKRET CAUSED ANTICOMPETITIVE IMPACT STARTING PRIOR TO MEDYTOX'S ANTICIPATED ENTRY DATE AND CONTINUING UNTIL THE PRESENT**

43.     Once Medytox developed, obtained Korean regulatory approval for, and made inroads into securing U.S. patent protection for its superior, albumin-free botulinum neurotoxin for cosmetic use, this posed a real and understandable concern for Allergan with respect to Botox's® competitive standing.

44.     This concern was well-founded.  Not only was Medytox's new offering superior and less expensive than Botox®, but even in the existing U.S. marketplace where no such superior albumin-free product existed, Allergan had already felt some price effects from the relatively recent presence of smaller existing U.S. competitors.  Up until the end of 2009, for example, Botox® vials sold in the U.S. by Allergan for use in cosmetic applications had seen a price increase every year.  Dysport® became available for use in the U.S. in early 2009.   A September 14, 2010 published article by Dr. Joel Schlessinger entitled, "*Botox v. Dysport*" in the newsletter Healthy Aging noted that, "[o]ne of the first things you might think about when discussing the use of Botox vs. Dysport is your own cost.  Prices for Botox have stayed around $525 a vial area for two years now, probably remaining in this plateau pattern because of the entrance of Dysport into the market."

**Price Constraints On Allergan's Pricing Of Botox® Would Have Resulted Before Medytox's Actual Entry Into The U.S. Market, But Were Forestalled By The Agreement**.

45.     Despite this price–plateau effect on Botox® pricing caused by Dysport's® availability in the U.S., Dysport® did not manage to take away significant market share from Botox®.  Thus, though Dysport's® presence may have served to slow the rate of price increases for Botox®, it did not cause a price reduction.

46.     With Medytox's new, albumin-free, superior product, Allergan's

1  competitive concern was significantly more pronounced.  Because of the superior
2  attributes of Innotox, Allergan was rightfully concerned that if it waited to respond until
3  Medytox's new product actually made entry into the United States, the competitive
4  impact would be disadvantageous to Allergan.

5       47.     Thus, relatively early on during Medytox's planned entry into the United
6  States after Medytox obtained Korean regulatory approval for Innotox and after Medytox
7  began making inroads towards its planned U.S. entry, Allergan came to the conclusion
8  that it was in its interest to keep Medytox from competing in the U.S. market.  From an
9  economic and business rationale, if Allergan were to make progress in convincing
10  Medytox to refrain from entering the U.S. market, it needed to do so well before
11  Medytox made significant investments of resources to facilitate that entry.  After all,
12  once Medytox spent millions of dollars in finalizing clinical trials and pursing FDA
13  approval for its Biologics License Application for sales of Innotox in the United States,
14  as well as securing manufacturing plant capacity (whether of its own or of third parties),
15  it would be implausible and unlikely that Allergan's efforts would convince Medytox to
16  effectively toss aside that significant investment and scrap its plans to enter the U.S.
17  market.  To succeed in persuading Medytox to abort its plans to enter the U.S. and
18  refrain from competing in the U.S., therefore, Allergan's efforts had to be undertaken
19  *before* Allergan made expensive inroads at obtaining FDA approval, and well before
20  Medytox's product was actually sold in the U.S.

21       48.     To pursue its plans at shielding Botox® from competition in the U.S. from
22  Medytox's superior product, Allergan had at its disposal two distinct alternatives.   The
23  first was to compete on price, which would entail Allergan reducing its pricing for
24  Botox® well before Medytox made its entry into the U.S. so as to dissuade Medytox
25  from continuing to pursue entry into the U.S. market.  Under this alternative, the reduced
26  pricing charged by Allergan for Botox®, while still profitable for Allergan (though not
27  amounting to monopoly profit returns), would mean that Medytox's prospects for
28

realizing profits in the U.S. market would be significantly diminished if not eliminated.

49.     Allergan's limiting of its pricing for Botox® in order to dissuade and economically disincentivize Medytox from pursuing entry into the U.S. market represents price competition and the hallmark of what the antitrust laws were designed to protect.  Purchasers of Botox®, like Plaintiffs and the putative Class members, would have benefitted by the lower prices charged by Allergan for Botox® as a competitive strategy to dissuade Medytox from continuing its efforts at U.S. entry.

