Roy A. Katriel (SBN 265463)
**THE KATRIEL LAW FIRM**
4225 Executive Square, Suite 600
La Jolla, CA 92037
Tel:   (858) 242-5642
Fax:   (858) 430-3719
E-mail: rak@katriellaw.com

Ralph B. Kalfayan (SBN 133464)
**KRAUSE, KALFAYAN, BENINK & SLAVENS, LLP**
550 West C Street, Suite 530
San Diego, California 92101
Telephone:  619-232-0331
Facsimile:  619-232-4019
Email: ralph@kkbs-law.com

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| ADEL TAWFILIS, DDS d/b/a CARMEL VALLEY CENTER FOR ORAL AND MAXILLOFACIAL SURGERY and HAMID A. TOWHIDIAN, M.D., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ALLERGAN, INC.,<br><br>Defendant. | **CASE NO.  8:15-CV-307-JLS (JCGx)**<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT ALLERGAN, INC.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>**Hearing Date: September 4, 2015**<br>**Time: 2:30 pm**<br>**Courtroom: 10A**<br>**Judge: Hon. Josephine L. Staton** |

# **TABLE OF CONTENTS**

FACTUAL BACKGROUND AND SUMMARY OF ARGUMENT…………….…...…..1

Factual Background……………………………………………………………...…………...1

Summary Of Argument………………………………………………………….3

ARGUMENT……………………………………………………………….………5

I.     ALLERGAN'S CAUSATION-BASED ATTACK ON PLAINTIFFS'
       ARTICLE III AND ANTITRUST STANDING, AS WELL AS ON
       THE MERITS OF THEIR ANTITRUST CLAIMS, FAILS……………….……..5

       A. Medytox's Lack Of FDA Approval Does Not Defeat Causation For
          Standing Or Merits Purposes………………………………………….……5

       B. Plaintiffs' Allegations Readily Comport With The Antitrust Standing And
          Merits Causation Requirements  Set Forth In *Retrophin*…………..………….7

       C. The Attacks On Plaintiffs' Aleged Timeline For FDA Approval Also Fail….10

          1.  Allergan Misstates The Clinical Trial Timeline………………………..10

          2.  Allergan Misstates The Timeline Of Medytox's Manufacturing Plant
              Capability……………………………………………………….………13

       D. The Principal Authorities Relied Upon By Allergan Show The Lack Of
          Merit Of Allergan's Motion………………………………………………..15

II.    PLAINTIFFS' "LIMIT PRICING" THEORY OF CAUSATION AND
       DAMAGES DOES NOT DEPEND ON FDA REGULATORY APPROVAL….18

       A. Plaintiffs' "Limit Pricing" Theory Of Causation And Damages Is
          Well-Accepted As Properly Stating A Monopolist's Plausible
          Response To Deter Entry At An Early Stage………………………………19

       B. The High Barriers To Entry Existing Here Make Allergan's Resort To
          Limit Pricing All The More Plausible…………………………………..…24

III.   ALLERGAN'S REMAINING ATTACKS ON THE MERITS OF PLAINTIFFS'
       ANTITRUST CLAIMS ALSO FAIL……………………………..……….....26

       A. The FAC Plausibly Alleges Interchangeability Between Botox And
          Innotox……………………………………………………………….…...26

B. The FAC Alleges Facts Plausibly Supporting The Conclusion That Innotox Could Take Customers Away From Botox…………………………..27

C. The FAC Plausibly Alleges That Medytox's Product Would Constrain Botox Pricing……………………………………………….……28

D. Plaintiffs Need Not Allege That They Personally Would Have Purchased Innotox…………………………………………………..………28

E. Allergan's Attempt To Obtain Dismissal By Self-Servingly Characterizing The Agreement As Pro-Competitive Also Fails……………………..………29

IV.   THE STATE LAW CLAIMS ARE NOT SUBJECT TO DISMISSAL………...…31

CONCLUSION…………………………………………………...………32

# **<u>TABLE OF AUTHORITIES</u>**

**Cases:**

*American Ad Mgmt., Inc. v. GTE of California*,
190 F.3d 1051 (9th Cir. 1999)………………………………..……….……5

*Anderson v. Peregrine Pharm., Inc.*,
2013 WL 4780059 (C.D. Cal. Aug. 23, 2013)………………………………..11

*Beech-Nut Nutrition Corp. v. Gerber Prods. Co.*,
69 F. App'x 350 (9th Cir. 2003)…………………………………………………31

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)…………………………………………………..……25

*Bubar v. Ampco Foods, Inc.*,
752 F.2d 445 (9th Cir. 1985)…………………………………………..……7

*California Computer Prods., Inc. v. IBM Corp.*,
613 F.2d 727 (1979)……………………………………………………………20

*County of Tuolomne v. Sonora Community Hosp.*,
236 F.3d 1148 (9th Cir. 2001)…………………………………………………31

*Cyntegra, Inc. v. Idexx Labs., Inc.*,
322 F. App'x 569 (9th Cir. 2009)……………………………………..…..15, 16

*Datel Holdings Ltd. v Microsoft Corp.*,
712 F. Supp.2d 974 (N.D. Cal. 2010)………………………………….……27

*Eastman Kodak Co. v. Image Technical Srvcs., Inc.*,
504 U.S. 451 (1992)……………………………………………….……30

*Federal Trade Comm'n v. Actavis*,
133 S. Ct. 2223 (2013)………..…………………………………..……29

*FTC v. Questar Corp.*,
No. 2:95-cv-1137S (D. Utah 1995)……………………………………….……22

*Gerlinger v. Amazon,*
526 F.3d 1253 (9ᵗʰ Cir. 2008)………………………………………..………15

*Image Technical Srvcs., Inc. v. Eastman Kodak Co.,*
125 F.3d 1195 (9ᵗʰ Cir. 1997)…………………………………………..………30

*In re Flonase Antitrust Litig.,*
798 F. Supp.2d 619 (E.D. Pa. 2011)…………………………………………17

*In re IBM Peripheral EDP Devices Antitrust Litig.,*
481 F. Supp. 965 (N.D. Cal. 1979)………………………………….....……20, 21

*In re NCAA Student Athlete Name and Likeness Antitrust Litig.,*
2014 WL 1949804 (N.D. Cal. May 12, 2014)……………………………….30

*In re Neurontin Antitrust Litg.,*
2009 WL 2751029 (D.N.J. Aug. 28, 2009)…………………………………….5-6

*In re Nexium Antitrust Litig.,*
42 F. Supp.3d 231 (D. Mass. 2014)…………………………………………17

*In re Nuvelo, Inc., Secs. Litig.,*
2008 WL 5114325 (N.D. Cal. Dec. 4, 2008)…………………………………11

*In re Skelaxin (Metaxalone) Antitrust Litig.,*
2013 WL 21811185 (E.D. Tenn.  May 20, 2013)………………………………5

*In re Wellbutrin SR/Zyban Antitrust Litig.,*
281 F. Supp.2d 751 (E.D. Pa. 2003)……………………………..………6

*Knevelbaard Dairies v. Kraft Foods, Inc.,*
232 F.3d 979 (9ᵗʰ Cir. 2000)……………………………………………31

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992)……………………………………………..………15

*MCI Telecommunications Corp. v. AT&T Corp.,*
708 F.2d 1081 (7ᵗʰ Cir. 1983)……………………………..…………21

*Padnes v. Scios Nova, Inc.*,
1996 WL 539711 (N.D. Cal. Sept. 18, 1996)……………………………..…………10-11

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979)…………………………………………………………..……..5

*Retrophin, Inc. v. Questor Pharmaceuticals, Inc.*,
41 F. Supp.3d 906 (C.D. Cal. 2014)……………………………………….……passim

*SmileCare Dental Group v. Delta Dental Plan of Cal., Inc.*,
88 F.3d 780 (9th Cir.1996)……………………………………………..……30-31

*Space Exploration Techs. Corp. v. Boeing Co.*,
2006 WL 7136649 (C.D. Cal. May 12, 2006)…………………………….……...16, 17

*Sullivan v. National Football League*,
34 F.3d 1091 (1st Cir. 1994)………………………………………..…………17

*TransAmerica Computer Co. v. IBM Corp.*,
698 F.2d 1377 (9th Cir. 1983)…………………………………..…………20

*United States v. Students Challenging Regulatory Agency Procedures*,
412 U.S. 669 (1973)………………………………………………..…………19

*United States v. Westinghouse Elec. Corp.*,
648 F.2d 642 (9th Cir. 1981)……………………………………..…………14, 15

*Zenith Radio Corp. v. Hazeltine Research Inc.*,
395 U.S. 100 (1969)……………………………………………………….……17

**Treatises, Law Reviews, and Other Publications:**

*An Economic and Legal Analysis of Physical Tie-Ins*,
89 Yale L.J., 769 (March 1980)…………………………………………..……...24

Areeda and Turner, *Predatory Pricing And Related Practices Under
Section 2 Of The Sherman Act*, 88 Harv. L. Rev. 697 (1975)………………………22-23

B. Pollina, *False Negatives Under A Discount Attribution Test For Bundled
Discounts*, 22 CommLaw Conspectus 74 (2014)…………………………..……..24

*Competition Policy In Communications Industries: New Antitrust Approaches*,
1997 WL 169672 (F.T.C.  Mar. 10, 1997)…………………………………………22

Hay, George A., "*The Economics Of Predatory Pricing,*"
51 Antitrust L.J. 361 (1982)……………………………………………….………25

R. Morse, "*The Measure of Damages In A Lawsuit Involving Allegations Of Price Discrimination Or Predatory Pricing*," 48 Brooklyn L. Rev. 479 (Spring 1982)…………………………………………………………………24

*Rationality Analysis In Antitrust*,
158 U. Pa. L. Rev. 261 (Jan. 2010)…………………………………..………..25

Defendant Allergan, Inc.'s ("Defendant" or "Allergan") Motion To Dismiss Plaintiffs' First Amended Complaint ("FAC") pursuant to Federal Rules of Civil Procedure 12(b)(1) or 12(b)(6) is without merit and should be denied.

