UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADEL TAWFILIS, DDS d/b/a CARMEL VALLEY CENTER FOR ORAL AND MAXILLOFACIAL SURGERY and HAMID A. TOWHIDIAN, M.D., individually and on behalf of all other similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> ALLERGAN, INC., <br><br> Defendant. | CASE NO. SACV 15-307-JLS (JCGx) <br><br> **ORDER DENYING DEFENDANT'S MOTION TO DISMISS (Doc. 32)** |

1

## I.      INTRODUCTION

Before the Court is Defendant Allergan, Inc.'s Motion to Dismiss.  (Mot., Doc. 32.) Plaintiffs Adel Tawfilis, DDS d/b/a Carmel Valley Center for Oral and Maxillofacial Surgery and Hamid A. Towhidian, M.D. filed an Opposition, and Allergan replied. (Opp'n, Doc. 39; Reply, Doc. 40.)  Having considered the parties' briefing, heard oral argument, and taken the matter under submission, the Court DENIES Allergan's Motion.

## II.      BACKGROUND[1]

This antitrust case arises out of an allegedly anticompetitive exclusive licensing agreement between Defendant Allergan, Inc. and Allergan's Korean-based competitor Medytox, Inc.  (First Amended Complaint, "FAC" ¶ 1, Doc. 28.)  Defendant Allergan, Inc. is a U.S.-based multinational pharmaceutical company and the producer of Botox, an injectable neuromodulator most notably used for the treatment of facial wrinkles.  (Id ¶ 4.) Plaintiff Adel Tawfilis is a dentist, oral and maxillofacial surgeon, and the principal of the Carmel Valley Center for Oral and Maxillofacial Surgery.  (Id. ¶ 2.)  Plaintiff Hamid A. Towhidian, M.D. is a cosmetic surgeon and the head of Total Cosmetix.  (Id. ¶ 3.) Plaintiffs allege that they "both purchased Botox directly from Allergan during the Class Period for use in cosmetic procedures they perform routinely within their respective practices."  (Id. ¶ 1.)

Plaintiffs bring this antitrust action against Allergan on behalf of a putative class of "direct purchasers within the United States of [Allergan]'s Botox neuromodulator product for cosmetic use during the Class Period."  (Id. ¶ 1.)  Plaintiffs define the relevant antitrust product market as "the market for injectable neurotoxins for cosmetic use," and the

---

[1] When ruling on a motion to dismiss, the Court accepts as true the factual allegations in the complaint.  *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 5 (2010).

1   relevant antitrust geographic market as the United States.  (Id. ¶¶ 16, 17.)  The Class

2   Period is defined as "the period between September 25, 2013[, and] such date as the Court

3   enters an Order certifying any Count of th[e FAC] as a class action."  (Id. ¶ 67.)

4       Injectable neurotoxin products like Botox are derived from the "acutely lethal"

5   botulinum toxin.  (Id. ¶¶ 9-10.)  Because of the high lethal effect of the botulinum toxin,

6   manufacturing facilities that produce injectable neuromodulators for sale in the United

7   States, even when located outside of the United States, are subject to heavy regulation and

8   control.  (Id. ¶ 21.)  Further, until recently, all injectable neurotoxins for cosmetic use have

9   contained the protein human albumin.  (Id. ¶ 13.)  The Food and Drug Administration

10  ("FDA") mandates that the human albumin found in any injectable neurotoxin for sale in

11  the United States must come from FDA-approved blood establishments.  (Id.)  Thus,

12  foreign neurotoxin manufacturers whose products rely on human albumin obtained outside

13  of the United States are unable to obtain FDA approval for the sale of those products

14  within the United States.  (Id.)

15      Allergan's Botox is the overwhelming leader in the United States market for

16  injectable neurotoxins for cosmetic use, with a market share of at least 85%.  (Id. ¶ 18.)

17  Because of the high barriers to entry and extensive government regulation and control,

18  only two other products, Dysport and Ximeon, compete with Botox in the United States.

19  (Id. ¶ 20.)  Plaintiffs allege, however, that Dysport's and Ximeon's small presences in the

20  United States are "insufficient to pose meaningful price-constraining competition to

21  Allergan's Botox."  (Id.)  Thus, Plaintiffs claim that "Botox's high market share, coupled

22  with the significant barriers to entry into the relevant antitrust market, mean that Allergan

23  possesses monopoly market power in this relevant antitrust market and has the ability,

24  which is has exercised, to raise prices or reduce output."  (Id. ¶ 19.)

25      Medytox is a Korean company that, like Allergan, manufactures and distributes an

26  injectable neurotoxin for cosmetic use.  (Id. ¶ 24.)  Medytox sells its primary product,

27

28

Meditoxin,[2] in approximately 40 countries throughout Asia, Eastern Europe, and Latin America.  (Id. ¶¶ 24-25.)  Medytox, however, does not sell Meditoxin within the United States.  (Id. ¶ 26.)  Nonetheless, Plaintiffs allege that Medytox posed a real and significant threat to Allergan's dominance of the United States market.  (Id. ¶ 27.)

Plaintiffs allege that "Medytox undertook considerable investment and preparation" to facilitate entry into the United States and other European countries.  (Id. ¶ 26.)  According to the FAC, Medytox understood that, due to FDA regulations, it could not enter the United States market if its injectable neurotoxin products contained Korean-based albumin.  (Id.)  Thus, "Medytox reformulated a bio-better version of its product that was manufactured without using animal-derived fermentation medium or human albumin – a significant advance in the industry, as it represented the only and first neurotoxin that did not require the presence of albumin."  (Id.)  Plaintiffs further assert that, because Medytox's albumin-free product does not need to be freeze-dried in a high vacuum for storage in order to be preserved like other competing neurotoxins that contain albumin, this new product has the clinical advantage of helping Plaintiffs and other direct purchasers reduce the risk of bacterial infection during treatment.  (Id. ¶ 32.)

According to the FAC, "in Korea, where Botox is also sold but faces competition from, *inter alia*, Medytox's rival injectable neurotoxin for cosmetic applications, Botox has only approximately 35 percent share of the Korean market and lags behind Medytox's near 40 percent or greater share of the Korean market."  (Id. ¶ 27.)  Plaintiffs allege that Medytox has had such success in Korea because Medytox's products are priced 30 to 50 percent lower than Allergan's Botox.  (Id. ¶¶ 29-30.)  In mid-2013, Medytox received regulatory approval in Korea for its "reformulated albumin-free botulinum toxin-based neurotoxin," and began marketing it under the brand name Innotox.  (Id. ¶ 26.)  According to the FAC, "[t]he approval of Medytox's [Innotox in Korea] meant that entry into the U.S.

