Roy A. Katriel (SBN 265463)
**THE KATRIEL LAW FIRM**
4225 Executive Square, Suite 600
La Jolla, CA 92037
Tel:   (858) 242-5642
Fax:   (858) 430-3719
E-mail: rak@katriellaw.com

Ralph B. Kalfayan (SBN 133464)
**KRAUSE, KALFAYAN, BENINK & SLAVENS, LLP**
550 West C Street, Suite 530
San Diego, California 92101
Telephone:  619-232-0331
Facsimile:  619-232-4019
Email: ralph@kkbs-law.com

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| ADEL TAWFILIS, DDS d/b/a CARMEL VALLEY CENTER FOR ORAL AND MAXILLOFACIAL SURGERY and HAMID A. TOWHIDIAN, M.D., individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>   vs.<br><br>ALLERGAN, INC.,<br><br>        Defendant. | **CASE NO.  8:15-CV-307-JLS (JCGx)**<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**<br><br>**Hearing Date: March 4, 2016**<br>**Time: 2:30 pm**<br>**Courtroom: 10A**<br>**Judge: Hon. Josephine L. Staton**<br><br>**REDACTED PUBLIC VERSION OF DOCUMENT FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER** |

# **TABLE OF CONTENTS**

I.  ALLERGAN IS FORECLOSED FROM ATTEMPTING TO INTRODUCE PURPORTED PROCOMPETITIVE EFFECTS OR JUSTIFICATIONS IN THIS SPECIFIC CASE IN ORDER TO AVOID THE *PER SE* RULE………….2

II. ALLERGAN BASELESSLY SEEKS TO EQUATE THE HORIZONTAL MARKET ALLOCATION AT ISSUE HERE WITH ALTOGETHER DIFFERENT VERTICAL RESTRAINTS THAT ARE SUBJECT TO A RULE OF REASON ANALYSIS……………………………………..…….7

III. ALLERGAN'S RESORT TO PATENT LAW TO SHIELD ITS HORIZONTAL MARKET ALLOCATION FROM ANTITRUST LIABILITY IS UNAVAILING BECAUSE THE AGREEMENT IS NOT LIMITED TO A MERE PATENT LICENSE………………………………....11

IV. THE ANCILLARY RESTRAINTS DOCTRINE IS INAPPLICABLE HERE.....18

CONCLUSION………………………………………………..…………22

Case No. 15-cv-307-JLS(JCGx)

Pltffs' Reply In Supp. Of Mtn. For Partial Judgmt. On Pleadings Or Partial Summ. Jdgmt.

-i-

## <u>TABLE OF AUTHORITIES</u>

**Cases:**

*Arizona v. Maricopa County Med. Society*,
457 U.S. 332 (1982)……………………………………………………………….2, 3

*Broadcast Music, Inc. v. CBS*,
441 U.S. 1 (1979)……………………………………………………………….....19

*Business Electronics Corp. v. Sharp Electronics Corp.*,
485 U.S. 717 (1988)……………………………………………….…....4, 9, 18-19

*Compton v. Metal Prods., Inc.*,
453 F.2d 38, 44-45 (4th Cir. 1971)……………………………...………….13, 17-18

*Federal Trade Comm'n v. Actavis*,
133 S. Ct. 2223 (2013)……………………………………………….………….10

*Freeman v. San Diego Ass'n of Realtors*,
322 F.3d 1133 (9th Cir. 2003)……………………………………….…..….19, 20

*In re Cardizem CD Antitrust Litig.*,
105 F. Supp.2d 682 (E.D. Mich. 2000)…………………………………………10

*Leegin Creative Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007)……………………………………………………….5, 6, 8-9

*Mercoid Corp. v. Minneapolis-Honeywell Regulator Co.*,
320 U.S. 680 (1944) ………………………………………...………….….12-13

*NCAA v. Board of Regents*,
468 U.S. 85 (1984)……………………………………………….….………….19

*Northern Pac. R. Co. v. United States*,
356 U.S. 1 (1958)…………………………………………………………………3

*Pace Electronics, Inc. v. Canon Computer Sys., Inc.*,
213 F.3d 118 (3d Cir. 2000)……………………………………………...…..5

*Palmer v. BRG of GA*,
498 U.S. 46 (1990)……………………………………….……………….5, 6, 7, 8

*United States v. A. Lanoy Alston, D.M.D., PC*,
974 F.2d 1206 (9th Cir. 1992)…………………………………………………19

*United States v. Topco Associates*,
405 U.S. 596 (1972)………………………………….……………………20, 21

*United States v. Westinghouse Elec. Corp.*,
648 F.2d 642 (9th Cir.. 1981)…………………………………………………11

Defendant Allergan, Inc.'s ("Defendant" or "Allergan") Opposition to Plaintiffs' Motion For Partial Judgment On The Pleadings Or, In the Alternative, Partial Summary Judgment Or Summary Adjudication is without merit and should be rejected.

Plaintiffs' motion presents a straightforward question whose answer is indisputably ascertainable by resort to the unambiguous text of the Allergan-Medytox Agreement ("the Agreement"): does the Agreement between Allergan and Medytox— rival manufacturers of botulinum-based injectable neuromodulators— amount to a horizontal market allocation that is subject to *per se* condemnation under the antitrust laws ?   The answer to this question is assuredly in the affirmative, as Plaintiffs' opening brief showed and as we confirm in this Reply brief.