50.     To have a plausible chance at success, however, Allergan's limitation of its pricing in order to persuade Medytox from continuing its efforts at entry into the U.S. market would have had to been undertaken sufficiently before Medytox already proceeded too far along the path of securing U.S. FDA approval and a cGMP manufacturing plant for selling its superior product in the U.S.   This is because the sooner that Allergan made the prospect of earning profitable returns in the U.S. market uncertain for Medytox (by Allergan's lowering of its own pricing for the incumbent Botox® product), the more likely it is that an entity like Medytox would be dissuaded from investing the significant sums of money and resources needed to secure entry into the U.S. market.  By contrast, if Allergan waited to implement its price-lowering strategy until after Medytox had already secured U.S. regulatory approval or made entry, it would have been economically implausible for Medytox, having already scaled these expensive barriers to entry, to do away with the plans for U.S. entry that it had already invested heavily in securing.

51.     Allergan's plan to dissuade Medytox from entering the U.S. market by having Allergan reduce its own pricing for Botox®, however, had two significant economic disadvantages for Allergan.  First, of necessity, implementation of this plan, meant that Allergan's returns from the sale of Botox® in the U.S. for cosmetic use would be reduced from the monopoly profits Allergan had heretofore been realizing.  Second, there would be no actual guarantee that lowered pricing charged by Allergan for Botox®

would sufficiently dissuade Medytox to abort its efforts to enter the U.S. market.  If the plan succeeded, Medytox would not enter the U.S. market but consumers would still reap the competitive rewards of Allergan's lowered pricing for Botox® brought about by the threat of Medytox's entry.  If the plan failed and Medytox did enter the U.S. market, U.S. consumers likewise would still benefit by then having competition among Botox® and Medytox's rival, superior product.  That, of course, is the essence of competition—a benefit to consumers from increased competition (whether actual or potential) on price and on the merits.

52.    Had Allergan limited its actions to merely competing on price against the prospect of Medytox's entry into the U.S. market by lowering its own prices for Botox®, there would have been no reason for this antitrust lawsuit.  But faced with the cost to Allergan of this price competition (in the form of reduced pricing, revenues, and profits), as well as the lack of a guarantee that Allergan would be victorious in keeping Medytox off the U.S. market, Allergan looked for another strategy to deal with the competitive threat posed by Medytox's new product.  Thus, in or about early 2013, Allergan began talks with Medytox to pursue an agreement that would ensure that Allergan would not face competition from Medytox's new product, and would obtain that outcome at a cost that was significantly less than the cost that would be borne by Allergan if it had had to implement price reductions to Botox® as a means of dissuading Medytox from entering the U.S. market.

53.    Those talks culminated in the so-called "licensing agreement" that forms the subject of this action.  On or about September 25, 2013, Allergan announced an agreement with Medytox.  The announced agreement was consummated and closed in January 2014.  Under the announced terms of the agreement between these two competitors, Allergan obtained worldwide rights to license and commercialize Medytox's new, albumin-free botulinum-based neuromodulator as well as any new products derived therefrom.  The only exceptions to this worldwide agreement were

Korea, where Allergan did not obtain any rights under the agreement and Japan, where the agreement allocated co-exclusive rights to both Allergan and Medytox.  In exchange, Allergan agreed to pay Medytox over $300 million, upon several developmental milestones being reached, plus a royalty stream on future sales.

54.     The over $300 million payment from Allergan to Medytox under this agreement represents a boon to Medytox, a company whose entire market capitalization was recently estimated to be about $857 million.  It also represents a bargain to Allergan because for a sum of $300 million (plus any future royalties if sales are made), which amounts to less than half of the yearly sales of Botox® for cosmetic use in the U.S., Allergan obtained an iron-clad assurance that it would not face competition from Medytox's superior product in the United States (or anywhere else across the globe other than Korea and Japan).  The exclusive nature of the rights that the agreement vests in Allergan alone means that Allergan is assured that in the U.S. (and elsewhere) it will not face competition from Medytox's new product, regardless of whether that product were to be manufactured and sold by Medytox or through any other competing provider. This $300 million market allocation and non-compete agreement represents a far lower cost to Allergan than the cost it would have incurred if it had to compete on price with Medytox by lowering the prices Allergan charged for Botox® in the U.S.  But the agreement has deprived Class members (i.e.,  U.S. purchasers of Botox® for cosmetic use) of the benefits of the price competition that would have resulted absent the agreement.