## FACTUAL BACGROUND AND SUMMARY OF ARGUMENT

### Factual Background

Plaintiffs Adel Tawfilis, DDS, a maxillofacial surgeon, and Hamid A. Towhidian, M.D., a cosmetic surgeon (collectively "Plaintiffs"), challenge an agreement entered into by Allergan, the manufacturer of Botox, and Allergan's Korean rival, Medytox (hereinafter "(the Agreement"). *See* FAC, at ¶ 1. While these two rivals compete abroad in the market for injectable neurotoxins for cosmetic use, the Agreement announced in September 2013, ensures that United States purchasers of Botox will not be able to enjoy the benefits of such market competition the United States.  This is because the Agreement provides that, with the exception of Korea and Japan, everywhere else in the world (including the United States), Allergan and only Allergan will have the exclusive right to commercialize the only injectable neurotoxin technology for cosmetic use developed by Medytox that could be sold in the United States.  *Id*. at ¶ 36.

As the FAC detailed, existing injectable Botulinum-based neurotoxins for cosmetic use, including Allergan's Botox and Medytox's Meditoxin (which is sold in over 40 countries across the world), contain human albumin as a binding agent. *Id*. at ¶¶ 11, 13.  Food and Drug Administration ("FDA") regulations generally prohibit the sale in the United States of products containing human albumin unless that albumin originated from United States-certified blood banks, thereby preventing the entry into the United States of Medytox's Korean manufactured product.  *Id*. at ¶ 13. Recognizing this restriction and in furtherance of its express intent and desire to enter the United States market, Medytox developed a revolutionary and technologically superior Botulinum-based neurotoxin for cosmetic use that does not contain albumin and, therefore, is not

1  disqualified from the United States market. *Id*. at ¶¶ 31, 32.

2      This new product, which already received regulatory approval in Korea and has

3  been the subject of clinical trials across the globe, posed a true and concrete threat to

4  Allergan's monopoly market power in the U.S. that Allergan had attained through sales

5  of its Botox Cosmetic product.   In Korea, where Medytox and Botox compete head-to-

6  head, Medytox has greater market share than Allergan in the cosmetic market. *Id*. at ¶

7  27.  Indeed, Medytox was able to take market share from Botox at an exponential pace,

8  gaining from a mere 8 percent to 38 percent market share in only a few years. *Id*. at ¶ 28.

9  Allergan's fear was that if, as Medytox had expressed and was prepared to do, Medytox

10 made entry (or even began making inroads into entry) into the United States market now

11 that its product was not ineligible to be sold in the United States, Allergan's monopoly

12 market power of its Botox Cosmetic in the United States. *Id*. at ¶ 29-32.

13      To deal with this real threat, in 2013 Allergan began meeting with Medytox.  It

14 eventually devised what turned out to be the Agreement, which was announced on

15 September 2013 and executed on January 2014.   *Id*. at ¶¶ 1, 37. Under the Agreement,

16 rather than  Medytox ever making entry into the United States, Allergan was granted the

17 worldwide exclusive rights (with the exception of Korea and Japan) to commercialize

18 Medytox's product and, in exchange, Allergan agreed to pay Medytox approximately

19 $300 million (including tens of millions of dollars in advance payments) plus a future

20 royalty stream.  *Id*. at ¶¶ 37-39.   The Agreement, therefore, prevents competition from

21 taking place between these two otherwise actual or potential competitors in the U.S.

22 market for injectable neuromodulators for use in cosmetic applications.  By thwarting

23 this competition, Allergan has been able to cement its monopoly market power in the

24 U.S. free from any pricing constraints that would be posed by competition in the U.S.

25 from Medytox's actual or potential entry, and thereby charge supra-competitive prices to

26 direct purchasers of Botox Cosmetic, like Plaintiffs and the Class members.  *Id*. at ¶ 42.

27      Plaintiffs seek to represent all direct purchasers within the United States who

28 purchased Botox Cosmetic directly from Allergan during the Class Period.  *Id*. at ¶ 67.

They seek redress for, *inter alia*, the alleged supra-competitive overcharges imposed upon Plaintiffs and the Class as a result of the Agreement.  Counts I and II state claims under Section 1 of the Sherman Act, claiming that the Agreement is an unlawful market allocation and an agreement in restraint of trade, respectively.  Count II states a claim under Section 2 of the Sherman Act, claiming that the Agreement permits Allergan to unlawfully maintain its monopoly market power by preventing competition in the U.S. market between Allergan and Medytox.  Counts IV and V state State law claims under California's Cartwright Act and Unfair Competition Law, respectively.

## Summary Of Argument

Allergan has moved to dismiss all the counts of the FAC, arguing not merely that Plaintiffs fail to state a claim, but that they are not even entitled to be in court because they lack Article III or antitrust standing.  The main premise of Allergan's attack is that Plaintiffs' claims are speculative because Plaintiffs fail to properly allege that their harm was caused by the Agreement.  It argues that Plaintiffs do not plead facts to plausibly show that, but for the Agreement, Medytox could have obtained regulatory approval to sell its product in the United States.  Allergan also maintains that any claim that Medytox could compete against Allergan in the U.S. (despite the fact that it has done so successfully abroad) is also overly speculative.  Separately, Allergan posits that the Agreement is inherently procompetitive.

None of Allergan's arguments have merit, and none lead to dismissal of the FAC. *First*, contrary to Allergan's claim, Medytox's lack of FDA approval does not render Plaintiffs' claims overly speculative.  This Court (consistent with the holdings of courts across the country) has held that even a competitor who has not entered the market states a non-speculative claim for relief under the antitrust laws if it can assert, as Plaintiffs have done with respect to Medytox, that this would-be competitor has the interest and preparedness to enter the market. *Second*, as detailed in Section I.C. *infra*, the detailed allegations of the FAC state plausible facts that show Medytox's intent and preparation

to enter the U.S. market so as to pose price-constraining competition to Allergan's Botox during the Class Period.  Moreover, as discussed in Section II *infra*, actual FDA approval and entry into the U.S. by Medytox is not dispositive of Plaintiffs' claim for relief.  This is because, in addition to claiming that a supra-competitive overcharge resulted from the Agreement causing a delay in Innotox being brought to market in the U.S., Plaintiffs also independently asserted a separate damages theory premised on the well accepted economic rationale of "limit pricing."

"Limit pricing" economic theory states that Allergan's natural and plausible response to Medytox's threat of future entry would have resulted in Allergan reducing (i.e., limiting) its own monopoly prices for Botox *well before* Medytox could enter the U.S. market so as to make it unprofitable for Medytox to continue making the resource-intensive investments needed to gain entry into the U.S. market.  These lower "limit prices" that would have been charged by Allergan for its own Botox product even before Medytox's entry would have benefitted Plaintiffs and the Class.  The unlawful Agreement, however, ensured that such lowered pricing would not have to be employed by Allergan to deter Medytox's entry because the Agreement achieved Medytox's exclusion from the U.S. market without Allergan having to resort to any price competition.  Though Allergan derides Plaintiffs' "limit damages" theory of causation and damages, we detail how that economic theory has been accepted by the Ninth Circuit, other federal appellate and district courts, as well as government antitrust enforcement agencies.

Lastly, Allergan's claim that dismissal is warranted because the as-yet-unproduced Agreement is procompetitive simply misstates the law.  In any event, such a justification for the Agreement cannot be decided at the pleadings stage.

# ARGUMENT

## I. ALLERGAN'S CAUSATION-BASED ATTACK ON PLAINTIFFS' ARTICLE III AND ANTITRUST STANDING, AS WELL AS ON THE MERITS OF THEIR ANTITRUST CLAIMS, FAILS.

### A. Medytox's Lack Of FDA Approval Does Not Defeat Causation For Standing Or Merits Purposes.

Ignoring the applicable case law and the facts properly alleged in the FAC, Allergan argues that Plaintiffs have failed to allege the requisite element of causation, thereby meriting a finding of lack of Article III or antitrust standing or, alternatively, a dismissal of the FAC for failure to state a claim. But Allergan's argument is erroneously premised on the notion that no antitrust claim could ever be asserted here because the allegedly excluded competitor, Medytox, had not yet secured FDA approval to market its allegedly superior and less expensive competing biologic product. *See* Dft's Br. at 9:16-14:17[1]. The law does not support Allergan's wishful conclusion.