---

[2] Medytox employs different brand names for Meditoxin, including Siax, Cunox, Botulift, and Neuronox.  (FAC ¶ 24.)

market was now in reach." (Id. ¶ 32.) Further, Plaintiffs allege that "Medytox was planning on building a new manufacturing plant starting the first quarter of 2012 to be completed during the first quarter of 2013 in order to supply Innotox for sales abroad, including planned sales to the U.S. and Europe." (Id. ¶ 57.) On July 27, 2010, Medytox filed a U.S. Patent Application for the invention embodied in Innotox. (Id. ¶ 33.) On December 31, 2013, Medytox's patent covering the invention embodied in Innotox was issued by the United States Patent Office.[3] (Id.) Plaintiffs also allege that Medytox implemented and invested in clinical trials for Innotox in Australia. (Id. ¶ 26.)

Plaintiffs claim that Innotox "could have been approved for sale in the U.S. in less than two years following its obtaining regulatory approval abroad in mid-2013." (Id. ¶ 65.) According to the FAC, "the pathway to obtain FDA approval [in the United States] to market and sell botulinum-toxin based injectable neuromodulators like Botox and Medytox's Innotox for cosmetic use is far less onerous and time-consuming than the regulatory approval process and timeline that involve the nonclinical and clinical tests required for drugs and biologics that treat or cure human disease." (Id. ¶ 60.) According to Plaintiffs, "[t]o market Botox or Innotox in the U.S. for cosmetic use requires FDA approval of a Biologics License Application ("BLA")." (Id.) However, "[w]hereas expensive and time-consuming genetic toxicology studies, carcinogenicity studies, drug interaction studies, and pharmacokinetic studies in humans relating to safety are required for drugs and biologics to treat or cure human diseases, no such studies were required for FDA approval of botulinum-based injectable neuromodulators for cosmetic use like Dysport or Ximeon because of the relatively low dose and non-systemic effects related to neurotoxin injectables used to temporarily reduce the appearance of wrinkles." (Id.) In sum, Plaintiffs claim that there is a "truncated clinical study timeline required to obtain FDA regulatory approval for botulinum-based injectable neurotoxins for treatment of

---

[3] Plaintiffs also allege that Medytox obtained two other related U.S. patents during this same time frame. (Id. ¶ 33.)

5

wrinkles like Botox and Innotox, as compared to the much lengthier timeline applicable to prescription drug clinical trials needed for submission of their FDA applications for approval." (Id. ¶ 65.)

Plaintiffs allege that, "[w]ith published medical studies documenting that the two companies' products' effectiveness was indistinguishable, and with Medytox's pricing being a fraction of Allergan's pricing of Botox, Allergan was rightfully concerned that Medytox's entry into the United States would adversely affect Allergan's market power and ability to continue to price Botox in the manner in which it had been doing prior to Medytox's entry when Botox held an 85 percent or so U.S. market share. (Id. ¶ 34.) According to the FAC, because Allergan was "[a]ware that the impending entry of Medytox into the U.S. market would adversely affect Botox's monopoly power and pricing ability, Allergan devised a plan to thwart the consequences of this competitive reality." (Id. ¶ 36.) Thus, Plaintiffs claim that "relatively early on during Medytox's planned entry into the United States after Medytox obtained Korean regulatory approval for Innotox and after Medytox began making inroads towards its planned U.S. entry, Allergan came to the conclusion that it was in its interest to keep Medytox from competing in the U.S. market." (Id. ¶ 47.) Plaintiffs contend that, "[t]o succeed in persuading Medytox to abort its plans to enter the U.S. and refrain from competing in the U.S., [] Allergan's efforts had to be undertaken *before* Medytox made expensive inroads at obtaining FDA approval [and building an approved manufacturing plant], and well before Medytox's product was actually sold in the U.S." (Id. ¶¶ 47, 50.)

On September 25, 2013, Allergan and Medytox announced an agreement, which closed in January 2014. (Id. ¶¶ 1, 37, 53.) The terms of the agreement are as follows:

Allergan obtained worldwide rights to license and commercialize Medytox's new, albumin-free botulinum-based neuromodulator as well as any new products derived therefrom. The only exceptions to this worldwide

6

agreement were Korea, where Allergan did not obtain any rights under the agreement[,] and Japan, where the agreement allocated co-exclusive rights to both Allergan and Medytox.  In exchange, Allergan agreed to pay Medytox over $300 million, upon several developmental milestones being reached, plus a royalty stream on future sales.

(Id. ¶ 53.)  Plaintiffs assert that the over $300 million payment by Allergan to Medytox "represents a boon to Medytox, a company whose entire market capitalization was recently estimated to be about $857 million."  (Id. ¶ 54.)

Plaintiffs claim that the "Allergan-Medytox agreement is a horizontal agreement between actual and potential competitors" and "has a direct anticompetitive consequence in that it assures Allergan that Medytox will not enter and compete against it in the U.S. market for injectable neurotoxins for cosmetic use."  (Id. ¶ 39.)  Plaintiffs assert that "[t]he Allergan-Medytox agreement also serves to cement and maintain Allergan's existing monopoly power in the United States market for injectable neurotoxins for cosmetic use" because "[t]he agreement removes Medytox's ability to challenge Allergan's market power in the United States."  (Id. ¶ 40.)  According to the FAC, "[a]bsent the agreement, Medytox's reformulated neurotoxin product line could and would have competed against Allergan's Botox offerings, and would have posed price-constraining competition to Botox."  (Id.)

In addition, Plaintiffs claim that direct purchasers of Botox have and continue to be injured by the delayed entry of Innotox into the U.S. market.  (Id. ¶ 55.)  Plaintiffs allege that, instead of being completed in 2013, the planned Medytox plant that would supply Innotox ingredients for sale in the United States still has not been built and completed.  (Id. ¶¶ 55, 57.)  According to Plaintiffs, after the Medytox-Allergan agreement, "Allergan does not have the same economic incentive to expedite the commercialization of Medytox's product, which would compete against and likely cannibalize sales away from Allergan's

1  established incumbent Botox product."  (Id. ¶ 56.)  Plaintiffs also claim that Innotox's

2  FDA approval has been delayed because "Phase 2 and 3 clinical trials that were in the

3  works in 2012 and 2013, have now been pushed back after the Allergan agreement to 2015

4  at the earliest."  (Id. ¶ 58.)