As between the contracting parties,

.  In its attempt to avoid a finding of a horizontal market allocation agreement that is unlawful *per se* under the antitrust laws, Allergan's Opposition makes four arguments. First, Allergan argues that it can avoid application of the *per se* rule by introducing its own declarations in support of an argument that, regardless of the horizontal allocation brought about by the Agreement, *in this particular case* Allergan may be able to present procompetitive effects.  *See* Dft's Opp., at 2:11-24; 17:22-25:2.   Second, Allergan baselessly argues that horizontal market allocation agreements are no longer subject to *per se* scrutiny and, under more recent case law, are subject to a rule of reason standard. *Id.*, a 10:20-14:10.  Third, Allergan argues that despite any *per se* liability that may attach to horizontal market allocations generally, here Medytox was privileged by the patent laws to engage in such a practice without running afoul of the antitrust laws.  Id., at 7:26-10:19.  Lastly, Allergan maintains that even if horizontal market allocation agreements are *per se* unlawful under the antitrust laws, the Agreement is safeguard from such *per se* liability here because it is merely an ancillary restraint.  *Id.*, at 14:21-

16:18.

None of Allergan's contentions has merit.  In Sections I-IV *infra*, we separately address each of Allergan's arguments and show why none serves to defeat Plaintiffs' motion.

## I. ALLERGAN IS FORECLOSED FROM ATTEMPTING TO INTRODUCE PURPORTED PROCOMPETITIVE EFFECTS OR JUSTIFICATIONS IN THIS SPECIFIC CASE IN ORDER TO AVOID THE *PER SE* RULE.

Allergan devotes much of its Opposition to pleading that *if only* it could be permitted to present its version of the procompetitive benefits flowing from the horizontal agreement with its competitor, Medytox, then it could prevail in this case. The so-called "procompetitive benefits" Allergan portrays are false in any event, but that is not the salient point here.  Instead, the pertinent point is that a required antecedent question prior to even considering Allergan's so-called procompetitive effects resulting from the Agreement is an inquiry into whether the Agreement represents the class or type of conduct that is subject to *per se* antitrust scrutiny.  If it is, then even a defendant who hypothetically could show procompetitive benefits in his particular case would be foreclosed from doing so precisely because the *per se* rule bars consideration of such evidence when the conduct at issue is subject to *per se* condemnation.  The United States Supreme Court could not have been more clear about this prohibition in cases subject to the *per se* rule—even those where, had the rule not applied, the particular defendant could have shown evidence of procompetitive benefits attributable to his conduct:

> ***The respondents' principal argument is that the per se rule is inapplicable because their agreements are alleged to have procompetitive justifications. The argument indicates a misunderstanding of the per se concept.*** *The anticompetitive potential inherent in all price-fixing agreements justifies their facial invalidation even if procompetitive justifications are offered for some. Those claims of enhanced competition are so unlikely to prove significant in any particular case that we adhere to the rule of law that is justified in its general application.*

*Arizona v. Maricopa County Med. Society*, 457 U.S. 332, 351 (1982) (emphasis added).

The Supreme Court's directive in this regard could not be more clear. The Court concluded its opinion in *Maricopa County* by reiterating that courts were required to apply the *per se* rule whenever the practices at issue fell within the sweep of that rule, regardless of the nature of the pleas of a particular defendant in a specific case:

> Our adherence to the *per se* rule is grounded not only on economic prediction, judicial convenience, and business certainty, but also on a recognition of the respective roles of the Judiciary and the Congress in regulating the economy. Given its generality, our enforcement of the Sherman Act has required the Court to provide much of its substantive content. ***By articulating the rules of law with some clarity and by <u>adhering to rules that are justified in their general application</u>, however, we enhance the legislative prerogative to amend the law. The respondents' arguments against application of the per se rule in this case therefore are better directed to the Legislature.*** Congress may consider the exception that we are not free to read into the statute.

*Id.*, at 354-55 (emphasis added, internal citations omitted).

Adhering to the notion that the *per se* rule is applicable once the alleged restraint is characterized as being of the type that falls within the rule, as opposed to requiring a new analysis involving the case-specific facts in each dispute, the Supreme Court in *Maricopa County* also rejected the argument that the *per se* rule should not apply in particular industries with which courts had lacked prior experience:

> We are equally unpersuaded by the argument that we should not apply the *per se* rule in this case because the judiciary has little antitrust experience in the health care industry. . . . ***Finally, the argument that the per se rule must be rejustified for every industry that has not been subject to significant antitrust litigation ignores the rationale for per se rules, which in part is to avoid 'the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken.'***

*Id.*, at 350-51 (quoting *Northern Pac. R. Co. v. United States*, 356 U.S. 1, 5 (1958) other internal citations omitted, emphasis added).

Case No. 15-cv-307-JLS(JCGx)

-3-

Pltffs' Reply In Supp. Of Mtn. For Partial Judgmt. On Pleadings Or Partial Summ. Jdgmt.

Six years after it decided *Maricopa County*, the Supreme Court once again reiterated its adherence to the principle that the *per se* rule was to be applied once the practice at issue fell within the *per se* rule's sweep, without the need to engage in a case-specific assessment of the procompetitive versus anticompetitive effects of a particular case:

> Certain categories of agreements, however, have been held to be *per se* illegal, ***dispensing with the need for case-by-case evaluation***.

*Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 723 (1988) (emphasis added).

Ignoring this clear directive, Allergan's Opposition attempts to avoid the application of the *per se* rule to Plaintiffs' allegations that the Agreement effected a horizontal market allocation by introducing self-serving Declarations of Allergan's own witnesses in an effort to convince the Court that this particular Agreement resulted in some procompetitive benefits in this instance. *See* Dft's Opp., at 17:22-25:2  As Allergan would have it, in order for Plaintiffs to prevail on their *per se* argument, Plaintiffs would first have to show that the Agreement produced no procompetitive benefit.  *See id.*, at 13:17-19.  But this gets it exactly backwards.  The whole purpose and advantage of resort to the *per se* rule of antitrust liability is that it relieves the plaintiff from having to show actual anticompetitive effects stemming from the particular agreement or restraint---such anticompetitive effects being conclusively presumed *per se*.