**Announcement And Execution Of The Allergan-Medytox Agreement Also Delayed Entry of Medytox's Product Into the U.S.—Thereby, Independently Harming Class Members**

55.     The Allergan-Medytox exclusive agreement deprived consumers of price competition that already would have resulted in lower prices in the absence of the agreement.  Going forward, following consummation of the agreement, moreover, the

agreement has continued to injure direct purchasers of Botox® by also delaying the entry into the U.S. market of Medytox's new and superior albumin-free botulinum-based injectable neuromodulator for cosmetic use.

56.    Put simply, prior to the agreement, Medytox, who was a competitor of Allergan across the globe, had every economic incentive to expedite the approval and entry of its product into the U.S. market so that it could compete with Allergan for the vast U.S. audience of botulinum-based injectable neuromodulators for cosmetic use. But now that the rights to commercialize the agreement have been vested exclusively in Allergan under the agreement, this urgency has been removed. Allergan does not have the same economic incentive to expedite the commercialization of Medytox's product, which would compete against and likely cannibalize sales away from Allergan's established incumbent Botox® product.

57.    This delay brought about by the parties' pursuit and eventual execution of their non-competition agreement is evidenced by the actual chronology of events. For example, an investment analysis published by Woori Investment and Securities in South Korea in March 13, 2012 (i.e., before the Medytox-Allergan agreement) reporting on Medytox documented that, as of that time, Medytox was planning on building a new manufacturing plant starting the first quarter of 2012 to be completed during the first quarter of 2013 in order to supply Innotox for sales abroad, including planned sales to the U.S. and Europe. That same timeline was echoed in a different investment analysis report published by Nomura Equity Research in December 2012. But fast forward to the time frame *after* the Medytox-Agreement had been announced, and an investment report for Medytox issued in February 2015 by NH Investments now reported that the planned Medytox plant for supply of Innotox ingredients to Allergan will only be built and completed in 2015—an approximate two year delay from the plans announced prior to the agreement with Allergan.

58.    Similar post-agreement delays over the pace existing prior to agreement are

also documented in industry reports with respect to Medytox's clinical trials. Phase 2 and 3 clinical trials that were in the works in 2012 and 2013, have now been pushed back after the Allergan agreement to 2015 at the earliest.

59.     Allergan's actions, after executing its agreement with Medytox, to delay the work-up required to bring Medytox's superior product into the U.S. market is a separate component of economically harmful and anticompetitive consequences imposed on Class members as a direct result of the Allergan-Medytox agreement.

60.     This is because the pathway to obtain FDA approval to market and sell botulinum-toxin based injectable neuromodulators like Botox® and Medytox's Innotox for cosmetic use is far less onerous and time-consuming than the regulatory approval process and timeline that involve the nonclinical and clinical tests required for drugs and biologics that treat or cure human disease. To market Botox® or Innotox in the U.S. for cosmetic use requires FDA approval of a Biologics License Application ("BLA"). Whereas expensive and time-consuming genetic toxicology studies, carcinogenicity studies, drug interaction studies, and pharmacokinetic studies in humans relating to safety are required for drugs and biologics to treat or cure human diseases, no such studies were required for FDA approval of botulinum-based injectable neuromodulators for cosmetic use like Dysport® or Xeomin® because of the relatively low dose and non-systemic effects related to neurotoxin injectables used to temporarily reduce the appearance of wrinkles.

61.     Indeed, In its Summary Review granting FDA approval to market and sell Dysport®, the FDA provided the following scientific justification for not requiring these time-consuming nonclinical and clinical tests to demonstrate the safety of Dysport®:

Given the structure and mechanism of action of [Dysport®][3], neither genetic toxicology nor carcinogenicity studies were required. . . . [Dysport's®] sponsor claims that [Dysport®] is not systemically available when administered using the proposed dose and route since the product would not produce measurable blood concentrations when injected locally in nanogram amounts into the target muscles. . . . [Dysport's®] sponsor decided not to conduct pharmacokinetic studies in humans.  No drug interaction studies have been conducted.

FDA Summary Review for Dysport® dated April 29, 2009 at 4, 5.

62.  Similarly, in support of its decision not to require an FDA Advisory Committee review for the approval of Dysport®, the FDA made the following findings:

ADVISORY COMMITTEE

Your application was not referred to an [FDA] advisory committee because    Dysport® (abobotulinumtoxinA) is not the first product in its class, the clinical    study    designs    were    acceptable,    no significant safety or efficacy issues were raised,    no    significant public health questions were raised regarding the role of the product in the diagnosis, cure, mitigation, treatment or prevention of a disease, and outside  expertise was not necessary."