To the contrary, the case law is consistent in holding that FDA approval is ***not*** a prerequisite to state an antitrust claim premised on an anticompetitive agreement that excludes a competing pharmaceutical manufacturer from the market. *See, e.g., In re*

---

[1] The first factor bearing on antitrust standing is "the nature of the plaintiff's alleged injury; that is whether it was the antitrust laws were intended to forestall." *American Ad Mgmt., Inc. v. GTE of California*, 190 F.3d 1051, 1054 (9th Cir. 1999). Allergan does not and cannot plausibly attack Plaintiffs' antitrust injury on this basis because it is longstanding precedent that a direct purchaser has antitrust standing to seek redress for an alleged anticompetitive overcharge imposed upon him for his purchases of the defendant's product—the very injury and claim made by Plaintiffs. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 342 (1979). And, because Plaintiffs are direct purchasers of Botox, there can be no attack on their antitrust standing that would be premised on any risk of duplicative recovery or apportioning damages. *See American Ad Mgmt*, 190 F.3d at 1054 (setting these as other factors bearing on antitrust standing inquiry); *Illinois Brick v. Illinois*, 431 U.S. 720, 741-43 (1977) (direct purchasers have antitrust standing to seek redress for anticompetitive overcharge because their status as direct purchasers eliminates problems of potential duplicative recovery or allocating damages down the distribution chain). Allergan's attack on Plaintiffs' antitrust standing (as well as Article III standing) is limited solely to the argument what it claims is the speculative nature of Plaintiffs' harm. For the reasons detailed in this Opposition, that lone attack on Plaintiffs' standing is unavailing.

*Skelaxin (Metaxalone) Antitrust Litig.*, 2013 WL 21811185, at \*16 (E.D. Tenn.  May 20, 2013) ("Defendants contend Plaintiffs cannot establish the agreement between King and Mutual harmed Plaintiffs because they cannot show the FDA ever granted tentative or final approval of Mutual's generic drug. Defendants argue it was not a foregone conclusion that Mutual's generic metaxalone would have received tentative or final FDA approval. At this early stage of the proceedings, however, Plaintiffs are not required to 'adduce proofs discrediting all possible intervening causes of the delayed launch of generic products, such as the failure to obtain tentative generic approval from the FDA before the expiration of the 30–month stays at issue.'") (quoting *In re Neurontin Antitrust Litig.*, 2009 WL 2751029, at \*12 (D.N.J. Aug. 28, 2009)); *In re Wellbutrin SR/Zyban Antitrust Litig.*, 281 F. Supp.2d 751, 756-57 (E.D. Pa. 2003) (noting that "Defendants argue that Plaintiffs' injuries flow not from the alleged antitrust violation, but rather from an independent cause—the requirements of the FDA and the Hatch–Waxman Act.  Defendants contend that the superceding cause for Andrx's failure to enter the market is the company's inability to obtain FDA approval. Defendants assert that even if they had filed frivolous lawsuits for the purpose of extending their monopoly, their actions are not responsible for Andrx's lack of entry because the 30–month stay has expired and Andrx has still failed to secure FDA approval, a prerequisite for entry into the market " but rejecting that argument because, "Defendants' ability to pose a plausible and legally permissible version of events that explains why generic manufacturers of Wellbutrin SR have not yet entered the market does not compel this Court to grant their Motion.").

One need not scour the decisions of courts across the country to discern the flaw in Allergan's argument.  ***This very Court in a decision authored by Judge Staton just last year ruled that "the necessity of FDA approval . . .  does not render the alleged harm too speculative.***" *Retrophin, Inc. v. Questor Pharmaceuticals, Inc.*, 41 F. Supp.3d 906, 915 (C.D. Cal. 2014) (Staton, J.,) (emphasis added).  Instead, Judge Staton held that a proper and sufficient allegation of causation would depend on the plaintiff having

properly alleged the ousted competitor's "intent and preparedness to enter the market." *Id*.  A comparison of the allegations pled in *Retrophin* to those pled here convincingly shows that Plaintiffs also have properly alleged Medytox's intent and affirmative action in preparation to enter the U.S. market so as to satisfy standing and causation on the merits.  Undeniably recognizing *Retrophin's* dispositive effect on its motion, Allergan preemptively cites that decision and attempts to distinguish the findings in *Retrophin* from the factual allegations pled in this case.  But, even a cursory review of the FAC shows that Plaintiffs have pled more than is required to satisfy the causation elements of Article III and antitrust standing, as well as the elements of an antitrust claim.

## B. Plaintiffs' Allegations Readily Comport With The Antitrust Standing And Merits Causation Requirements  Set Forth In *Retrophin*.

In *Retrophin*, Judge Staton found that, despite lacking FDA approval, the pharmaceutical plaintiff properly and sufficiently alleged antitrust injury and the causation element of an antitrust claim because it had voiced an intent to enter the market and shown sufficient action evincing its "preparedness to do so." *Id*. at 914-15 (quoting *Bubar v. Ampco Foods, Inc.*, 752 F.2d 445, 450 (9th Cir. 1985))[2].  Juxtaposing the factual allegations in *Retrophin* that Judge Staton found sufficient to make this showing against the facts pled by Plaintiffs shows that Plaintiffs likewise properly plead facts sufficient to show antitrust standing and causation in this case:

▪ This Court's finding that Retrophin met the antitrust standing requisite showing of intent and preparedness to enter the market because ***"Retrophin alleges it has 'expertise as a biopharmaceutical company focusing on rare diseases'"*** (*Retrophin*, 41 F. Supp.3d at 915 (quoting *Retrophin* Complaint, at ¶¶ 49, 52, 54) is the same type of allegation found in Plaintiffs' FAC, *except that the FAC provides even more detail as to Medytox's expertise in the Botulinum-based neuromodulator market.*

---

[2] *Retrophin* found that the plaintiffs' allegations sufficed both to satisfy standing and to state an antitrust claim under Rule 12(b)(6).  *See Retrophin*, 41 F. Supp.3d at 912-16. We, therefore, discuss both antitrust standing and the causation element of an antitrust claim together.

*See* FAC, at ¶ 24 ("***Medytox's primary product is known as Meditoxin, and is sold not only in Korea, but also in approximately 40 countries with additional countries planned for the product's registration***."); *id.* at ¶ 25 ("***Though a Korean company, Medytox's product offering of its injectable neurotoxin was not regionally limited to that country or the Asia Pacific Rim.  Instead, Medytox's product was approved and sold across the globe not only in Korea, Japan, Thailand, India, and other countries in Asia, but also in Eastern Europe and Latin America.***") ; *id.*at ¶ 32 ("***The approval of Medytox's reformulated albumin-free neurotoxin not only meant that entry into the U.S. market was now in reach, but the reformulated product also presented a significant product advance and improvement over Botox® and other competing neurotoxins, all of which contained albumin.***").

- This Court's finding that "***Retrophin also alleges affirmative action to engage in the proposed business, not only by attempting to license Synacthen, but also by preparing a plan to obtain regulatory approvals for and sell Synacthen and putting in place an 'apparatus to conduct clinical trials to obtain FDA approval***,*" (*Retrophin*, 41 F. Supp.3d at 915), is precisely the type of allegation Plaintiffs make as to Medytox, except that Medytox already has a prior record of obtaining regulatory approval for its product (including the very product at issue here).  *See* FAC, at ¶ 26 ("Moreover, ***the company implemented and invested in clinical trials in Australia with this reformulated product.  This investment proved fruitful because in mid-2013, Medytox received regulatory approval in Korea for its reformulated albumin-free botulinum toxin-based neurotoxin, and it began marketing this new generation neurotoxin under the brand name Innotox***."); *id.*  ("***Medytox's expansion of its injectable neurotoxin product offering continued apace.  It planned and was poised to enter at least six other national markets, including additional countries in Europe as well as planned entry into the United States market.  To facilitate entry into these added markets, Medytox undertook considerable investment and preparation.  In this regard, whereas***

1   *Medytox's injectable neurotoxin product commercialized in Asia, Eastern Europe, and*

2   *Latin America contained Korean albumin, the company recognized that the presence*

3   *of Korean albumin would impede the licensure and approval process for the product*

4   *into the U.S. market.  As a result, Medytox reformulated a bio-better version of its*

5   *product that was manufactured without using animal-derived fermentation medium or*

6   *human albumin—a significant advance in the industry, as it represented the only and*

7   *first neurotoxin that did not require the presence of albumin.*"); *id.* at ¶ 33 ("*In*

8   *furtherance of its plans to enter the U.S. market with its new albumin-free neurotoxin,*

9   *Medytox undertook considerable and significant steps evidencing its intent and*

10  *commitment to enter the U.S. market.  Thus, for example, as early as July 27, 2010,*

11  *Medytox filed a U.S. Patent Application for an invention entitled, "Pharmaceutical*

12  *liquid composition of botulinum toxin with improved stability."  This application*

13  *covered the invention embodied in Medytox's albumin-free Innotox product.   The*

14  *United States Patent Office granted the application on December 31, 2013, causing*

15  *U.S. Patent No. 8,617,568 to issue on that date."*).

16  ▪   This Court's finding that *"Retrophin further alleges its belief that the*

17  *history of Synacthen's use in other countries would aid it in obtaining FDA approval"*

18  is also the same factual allegation found in Plaintiffs' FAC with respect to Medytox,

19  except that Medytox's Meditoxin and Innotox not only had a "history of use*," but had*

20  *already obtained regulatory approval abroad*.  *See* FAC, at ¶ 24 ("¶ 24 ("*Medytox's*

21  *primary product is known as Meditoxin, and is sold not only in Korea, but also in*

22  *approximately 40 countries with additional countries planned for the product's*

23  *registration*."); *id.* at ¶ 32 *("The competitive threat from Medytox, however, changed in*

24  *mid-2013 when Medytox received regulatory approval in Korea for its new generation*

25  *reformulated neurotoxin (marketed in Korea under the name Innotox) that did not*

26  *require and did not include human albumin as an ingredient.")*.