5        On February 24, 2015, Plaintiffs filed their Complaint against Allergan.

6  (Complaint, Doc. 1.)  On May 8, 2015, Allergan filed a Motion to Dismiss Complaint.

7  (Doc. 26.)  Before the Court could rule on Allergan's Motion to Dismiss Complaint,

8  Plaintiffs filed their FAC.  (FAC.)

9        The FAC asserts the following claims against Allergan: (1) unlawful market

10  allocation in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) agreement in

11  restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (3) unlawful

12  maintenance of monopoly market power in violation of Section 2 of the Sherman Act, 15

13  U.S.C. § 2; (4) violations of California's Cartwright Act, California Business and

14  Professions Code § 16700 *et seq.*; and (5) violations of California's Unfair Competition

15  Law ("UCL"), California Business and Professions Code § 17200 *et. seq.*  (Id. ¶¶ 76-113.)

16  Plaintiffs allege that "[t]he net result of the Allergan-Medytox agreement is that it thwarted

17  actual and/or potential competition, allocated markets, unlawfully maintained Allergan's

18  monopoly market power, and as a direct result caused those, like Plaintiffs, who purchased

19  Botox directly from [Allergan] during the Class Period, to pay a supra-competitive

20  overcharge for their Botox purchases that would not have existed but for the agreement."

21  (Id. ¶ 42.)

22

23  **III.   LEGAL STANDARD**

24

25        When a motion is made pursuant to Rule 12(b)(1), the plaintiff has the burden of

26  proving that the court has subject matter jurisdiction. *Tosco Corp. v. Cmtys. for a Better*

27  *Env't*, 236 F.3d 495, 499 (9th Cir. 2001), *overruled on other grounds by Hertz Corp. v.*

28

1  *Friend*, 559 U.S. 77 (2010).  For the court to exercise subject matter jurisdiction, a plaintiff

2  must show that he or she has standing under Article III.  *Cetacean Cmty. v. Bush*, 386 F.3d

3  1169, 1174 (9th Cir. 2004) ("A suit brought by a plaintiff without Article III standing is

4  not a 'case or controversy,' and an Article III federal court therefore lacks subject matter

5  jurisdiction over the suit." (citation omitted)).  Article III sets forth the constitutional

6  limitations on standing, requiring a plaintiff to establish (1) injury in fact, (2) causation,

7  and (3) redressability.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  The

8  injury in fact must be concrete and particularized and actual or imminent, not conjectural

9  or hypothetical.  *Id.* at 560 (internal quotation marks and citations omitted).  "A

10  jurisdictional challenge under Rule 12(b)(1) may be made either on the face of the

11  pleadings or by presenting extrinsic evidence."  *Warren v. Fox Family Worldwide, Inc.*,

12  328 F.3d 1136, 1139 (9th Cir. 2003).  "In a facial attack, the challenger asserts that the

13  allegations contained in a complaint are insufficient on their face to invoke federal

14  jurisdiction."  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

15  "Dismissal for lack of subject matter jurisdiction is appropriate if the complaint,

16  considered in its entirety, on its face fails to allege facts sufficient to establish subject

17  matter jurisdiction."  *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546

18  F.3d 981, 984-85 (9th Cir. 2008).

19       A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal

20  sufficiency of the claims asserted in the complaint.  *See Ashcroft v. Iqbal*, 556 U.S. 662,

21  678-79 (2009).  When evaluating a Rule 12(b)(6) motion, the Court must accept as true all

22  allegations of material facts that are in the complaint and must construe all inferences in

23  the light most favorable to the non-moving party.  *See Moyo v. Gomez*, 32 F.3d 1382, 1384

24  (9th Cir. 1994).  Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only a

25  "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed.

26  R. Civ. P. 8(a)(2).  Dismissal of a complaint for failure to state a claim is not proper where

27  a plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face."

28

1  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility

2  when the plaintiff pleads factual content that allows the court to draw the reasonable

3  inference that the defendant is liable for the misconduct alleged.  The plausibility standard

4  is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a

5  defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

6  *Twombly*, 550 U.S. at 556).  A complaint must (1) "contain sufficient allegations of

7  underlying facts to give fair notice and to enable the opposing party to defend itself

8  effectively," and (2) "plausibly suggest an entitlement to relief, such that it is not unfair to

9  require the opposing party to be subjected to the expense of discovery and continued

10  litigation."  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).  "Although for the

11  purposes of a motion to dismiss [the Court] must take all of the factual allegations in the

12  complaint as true, [it] '[is] not bound to accept as true a legal conclusion couched as a

13  factual allegation.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

14  Moreover, the Supreme Court has cautioned against permitting antitrust cases to proceed

15  to discovery without a plaintiff demonstrating "plausibility" because of the high cost of

16  discovery in antitrust cases in particular.  *See Twombly*, 550 U.S. at 558 ("Thus, it is one

17  thing to be cautious before dismissing an antitrust complaint in advance of discovery, but

18  quite another to forget that proceeding to antitrust discovery can be expensive.") (internal

19  citation omitted).

20

21  **IV.   DISCUSSION**

22

23        In support of its Motion, Allergan requests that the Court take judicial notice of or

24  otherwise consider a number of documents outside the pleadings.  The Court first will

25  address Allergan's requests for the Court to consider these documents.  The Court then

26  will discuss Allergan's arguments for why Plaintiff's FAC should be dismissed.

27

28

1    **A.    Requests for Judicial Notice and Matters Outside the Pleadings**

2

3    "As a general rule, [courts] may not consider any material beyond the pleadings in

4    ruling on a Rule 12(b)(6) motion." *U.S. v. Corinthian Colls.*, 655 F.3d 984, 998 (9th Cir.

5    2011) (citation and quotation marks omitted).  "[Courts] may, however, consider materials

6    that are submitted with and attached to the Complaint."  *Id*. at 999.  "[Courts] may also

7    consider unattached evidence on which the complaint necessarily relies if: (1) the

8    complaint refers to the document; (2) the document is central to the plaintiff's claim; and

9    (3) no party questions the authenticity of the document."  *Id*. (citation omitted).  "Pursuant

10   to Federal Rule of Evidence 201, [courts] may also take judicial notice of matters of public

11   record, but not of facts that may be subject to reasonable dispute.  More specifically,

12   [courts] may not, on the basis of evidence outside of the Complaint, take judicial notice of

13   facts favorable to [a defendant] that could reasonably be disputed."  *Id*.