To endorse Allergan's view, would require a circular or tautological exercise in which a plaintiff could only employ the *per se* rule in order to excuse his burden of proving actual anticompetitive effects resulting from the accused practice if he could *first* show that the defendant's conduct actually resulted in anticompetitive effects.  This would effectively eviscerate the *per se* rule.  This is precisely what a federal court of appeals explained in rejecting this precise argument:

> ***First, we believe that requiring a plaintiff to demonstrate that an injury stemming from a per se violation of the antitrust laws caused an actual, adverse effect on a relevant market in order to satisfy the antitrust injury***

Case No.  15-cv-307-JLS(JCGx)

-4-

Pltffs' Reply In Supp. Of Mtn. For Partial Judgmt. On Pleadings Or Partial Summ. Jdgmt.

> ***requirement comes dangerously close to transforming a per se violation into a case to be judged under the rule of reason***. The *per se* standard is reserved for certain categories of conduct which experience has shown to be 'manifestly anticompetitive.' *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 39 (1977). That standard, which is based on considerations of 'business certainty and litigation efficiency,' *Arizona v. Maricopa County Med. Society,* 457 U.S. 332, 344 (1982), ***allows a court to presume that certain limited classes of conduct have an anticompetitive effect without engaging in the type of involved, market-specific analysis ordinarily necessary to reach such a conclusion***. *See Business Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. 717, 723 (1988) ('Certain categories of agreements, however, have been held to be *per se* illegal, dispensing with the need for case-by-case evaluation.'). ***Were we to accept the defendants' construction of the antitrust injury requirement, we would, in substance, be removing the presumption of anticompetitive effect implicit in the per se standard under the guise of the antitrust injury requirement.***

*Pace Electronics, Inc. v. Canon Computer Sys., Inc.*, 213 F.3d 118, 123 (3d Cir. 2000) (emphasis added).

And, more recently, *in Leegin Creative Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007), the United States Supreme Court reaffirmed the well-established principle that the utility of the *per se* rule is precisely that once the type of restraint at issue is characterized as one that falls within the scope of the rule, the *per se* rule does away with the need to analyze the reasonableness of that restraint in a particular individual case:

> The rule of reason does not govern all restraints. Some types are deemed unlawful *per se.* The *per se* rule, treating categories of restraints ***<u>as necessarily illegal, eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work</u>***, and, it must be acknowledged, the *per se* rule can give clear guidance for certain conduct. Restraints that are *per se* unlawful include horizontal agreements among competitors to fix prices, ***or to divide markets***, ***see Palmer v. BRG of GA, 498 U.S. 46, 49-50 (1990) (per curiam)***.[1]

---

[1] Allergan incorrectly argues that Plaintiffs' reliance on *Palmer* is misplaced because that case has been discredited or confined to extreme facts. *See* Dft's Opp., at 12, n.7. This untrue, and is evidenced by the fact that Palmer was singled out for citation by the Supreme Court in *Leegin*—the very opinion that Allergan's Opposition relies upon.

---

Case No. 15-cv-307-JLS(JCGx)

-5-

Pltffs' Reply In Supp. Of Mtn. For Partial Judgmt. On Pleadings Or Partial Summ. Jdgmt.

*Leegin*, 551 U.S. at 886 (emphasis added, additional internal citations or quotations omitted).

The foregoing Supreme Court precedent instructs that a court's decision whether to apply the *per se* rule does not turn on whether in each specific case the plaintiff first shows that the defendant's actions actually were devoid of any procompetitive effects. Instead, application of the *per se* rule is proper once the restraint that is alleged in a particular case is shown to be of the type or category that the Supreme Court has previously identified as falling within the sweep of the *per se* rule. These classes of restraints include horizontal price fixing as well as horizontal market allocation. *See Leegin*, 551 U.S. at 886 (citing *Palmer*, 498 U.S. at 49-50).

The whole point of the per *se rule* is that it relieves the plaintiff from having to introduce separate evidence of anticompetitive conduct resulting from the restraint at issue. Once the restraint is shown to be the type of restraint that calls for application of the *per se* rule, such an anticompetitive effect is *conclusively presumed*. For this reason, Allergan's attempts to show through the Neervannan, Hovland, and Cremieux declarations that, in this particular case, procompetitive effects purportedly resulted despite the horizontal market allocation, is beside the point and cannot serve to defeat judgment on the pleadings or summary judgment.

There is no question here that,

. Unable to deny that, Allergan cannot escape application of the *per se* rule by attempting to introduce into evidence self-serving declarations that tout the purported pro-competitive effects of this particular Agreement in this particular case---the very evidence that would be foreclosed if the conduct at issue were deemed subject to *per se* antitrust scrutiny.

## II. **ALLERGAN BASELESSLY SEEKS TO EQUATE THE HORIZONTAL MARKET ALLOCATION AT ISSUE HERE WITH ALTOGETHER DIFFERENT VERTICAL RESTRAINTS THAT ARE SUBJECT TO A RULE OF REASON ANALYSIS.**

As Plaintiffs' opening brief made clear, the Supreme Court's unanimous *per curiam* opinion in *Palmer* unequivocally held that agreements between competitors to allocate markets to one another—that is, competitors' agreement on a market where one will not compete against the other—are *per se* unlawful under the antitrust laws. *See* Plfts' Br. at 10:7-12:21 (citing *Palmer*, 498 U.S. at 49-50). As stated in Plaintiffs' opening brief, *Palmer* provided that such agreements were antitrust violations even if the geographic market allocated by the agreement was one in which both parties had not previously competed against one another—it sufficed if they were potential competitors. *See* Pltffs' Br., at 11:12-15 (citing *Palmer*, 498 U.S. at 49). And, as spelled out in Plaintiffs' opening brief, *Palmer* held that such horizontal market allocation agreements were *per se* unlawful even if the agreement was part of an intellectual property licensing agreement. *See* Pltffs' Br., at 10:19021 (citing *Palmer*, 498 U.S. at 47).