FDA Summary Review for Dysport® dated  April 29, 2009.

63.  Dysport's® BLA was granted final approval by the FDA approximately 1 year (13 ½ months) after its submission.  Given the significantly less onerous clinical studies required by the FDA prior to consideration of a BLA for such a botulinum-toxin based injectable neuromodulator for cosmetic use, as compared to the more comprehensive clinical trials required prior to FDA approval of new drugs for treating disease, the whole timeline from inception of clinical trials to BLA approval by the FDA was far shorter than what would have been entailed in bringing a new prescription drug to market.

64.    The foregoing narrative is hardly anomalous.  Clinical studies necessary for

---

[3]  Many FDA Documents, including the cited FDA Summary Review, relating to the FDA Approval process for Dysport® sometime refer to the proposed trade name "Reloxin" rather than "Dysport®." However, the FDA ultimately rejected the proposed trade name of "Reloxin" and approved the name "Dysport®" instead.  All references to "Reloxin" in FDA Documents are in fact references to "Dysport®", one of the two products currently competing in the marketplace with Botox®.

---

1    the submission of a BLA for such neurotoxins like Botox® or its competitors are and

2    have been routinely completed in 120 days.  Thus, the phase 3 clinical trials for

3    Dysport®, Xeomin® and Botox® all involved 120-day clinical studies.  All three products

4    received FDA approval of their respective BLAs based on these studies.

5         65.    Given the truncated clinical study timeline required to obtain FDA

6    regulatory approval for botulinum-based injectable neurotoxins for treatment of wrinkles

7    like Botox® and Innotox, as compared to the much lengthier timeline applicable to

8    prescription drug clinical trials needed for submission of their FDA applications for

9    approval, the post-agreement delay by Allergan in implementing the steps necessary to

10   bring Medytox's product to market in the U.S. has had a real adverse economic impact

11   on Class members.  A superior competing product that could have been approved for

12   sale in the U.S. in less than two years following its obtaining regulatory approval abroad

13   in mid-2013, has still to even have its BLA submitted for FDA review by Allergan.  This

14   ongoing delay inures to the benefit of Allergan whose Botox® product remains free from

15   competition from Medytox's superior product in the U.S. for an extended period of time,

16   but acts to the continued detriment of Class members who are being deprived of the

17   timely availability of a competing, superior product.

18        66.    Thus, as the foregoing narrative shows, the Allergan-Medytox agreement

19   served to economically injure Class members in their business or property in at least two

20   independent ways.  First, Class members were deprived of the benefits of price

21   competition that, but for the agreement, would have ensued and resulted in lower

22   Allergan pricing for Botox® even before Medytox's entry into the U.S. market.  Second,

23   post-agreement, Class members continue to be harmed, not only due to this thwarting of

24   price competition, but also because the negotiation and execution of the agreement has

25   allowed Allergan to delay the process of having Medytox's superior product enter the

26   U.S. market—a delay that continues to date.

27

28

## CLASS PERIOD

67.   For purposes of this First Amended Complaint, the Class Period corresponds to the period between September 25, 2013 until such date as the Court enters an Order certifying any Count of this First Amended Complaint as a class action.

## CLASS ACTION ALLEGATIONS

68.   Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs bring this action as a class action on behalf of themselves and all other similarly situated direct purchasers within the United States of Defendant Allergan's Botox® product for cosmetic use during the Class Period.   Specifically excluded from the class definition are all federal, state, and local government officials, as well as all judicial officers assigned to this case and their staff.  Likewise, excluded from the class definition are all employees, officers and directors of Defendant.  Plaintiffs reserve the right to amend this class definition upon the attainment of discovery.

69.   Although the exact number of Class members is presently unknown, Plaintiffs are informed and believe, based on the millions of Botox® units sold within the United States, that the Class, as defined, readily satisfies the numerosity requirement for class certification.  The members of the Class are so numerous that joinder of all members is impracticable.

70.   Class certification is also appropriate because there is an identifiable class on whose behalf this class action would be prosecuted.  Specifically, Plaintiffs seek to represent a class of all direct purchasers of Botox® within the United States during the Class Period.  This Class is ascertainable and identifiable based on the records of invoices of such purchases from Allergan.  Allergan generates records and invoices documenting such direct purchases of Botox® that show the purchase and its price and quantity details, as well as the identity of the direct purchaser.