27

28

### C.   The Attacks On Plaintiffs' Alleged Timeline For FDA Approval Also Fail.

#### 1.   Allergan Misstates The Clinical Trial Timeline.

Allergan fares no better when it disputes Plaintiffs' allegations as to the time required for clinical trial or FDA approval.  It disingenuously cites opinions dealing with *New Drug Applications("NDAs") for therapeutic drugs designed to treat disease* for the proposition that such trials require in excess of a year and enrollment of thousands of patients to test for efficacy.  *See* Allergan's Br. at 11:1812:4.  All of the opinions cited by Allergan ***dealt with an NDA for a  disease-treating proposed new drug***. *See Padnes v. Scios Nova, Inc.*, 1996 WL 539711 (N.D. Cal. Sept. 18, 1996) (cited in Dft's Br. at 11:19-20) (dealing with proposed new drug to treat obesity); *In re Nuvelo, Inc., Secs. Litig.*, 2008 WL 5114325 (N.D. Cal. Dec. 4, 2008) (cited in Dft's Br. at 11:201-21 (involving clinical trials for proposed new drug to treat blood clots); *Anderson v. Peregrine Pharm., Inc.*, 2013 WL 4780059, at *1 (C.D. Cal. Aug. 23, 2013) (cited in Dft's Br. at 11:24-25) (dealing with clinical trial required for "experimental drug intended for use as a treatment for non-small cell lung cancer and other cancers.").  ***None involved the more truncated clinical studies required for FDA approval of a Biologic License Application ("BLA") for cosmetic applications***. This is a pertinent difference:

> [T]he pathway to obtain FDA approval to market and sell botulinum-toxin based injectable neuromodulators like Botox® and Medytox's Innotox for cosmetic use is far less onerous and time-consuming than the regulatory approval process and timeline that involve the nonclinical and clinical tests required for drugs and biologics that treat or cure human disease.  To market Botox® or Innotox in the U.S. for cosmetic use requires FDA approval of a Biologics License Application ("BLA").   Whereas expensive and time-consuming genetic toxicology studies, carcinogenicity studies, drug interaction studies, and pharmacokinetic studies in humans relating to safety are required for drugs and biologics to treat or cure human diseases, no such studies were required for FDA approval of botulinum-based injectable neuromodulators for cosmetic use like Dysport® or Xeomin® because of the relatively low dose and non-systemic effects related to neurotoxin injectables used to temporarily reduce the appearance of wrinkles.

FAC, at ¶ 60[3].

Allergan compounds its error by summarily dismissing the significance of Medytox's already conducted clinical trials abroad (Dft's Br. at 12:20-28)- *clinical trials that have already resulted in regulatory approval for Innotox overseas.  See* FAC, at ¶ 26 (detailing clinical trial in Australia for Medytox's reformulated product); *id.* at ¶ 32 (regulatory approval obtained for Innotox).   First, Allergan relies on a *Draft document* extrinsic to the FAC that Allergan has improperly attached as Exhibit H to the Pace Declaration.  The document is entitled, "Guidance for Industry Upper Facial Lines: Developing Botulinum Toxin Drug Products Draft Guidance," and is dated August 2014. *See* Ex. H to Pace Decl. [Dkt. No. 32-10] at cover page.  This is precisely the type of extrinsic document that Judge Staton refused to credit in *Retrophin* in deciding a motion to dismiss that made arguments about the timelines for FDA approval.  Her opinion instead focused on the plaintiff's allegations in the *Retrophin* complaint.  *See Retrophin*, 41 F. Supp.3d at 915, n.6 ("The Court grants Questcor's request for judicial notice of FDA publications in the Federal Register, which describe procedures and statistics regarding FDA approval.   The Court nonetheless focuses on the allegations in

---

[3] Allergan relies on an extrinsic 2014 "Draft Guidance" document from the FDA to attack Plaintiffs' allegation that clinical trials for a BLA for treatment of facial wrinkles can be conducted on a more truncated timeline than clinical trials for new drugs treating disease.  The Draft Document is problematic for the reasons we articulate in this Opposition but, aside from that, the Draft Document does not make the point that Allergan suggests it does.  Instead, the Draft Document states that because upper facial lines are not a life-threatening condition, "accelerated *approval* is not appropriate." Ex. H. to Pace Decl. [Dkt. No. 32-10], at 11:447-48 (emphasis added).  Plaintiffs' allegations, however, are not that the *approval* turnaround by the FDA is more truncated, but that the *clinical trials* required in order to submit the BLA are more truncated than the clinical trials required in order to submit a New Drug Application for a drug proposed to treat disease.  It is the significantly shorter clinical trial timeframe required for a BLA application for Botulimum-toxin based neuromodulator as compared to the clinical trials required for a disease-treating proposed new drug, and not the time frame for FDA action in response to the applications, that makes the approval timeline for such BLAs significantly shorter than the approval timeline for disease-treating NDAs.  See FAC, at ¶ 65 (explaining that what is at issue is "*the truncated clinical study timeline required* to obtain FDA regulatory approval for botulinum-based injectable neurotoxins for treatment of wrinkles like Botox® and Innotox, as *compared to the much lengthier timeline applicable to prescription drug clinical trials* needed for submission of their FDA applications for approval.").

Retrophin's Complaint, *as opposed to generally-applicable facts about the FDA, in determining whether Retrophin has sufficiently alleged an intent and preparedness to enter the market.*") (emphasis added).  Here, there is even more reason to discredit the Draft document relied upon by Allergan. Not only is it a mere "Draft," but its August 2014 date means that even that draft would not have been in effect at the time of interest (the 2013 timeframe when Medytox and Allergan negotiated their Agreement and when Plaintiffs allege that, but for that Agreement, Medytox would be seeking FDA approval).

Further, the very content of the Draft Document makes clear that it does not stand for the proposition that Allergan argues—it does not state the FDA required timelines or clinical study contents.  To the contrary it makes clear that, at most, it offers mere ***suggestions that have no legally binding effect***:

> FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities. Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word *should* in Agency guidances means that something is suggested or recommended, but not required.

Ex. H. to Pace Decl. [Dkt. No. 32-10], at 2:44-48 (emphasis in original).

Further, even this discredited Draft does not support Allergan's substantive assertions.  Instead of forbidding a BLA applicant's reliance on foreign clinical trials in order to obtain FDA approval, the FDA's own Draft document assumes that ***such foreign clinical trial could be employed to seek U.S. FDA approval***.  The Draft document makes allowance for reliance on foreign trials, but merely suggests that:

> The trial population should[4] be representative of the target population for which the drug product is intended for use in clinical practice (e.g., reflective of the age, race, and sex of the population that will be using it for an improvement in upper facial lines in the United States).

*Id*. at 3:90-92.

---

[4] Recall that FDA's own document clarifies that the word "should" means merely "that something is suggested or recommended, but not required." Ex. H. to Pace Decl. [Dkt. No. 32-10], at 2:44-48 (emphasis in original).

Allergan is free to challenge, as it does, the validity of Medytox's foreign clinical trials. That, however, is an argument as to the merits of those trials and their results, and is not an argument that leads to dismissal at the pleadings stage or on standing grounds.

### 2. Allergan Misstates The Timeline Of Medytox's Manufacturing Plant Capability.

Equally flawed is Allergan's attempt to show that, absent the Agreement, Medytox would not have had a manufacturing plant capable of securing FDA approval for the production of Innotox to be sold in the United States. The FAC alleges, and the extrinsic documents attached by Allergan confirm, that well prior to the Agreement, "Medytox was planning on building a new manufacturing plant starting the first quarter of 2012 *to be completed during the first quarter of 2013 in order to supply Innotox for sales abroad, including planned sales to the U.S. and Europe*." FAC, at ¶ 57 (emphasis added). That is no mere bald allegation. It is supported by the fact that a Korean investment newsletter published in March 13, 2012 (more than a year before the Agreement) reported on this exact timeline for Medytox's manufacturing plant to supply Innotox to, *inter alia*, the United States. *Id*. (quoting Woori Investment Newsletter).

Allergan has now filed that Woori Investment Newsletter [Dkt. No. 32-11] and it confirms precisely the timeline pled in the FAC. Even back in 2012, Korean investment advisors monitoring Medytox's performance opined that:

> *Based on expectations for exports to the US and Europe, the company plans to build a new plant in Osong over 1Q12~1Q13.*

Ex. I to Pace Decl. [Dkt. No. 32-11], at 19 (emphasis added).

As that writing evidences, therefore, Medytox planned as early as 2012 to have a new manufacturing *plant completed by the first quarter of 2013* specifically to supply "exports to the US and Europe" (meaning that it would be US c-GMP compliant). That timeline was also independently confirmed by a separate investment newsletter (the

"Nomura Equity Research" publication) which, like the Woori Investment Newsletter, reported that, "Medy-Tox plans to set up a new factory in Osong by FY13 and expects a 10x rise in capacity due to this additional facility." Ex. E to Pace Decl. [Dkt. No. 32-7], at 131.