14          Notably, Allergan asks the Court to take judicial notice of or otherwise consider the

15   following documents attached to the Declaration of Jack E. Pace III (Doc. 32-2): (1) J.P.

16   Morgan's "Korean Healthcare" report, dated August 13, 2014 (Doc. 32-6); (2) Nomura

17   Equity Research's "Medy-Tox" investment analysis, dated December 13, 2012 (Doc. 32-

18   7); (3) an October, 2009 FDA publication, titled "FDA Law Enforcers Crack Down on

19   Illegal Botox Scammers" (Doc. 32-8); (4) an FDA Summary Review for Dysport, dated

20   March 24, 2009 (Doc. 32-9); the FDA's August 2014 "Guidance for Industry – Upper

21   Facial Lines: Developing Botulinum Toxin Drug Products" (Doc. 32-10); (6) Woori

22   Investment & Securities "Medytox" investment analysis, dated March 13, 2012 (Doc. 32-

23   11); and (7) NH Investment & Securities' "Medytox" investment analysis, dated February

24   10, 2015 (Doc. 32-12).  These documents were not attached to Plaintiffs' Complaint or

25   FAC.  The FAC, however, does mention and rely upon Documents 32-6, 32-7, 32-9, 32-

26   11, and 32-12.  (*See* FAC ¶¶ 28, 57, 61.)  Neither party questions the authenticity of these

27   five documents, and these documents are central to Plaintiffs' claims.  Thus, the Court

28

1    grants Allergan's request for judicial notice of Documents 32-6, 32-7, 32-9, 32-11, and 32-

2    12.

3          The Court also grants Allergan's request for judicial notice of the FDA's Guidance

4    for Industry (Doc. 32-10), which, as of August 2014, addressed "the FDA's current

5    thinking regarding the overall development program and clinical trial designs of botulinum

6    toxin drug products to support approval for an upper facial lines indication." (Id. at 1.)

7    The Court nonetheless focuses on the allegations in Plaintiffs' FAC, as opposed to

8    generally-applicable facts about and guidance from the FDA, in determining whether

9    Plaintiffs have sufficiently alleged standing, causation, and Medytox's intent and

10   preparedness to enter the market. The Court also will not take judicial notice of this

11   document as to facts that could be reasonably disputed.

12         Finally, the Court denies Allergan's request for judicial notice of Document 32-8

13   because this document was not attached to or referenced in Plaintiffs' FAC and it is not a

14   matter of public record.[4]

15

16   **B.      Merits of Federal Antitrust Claims**

17

18         Plaintiffs' theory of injury is that they and other direct purchasers have paid

19   supracompetitive prices for Botox because Allergan would have reduced the price of

20   Botox but for Allergan's allegedly anticompetitive exclusive licensing agreement with

21   Medytox. (*See, e.g.*, FAC ¶ 42.) Allergan, however, argues that the FAC must be

22   dismissed pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) because

23   Plaintiffs lack Article III standing, have failed to allege adequately antitrust standing, and

24   have failed to plead sufficiently causation for Plaintiffs' Sherman Act claims. (Mot.)

25   _____

26         [4] The Court denies Allergan's request for judicial notice of any other documents not
     specifically discussed for the same reason that the Court denies Allergan's request for judicial
27   notice of Document 32-8.

28

1

2                **1.**      **Standing**

3

4      "[T]he Supreme Court has identified several factors courts are to consider in

5 determining whether an antitrust plaintiff has standing to sue." *Lucas Auto. Eng'g, Inc. v.*

6 *Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1232 (9th Cir. 1998). "As with all federal

7 claims, a plaintiff must establish Article III standing, which requires proof of (1) injury-in-

8 fact, (2) causation, and (3) redressability." *In re Online DVD-Rental Antitrust Litig.*, 779

9 F.3d 914, 921-22 (9th Cir. 2015). "For Article III purposes, an antitrust plaintiff

10 establishes injury-in-fact when he has suffered an injury which bears a causal connection

11 to the alleged antitrust violation." *Gerlinger v. Amazon.com Inc., Borders Grp., Inc.*, 526

12 F.3d 1253, 1255 (9th Cir. 2008) (internal quotation marks and citation omitted).

13      "If the plaintiff meets the requirements for standing under Article III, the court must

14 then determine whether the plaintiff also meets 'the more demanding standard for antitrust

15 standing.'" *Lucas*, 140 F.3d at 1232 (quoting *Amarel v. Connell*, 102 F.3d 1494, 1507 (9th

16 Cir. 1997)). "Antitrust standing is distinct from Article III standing" because "antitrust

17 standing affects a plaintiff's ability to recover, but does not implicate the subject matter

18 jurisdiction of the court." *Gerlinger*, 526 F.3d at 1256.

19      "In deciding whether antitrust standing has been established, courts are to consider:

20 (1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust

21 laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure

22 of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning

23 damages." *Lucas*, 140 F.3d at 1232 (internal quotation marks and citation omitted). A

24 showing on the first factor—antitrust injury—is "necessary, but not always sufficient, to

25 establish standing under [section] 4 [of the Clayton Act]." *Am. Ad Mgmt. Inc. v. Gen. Tel.*

26 *Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999) (internal quotation marks and citation

27

28

omitted).  As to the remaining factors, Plaintiff need not make a showing on each; instead, the factors are balanced.  *See id.*

"Antitrust injury is made up of four elements: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 372 (9th Cir. 2003) (internal quotation marks and citation omitted).  In addition, the Ninth Circuit imposes a fifth requirement, "that the injured party be a participant in the same market as the alleged malefactors." *Bhan v. NME Hosps., Inc.*, 772 F.2d 1467, 1470 (9th Cir. 1985).  "In other words, the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market." *Glen Holly*, 352 F.3d at 372 (citation omitted).  "Consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury." *Id.* (citation omitted).

Further, "[t]o show antitrust injury, a plaintiff must prove that his loss flows from an *anticompetitive* aspect or effect of the defendant's behavior, since it is inimical to the antitrust laws to award damages for losses stemming from acts that do not hurt competition.  If the injury flows from aspects of the defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury, even if the defendant's conduct is illegal per se." *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001) (citation omitted).  However, antitrust injury "can be established by showing that consumers paid higher prices for a product due to anticompetitive actions of a defendant, such as a horizontal market allocation scheme." *In re Online DVD-Rental*, 779 F.3d at 922.