One would have thought that faced with this Supreme Court opinion that is directly on point, any Opposition filed by Allergan to Plaintiffs' motion would have included a persuasive presentation as to why *Palmer* was distinguishable or inapplicable here. Yet, remarkably, Allergan's Opposition relegates its discussion of *Palmer* to basically a lone footnote. *See* Allergan's Opp. at 12, n.7 (discussion of *Palmer*). And, that footnote discussion of *Palmer* is highly unconvincing. The most that Allergan can muster in its attempts to deal with *Palmer's* holding is to assert that "commentators have criticized *Palmer's* use of the per se rule and explained that courts have not given *Palmer* the sweeping application that Plaintiffs' propose here." Dft's Opp., at 12, n.7 (citing Areeda & Hovenkamp, *Antitrust Law* ¶ 2033c).

Even if "commentators" (Allergan cites only one treatise although it refers to "commentators" in the plural) had "criticized *Palmer's* use of the *per se* rule," as Allergan suggests, that would be irrelevant to *Palmer's* ongoing vitality as binding

Case No. 15-cv-307-JLS(JCGx)

-7-

Pltffs' Reply In Supp. Of Mtn. For Partial Judgmt. On Pleadings Or Partial Summ. Jdgmt.

Supreme Court precedent. We know this because when the United States Supreme Court decided *Leegin* in 2007 (an opinion that Allergan's Opposition relies upon), the Supreme Court went out of its way to cite *Palmer* precisely for the proposition that horizontal market allocation agreements were subject to the *per se* rule of antitrust liability. *See Leegin*, 551 U.S. at 886 ("Restraints that are *per se* unlawful include horizontal agreements among competitors to fix prices, ***or to divide markets***, ***see Palmer v. BRG of GA, 498 U.S. 46, 49-50 (1990) (per curiam)***). *Palmer* undeniably remains good law, and Allergan's failure to convincingly deal with the clear impact of that opinion dooms its Opposition to Plaintiffs' motion.

Allergan's Opposition also suggests that because the Supreme Court's decision in *Leegin* somehow reversed the district court in that case, that somehow overrules the binding authorities that Plaintiffs pointed to as controlling this case. But the Supreme Court's opinion in *Leegin* has nothing to do with the issue presented in this case. To the contrary, in *Leegin* the Supreme Court did reverse course as to the applicable standard that governed the *vertical* resale price maintenance agreements. *See Leegin*, 551 U.S. at 881. The lower court, in keeping with prior precedent, had held that such vertical resale price maintenance agreements were subject to the *per se* rule applicable to price fixing agreements (without distinguishing between horizontal and vertical price fixing agreements). *Id.*, at 884. The Supreme Court reversed and held in *Leegin* that such vertical resale price maintenance agreements would be subject to the antitrust rule of reason and not the *per se* rule. *Id.*, at 881.

But, unlike *Leegin*, this case does not involve an alleged *vertical* restraint but a *horizontal* agreement among actual or potential competitors. Even the Supreme Court's reversal in *Leegin* took great pains to underscore that while the Supreme Court was now reversing course with respect to *vertical* agreements, *horizontal* agreements among competitors to allocate markets still were—as they had always been—unlawful *per se* under antitrust law:

The rule of reason does not govern all restraints. Some types are deemed

Case No. 15-cv-307-JLS(JCGx)

-8-

Pltffs' Reply In Supp. Of Mtn. For Partial
Judgmt. On Pleadings Or Partial Summ. Jdgmt.

unlawful *per se*. . . . Restraints that are *per se* unlawful include horizontal agreements among competitors to fix prices, *or to divide markets*, *see Palmer v. BRG of GA, 498 U.S. 46, 49-50 (1990) (per curiam)*.

*Leegin*, 551 U.S. at 886 (emphasis added, additional internal citations or quotations omitted).

So, the fact that the Supreme Court reversed course in *Leegin* and overruled the district court's use of the *per se* rule in that case (a fact that Allergan places great emphasis on—*see* Allergan's Opp., at 11:3-26) plainly does not aid Allergan one bit in this case that deals with a horizontal, as opposed to a vertical, restraint. Allergan's reliance on *Leegin* simply confounds basic tenets of antitrust law. Allergan suggests that because use of the *per se* rule was overruled in *Leegin* it should also be deemed to have been overruled in this case. As already detailed, however, *Leegin* itself rejected that suggestion, and went out of its way to clarify that horizontal market allocation (and also horizontal price fixing) were still *per se* unlawful.

The distinction between horizontal and vertical agreements is a key difference that Allergan's Opposition sidesteps. As the Supreme Court has articulated, "[r]estraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." *Business Electronics Corp.*, 485 U.S. at 729. And, that same Supreme Court opinion went on to explain why keeping the "vertical" versus "horizontal" nomenclature straight was important:

> This notion of equivalence between the scope of horizontal *per se* illegality and that of vertical *per se* illegality was explicitly rejected in *GTE Sylvania*, -as it had to be, since a horizontal agreement to divide territories is *per se* illegal, see *United States v. Topco Associates, Inc.*, 405 U.S. 596, 608, 92 S.Ct. 1126, 1133-34, 31 L.Ed.2d 515 (1972), while *GTE Sylvania* held that a vertical agreement to do so is not.