71.   Class certification is also appropriate because there are questions of fact

and/or law that are common to the Class members, and that predominate over any issues that may affect only individual members of the Class.  Among these predominating common questions of fact and/or law are:

        a.  Whether Defendant entered into an agreement with Medytox that affected the relevant market;

        b.  Whether the agreement had anticompetitive effects, including, but not limited to: thwarting competition between Botox® and Medytox neurotoxins; allocating the U.S. market to Allergan; and, cementing Allergan's monopoly market power;

        c.  Whether Plaintiffs have defined a legally and factually supported relevant antitrust market (to the extent such a market definition is necessary);

        d.  Whether Defendant possesses the requisite market power;

        e.  Whether Defendant's conduct injured Class members in their business or property within the meaning of the antitrust laws;

        f.  Whether Class members are entitled to the relief sought, and if so, the proper scope of such relief.

72.    Plaintiffs' claims are typical of the claims of the absent Class members in that Plaintiffs, like all the absent class members, claim that they were direct purchasers of Defendant's Botox® product line for cosmetic use during the Class Period and further allege that, as a result of the conduct alleged in this First Amended Complaint, competition was thwarted and they were subject to a supra-competitive overcharge on their purchases.  Plaintiffs are members of the Class they seek to represent. The claims Plaintiffs advance on their own behalf are identical to the claims asserted on behalf of the members of the Class that Plaintiffs seek to represent.

73.    Plaintiffs are adequate class representatives in that, as members of the Class Plaintiffs seek to represent and as direct purchasers of Botox® during the Class Period,

Plaintiffs' interests are entirely aligned with those of the class.  There are no individual conflicts that prevent Plaintiffs from adequately representing the class.  Plaintiffs have also retained competent counsel experienced in class action litigation.

74.    A class action presents a superior form of adjudication over individual litigation.  The costs of litigating this action against a large and sophisticated defendant like Allergan in comparison to the recovery or relief sought would make individual litigation impracticable.  In addition, forcing individual litigation would risk the result of inconsistent rulings with respect to Allergan's duties owed to the members of the putative class.

75.    A class action is manageable.  The proposed class represents an identifiable community that can be readily identified, and the relief sought is one that can be overseen by the Court.

## COUNT I
### (UNLAWFUL MARKET ALLOCATION IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1)

76.    Plaintiffs hereby incorporate by reference paragraphs 1-75 of this First Amended Complaint with the same force and effect as if they had been fully restated herein.

77.    During the Class Period, Defendant has had and continues to have monopoly market power in the United States market for injectable neurotoxins for cosmetic use.

78.    Defendant's market power would face price-constraining competition from the impending and projected entry into the U.S. market by rival Medytox.  Indeed, in markets like Korea, where Medytox competes head-to-head with Allergan in the injectable neurotoxin market, Medytox has constrained Allergan's market share and

1   pricing power, and actually is the market share leader.

2       79.    Medytox's reformulated new generation neurotoxin not only provides a

3   significant price advantage over Allergan's Botox®, but also presents significant

4   technological advances and advantages, as it is the first and only albumin-free botulin-

5   toxin-based neurotoxin.

6       80.    Rather than compete on the merits in the U.S. market, Allergan embarked

7   on a different course by which it agreed with Medytox to thwart competition in the U.S.

8   market by way of a so-called licensing agreement that gave Allergan exclusive rights in

9   the United States to Medytox's reformulated neurotoxin product line in exchange for a

10  significant multi-million dollar payment from Allergan to Medytox.

11      81.    The agreement, therefore, ensures that, as between the two contracting

12  parties, the U.S. market will be allocated solely to Allergan during the term of the

13  agreement in exchange for Allergan's payments to Medytox.

14      82.    This market allocation is *per se* unlawful under the federal antitrust laws.

15  Alternatively, even if the Court were to find the alleged market allocation agreement to

16  not be subject to *per se* condemnation, this same conduct is still unlawful and violates

17  the antitrust Rule of Reason because its anticompetitive effects outweigh any

18  procompetitive justifications that could be proffered and, in any event, any such

19  procompetitive effects could be achieved by less restrictive means.