Allergan selectively misquotes that document to make it appear as though it states that Medytox "hoped to be able to launch its new formulation 'in advanced markets from 2016.'") (Dft's Br. at 1:27-2:1) (purporting to quote Ex. E to Pace Decl. [Dkt. No. 32-7], at 131).  But what the Nomura Equity Research publication *actually stated* back in 2012 was that:

> In 2013, the company plans to complete its third clinical test[5] for a next generation formulation *to take a lead in advanced markets from 2016*.

Ex. E to Pace Decl. [Dkt. No. 32-7], at 131 (emphasis added).

The document misquoted by Allergan does not say that Medytox had no plans *to enter the U.S. market* at all until 2016.  The document refers only to the time frame by which Medytox planned to "take a lead" in the U.S. market (i.e., in "advanced markets"). (Recall that in Korea, Medytox had already "taken the lead" in market share from Allergan's Botox.  *See* FAC, at ¶ 27 (Medytox's greater market share than Botox in Korea for cosmetic applications) ; *id*. at ¶ 27 (detailing Medytox's market share expansion in Korea from 8% to 38% in a matter of years).    Clearly, however, Plaintiffs need not establish that Medytox would have been a "market leader" in the U.S. before the Agreement's announcement in September 2013.  It suffices if Medytox had entered or been ready to enter by then in order for it to pose price-constraining competition to Allergan's pricing for Botox.  Contrary to Allergan's misquote of the Nomura Equity Research publication, nothing in that document contradicts Plaintiffs' asserted timeline.

---

[5] This was the "third clinical test" and recall that, even under Allergan's interpretation of FDA "standards," (which really are non-binding suggestions) *two* clinical tests suffice for submitting the BLA.  *See* Dft's Br. at 12:14-15 (the 2014 [FDA] Guidance asks manufacturers 'to conduct two randomized, double-blind, controlled trials to establish safety and efficacy.")

### D.  The Principal Authorities Relied Upon By Allergan Show The Lack Of Merit Of Allergan's Motion.

The cases cited by Allergan, most of which do not involve the pharmaceutical industry at all, actually advance Plaintiffs' position.  For example, Allergan highlights in bold its recitation of *United States v. Westinghouse Elec. Corp.*, 648 F.2d 642 (9th Cir. 1981).  It claims that *Westinghouse* supports its argument for dismissal of Plaintiffs' case at the pleadings stage because in that case the Ninth Circuit affirmed a finding that the exclusion to competition was caused not by the defendant's licensing actions but by the presence of governing patents.  *See* Dft's Br. at 7 (citing in bold *Westinghouse*, 648 F.2d at 645 and 649).  *Westinghouse* was not at all a case about standing or pleading standards.  Instead, in *Westinghouse*, the Ninth Circuit was reviewing *a full trial record that took place after six years of discovery that concluded with a bench trial resulting in a verdict in favor of the defendants*.  *Westinghouse*, 648 F.2d at 645. The correctness of a verdict reached after years of discovery and witness testimony has no bearing on whether a pleading should be dismissed *before* any opportunity for the very factual development that *Westinghouse* relied upon could be had.

So too, Allergan's reliance on *Gerlinger v. Amazon*, 526 F.3d 1253 (9th Cir. 2008) (cited in Dft's Br. at 6:15-27) is equally misplaced.  That decision was also not resolved at the pleadings stage, but was an affirmance of the district court's grant of *summary judgment*.  The Ninth Circuit went to explain that *the district court properly <u>denied the motion to dismiss</u> the pleading, only to months later grant summary judgment after the actual evidence, including voluminous witness testimony introduced by the defendants went unrebutted by the plaintiff*:

> Here, in their *summary judgment motion*, the *defendants <u>submitted evidence that the plaintiff suffered no injury-in-fact</u>*. In response to a summary judgment motion or a trial court's post-pleading stage order to establish Article III standing, a plaintiff can no longer rest on 'mere allegations' but must set forth by affidavit or other admissible evidence 'specific facts' *as delineated in Federal Rule of Civil Procedure 56(e)* as to the existence of such standing. *Lujan,* 504 U.S. at 561.  In his complaint,

> Gerlinger alleged that as a result of the marketing agreement, he was 'forced to pay supra-competitive prices for [his] purchases.' ***The defendants' evidence showed*** this was not the case.

*Id.* at 1255-56 (emphasis added, quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

The same flaw dooms Allergan's reliance on the Ninth Circuit's unpublished opinion in *Cyntegra, Inc. v. Idexx Labs., Inc.*, 322 F. App'x 569 (9th Cir. 2009) (unpublished), cited at length in Allergan's Opposition. *Cyntegra* also is a non-precedential *summary judgment opinion* that addressed the plaintiff's antitrust standing *after evidence, discovery, and testimony had been obtained. Id.* at *2-*3.

In any event, the factual allegations pled by Plaintiffs here, even without the benefit of *any* discovery far outweigh and are in stark contrast to the dearth of supporting evidence adduced by the *Cyntegra* plaintiff. Whereas Medytox, a company of nearly $1 billion market capitalization, has: a recognized global presence in the Botulinum-toxin neuromodulator market with sales in 40 countries; regulatory approval and sales for a number of its products; ***and, actually is the market share leader over Allergan's Botox in Korea where both entities compete head-to-head***, the *Cyntegra* plaintiff was found to have no experience, qualifications or capability whatsoever to produce anything in the product market from which it claimed that it was unlawfully excluded.   The contrast with Medytox could not be more clear, as detailed in Ninth Circuit's opinion:

> Cyntegra has meager background or experience in the animal testing services industry. Its founder and Chief Executive Officer, Simon Brodie, has no background education or experience in molecular diagnostic testing, or in the relevant science, technology, and business generally. Aside from Dr. Okumabua's declaration that he provided roughly six months of research and development assistance to Cyntegra, the evidence in the record indicates that Cyntegra operates through a skeleton crew of part-time outside consultants who lack any background or experience in the prospective business.

*Cyntegra*, 322 F. App'x 569, at *2.

Allergan places great stock on this Court's decision in *Space Exploration Techs*.

*Corp. v. Boeing Co.*, 2006 WL 7136649 (C.D. Cal. May 12, 2006) (cited in Dft's Br. at 8:10-20), another non-pharmaceutical case, as support for the proposition that Medytox's lack of FDA approval dooms Plaintiffs' standing or their claims on the merits. *Space Exploration*, however, held no such thing. Instead, in *Space Exploration* the plaintiff sued Boeing and other for antitrust violations for allegedly excluding it from the market for satellite vehicles. *Id.* at *1. This Court dismissed that antitrust complaint on standing and on the merits, but not because the plaintiff, SpaceX, failed to secure regulatory approval (in fact, the plaintiff had secured government contracts to supply such launch vehicles (*see id.* at *2). Instead, the fatal flaw was that SpaceX ***did not even have a product to offer at the time of its filing of the suit.*** As this Court explained, "***SpaceX has never successfully launched an EELV-class vehicle.***" *Id.* at *5. Those damning facts could not be in sharper contrast to the allegations in the FAC. That pleading alleges not only that Medytox has a superior, rival product to Botox, but that that product, Innotox, has obtained full-fledged regulatory approval abroad, and has been on sale. Moreover, the FAC also details Medytox's history of selling prior products not only in competition with Botox, but also in a manner that caused Medytox's prior product line to exceed the market share of Botox in countries where these two entities did compete. *Space Exploration* has no bearing to the factual scenario presented in this case.

This Court's holding that FDA approval is not a prerequisite to fulfilling Article III or antitrust standing is hardly anomalous. "An antitrust plaintiff must prove that he or she suffered damages from an antitrust violation and that there is a causal connection between the illegal practice and the injury." *Sullivan v. National Football League,* 34 F.3d 1091, 1103 (1st Cir. 1994). However, the "Plaintiffs need not prove that the antitrust violation was the sole cause of their injury, but only that it was a material cause." *In re Nexium Antitrust Litig.*, 42 F. Supp.3d 231, 267 (D. Mass. 2014) (citing *Zenith Radio Corp. v. Hazeltine Research Inc.,* 395 U.S. 100, 114, n. 9 (1969)). It suffices if the defendant's action was a material cause of the harm, even if there were other causes that caused the same injury. *Zenith*, 395 U.S. at 114, n.9. This is so

because, "[a]n antitrust violation can be the proximate cause of a plaintiff's injury *even if there are additional independent causes of the injury.*" *In re Flonase Antitrust Litig.*, 798 F. Supp.2d 619, 627 (E.D. Pa. 2011) (emphasis added).

That recognition applies with full force to this case. The allegation is that the Agreement forbids Medytox from selling its superior product in the United States because it grants those rights exclusively to Allergan. So, whether or not FDA approval had been or ever were awarded to Medytox's product, the fact is that it is the Agreement that prevents Medytox from selling that product in the United States.

For all its bravado in its present Motion in attacking Innotox's prospect for FDA approval, the rational conclusion based on the alleged facts is that Allergan believed that FDA approval for Innotox was reasonably attainable. Otherwise, it would be economically irrational for Allergan to have agreed to pay hundreds of millions of dollars (with tens of millions of dollars paid up front) for a product that Allergan had concluded held no prospect of obtaining regulatory approval. The Agreement, however, ensures that even once FDA approval is forthcoming, competition from Medytox for that superior product will not materialize (because the exclusive worldwide rights to the product are allocated to Allergan by the Agreement). That assuredly suffices to meet causation for Article III and antitrust standing, as well as the merits of an antitrust claim.