Because Article III standing imposes a lower bar than antitrust standing, a plaintiff meeting the requirements for antitrust standing also meets the requirements for Article III standing.  *See Retrophin, Inc. v. Questcor Pharms., Inc.*, 41 F. Supp. 3d 906, 914 n.5 (C.D. Cal. 2014).  Thus, because the Court finds that Plaintiffs have alleged adequately antitrust

standing, the Court need not discuss Article III standing or address Allergan's arguments for why Plaintiffs' FAC should be dismissed pursuant to Rule 12(b)(1).  The Court therefore focuses on Allergan's contention that the first three factors that courts consider when deciding whether antitrust standing has been established, namely, antitrust injury, the directness of the injury, and the speculative measure of the harm, warrant the dismissal of Plaintiffs' claims.[5]  (Mot. at 20-21, Doc. 32-1.)

### a.  Antitrust Injury

Allergan contends that Plaintiffs have failed to adequately allege antitrust injury because "Plaintiffs' alleged injury flows only from conduct that is beneficial or, at worst, neutral to competition."  (Id. at 22-23.)  According to Allergan, Plaintiffs fail to state a claim because the Medytox-Allergan exclusive licensing agreement is "pro-competitive on the face of the FAC."  (Id. at 23 (emphasis omitted).)

First, Allergan argues that Plaintiffs have admitted the pro-competitive purpose of the Medytox-Allergan exclusive licensing agreement because Plaintiffs allege that "Medytox must have 'providers within the United States' in order to sell Innotox." (Id. at 23 (citing FAC ¶ 17).)  However, Allergan misconstrues Plaintiffs' FAC.  The FAC alleges that foreign neurotoxin manufacturers whose products rely on human albumin obtained outside of the United States are unable to obtain FDA approval for the sale of those products within the United States.  (FAC ¶ 13)  The FAC asserts that Medytox understood that, due to FDA regulations, it could not enter the United States market if its injectable neurotoxin products contained Korean-based albumin.  (Id. ¶ 26.)  Thus, "Medytox reformulated a bio-better version of its product that was manufactured without using animal-derived fermentation medium or human albumin – a significant advance in the

---

[5] Allergan concedes that the final two factors – (4) risk of duplicative recovery, and (5) complexity in apportioning damages – "are not relevant to Plaintiffs' claims."  (Mot. at 20.)

industry, as it represented the only and first neurotoxin that did not require the presence of albumin."  (Id.)  The FAC therefore alleges that, though Medytox may need a U.S.-based partner to sell Meditoxin within the United States, Medytox does not need such a partner to sell Innotox in the United States because it does not contain human albumin.  This, coupled with the allegation that "Medytox was planning on building a new manufacturing plant starting the first quarter of 2012 to be completed during the first quarter of 2013 in order to supply Innotox for sales abroad, including planned sales to the U.S. and Europe," (id. ¶ 57), refutes Allergan's argument that Medytox necessarily needed a partner in order to sell Innotox in the United States.

Second, Allergan argues that "[e]xclusive vertical licenses are procompetitive and presumptively lawful under the antitrust laws."  (Mot. at 24.)  However, Plaintiffs have not alleged a vertical agreement between Medytox and Allergan; rather, Plaintiffs specifically allege that the "Allergan-Medytox agreement is a *horizontal* agreement between actual and potential competitors" and "has a direct anticompetitive consequence in that it assures Allergan that Medytox will not enter and compete against it in the U.S. market for injectable neurotoxins for cosmetic use."  (FAC ¶ 39 (emphasis added).)  Further, though Allergan is correct that courts have recognized the procompetitive benefits of exclusive IP licensing agreements in the past, (*see* Mot. at 24-25), that does not necessarily mean that the specific exclusive licensing agreement alleged here is pro-competitive in light of Plaintiffs' claim that "[t]he net result of the Allergan-Medytox agreement is that it thwarted actual and/or potential competition, allocated markets, [and] unlawfully maintained Allergan's monopoly market power."  (FAC ¶ 42.)  *See also In re Online DVD-Rental*, 779 F.3d at 922 (explaining that antitrust injury "can be established by showing that consumers paid higher prices for a product due to anticompetitive actions of a defendant, such as a horizontal market allocation scheme").

Third, even if the Court were to agree with Allergan that the FAC alleges certain procompetitive aspects to the Medytox-Allergan agreement, (*see, e.g.* FAC ¶ 32), the

1   purported procompetitive nature of the Medytox-Allergan IP license is not a matter that

2   can be adjudicated on a motion to dismiss.  At most, Allergan has raised factual issues that

3   are inappropriate to resolve at this stage.  *Cf. Solinger v. A&M Records, Inc.*, 586 F.2d

4   1304, 1310 (9th Cir. 1978).

5          In short, Plaintiffs' FAC specifically alleges Allergan's unlawful conduct, which

6   Plaintiffs characterize as a "horizontal agreement between actual and potential

7   competitors."  (FAC ¶ 39)  Plaintiffs also have alleged that Allergan's conduct caused an

8   injury to Plaintiffs and that this injury flows from that which makes the conduct unlawful

9   because, as direct purchasers of Botox, Plaintiffs purportedly have paid and continue to

10  pay supracompetitive prices for Botox due to Allergan's allegedly anticompetitive

11  exclusive licensing agreement with Medytox.  (Id. ¶ 42.)  "[T]he Sherman Act was enacted

12  to assure customers the benefits of price competition."  *Associated Gen. Contractors of*

13  *Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 538 (1983).  Thus, Plaintiffs'

14  FAC alleges sufficiently that Plaintiffs' purported injury is of the type the antitrust laws

15  were intended to prevent.   Finally, by asserting that they are direct purchasers of Botox,

16  Plaintiffs have alleged adequately that they are participants in the same market as Allergan.

17  *See Bhan*, 772 F.2d at 1470.  Accordingly, the Court finds that Plaintiffs have sufficiently

18  alleged antitrust injury.[6]  *See* 2A Phillip E. Areeda & Herbert Hovenkamp,