*Id.*, at 734 (other internal citations omitted).

Separately, Allergan also suggests that Plaintiffs' citation to *In re Cardizem* in their opening brief as an example where courts had applied the *per se* rule to horizontal

Case No. 15-cv-307-JLS(JCGx)

-9-

Pltffs' Reply In Supp. Of Mtn. For Partial Judgmt. On Pleadings Or Partial Summ. Jdgmt.

market allocation agreements shows the error of Plaintiffs' argument because Allergan claims that *In re Cardizem CD Antitrust Litig.*, 105 F. Supp.2d 682 (E.D. Mich. 2000), was abrogated by the Supreme Court in *FTC v. Actavis*, 133 S. Ct. 2223 (2013). *See* Allergan's Opp., at 12:1-6. This too is inaccurate. In fact, Plaintiffs' own opening brief cited *Actavis* from the outset, but explained why its holding provides no comfort to Allergan here. *See* Pltffs' Br., at 14:20-27. Specifically, Plaintiffs correctly explained that:

> In *Federal Trade Comm'n v. Actavis*, 133 S. Ct. 2223 (2013), the United States Supreme Court held that when a patent infringement lawsuit in which one party challenges the validity of the patent-in-suit results in a settlement agreement whereby the accused infringer (who challenges the patent's validity) agrees, as part of the litigation settlement, not to challenge the patent and to refrain from entering the market for some period of time in exchange for settlement payment, such a *settlement agreement* may violate the antitrust laws but is to be scrutinized under the rule of reason. *Id.*, at 2234-35. **But *Actavis* was limited to the context of a settlement agreement reached during the course of legitimate patent validity/infringement litigation in "light of the public policy favoring settlement of disputes." *See Actavis*, 133 S. Ct. at 2230.** Here, of course, the Agreement was not a settlement agreement, did not arise out of litigation, and did not involve a judicial challenge to a patent's validity. Instead, Medytox's ouster from the U.S. market was achieved in a pure business transaction—the Agreement—entered into by actual and potential competitors. Under this circumstance, *Actavis* does not apply and does not safeguard Allergan from *per se* liability for this horizontal market allocation.

Pltffs' Br., at 14, n.3 (emphasis added, citing and quoting *Actavis*, 133 S. Ct. at 2230).

Contrary to Allergan's accusation, Plaintiffs did not "rely on more bad law." Dft's Opp., at 12:1. Plaintiffs forthrightly explained that the different standard handed down by the Supreme Court in *Actavis* (rule of reason over *In re Cardizem's* use of the *per se* rule) was expressly limited to the circumstance of an agreement as part of a patent litigation "settlement" where the "public policy favoring settlement of disputes" is plainly implicated. *Id.*, at 14:24-25 (quoting *Actavis*, 133 S. Ct. at 2230). Here, of course, there is and has never been any ongoing litigation between Allergan and

Case No. 15-cv-307-JLS(JCGx)    Pltffs' Reply In Supp. Of Mtn. For Partial Judgmt. On Pleadings Or Partial Summ. Jdgmt.

-10-

Medytox that led to the Agreement.  Instead, the Agreement is a standalone market allocation contract negotiated by the parties.  As Plaintiffs opening motion made clear, *Actavis* has no application here.

The fact of the matter is that, Allergan's accusations notwithstanding, the authorities Plaintiffs cited and relied upon are controlling here.  *Palmer* remains the Supreme Court's binding precedent condemning horizontal market allocation agreements as *per se* unlawful.  Try as Allergan might to couch *Palmer* as an opinion that has been "criticized" by "commentators" (a fate visited upon nearly every Supreme Court decision of any consequence), Allergan cannot escape the ineluctable result of *Palmer's* holding—because the Agreement is a horizontal market allocation agreement among actual and potential competitors, it is *per se* unlawful under the antitrust laws.

## III.  ALLERGAN'S RESORT TO PATENT LAW TO SHIELD ITS HORIZONTAL MARKET ALLOCATION FROM ANTITRUST LIABILITY IS UNAVAILING BECAUSE THE AGREEMENT IS NOT LIMITED TO A MERE PATENT LICENSE.

Unable to credibly deny that the Agreement amounts to what antitrust law terms a classic horizontal market allocation, Allergan seeks to shield itself from antitrust liability by resort to patent law instead.  Thus, Allergan pronounces that:

> Territorial limitations in exclusive IP licenses have been approved in antitrust law for over a century; they incentivize and facilitate the transfer of technology.  . . . Patent licenses 'cannot be characterized as true horizontal agreements dividing markets.  They are merely territorial licenses granted by a patentee such as are permitted by 35 U.S.C. § 261'

Dft's Opp., at 1:9-14 (quoting *United States v. Westinghouse Elec. Corp.*, 648 F.2d 642, 647-48 (9th Cir. 1981)).

The foregoing may be true insofar as it goes but it hardly advances Allergan's cause.  The reason is straightforward.  While it is true that U.S. patent law permits a U.S. patent holder to grant an exclusive license to anyone else in all or part of the territory of the United States (*see* 35 USC § 261), that permission is strictly construed to extend only

to nothing more than a license to the patented product or invention itself.