20      83.    The market allocation agreement has the anticompetitive effect of

21  foreclosing competition between Allergan and Medytox in the U.S., and thereby

22  cementing Allergan's monopoly market power within the United States.  As a result,

23  Allergan continues to be able to, and has throughout the Class Period, charged a supra-

24  competitive price for its sales of Botox® products for cosmetic use.

25      84.    During the Class Period, Plaintiffs made repeated purchases directly from

26  Defendant of Allergan's Botox® for cosmetic use.  Plaintiffs were injured in their

27  business or property within the meaning of the federal antitrust laws because, as a direct,

28

proximate, and foreseeable result of Defendant's conduct, including the market allocation alleged in this Count, Plaintiffs were subjected to a supra-competitive overcharge for their Botox® purchases during the Class Period. This overcharge would not have existed but for the market allocation agreement because, *inter alia*, the potential or actual competition from Medytox in the U.S. market, which the agreement prevents from occurring, would have a price-constraining effect on Allergan sales of its Botox® product line.

85.    As direct purchasers within the alleged relevant market who have been injured in their business or property, Plaintiffs have standing to and do bring this suit seeking to recover on behalf of themselves and the absent class members, *inter alia*, treble damages for the supra-competitive overcharges they were subjected to during the Class Period, declaratory and injunctive relief to, *inter alia*, enjoin the continued validity or enforcement of the agreement, as well as an award of attorneys' fees and costs of suit, and any other relief this Court deems proper.

## COUNT II
## (AGREEMENT IN RESTRAINT OF TRADE IN VIOLATION OF 15 U.S.C. § 1)

86.    Plaintiffs hereby incorporate by reference paragraphs 1-75 of this First Amended Complaint with the same force and effect as if they had been fully restated herein.

87.    During the Class Period, Defendant has had and continues to have monopoly market power in the United States market for injectable neurotoxins for cosmetic use.

88.    Medytox was an actual and potential competitor of Defendant that was poised and planned to enter the United States market for injectable neurotoxins for cosmetic use.

89.    Defendant's market power would face price-constraining competition from

the impending and projected entry into the U.S. market by rival Medytox.  Indeed, in markets like Korea, where Medytox competes head-to-head with Allergan in the injectable neurotoxin market, Medytox has constrained Allergan's market share and pricing power, and actually is the market share leader.

90.    Rather than facing competition on the merits from its rival Medytox in the U.S., Defendant decided to and did enter into an agreement with Medytox, as is alleged herein, pursuant to which it thwarted and foreclosed the prospects for any such competition from taking place in the United States.  Instead, the agreement provided that Allergan was to be the sole party with rights to commercialize Medytox's new generation of injectable neurotoxins.

91.    The agreement between Allergan and Medytox is a classic and naked horizontal agreement between actual and/or potential competitors.  As such, it is *per se* unlawful under the antitrust laws.  Alternatively, even if the Court were to find the agreement to not be subject to *per se* condemnation, this same conduct is still unlawful and violates the antitrust Rule of Reason because its anticompetitive effects outweigh any procompetitive justifications that could be proffered and, in any event, any such procompetitive effects could be achieved by less restrictive means.

92.    The agreement has the anticompetitive effect of foreclosing competition between Allergan and Medytox in the U.S., and thereby cementing Allergan's monopoly market power within the United States.  As a result, Allergan continues to be able to and has throughout the Class Period charged a supra-competitive price for its sales of Botox® products for cosmetic use.

93.    During the Class Period, Plaintiffs made repeated purchases directly from Defendant of Allergan's Botox® for cosmetic use.  Plaintiffs were injured in their business or property within the meaning of the federal antitrust laws because, as a direct, proximate, and foreseeable result of Defendant's conduct, including the horizontal agreement alleged in this Count, Plaintiffs were subjected to a supra-competitive

1  overcharge for their Botox® purchases during the Class Period.  This overcharge would
2  not have existed but for the agreement because, *inter alia*, potential or actual competition
3  from  Medytox into the U.S. market, which the agreement prevents from occurring,
4  would have a price-constraining effect on Allergan sales of its Botox® product line.

5       94.     As direct purchasers within the alleged relevant market who have been
6  injured in their business or property, Plaintiffs have standing to and do bring this suit
7  seeking to recover on behalf of themselves and the absent class members, *inter alia*,
8  treble damages for the supra-competitive overcharges they were subjected to during the
9  Class Period, declaratory and injunctive relief to, *inter alia*, enjoin the continued validity
10  or enforcement of the agreement, as well as an award of attorneys' fees and costs of suit,
11  and any other relief this Court deems proper.