## II.   PLAINTIFFS' "LIMIT PRICING" THEORY OF CAUSATION AND DAMAGES DOES NOT DEPEND ON FDA REGULATORY APPROVAL.

The parties' disagreement as to precisely when Medytox could have obtained FDA approval for its superior product is informative but not dispositive to this action. This is because Plaintiffs' FAC posits two separate and distinct alternative theories of causation and damages. *See* FAC, at ¶¶ 55-66 (damages theory resulting from delayed entry caused by Agreement); *id.* at ¶¶ 45-54 (damages theory resulting from absence of "limit pricing" that Allergan would have employed prior to Medytox's entry). Only the second theory of causation hinges Plaintiffs' overcharge damages on Medytox's actual

entry into the U.S. market.   The first asserted theory of damages proximately caused by Allergan's actions relies on what Allergan's plausible and competitive response would have been, but for the Agreement, *prior to* Medytox's entry into the U.S. market.

### A. Plaintiffs' "Limit Pricing" Theory Of Causation And Damages Is Well-Accepted As Properly Stating A Monopolist's Plausible Response To Deter Entry At An Early Stage.

In this regard, Plaintiffs rely on the well-accepted and longstanding economic principle of "limit pricing" to allege that, once Medytox had launched its superior Innotox product, a natural and plausible response of Allergan would have been to limit (i.e., to reduce) its own monopoly pricing for Botox so as to make it unprofitable for Medytox to continue investing resources and effort to seek entry into the U.S. market. *Id*., at ¶¶ 45-54.  This economically rational pricing response would, of necessity, have occurred *before* Medytox had gained FDA approval and been able to enter the market because, as the FAC explains, if Allergan had waited to adjust its pricing for Botox until only after Medytox had entered the U.S. market, that would have been too late, given Medytox's undisputed record of taking market share and pricing power away from Botox. *Id*. at ¶ 50.   Rather than limiting its own pricing of Botox as a means of deterring Medytox's entry, which would have cost Allergan profits and revenues due to the decreased pricing it would be charging for its own product, however, Allergan instead engaged in executing the anticompetitive exclusive Agreement with Medytox to prevent Medytox's entry into the U.S. in that less costly manner.  *Id*. at ¶¶ 51-54. Thus, U.S. purchasers of Botox (like Plaintiffs) who, but for the Agreement, would have benefitted from the lower prices brought about by Allergan's own reduction of its own prices as a means of Allergan's rationale response to Medytox's superior product were deprived of the benefits of this lowered pricing because Allergan secured Medytox's exclusion from the U.S. market by way of the anticompetitive Agreement instead.  *Id*. at ¶ 54.

Allergan assails this independent theory of damages and causation as being merely an "ingenious academic exercise in the conceivable." Dft's Br. at 17:4-5 (quoting *United*

*States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 688 (1973)).   This is not so.   Plaintiffs' "limit price" economic principle is a rational and plausible economic response of alleged monopolists when faced with a prospect of future entry by a competitor.  These monopolists seek to deter entry by dropping their own monopoly prices so as to make entry unprofitable to the would-be entrant.   That this allegation is not implausible is evidenced by the fact that it has been recognized by the United States Department of Justice, the Ninth Circuit,  California federal courts, and antitrust and economic commentators across the country.

The U.S. Department of Justice recognizes this same "limit pricing" argument:

> ***The economic theory of limit pricing suggests that monopolists and groups of colluding firms may find it profitable <u>to restrain their pricing</u> in order to deter new entry*** *that is likely to push prices even lower by adding capacity to the market.*

U.S. Dept. of Justice, *Non-Horizontal Merger Guidelines*, at § 4.111 (Revised Apr. 8, 1997) (reported at 1992 WL 1470192 (Apr. 8, 1997)) (emphasis added).

The Ninth Circuit has similarly weighed in, recognizing that such "limit pricing" is a rational, plausible response of a monopolist:

> ***The specific example we discussed was 'limit pricing,' in which a monopolist sets prices above average total cost but below the short-term profit-maximizing level so as to discourage new entrants and thereby maximize profits over the long run****. See* 3 P. Areeda & D. Turner, *supra* ¶ 714b. We explained that 'limit pricing by a monopolist might, on a record which presented the issue, be held an impermissible predatory practice.' A similar pricing strategy would be for a monopolist to make *temporary* reductions to a level above average total cost but below the profit-maximizing price whenever a new entrant appears ready to enter the market. One or two such reductions could discourage potential entrants in a market that requires sizable initial investments.

*TransAmerica Comp. Co. v. IBM Corp.*, 698 F.2d 1377, 1387  (9th Cir. 1983) (emphasis added, quoting *California Comp. Prods., Inc. v. IBM Corp.*, 613 F.2d 727, 743 (1979)).

Similarly, in *In re IBM Peripheral EDP Devices Antitrust Litig.*, 481 F. Supp. 965,

990-91 (N.D. Cal. 1979), the United States District Court for the Northern District of California, not only recognized the concept of "limit pricing" as a rational reaction by a monopolist to potential competition from would-be new entrants, but held that such a pricing response was a pro-competitive response that the law embraces because it represents competition on price, i.e. a reduction in prices by the monopolist to compete against potential future entrants that benefits consumers by providing them with reduced prices from the monopolist.   The Agreement deprived Plaintiffs and other U.S. Botox purchasers of this price competition because with the Agreement having removed any threat that Medytox would compete against Allergan in the U.S., Allergan no longer had any need to reduce its own pricing for Botox as a means to compete against a potential entry by Medytox.   As the Northern District of California explained:

> The first issue to be addressed in adopting a cost-based test is whether any range of pricing conduct should be beyond the reach of the law. A 'free zone' of price activity would preserve competitive incentives, but could also sanction undesirable conduct. If monopolists are allowed with impunity to lower price to a level equal to their average cost, ***then the monopolist might lower its price from the profit maximizing level to a level competitors cannot meet in order to discourage entry and preserve the monopoly (limit pricing).*** Or, entry could be defeated and discouraged by temporary reductions to average cost levels, followed by a return to monopoly pricing once the threat had been vanquished. In either case, the competitive process would be thwarted, and the monopolist could preserve its status without risking antitrust liability.
>
> . . . .
>
> It would be all but impossible to distinguish between above cost limit pricing conduct and a monopolist's pro-competitive reaction to lower priced competitors.  One external characteristic is common to both cases, a lowered price. Any attempt to attach liability to the one will surely inhibit the indistinguishable other.

*Id*. (emphasis added).

The Seventh Circuit has also expressly recognized a monopolist's "limit pricing" response to possible future entry by a rival as one that should be expected:

> There are, however, a variety of more subtle ways in which a monopolist can exploit his power. ***For example, the lowering of price in anticipation of entry can be as effective a threat to new competition as actually engaging in a price war. Indeed, a respected branch of the field of industrial organization economics cautions us to be wary of the problems of this form of "limit pricing" whereby a monopolist may still make a profit but eliminate the threat or actual entry of a new competitor as the field suddenly looks less economically inviting.***

*MCI Telecommunications Corp. v. AT&T Corp.*, 708 F.2d 1081, 1181 (7th Cir. 1983) (Tymkovich, J., concurring in part) (emphasis added, citing L. Sullivan, *Antitrust Law*, § 46 (c) (1977)).

Former Chairman of the Federal Trade Commission ("FTC"), Robert Pitofsky, has described the FTC's reliance on "limit pricing" as a basis to pursue antitrust action against would be monopolists. In commenting on why the FTC enjoined under the federal antitrust laws a merger agreement in the market for natural gas transmission in a case styled as *FTC v. Questar Corp.*, No. 2:95-cv-1137S (D. Utah 1995), Chairman Pitofsky explained the FTC's strong reliance on "limit pricing":

> The potential competition theory in *Questar* involved primarily the actual potential entry theory, but there was also an element of perceived potential entry. Kern River was an actual potential entrant in that it was actually planning to enter, and entry would have had a significant procompetitive effect on the market. ***There was also evidence that Kern River was perceived as a potential entrant <u>at an earlier stage</u>. <u>Theory predicts that a perceived likelihood of entry can induce an incumbent firm to engage in limit pricing -- i.e., moderate prices -- to discourage entry. There was evidence of that here</u>***.

*Competition Policy In Communications Industries: New Antitrust Approaches*, 1997 WL 169672, at *5 (F.T.C. Mar. 10, 1997) (Remarks of Chairman Robert Pitofsky, emphasis added).

Professors Areeda and Turner, whose treatises on antitrust law are indisputably

authoritative, confirm the rational and plausible nature of concluding that a monopolist

will engage in such limit pricing in order to deter would-be entrants:

> When a monopolist sells at a price at or above average cost, but could earn higher shortrun profits at a higher price, the necessary element of predation is presumably present. Unless acting irrationally or out of ignorance, ***the firm is likely to be charging the lower price in order to preserve or enhance its market share by deterring rivals***. Such pricing may take two forms: (1) the firm may permanently charge less than a profit-maximizing price in order to deter entry or to destroy rivals. . .
>
> *1. Limit Pricing.*--A monopolist protected by an insurmountable barrier to the entry of others can charge whatever price will maximize his profit. The ability of other firms to overcome entry barriers may, however, affect the monopolist's price. To oversimplify a bit, suppose that the monopolist's profit-maximizing price is $100 per unit, but a $100 price would attract entry while a $90 price would not. Average total costs (including a normal return on investment) at an efficient scale of output might be $80 to the monopolist but $91 for newcomers. In that event, the monopolist will have to choose between inducing entry at the profit-maximizing price of $100 and retaining the entire market at the $90 price. If the discounted income stream at the lower price exceeds that from sharing the market at the higher price, *the monopolist will charge the lower price*. Although the lower price would thus be the longrun, profit-maximizing price, it is usually called a 'limit price' and contrasted with the higher, shortrun, profit-maximizing price determined without reference to possible entry.
>
> The limit price is intended by the monopolist to impair the opportunities of rivals.