---

19

20         [6] Plaintiffs also claim that "Allergan's natural and plausible response to Medytox's threat of
21  future entry would have resulted in Allergan reducing (i.e. limiting) its own monopoly prices for
    Botox *well before* Medytox could enter the U.S. market so as to make it unprofitable for Medytox
22  to continue . . . to [try to] gain entry into the U.S. market."  (Opp'n at 4.)  According to Plaintiffs,
    "[t]hese lower 'limit prices' that would have been charged by Allergan for its own Botox product
23  even before Medytox's entry would have benefitted Plaintiffs and the Class."  (Id. at 4.)  However,
    while Plaintiffs cite a variety of authorities to support their argument that the economic concept of
24  limit pricing *exists*, Plaintiffs do not cite any authority, and the Court knows of none, for the
    proposition that a defendant can be found to have violated the antitrust laws by *failing to engage*
25  in limit pricing, which itself has been found to violate the antitrust laws.  (*See generally* Opp'n at
    18-26.)  Plaintiffs seem to confound the concepts of price competition, which the antitrust laws
26  were designed to protect, with limit pricing, a practice that in certain circumstances violates the
    antitrust laws.  Therefore, the Court rejects this alternative, albeit creative, theory.
27

28

ANTITRUST LAW ¶ 391e, at 328 (3d ed. 2007) ("If an incumbent monopolist takes steps to maintain its monopoly by foreclosing a would-be rival from entering . . . . [b]oth consumers and foreclosed rivals suffer antitrust injury.").

**b.  Directness of Injury and Speculative Harm**

In regards to the second and third factors relevant to antitrust standing, Allergan contends that "Plaintiffs fail to allege a direct 'line of causation' between the Medytox-Allergan license agreement and Plaintiffs' generalized suspicion that Botox Cosmetic prices are too high."  (Mot. at 25.)  According to Allergan, Plaintiffs "allege nothing at all regarding Medytox's ability to obtain an approved manufacturing plant capable of making Innotox for the U.S., obtain FDA approval, market and sell Innotox in the U.S., or any other steps to overcome the 'high barrier to entry' Plaintiffs concede exist."  (Id. at 27.)  More specifically, Allergan contends that Plaintiffs have failed to allege that at the time Allergan and Medytox entered into the exclusive licensing agreement that Medytox had or was close to (1) completing the required Phase I, II, or III studies to bring Innotox to market, (2) having an FDA-compliant manufacturing plant, (3) receiving approval for a Biologics License Application, (4) having the ability to obtain the specialized distribution systems required in the U.S. for handling injectable neurotoxins, or (5) obtaining a specialized U.S. sales force.  (Reply at 7-8; *see also* Mot. at 8.)  In sum, Allergan argues that Plaintiffs have failed to allege adequately that Medytox had the "intent and preparedness" to make and market Innotox.[7]  (Mot. at 21-22, 25-27.)

_____

[7] The cases that Allergan cites in support of its "intent and preparedness" arguments all relate to competitor antitrust standing, rather than customer antitrust standing.  Nevertheless, the Court finds that Allergan's arguments regarding "intent and preparedness" are relevant to Plaintiffs' claims because if Plaintiffs have failed to allege adequately Medytox's "intent and preparedness" to enter the United States market, the second and third factors courts consider when determining whether a plaintiff has plead adequately antitrust standing would weigh in favor of dismissal for failure to plead adequately antitrust standing.  *See Glen Holly*, 352 F.3d at 378 ("If the antitrust

(footnote continued)

According to Plaintiffs, however, "the detailed allegations of the FAC state plausible facts that show Medytox's intent and preparation to enter the U.S. market [and] pose price-constraining competition to Allergan's Botox during the Class Period."  (Opp'n at 3-4.)  In addition, Plaintiffs argue that "FDA approval is not a prerequisite to state an antitrust claim premised on an anticompetitive agreement that excludes a competing pharmaceutical manufacturer from the market" because a plaintiff need only "properly allege[] the ousted competitor's 'intent and preparedness to enter the market.'"  (Opp'n at 5-7.)

The Ninth Circuit has not specifically ruled on whether the absence of FDA approval indicates that any harm is too speculative to warrant finding antitrust standing. However, it "has held that a potential competitor has standing if he can show a genuine intent to enter the market and a preparedness to do so."  *Bubar v. Ampco Foods, Inc.*, 752 F.2d 445, 450 (9th Cir. 1985); *see also Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 806 (D.C. Cir. 2001) ("A competitor that has not yet entered the market may also suffer injury but courts require a 'potential' competitor to demonstrate both its intention to enter the market and its preparedness to do so.").  In determining whether a potential competitor has shown the necessary intention and preparedness to enter the market, the Ninth Circuit considers "varying combinations of the following typical elements:" (1) the background and experience of the [competitor]; (2) affirmative action by the [competitor] to engage in the proposed business; (3) the ability of [the competitor] to finance the business; and (4) the consummation of contracts by the [competitor].  *See Solinger*, 586 F.2d at 1310.

_____

laws are designed to protect customers from the harm of unlawfully elevated prices, and from agreements between competitors at the same level of the market structure to allocate territories in order to minimize competition, it is no stretch to conclude that these same laws protect customers from harm directly related to the unlawful removal of a competitive product from the market.") (internal quotation marks and citations omitted).

In regards to the first element, Allergan argues that "Plaintiffs fail to allege that Medytox has any 'background or experience' with clinical trials in the U.S., with getting a drug approved by the FDA, or with building a manufacturing facility capable of making an FDA-compliant product."  (Mot. at 25.)  Similarly, and in regards to the second element, Allergan contends that "Plaintiffs allege no affirmative action by Medytox to get its Innotox product to the U.S. Market."  (Id.; *see also* id. at 25-26 (arguing that Plaintiffs fail to allege that Medytox took steps "toward building a cGMP-compliant plant, conducting clinical trials, applying for or obtaining FDA approval, building a sales force, or overcoming any other barriers to successful U.S. entry").  However, Allergan's arguments regarding the first two elements are too narrow.

While it may be true that Medytox has little experience with Innotox in relation to the United States market, Plaintiffs allege that Medytox has extensive experience selling drugs throughout the world, and specifically products that directly compete with Botox abroad.  Plaintiffs also allege that Medytox sells Meditoxin in approximately 40 countries throughout Asia, Eastern Europe, and Latin America, and competes directly with Allergan's Botox in Korea, where Medytox has acquired a 40 percent market share.  (FAC ¶¶ 9, 24-25, 27.)  Further, the FAC alleges that Medytox received regulatory approval for and began marketing Innotox in Korea in mid-2013.  (Id. ¶ 26.)  In addition, Plaintiffs allege that "Medytox was planning on building a new manufacturing plant starting the first quarter of 2012 to be completed during the first quarter of 2013 in order to supply Innotox for sales abroad, including planned sales to the U.S. and Europe."  (Id. ¶ 57.)  As for clinical trials, Plaintiffs allege that Medytox implemented and invested in clinical trials for Innotox in Australia.  (Id. ¶ 26.)  Finally, specific to the United States, Plaintiffs allege that Medytox filed for three patents covering the invention embodied in Medytox in 2010, and the United States Patent Office issued those patents at the end 2013.  (Id. ¶ 33.)