The Agreement is not a mere patent license. Indeed, at the time the Agreement was executed by Allergan and Medytox (September 25, 2013), Medytox had not yet obtained any U.S. patents. Medytox's first U.S. Patent (U.S. Patent No. 8,617,568) related to a botulinum neurotoxin issued only on December 31, 2013—nearly three months after the Agreement[2]. But the real problem with Allergan's resort to patent law to shield its market allocation arrangement with Medytox from antitrust scrutiny is that review of the actual terms of the Agreement conclusively shows that the Agreement was *not* limited to a mere patent license by Medytox to Allergan. As we show below, by its express terms, the Agreement's license and exclusivity restrictions far exceeded the limited scope of a patent license grant. Because the Agreement sought to allocate exclusive territories and thereby shield from competition products or technologies that went beyond the U.S. patent grant that Medytox eventually obtained, Allergan cannot rely on U.S. patent law to shield its horizontal market allocation agreement with Medytox from antitrust scrutiny. The opposite is true. As the United States Supreme Court has explained:

> The Circuit Court of Appeals concluded that although the combustion furnace control was unpatented, it served 'to distinguish the invention' and to mark the 'advance in the art' achieved by the Freeman patent. It accordingly held that the patent laws permit and the anti-trust laws do not forbid the control over the sale and use of the unpatented device which Minneapolis-Honeywell sought to achieve through its licensing agreements. We do not agree, even though we assume the patent to be valid.

> The fact that an unpatented part of a combination patent may distinguish the

---

[2] *See* https://patents.google.com/patent/US8617568B2/en (last visited FEb. 19, 2016); Medytox subsequently obtained two other U.S. Patents. The first of these was U.S. Pat. No. 8,920,795 issued on December 30, 2014—more than a full year after the Agreement was executed. *See* https://www.google.com/patents/US8920795 (last visited Feb. 19, 2016). The last U.S. patent issued to Medytox was U.S. Pat. No. 9,198,958, issued on December 1, 2015—more than two years after the Agreement was executed and months after Plaintiffs filed suit. *See* https://www.google.com/patents/US9198958 (last visited Feb. 19, 2016).

---

Case No. 15-cv-307-JLS(JCGx)

-12-

Pltffs' Reply In Supp. Of Mtn. For Partial Judgmt. On Pleadings Or Partial Summ. Jdgmt.

invention does not draw to it the privileges of a patent. That may be done only in the manner provided by law. However worthy it may be, however essential to the patent, an unpatented part of a combination patent is no more entitled to monopolistic protection than any other unpatented device. For as we pointed out in *Mercoid v. Mid-Continent Investment Co., supra*, a patent on a combination is a patent on the assembled or functioning whole, not on the separate parts. ***The legality of any attempt to bring unpatented goods within the protection of the patent is measured by the anti-trust laws not by the patent law.*** *For the reasons stated in Mercoid v. Mid-Continent Investment Co., supra, the effort here made to control competition in this unpatented device plainly violates the anti-trust laws,* even apart from the price-fixing provisions of the license agreements.

*Mercoid Corp. v. Minneapolis-Honeywell Regulator Co.*, 320 U.S. 680, 683-84 (1944) (emphasis added); *see also Actavis*, 133 S. Ct at 2237 ("even a valid patent confers no right to exclude products or processes that do not actually infringe."); *see Compton v. Metal Prods., Inc.*, 453 F.2d 38, 44-45 (4th Cir. 1971) ("in exclusively licensing his patents, the patentee himself could neither require non-competition beyond the term of the patents ***nor as to items not covered by the patents.***") (emphasis added).

To confirm that what Medytox purported to license on an exclusive basis to Allergan in the United States went beyond the mere patent rights that Medytox ultimately obtained when its U.S. patents eventually issued, one need only refer to the express terms of the Agreement.

Case No. 15-cv-307-JLS(JCGx)

-13-

Pltffs' Reply In Supp. Of Mtn. For Partial Judgmt. On Pleadings Or Partial Summ. Jdgmt.





Case No. 15-cv-307-JLS(JCGx)

-15-

Pltffs' Reply In Supp. Of Mtn. For Partial
Judgmt. On Pleadings Or Partial Summ. Jdgmt.



*Compton* is instructive here in showing that when the license at issue went beyond that four corners of the patent, the parties could no longer rely on patent law statutory privileges to immunize their horizontal exclusive agreement from liability under antitrust law..  At issue in *Compton* was a challenge to an exclusive license to a patent dealing

Case No.  15-cv-307-JLS(JCGx)

-16-

Pltffs' Reply In Supp. Of Mtn. For Partial
Judgmt. On Pleadings Or Partial Summ. Jdgmt.

with equipment machinery. The pertinent part of the license provided that:

> During any period for which he is entitled to royalties hereunder Compton shall not without Joy's prior consent engage in any business or activity relating to the manufacture or sale of equipment of the type licensed hereunder, or have any affiliation financial or otherwise with, or give any advice, counsel or assistance to, any other person, firm, company, or entity directly or indirectly engaged in the manufacture or sale of such equipment.

*Compton*, 453 F.2d at 44.

The district court had found the agreement a valid license agreement, but the Fourth Circuit reversed. It explained that:

> The plaintiff contends that this paragraph restricts Compton from competing only with respect to the licensed devices, which he was precluded from doing anyway since he granted an exclusive license. We cannot agree that paragraph 15 is so restrictive. Whether or not 'equipment of the type licensed' refers to mining equipment in general or just to augers, the use of the word 'type' indicates clearly that more than a restriction upon the specific machines embodying the licensed patents was contemplated. . . ..

> *No citation is necessary for the proposition that such an agreement, standing alone, would violate the common law prohibition against agreements in restraint of trade as well as Section 1 of the Sherman Act, 15 U.S.C. § 1, were it not for the limited exception carved out by the patent laws. However, a patentee is not allowed to extend the monopoly granted him beyond the exclusive right to make, use, and vend the device described in the patent for the term of the patent. Here, the agreement that Compton was not to compete with respect to the type of equipment licensed meant that Compton also agreed not to compete with regard to equipment which may not have embodied any of his patents.*

*Id.*, at 44-45 (emphasis added).