12

### COUNT III
### (UNLAWFUL MAINTENANCE OF MONOPOLY MARKET POWER IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. §2).

15       95.     Plaintiffs hereby incorporate by reference paragraphs 1-75 of this
16  First Amended Complaint with the same force and effect as if it had been fully restated
17  herein.

18       96.     During the Class Period, Defendant has had and continues to have
19  monopoly market power in the United States market for injectable neurotoxins for
20  cosmetic use.

21       97.     Medytox was an actual and potential competitor of Defendant that was
22  poised and planned to enter the United States market for injectable neurotoxins for
23  cosmetic use.

24       98.     Defendant's monopoly market power would face price-constraining
25  competition from the impending and projected entry into the U.S. market by rival
26  Medytox.  Indeed, in markets like Korea, where Medytox competes head-to-head with
27  Allergan in the injectable neurotoxin market, Medytox has constrained Allergan's

28

market share and pricing power, and actually is the market share leader.

99.   Rather than facing completion from Medytox in the United States based on price, the merits, superior business acumen, or industry, Allergan entered into the agreement with Medytox that is alleged and described herein.

100.   The Allergan-Medytox agreement ensures that during the agreement's term Allergan's injectable neurotoxins for cosmetic use (of which Botox® is the market leader) will not face either actual or even the prospect of competition from Medytox, thereby insulating Allergan's monopoly market power in the United States.   The agreement is, therefore, an unlawful and anticompetitive means of maintaining Allergan's monopoly market power in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

101.   During the Class Period, Plaintiffs made repeated purchases directly from Defendant of Allergan's Botox® for cosmetic use.  Plaintiffs were injured in their business or property within the meaning of the federal antitrust laws because, as a direct, proximate, and foreseeable result of Defendant's conduct, Plaintiffs were subjected to a supra-competitive overcharge for their Botox® purchases during the Class Period.  This overcharge would not have existed but for the Allergan-Medytox agreement because the potential or actual entry of Medytox into the U.S. market, which the agreement prevents from occurring, would have a price-constraining effect on Allergan sales of its Botox® product line.

102.   As direct purchasers within the alleged relevant market who have been injured in their business or property, Plaintiffs have standing to and do bring this suit seeking to recover on behalf of themselves and the absent class members, *inter alia*, treble damages for the supra-competitive overcharges they were subjected to during the Class Period, declaratory and injunctive relief to, *inter alia*, enjoin the continued validity or enforcement of the agreement, as well as an award of attorneys' fees and costs of suit, and any other relief this Court deems proper.

## COUNT IV

## (VIOLATIONS OF CALIFORNIA'S CARTWRIGHT ACT, SECTION 16700 ET. SEQ. OF CALIF. BUS. AND PROF. CODE)

103.   Plaintiffs hereby incorporate by reference paragraphs 1-94 of this First Amended Complaint with the same force and effect as if they had been fully restated herein.

104.   The same agreement and conduct alleged in Counts I-III *supra* that give rise to Defendant's alleged violations of the federal Sherman Act, also amount to violations of California's Cartwright Act, Section 16700 et. seq. of the California Business and Professions Code that are *per se* unlawful or, alternatively, unlawful and actionable under the Rule of Reason.

105.   Because Defendant is headquartered in California and, upon information and belief, all material decisions relating to the agreement with Medytox that give rise to this suit were planned, originated, and ratified from within California, and because the purchase transactions and pricing of Botox® were orchestrated from within California, it is fair and appropriate to apply California's Cartwright Act to the transactions of the nationwide Class.

106.   During the Class Period, Plaintiffs made repeated purchases directly from Defendant of Allergan's Botox® for cosmetic use.  Plaintiffs were injured in their business or property within the meaning of the Cartwright Act because, as a direct, proximate, and foreseeable result of Defendant's conduct Plaintiffs were subjected to a supra-competitive overcharge for their Botox® purchases during the Class Period.  This overcharge would not have existed but for the market allocation agreement because potential or actual competition from Medytox in the U.S. market, which the agreement prevents from occurring, would have a price-constraining effect on Allergan sales of its Botox® product line.