Areeda and Turner, *Predatory Pricing And Related Practices Under Section 2 Of The Sherman Act*, 88 Harv. L. Rev. 697, 704-05 (1975) (emphasis added).

The *Questar* case referenced by Chairman Pitofsky not only documents the FTC's acceptance of "limit pricing" as a basis to impose antitrust liability, but also supports Plaintiffs' allegation and causation theory that "limit pricing" is employed by the monopolist well before actual entry is made or before the would-be entrant is "actually planning to enter" *Id*.  As Chairman Pitofsky explained, by their nature, pricing reductions of a limit pricing monopolist occur "at an earlier stage." *Id*.

**B. The High Barriers To Entry Existing Here Make Allergan's Resort To Limit Pricing All The More Plausible.**

Not only do the reductions of price effectuated by a monopolist intent on deterring entry exhibit themselves earlier than when the rival's entry is relatively certain but the greater the barriers to entry, the more plausible, likely, and effective that a limit pricing response by the monopolist will be:

> *This limit-pricing strategy is especially effective where there are substantial barriers to entry into the competitive product market itself, since structural disincentives to enter already exist.* Moreover, it is possible for incumbents to achieve this sort of exclusion without offending the *Cascade* rule of per se legality for above-cost discounts, since below-cost (i.e., "predatory") pricing is unnecessary to deter entry in these particular ways.

B. Pollina, *False Negatives Under A Discount Attribution Test For Bundled Discounts*, 22 CommLaw Conspectus 74, 76 (2014) (emphasis added).

Other economics commentators are in accord, linking the efficacy and rationality of a monopolist employing "limit pricing" as a means of deterring entry to the existence of higher entry barriers:

> *If entry barriers are high, the monopolist need only reduce his price slightly in order to deter new entrants.* This behavior, known as "limit pricing," differs from predation in that the monopolist arguably does not actually lose money in the hope of recouping his losses at a later date. It can, however, bring about the same anticompetitive effect of driving out rivals and deterring new entry.

R. Morse, "*The Measure of Damages In A Lawsuit Involving Allegations Of Price Discrimination Or Predatory Pricing*," 48 Brooklyn L. Rev. 479, 487 (Spring 1982) (emphasis added).

Or, as still other economists have found:

> The concept of 'limit pricing' is based on the observation that if a monopolist or a group of collusive oligopolists sets a price that maximizes shortrun profits and thus earns some monopoly profit, this might attract new rivals into the market, which will result in an eventual reduction in price and

corresponding erosion of monopoly returns. ***In such concentrated markets it is recognized that existing firms that seek to maximize profits over the longrun and to maintain their market shares might set prices just low enough to make entry unprofitable. If the market exhibits economies of scale or barriers to entry, the existing firms may still be able to earn some monopoly profits even at this limit price, though profits will be lower than those obtained at the shortrun profit- maximizing price***.

"*An Economic and Legal Analysis of Physical Tie-Ins*," 89 Yale L.J., 769, 778, n.48 (March 1980) (emphasis added, citing F. Scherer, Industrial Market Structure and Economic Performance 346 (1970)).

Allergan derides Plaintiffs' "limit pricing" theory of causation and resultant damages as being implausible and speculative. The foregoing authorities, however, show that far from being an irrational or newfound fabrication of counsel, Plaintiffs' pleading represents a long-recognized economic principle explaining a monopolist's rational behavior. As one commentator has stated, "***a rich economics literature has developed, the thrust of which is to demonstrate that, as a matter of economic theory, predatory or limit pricing cannot be dismissed as irrational behavior***." *Rationality Analysis In Antitrust*, 158 U. Pa. L. Rev. 261, 288 (Jan. 2010) (quoting Hay, George A., "*The Economics Of Predatory Pricing*," 51 Antitrust L.J. 361, 364 (1982))[6].

Allergan is sure to argue that, even absent the Agreement, it would not have reduced its pricing regardless of Medytox's Innotox. It can make those arguments. The United States Supreme Court has cautioned lower federal courts, however, that in a motion to dismiss an antitrust case, a court is not to require the plaintiff to show that he is likely to prevail—it suffices if, as here, the plaintiff posits a "plausible" scenario, regardless of how long the odds are that he will ultimately prove his allegations:

> Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact

---

[6] Professor Hay is the Charles Frank Reavis, Sr. Professor of Law and Professor of Economics at Cornell Law School, and was the Director of Economics for the U.S. Department of Justice Antitrust Division. *See* www.lawschool.cornell.edu/faculty/bio_george_hay.cfm (last visited Jul. 27, 2015).

1
2
3

to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.  And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.

4

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (internal quotation omitted).

5
6

### III.   ALLERGAN'S REMAINING ATTACKS ON THE MERITS OF PLAINTIFFS' ANTITRUST CLAIMS ALSO FAIL.

7
8

The other purported bases for Allergan's attack on the merits of Plaintiffs' antitrust claims are equally unavailing.

9
10

#### A.   The FAC Plausibly Alleges Interchangeability Between Botox And Innotox.

11
12
13
14
15
16
17
18
19

Aside from challenging the prospects of Medytox's product obtaining FDA approval, Allergan also attacks Plaintiffs' FAC for containing "[n]o allegation of interchangeability between Botox Cosmetic and Innotox." Dft's Br. at 14:28-15:1.  The FAC is replete with allegations as to why all Botulinum-based neuromodulators for cosmetic and aesthetic use are substitutable products in the eyes of consumers, such that they form a proper relevant market.  *See* FAC, at ¶¶ 9-17.  Also contrary to Allergan's unsupported assertion, the FAC detailed precisely why Innotox was not only an alternative to Botox, but a vastly superior one at that (*id*. at ¶¶ 32), such that it had the real prospect of taking customers away from Botox in the United States. *Id*. at ¶¶ 27-30.

20
21
22
23
24
25
26
27
28

Allergan argues that because other smaller competing products in the market, Dysport and Xeomin (neither of which had the albumin-free technological advantage of Innotox), had achieved only a small market share in the U.S., it would be implausible to assert that Medytox's Innotox could take sales away from Botox.  *See* Dft's Br. at 15:5-9 (citing FAC, at ¶ 20).  But the FAC documented that, even though they did not curtail Botox's market share to a significant degree, these two smaller competitors still managed to restrain the rate of price increases for Botox.  *See* FAC, at ¶¶ 44, 45.  Moreover, the FAC documented that in Korea, where Medytox and Allergan had been allowed to compete against one another (i.e., where there was no Agreement), Medytox's product

not only took share away from Botox, but Medytox actually beat Allergan in market share in the market for Botulinum-based neuromodulators for cosmetic use. *Id.* at ¶ 27.

To the extent that Allergan argues that no other Botulinum-based neuromodulator product for cosmetic use is viewed as interchangeable to Botox by consumers, that argument is legally flawed. It would be tantamount to Allergan defining a relevant product market by reference to the single Botox brand only. The law is clear, however that, with the narrow exception of aftermarket services that is wholly inapplicable here, "[i]n general, single brand markets do not constitute a relevant market." *Datel Holdings Ltd. v Microsoft Corp.*, 712 F. Supp.2d 974, 986 (N.D. Cal. 2010).

**B. The FAC Alleges Facts Plausibly Supporting The Conclusion That Innotox Could Take Customers Away From Botox.**

In a related vein, Allergan attacks Plaintiffs for failing to allege Medytox's "ability to market and convert customers from Botox." Dft's Br. at 15:10-11. Allergan's accusation, however, self-servingly ignores detailed allegations of Medytox's successful history of managing to enter the markets of 40 countries across the globe where it necessarily began with zero market presence. *See* FAC, at ¶ 24. Not only that, but the FAC spells out in detail Medytox's proven ability to capture market share directly from Allergan at an exponential rate and pace of growth. Thus, in Korea, Medytox launched its Botulinm-based neuromodulator product in 2006 to compete against Botox, ***and achieve and over 400 % market growth (from a mere 8% market share to 38% market share) in merely a few years***. *Id.*, at ¶ 28.

With Medytox having trounced Botox once with an older and less innovative Neuronox product, there is no basis to assert that it is implausible to allege that Medytox could do so again, particularly with a newer and technologically superior product (Innotox) than the one it used to beat Allergan attaining market share.

### C.  The FAC Plausibly Alleges That Medytox's Product Would Constrain Botox Pricing.

Allergan also claims that there are "no facts to suggest plausibly that Allergan would have lowered Botox Cosmetic prices to compete with the hypothetical Korean alternative product." Dft's Br. at 15:25-26.  Much of the refutation to this self-serving argument has already been addressed in Sections I and II *supra*.  Beyond that, the fact is that the FAC *does* allege repeatedly that, absent the Agreement, Allergan would have responded to Innotox by lowering Botox prices—that is, Allergan would have faced "price constraining competition" from Medytox.  *See* FAC, at ¶¶ 34, 48, 78, 106.  That conclusion does not follow merely from basic economic theory (although that would suffice to render the FAC's allegation plausible).  Instead, the FAC detailed that it was even the limited entry of competing products like Dysport (which are alleged to be technologically inferior to Innotox) that managed to quell price increases for Botox.  *See* FAC, at ¶ 44 (quoting a medical newsletter as stating that, "[p]rices for Botox have stayed around $525 a vial area for two years now, probably remaining in this plateau pattern *because of the entrance of Dysport into the market.*). (emphasis added).