Granted, these allegations largely focus on Medytox's background and experience and affirmative actions in countries outside of the United States.  However, this is to be

20

expected in light of Plaintiffs specific allegation that "relatively early on during Medytox's planned entry into the United States after Medytox obtained Korean regulatory approval for Innotox and after Medytox began making inroads towards its planned U.S. entry, Allergan came to the conclusion that it was in its interest to keep Medytox from competing in the U.S. market."  (Id. ¶ 47.)  Plaintiffs also claim that, "[t]o succeed in persuading Medytox to abort its plans to enter the U.S. and refrain from competing in the U.S., [] Allergan's efforts had to be undertaken *before* Medytox made expensive inroads at obtaining FDA approval [and building an approved manufacturing plant], and well before Medytox's product was actually sold in the U.S."  (Id. ¶¶ 47, 50.)  Thus, it is not surprising that the FAC focuses on Medytox's sales of Meditoxin and affirmative actions that the company took in regards to Innotox abroad, rather than in the United States.   A key element of Plaintiffs' claims is that Allergan did not wait until Innotox was ready to be sold in the United States before entering into an exclusive licensing agreement.  Thus, any lack of concrete affirmative steps on the part of Medytox to enter the United States market, or lack of background and experience related to the United States, seems to be directly attributable to the anticompetitive conduct that Plaintiffs claim the exclusive licensing agreement represents.

The Court therefore finds that Plaintiffs have alleged in detail Medytox's background and experience with the drug approval process and clinical trials, pharmaceutical sales, and manufacturing abroad, which, if taken as true, weighs in favor of the Court finding that Medytox had the requisite intent and preparedness to enter the market.  For the same reasons, the Court finds that the FAC specifically alleges that Medytox took affirmative steps towards building an FDA-compliant manufacturing facility, conducting clinical trials, overcoming barriers to a successful U.S. entry, building a sales force, and obtaining regulatory approval for its products abroad, which, if taken as true, weigh in favor of the Court finding that Medytox had the requisite intent and preparedness to enter the market.

In regards to the third factor, Allergan contends that "Plaintiffs do not allege that Medytox's resources are sufficient to expand into the U.S. without the Allergan license, including conducting clinical studies, getting Innotox approved by the FDA, building an approved manufacturing plant, navigating the U.S. biohazard handling requirements, and successfully marketing Innotox in competition with Botox." (Mot. at 26.) However, as discussed above, Plaintiffs have alleged adequately that Medytox invested in clinical trials in Australia, obtained regulatory approval for Innotox in Korea, was planning to build a new manufacturing plant to be completed in 2013, and had successfully marketed and sold Innotox in Korea. There is no reason for the Court to believe that Medytox, a company that sells Meditoxin in approximately 40 countries throughout the world, and whose market capitalization was recently estimated to be about $857 million, (FAC ¶ 54), could not expand its business and sell Innotox in the United States. Accordingly, the Court finds that Plaintiffs have alleged adequately Medytox's ability to finance the business, which weighs in favor of the Court finding that Medytox had the requisite intent and preparedness to enter the market.

In regards to the fourth factor, Allergan argues that "Plaintiffs fail to allege that Medytox entered into contracts with any consultants, suppliers, manufacturers, distributors, salespersons, or others in a way that would suggest its U.S. entry was imminent." (Mot. at 26.) However, it is not surprising that the FAC fails to allege Medytox's consummation of contracts specific to the United States market because Plaintiffs allege that Allergan acted "*before* Medytox made expensive inroads at obtaining FDA approval [and building an approved manufacturing plant]," and well before Medytox's product was actually sold in the U.S. (Id. ¶ 50.) The Court will not dismiss Plaintiffs' FAC simply because Plaintiffs have alleged that Allergan entered into an anticompetitive horizontal market allocation agreement before Medytox had entered into contracts specific to the U.S. market.

Thus, the Court finds that the typical four elements that courts consider when analyzing a competitor's "intent and preparedness" to enter the relevant antitrust market weigh in favor of Plaintiffs.

Although Allergan relies extensively on *Space Exploration Technologies Corp. v. Boeing Co.*, No. CV 05-07533 FMC MANX, 2006 WL 7136649 (C.D. Cal. May 12, 2006) *aff'd*, 281 F. App'x 769 (9th Cir. 2008) to support its argument that Plaintiffs lack antitrust standing,[8] the Court concludes that *Space Exploration* is distinguishable and does not counsel a different result.

In *Space Exploration*, the plaintiff, a company that had "invested tens of millions of dollars in conceiving, developing, and marketing satellite launch vehicles known as Evolved Expendable Launch Vehicles ('EELV')," claimed that the defendants had attempted "to preclude competition in the provision of satellite launch vehicles and services to the United States Government and commercial buyers." *Id.* at *1.  In granting defendants' motion to dismiss, the *Space Exploration* court concluded that the plaintiff's "alleged injuries ar[o]se either from past awards for which it was not eligible to bid or future claims that are speculative and unripe." *Id.* at 7. The Court noted how the plaintiff had "failed to identify a single contractual opportunity which it lost, or for which it was excluded from competing, as a result of [the d]efendants' allegedly anticompetitive conduct." *Id.*  Further, based on the plaintiff's "conce[ssion] in its papers [that] it was not yet ready to compete with [the d]efendants in the EELV market," *id.* at *4, the Court also found that, "as a 'potential' competitor who has never launched an EELV-class vehicle, and therefore has never, by its own admission, completed a launch services contract," the

---

[8] Allergan also relies extensively on *Cyntegra, Inc. v. IDEXX Labs., Inc.*, 322 F. App'x 569 (9th Cir. 2009) and *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223 (3d Cir. 2013) in its pleadings, and specifically highlighted these cases at oral argument, in support of its argument that Plaintiffs lack antitrust standing.  These cases, however, were decided at the summary judgment stage.  Thus, at the motion to dismiss stage, where the Court must take as true the allegations included in the FAC, the Court finds that *Cyntegra* and *Ethypharm* are of limited applicability.

1  plaintiff had failed "to satisfy the constitutional injury-in-fact requirement." *Id.* at *7.

2  Further, the court found that the plaintiff could not have been excluded from competition

3  during the time period at issue "because it lacked the capability to perform EELV launch

4  services at the time." *Id.* at 5.