The Fourth Circuit, therefore went on to find that, because the exclusive license encompassed more than what the patent actually covered, the patentee could not turn to patent law to shield itself from antitrust liability for this horizontal market allocation. *Id*. The court, therefore found, "that paragraph 15 of the license agreement between Compton and Joy Manufacturing Company is an unreasonable restraint of trade." *Id.*, at

Case No. 15-cv-307-JLS(JCGx)

-17-

Pltffs' Reply In Supp. Of Mtn. For Partial Judgmt. On Pleadings Or Partial Summ. Jdgmt.

40.

Allergan's Opposition looks to patent law, and argues that under 35 U.S.C. § 261 and the case Allergan cited, any horizontal market allocation that the Agreement may achieve between Medytox and Allergan is not actionable by the antitrust laws because the patent laws grant Medytox an unconditional right to license its patent rights in exclusive fashion in whatever territorial designation within the United States. *See* Dft's Opp., at 7:26-10:19. As the foregoing authorities make clear, however, that reliance on patent law as a shield to what would otherwise be an antitrust violation amounting to horizontal market allocation can only be upheld if what the licensor grants the licensee is strictly within what the patent granted to the licensor and nothing more. Because the text of the Agreement makes clear (and undisputed) that Medytox licensed more than its mere patent rights, Allergan cannot now rely on patent law to shield itself from antitrust liability.

## IV. THE ANCILLARY RESTRAINTS DOCTRINE IS INAPPLICABLE HERE.

Allergan argues that characterizing the Agreement as a horizontal restraint is irrelevant here. *See* Dft's Opp. at 14:11-20. It maintains that, even if the Agreement is a horizontal one among competitors (as its assuredly is), the horizontal market allocation guaranteed by the Agreement is merely an "ancillary" restraint that, therefore, would be subject to rule of reason analysis. *Id.*, at 14:21-16:18. Allergan's invocation of the ancillary restraints doctrine is misplaced.

As the Supreme Court has explained, an ancillary restraint that avoids the impact of the otherwise applicable *per se* rule in favor of the rule of reason, is one that is "necessary" to carry out the procompetitive purposes of a broader agreement:

> Certain contracts, however, such as covenants not to compete in a particular business, for a certain period of time, within a defined geographical area, had always been considered reasonable *when necessary* to carry out otherwise procompetitive contracts, such as the sale of a business.

*Business Elec. Corp.*, 485 U.S. at 737 (emphasis added); *see also id.*, at 738 ("if the

Case No. 15-cv-307-JLS(JCGx)

-18-

Pltffs' Reply In Supp. Of Mtn. For Partial Judgmt. On Pleadings Or Partial Summ. Jdgmt.

[allegedly ancillary] restraint exceeds *the necessity* presented by the main purpose of the contract, it is void.") (emphasis added).

The Ninth Circuit has taken a particularly narrow view of when the so-called "ancillary restraint doctrine" may be invoked by a defendant in order to safeguard a horizontal restraint from the *per se* rule:

> The government analogizes the dentists here to the lawyers in SCTLA, and argues that the per se rule is thus applicable. Amici supporting the dentists argue that the case should be analyzed instead under the rule of reason. It's true that in a ***very narrow class*** of cases, market arrangements involving horizontal restraints are nevertheless analyzed under the rule of reason rather than the per se approach. Such cases, however, involve industries 'in which horizontal restraints on competition are ***essential*** if the product is to be available at all.'

*United States v. A. Lanoy Alston, D.M.D., PC*, 974 F.2d 1206, 1209 (9th Cir. 1992) (emphasis added) (quoting *NCAA v. Board of Regents*, 468 U.S. 85, 101 (1984) and citing *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 16-24 (1979)).

In *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2003), the Ninth Circuit similarly rejected the defendants' attempt to invoke the "ancillary restraint" argument to avoid application of the per se rule. *Id.*, at 1146-47. The Ninth Circuit first reiterated that the ancillary restraint doctrine amounted to a "very narrow exception[]" to the otherwise applicable principle that the *per se* rule applies to horizontal restraints among competitors. *Id.*, at 1151. In *Freeman* competing California operators of real estate Multiple Listing Service ("MLS") databases, who each had previously operated their own separate MLS database, engaged in a joint venture to collectively offer a single MLS database that would enhance efficiency and avoid unnecessary duplication of efforts. *Id.*, at 1140-41. The claimed efficiency of having realtors be able to subscribe to a single MLS database in order to access all real estate listings in the State, as opposed to having to subscribe to a patchwork of the previously existing 11 such databases covering California, was unquestionable. *Id*.

At issue in *Freeman*, however, was a term in the operators' broader agreement to

Case No. 15-cv-307-JLS(JCGx)

-19-

Pltffs' Reply In Supp. Of Mtn. For Partial Judgmt. On Pleadings Or Partial Summ. Jdgmt.

offer this collective database that forbade each of the operators from discounting its MLS subscription fees to their realtor customers. *Id.*, at 1141-42. The defendant MLS operators argued that application of the *per se* rule to the contract term banning such discounting (which would amount to a horizontal price-fixing agreement) was improper because the discount ban was merely ancillary to the operators' broader joint venture to offer the single MLS database. *Id.*, at 1150-52. They maintained that this "ancillary restraint" was necessary to encourage each of the rival operators to join in the collective effort, as these operators would not have agreed to jointly establish an MLS database with their rivals if these competitors could later compete against them on price in selling MLS subscription. *Id.*, at 1152. The Ninth Circuit unanimously rejected the argument:

> Stripped to its essentials, defendants' argument is that some of the firms they wanted to include in the joint venture were so inefficient that they could survive only under cartel pricing. Defendants' concern for the weakest among them has a quaint Rawlsian charm to it, but we find it hard to square with the competitive philosophy of our antitrust laws. Inefficiency is precisely what the market aims to weed out. The Sherman Act, to put it bluntly, contemplates some roadkill on the turnpike to Efficiencyville.