107.   As direct purchasers within the alleged relevant market who have been

injured in their business or property, Plaintiffs have standing to and do bring this suit seeking to recover on behalf of themselves and the absent class members, *inter alia*, treble damages for the supra-competitive overcharges they were subjected to during the Class Period, declaratory and injunctive relief to, *inter alia*, enjoin the continued validity or enforcement of the agreement, as well as for an award of attorneys' fees and costs of suit, and any other relief this Court deems proper.

## <u>COUNT V</u>

## (VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW, SECTION 17200 ET. SEQ. OF CALIF. BUS. AND PROF. CODE)

108.   Plaintiffs hereby incorporate by reference paragraphs 1-107 of this First Amended Complaint with the same force and effect as if they had been fully restated herein.

109.   The same conduct alleged in Counts I-IV *supra* that gives rise to Defendant's alleged violations of the federal Sherman Act and California's Cartwright Act, also amounts to unlawful and/or unfair business practices within the meaning of California's Unfair Competition Law, Section 17200 et. seq. of the California Business and Professions Code.

110.   The conduct is an unlawful business practice in that it violates the federal Sherman Act and the California Cartwright Act, as has been alleged in Counts I-IV.

111.   The conduct is also an unfair business practice because the agreement threatens to thwart competition at its incipiency by preventing even the prospect of any potential competition from occurring within the United States between Medytox's injectable neurotoxins for cosmetic use and Allergan's Botox.®

112.   Because Defendant is headquartered in California and, upon information and belief, all material decisions relating to the agreement with Medytox that gives rise to this suit were planned, originated, and ratified from within California, and because the

purchase transactions and pricing of Botox® were orchestrated from within California, it is fair and appropriate to apply California's Unfair Competition Law to the transactions of the nationwide Class.

113.    Plaintiffs and the Class members, as direct purchasers of Botox® from Defendant, conveyed money and other benefits on Defendant, and have an interest in that conveyance.  Plaintiffs and the Class members, therefore, have standing, are entitled to seek, and do seek all available equitable remedies under the California Unfair Competition Law, including but not limited to restitution, declaratory and injunctive relief, an award of fees and costs, and all other relief that this Court deems proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class members pray for judgment against Defendant as follows:

      A.     That the Court determine that this action may be litigated as a class action, and that Plaintiffs and their counsel be appointed class representatives and class counsel, respectively;

      B.     That notice be disseminated to the Class members at Defendant's expense, informing them of the pendency of this action and their legal rights regarding the same;

      C.     That judgment be entered against Defendant and in favor of Plaintiffs and the Class members on all counts;

      D.     That Defendant be ordered to bear the cost of notifying the absent Class members of this class action, and of the Class members' rights respecting the same;

      E.     That, with respect to Counts I-IV, Defendant be ordered to pay treble the actual damages and losses sustained by Plaintiffs and the class members, and that Defendant be Ordered to pay Plaintiffs' counsel's attorneys' fees and costs of suit, as awarded by the Court;

      F.     That the Court order the creation of a common fund from which Plaintiffs and their counsel shall be awarded their reasonable costs of suit, including reasonable attorneys' fees and expenses incurred in prosecuting this class action and in conferring a common benefit upon the Class

members;

G.      That, with respect to Count V, Defendant be ordered to restore to Plaintiff Class members all monies and/or benefits conveyed onto Defendant by members of the Class;

H.      That Defendant's conduct be declared to be in violation of the federal antitrust laws and the California Cartwright Act, and that said conduct, including but not limited to the continued validity and enforcement of the Allergan-Medytox agreement, be enjoined;

I.       That Plaintiffs and the Class members be awarded all such other relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiffs respectfully request a trial by jury on all claims and causes of action properly triable before a jury.

DATED:  May 29, 2015

Respectfully Submitted,

**/s/ Roy A. Katriel**
Roy A. Katriel (SBN 265463)
**THE KATRIEL LAW FIRM**
4225 Executive Square, Suite 600
La Jolla, CA 92037
Tel:    (858) 242-5642
Fax:   (858) 430-3719
E-mail: rak@katriellaw.com

Ralph B. Kalfayan (SBN 133464)
**KRAUSE, KALFAYAN, BENINK &
SLAVENS, LLP**
550 West C Street, Suite 530
San Diego, California 92101
Telephone:  (619) 232-0331
Facsimile:    (619) 232-4019
Email: ralph@kkbs-law.com

*Counsel for Plaintiffs*