### D. Plaintiffs Need Not Allege That They Personally Would Have Purchased Innotox.

Allergan baselessy attacks Plaintiffs for failing to allege "even that they themselves would have purchased Innotox." Dft's Br. at 17:17-18.  That facile accusation misses the mark entirely.   To prevail, Plaintiffs need not show that they would have actually purchased Innotox.  Instead, their FAC alleges the basic economic principle, that facing the prospect of actual or potential competition from Medytox's Innotox, Allergan would have lowered its *own* prices for Botox so as to avoid losing market share (as it did to Medytox when the two firms did compete head-to-head in Korea).  Thus, all Class members who had purchased Botox during the Class Period would have paid a lower price for their own purchases of Botox without regard to whether they individually would have purchased Innotox.

### E. Allergan's Attempt To Obtain Dismissal By Self-Servingly Characterizing The Agreement As Pro-Competitive Also Fails.

Allergan attempts to blunt the well pleaded allegations of the FAC by arguing that what transpired here was nothing more than the permissible exercise of licensing rights by Medytox as a patentee. *See* Dft's Br. at 8:4-7; 24:2-25:1. It also argues that the Agreement (which Allergan has not produced) must be viewed as procompetitive because it permits Allergan to manufacture for Medytox a product that Medytox could not have manufactured itself in the United States.

For starters, however, Medytox's U.S. Patent that covers the Innotox invention did not even issue until December 31, 2013, well after Allergan announced the Agreement with Medytox on September 25, 2013. *See* FAC, at ¶ 1 (agreement announced by Allergan on September 25, 2013); *id.* at ¶ 33 (Medytox's '568 Patent not issued until December 31, 2013). Moreover, even if all the Agreement had done was convey rights to Allergan that Medytox was entitled to exploit under the patent laws that still would not have immunized the Agreement from antitrust scrutiny. That much was announced by the United States Supreme Court in *Federal Trade Comm'n v. Actavis*, 133 S. Ct. 2223, 2231 (2013) (holding that settlement that is permissible exercise of patent rights is still subject to antitrust attack because "it would be incongruous to determine antitrust legality by measuring the settlement's anticompetitive effects solely against patent law policy.").

Beyond that, it is factually inaccurate to argue that all that occurred here was Medytox's licensing of rights that it was entitled to exercise or grant under the patent laws. That is not the case. In the Agreement, Allergan and Medytox agreed that, except in Korea and Japan, Allergan would have exclusive *worldwide* rights to commercialize Medytox's technology that led to the development of Innotox. *See* FAC, at ¶ 37. Medytox, however, does not have *worldwide* patent rights to its invention. At most, it has a later-issued patent in the United States, which stemmed from an issued patent in Korea that may have been filed in some other countries that are signatories to the Patent Cooperation Treaty ("PCT"). As between the Allergan and Medytox parties, however,

the Agreement purported to grant Allergan *worldwide* rights, even in countries where Medytox had no patent rights to license.  It is an agreement far exceeding the mere patent rights that Medytox may exercise under patent law (and even the licensing of those patent rights are subject to antitrust attack under *Actavis*).

Nor does Allegan gain traction by arguing that the Agreement must be viewed as procompetitive because Dysport and Xeomin "required the help of U.S. companies" to market these biologics in the U.S.  *See* Dft's Br. at 1:21-22.  There is no allegation that any of these companies had to give away worldwide exclusive rights to their U.S. distributors in order to secure their respective U.S. distribution agreements. Put differently, even if ultimately Allegan could show that the Agreement achieved the goal of allowing Allergan, a U.S. entity, to manufacture or distribute Innotox within the United States and that Medytox could not have done so itself (which Plaintiffs dispute), that would not render the Agreement procompetitive. Even then, Plaintiffs could still prevail by introducing evidence that such a goal could have been accomplished through less restrictive restraints. *See In re NCAA Student Athlete Name and Likeness Antitrust Litig.*, 2014 WL 1949804, at *1 (N.D. Cal. May 12, 2014) (NCAA could not rely on the procompetitive effect of its licensing agreement because of "evidence that the NCAA could provide support for women's sports and less prominent men's sports through less restrictive means.").

That observation carries particular force here because the undisputed allegations are that Allergan is a monopolist in the United States relevant market.  *See* FAC, at ¶¶ 18-22.  The Agreement, therefore, represents an acquisition by a monopolist of the rights of the only source (i.e., a manufacturer outside the United States) that posed a real prospect of checking Allergan's monopoly market power.  *Id*. at ¶ 23.  Antitrust law is clear that "[b]ehavior that might otherwise not be of concern to the antitrust laws—or that might even be viewed as procompetitive—can take on exclusionary connotations when practiced by a monopolist." *Image Technical Srvcs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1217 (9th Cir. 1997) (on remand from United States Supreme Court) (quoting

*Eastman Kodak Co. v. Image Technical Srvcs., Inc.*, 504 U.S. 451, 488 (1992) (Scalia, J., dissenting)).  Given Allergan's status as a monopolist, even a licensing agreement that hypothetically could otherwise be shown to have been procompetitive if it had been undertaken by a different U.S. distributor of Botulinum-based neuromodulators would still pose anticompetitive concerns when employed by Allergan.

In any event, whether the Agreement ultimately could be defended as advancing a procompetitive business justification is not a matter that can be adjudicated on a motion to dismiss.  *See Retrophin*, 41 F. Supp.3d at 917 ("In any event, 'the existence of valid business reasons is ordinarily a question of fact.'") (quoting *SmileCare Dental Group v. Delta Dental Plan of Cal., Inc.,* 88 F.3d 780, 786 (9th Cir.1996)).   Allergan's attempt to obtain dismissal by arguing a purported justification for the Agreement, therefore, fails.

## IV.    THE STATE LAW CLAIMS  ARE NOT SUBJECT TO DISMISSAL.

Plaintiffs' California State law claims under the Cartwright Act and California's Unfair Competition Law are premised on the same conduct alleged with respect to Plaintiffs' federal antitrust claims.  Because the FAC properly alleges federal antitrust claims, Allergan's motion to dismiss the State law claims fails for the same reasons that its attempt to dismiss the federal antitrust claims fail.

The reach of the Cartwright Act is generally being co-extensive with the reach of the federal Sherman Act.  *See Retrophin*, 41 F. Supp.3d at 918 (quoting *County of Tuolomne v. Sonora Community Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001)).  But "California law affords standing more liberally than does federal law." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000).  So, even assuming *arguendo* that the Court would somehow find Plaintiffs' antitrust standing lacking for their federal antitrust counts (and it should not), that would still not result in dismissal of Plaintiffs' Cartwright Act claims.

Similarly, because Plaintiffs have properly alleged claims under the antitrust laws, they also state claims under Section 17200 of the UCL.  *See Beech-Nut Nutrition Corp. v.*

*Gerber Prods. Co.*, 69 F. App'x 350, 353 (9th Cir. 2003) ("Because we hold that Beech-Nut has stated a claim under the federal antitrust laws, we reverse the district court's dismissal of Beech-Nut's state-law claims as well. Conduct that violates the federal antitrust laws also violates the California Unfair Competition Law."). Plaintiffs' motion to dismiss Count V of the FAC, therefore, should also be denied.[7]

## CONCLUSION

For all the foregoing reasons, Allergan's motion to dismiss the FAC should be denied. If the Court were inclined to grant Allergan's motion in any respect, Plaintiffs' respectfully request leave of Court to amend their pleading so as to address any pleading deficiencies the Court may identify.

Respectfully Submitted,

DATED: July 27, 2015

**/s/ Roy A. Katriel**
Roy A. Katriel (SBN 265463)
**THE KATRIEL LAW FIRM**
4225 Executive Square, Suite 600
La Jolla, CA 92037
Tel:   (858) 242-5642
Fax:   (858) 430-3719
E-mail: rak@katriellaw.com

Ralph B. Kalfayan (SBN 133464)
**KRAUSE, KALFAYAN, BENINK &**
**SLAVENS, LLP**
550 West C Street, Suite 530
San Diego, California 92101
Telephone:  (619) 232-0331
Facsimile:   (619) 232-4019
Email: ralph@kkbs-law.com

*Counsel for Plaintiffs*

---

[7] Allergan maintains that Plaintiffs are not entitled to injunctive relief. *See* Dft's Br. at 31:7-18. It cites to the standard for *preliminary* injunctive relief, which Plaintiffs do not seek. Instead, Plaintiffs seek *final* injunctive relief. That is, if they are successful in ultimately proving the merits of their claims and in showing the unlawfulness of the Agreement under the antitrust laws, Plaintiffs seek an order enjoining the continued enforcement of the Agreement. Such relief is expressly permitted under the federal antitrust laws. See 15 U.S.C. § 26. It would be anomalous to argue that after the Court were to find that the Agreement violated the antitrust laws, the Court would nevertheless be powerless to enjoin the Agreement's enforcement. There is no basis to dismiss Plaintiffs' plea for injunctive relief.