5       Here, however, Plaintiffs have not conceded that Medytox was not yet ready to

6  compete with Defendants in the relevant antitrust market.  Further, unlike in *Space*

7  *Exploration* where the plaintiff had "never successfully launched an EELV-class vehicle,"

8  *id.* at *5, here, Plaintiffs specifically allege that Medytox has successfully launched and

9  sold injectable neurotoxins in approximately 40 countries throughout the world.  In

10 addition, Plaintiffs specifically allege that Innotox "could have been approved for sale in

11 the U.S. in less than two years following its obtaining regulatory approval abroad in mid-

12 2013."  (FAC ¶ 65.)  Plaintiffs have defined the Class Period as "the period between

13 September 25, 2013[, and] such date as the Court enters an Order certifying any Count of

14 th[e FAC] as a class action."  (Id. ¶ 67.)  To date, nearly two years after September 25,

15 2013, the Court has not certified any portion of this case as a class action.  The crux of the

16 FAC is that Medytox is a seasoned, sophisticated, and well-funded seller of injectable

17 neurotoxins outside of the United States and that Allergan entered into an anticompetitive

18 horizontal agreement to thwart the "impending entry of Medytox into the U.S. market."

19 (FAC ¶ 36.)

20      Accordingly, the Court DENIES Allergan's motion to dismiss for lack of standing.

21

22           **2.      Causation**

23

24      In addition, Allergan argues that Plaintiffs have failed to plead facts showing that

25 Allergan's conduct caused Plaintiffs' injury.  (Mot. at 18.)  According to Allergan, "[t]he

26 absence of any allegations that Medytox could have or would have taken all the steps

27 necessary to sell its first-ever product in the U.S. fails to carry Plaintiffs' burden to plead

28

causation." (Id. at 20.)  Thus, Allergan claims that Medytox's "hypothetical entry depends on an attenuated, speculative chain of events," and thus dismissal is appropriate under both Rule 12(b)(1) and 12(b)(6).  (Id. at 19.)

"To sufficiently plead causation, a plaintiff must allege that the defendant violated the antitrust laws, that the defendant's alleged violation had a tendency to injure the plaintiff's business or property, and that the plaintiff suffered a decline in its business or property not shown to be attributable to other causes. *Andrx Pharm.*, 256 F.3d at 808 (internal quotation marks and citation omitted).  "It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969).

For the same reasons that the Court rejects Allergan's arguments concerning Plaintiffs' standing, the Court rejects Allergan's causation arguments.  The Court has already found that Plaintiffs have pled facts to support their claims that Plaintiffs suffered antitrust injury and that Medytox had a sufficient intent and preparedness to enter the United States market.  Further, Plaintiffs specifically allege that the "Allergan-Medytox agreement . . . has a direct anticompetitive consequence in that it assures Allergan that Medytox will not enter and compete against it in the U.S. market for injectable neurotoxins for cosmetic use." (FAC ¶ 39.)  Plaintiffs assert that "[t]he Allergan-Medytox agreement also serves to cement and maintain Allergan's existing monopoly market power in the United States market for injectable neurotoxins for cosmetic use" because "[t]he agreement removes Medytox's ability to challenge Allergan's market power in the United States." (Id. ¶ 40.)  Thus, according to the FAC, "[a]bsent the agreement, Medytox's reformulated neurotoxin product line could and would have competed against Allergan's Botox offerings, and would have posed price-constraining competition to Botox." (Id. ¶ 40.)  Based on all of these factual allegations, the Court finds that Plaintiffs have alleged adequately that the Medytox-Allergan agreement caused Plaintiffs' alleged harm.  *See*

*Andrx Pharm.*, 256 F.3d at 809 ("One can fairly infer from these facts . . . that but for the Agreement, Andrx would have entered the market.  As one commentator has noted, '[a] payment flowing from the innovator to the challenging generic firm may suggest strongly the anticompetitive intent of the parties in entering the agreement and the rent-preserving effect of that agreement.'") (citation omitted).  The Court therefore denies Allergan's motion to dismiss for failure to plead adequately causation.

Accordingly, because the Court finds that Plaintiffs have adequately alleged Article III standing, antitrust standing, and causation, the Court DENIES Allergan's motion to dismiss Plaintiffs' federal law claims.[9]

**C.    State Law Claims**

Allergan also moves to dismiss Plaintiffs' state law claims for violation of the Cartwright Act and for violation of California Business & Professions Code section 17200.  (Mot. at 28-31.)  Allergan argues that "Plaintiffs' claims under the Cartwright Act rise and fall with [their] claims under the Sherman Act."  (Id. at 28.)  Allergan also argues that, "[b]ecause Plaintiffs' Section 17200 claim is derivative of their antitrust claims, Plaintiffs' UCL claim fails for the same reasons the antitrust claims fail."  (Id. at 29.)  Plaintiffs agree that their state law claims rise and fall with their federal antitrust claims.  (Opp'n at 31.)

"The analysis under California's antitrust law mirrors the analysis under federal law because the [Cartwright Act] was modeled after the Sherman Act."  *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) (citations omitted).  Because the Court has found that Plaintiffs have sufficiently stated their federal antitrust claims, the Court also finds that, at this stage, Plaintiffs have sufficiently stated a claim under the

---

[9] The Court also rejects Allergan's request that the FAC's prayer for injunctive relief "should be dismissed both because Plaintiffs fail to allege injury or causation and because Plaintiffs fail to allege any of the requirements for an injunction."  (Mot. at 31.)

Cartwright Act.  Further, because the parties agree that Plaintiffs' UCL claim is derivative of Plaintiffs' antitrust claims, and because Plaintiffs have sufficiently alleged their other claims, the Court finds that Plaintiffs have sufficiently alleged a violation of California Business & Professions Code section 17200 as well.  *See Ingels v. Westwood One Broad. Servs., Inc*., 129 Cal. App. 4th 1050, 1060 (2005) ("If the [underlying] claim is dismissed, then there is no 'unlawful' act upon which to base [ ] the derivative Unfair Competition claim.").

Accordingly, the Court DENIES Allergan's motion to dismiss Plaintiffs' state law claims.  The Court therefore DENIES Allergan's Motion in its entirety.

## V.  CONCLUSION

For the foregoing reasons, Allergan's Motion is DENIED.

**SO ORDERED.**

DATED: October 20, 2015

_____
Honorable Josephine L. Staton
United States District Judge