*Id.*, at 1154.

The Supreme Court also has specifically rejected a defendant's invocation of the ancillary restraint doctrine in a horizontal market allocation case. In *United States v. Topco Associates*, 405 U.S. 596 (1972), Topco was "a cooperative association of approximately 25 small and medium-sized regional supermarket chains." *Id.*, at 598. The cooperative procured and distributed to its members a variety of food and nonfood items, branded under various names owned by Topco. *Id.* As a buying cooperative, Topco's "very existence . . . improved the competitive potential of Topco members with respect to other large and powerful chains." *Id.*, at 600. Topco was, what antitrust parlance would term a cooperative procompetitive joint venture. But a term within the Topco joint venture's bylaws required horizontal territorial division among the association's members, and that led the Supreme Court to condemn it as a *per*

Case No. 15-cv-307-JLS(JCGx)

-20-

Pltffs' Reply In Supp. Of Mtn. For Partial
Judgmt. On Pleadings Or Partial Summ. Jdgmt.

*se* violation of the Sherman Act. *Id.*, at 608. Notably, in doing so, the *Topco* majority rejected then-Chief Justice Burger's *dissent* in which he had argued that:

> [W]e have here an agreement among several small grocery chains to join in a cooperative endeavor that, in my view, has an unquestionably lawful principal purpose; in pursuit of that purpose they have mutually agreed to certain *minimal ancillary restraints that are fully reasonable in view of the principal purpose*.

*Id.*, at 613 (Burger, C.J., dissenting) (emphasis added).

The foregoing authorities teach that to be able to even invoke the ancillary restraint doctrine's "very narrow" exception to the prevailing application of the *per se* rule to horizontal agreements such as the one presented here, Allergan has to show that its market allocation with Medytox was "necessary" or "essential to" the product itself. But it cannot do so. At bottom, Allergan's "ancillary restraint" argument boils down to the representation that Allergan would have been unwilling to invest the resources necessary to secure regulatory approval for Medytox's albumin-free product if Allergan had to fear that once the product was cleared for sale in the United States, Allergan would then face price-competition for that product from Medytox or other licensees of Medytox. But this argument is, in effect, similar or identical to the argument that *Freeman* unanimously rejected, wherein members of the joint MLS venture argued that they would not have agreed to commit resources to launching a common MLS database if they had to fear that once the database was in place they would face price competition for MLS subscription fees from the other rival members who co-founded the joint MLS database.

Beyond that, Allergan's contention that, absent an assurance of an exclusive territorial market, no party would be willing to commit the resources to secure regulatory approval for Medytox's new product is unsupported by the Agreement itself.

Pltffs' Reply In Supp. Of Mtn. For Partial
Judgmt. On Pleadings Or Partial Summ. Jdgmt.

The very terms of the Agreement undermine and defeat any notion that a horizontal market allocation agreement is "necessary" or "essential to" achieving the broader commercialization or regulatory approval of the Medytox product.  Allergan's reliance on the "ancillary restraint" doctrine as a means to avoid the clearly applicable *per se* rule here, therefore, fails[3].

## **CONCLUSION**

For all the foregoing reasons, Plaintiffs' motion should be GRANTED.

---

[3] Allergan separately accuses Plaintiffs' of violating this Court's Standing Order by not filing a separate Statement of Undisputed Facts.  See Dfts' Opp., at 25:3-14.  But the Standing Order is only applicable to motions for summary judgment.  Here, Plaintiffs' motion is brought for partial judgment on the pleadings pursuant to Federal Rule of Civil Procedure, and Plaintiffs did not cite or rely on anything other than the pleadings or the Agreement (which is made part of the pleadings through the doctrine of incorporation b reference).  Plaintiffs' motion is only styled, in the alternative, as one for partial summary judgment or summary adjudication in the event that the Agreement is not deemed part of the pleadings. But the Agreement is not and cannot be disputed by Allergan (the party that produced the Agreement), and interpretation of the Agreement's terms is a pure question of law.  In this circumstance, where the motion is one based solely on the pleadings (including those materials incorporated into the pleadings) the requirement for a Rule 56 separate Statement of Undisputed Facts is inapplicable.

Case No.  15-cv-307-JLS(JCGx)

-22-

Pltffs' Reply In Supp. Of Mtn. For Partial
Judgmt. On Pleadings Or Partial Summ. Jdgmt.

DATED: February 19, 2016

Respectfully Submitted,

**/s/ Roy A. Katriel**
Roy A. Katriel (SBN 265463)
**THE KATRIEL LAW FIRM**
4225 Executive Square, Suite 600
La Jolla, CA 92037
Tel: (858) 242-5642
Fax: (858) 430-3719
E-mail: rak@katriellaw.com

**KRAUSE, KALFAYAN, BENINK & SLAVENS, LLP**
550 West C Street, Suite 530
San Diego, California 92101
Telephone: (619) 232-0331
Facsimile: (619) 232-4019
Email: ralph@kkbs-law.com

*Counsel for Plaintiffs*

Case No. 15-cv-307-JLS(JCGx)

-23-

Pltffs' Reply In Supp. Of Mtn. For Partial
Judgmt. On Pleadings Or Partial Summ. Jdgmt.