1
2
3
4

BRYAN A. MERRYMAN (SBN 134357)
bmerryman@whitecase.com
WHITE & CASE LLP
555 S. Flower Street, Suite 2700
Los Angeles, CA  90071-2433
Telephone:  (213) 620-7700
Facsimile:  (213) 452-2329

5
6
7
8

J. MARK GIDLEY (pro hac vice)
mgidley@whitecase.com
WHITE & CASE LLP
701 13th Street NW
Washington, DC  20005
Telephone:  (202) 626-3600
Facsimile:  (202) 639-9355

9
10
11
12

JACK E. PACE III (pro hac vice)
jpace@whitecase.com
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY  10020
Telephone:  (212) 819-8200
Facsimile:  (212) 354-8113

13
14

Attorneys for Defendant
ALLERGAN, INC.

15

# UNITED STATES DISTRICT COURT

16

## CENTRAL DISTRICT OF CALIFORNIA

17

### SOUTHERN DIVISION

18
19
20

ADEL TAWFILIS, DDS d/b/a
CARMEL VALLEY CENTER FOR
ORAL AND MAXILLOFACIAL
SURGERY, individually and on behalf
of all others similarly situated,

No. 8:15-cv-00307-JLS-JCG

Hon. Josephine L. Staton

Magistrate Judge Jay C. Gandhi

21

              Plaintiff,

22

       v.

23

ALLERGAN, INC.,

24

              Defendant.

**DEFENDANT ALLERGAN,
INC.'S MEMORANDUM OF
POINTS AND AUTHORITIES
IN SUPPORT OF ITS MOTION
FOR SUMMARY JUDGMENT**

25
26

 Hearing Date:  October 27, 2017
 Time:  2:30 p.m.
 Courtroom:  10A
 Judge:  Hon. Josephine L. Staton
 Trial Date:  February 20, 2018

27
28

REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL

# **TABLE OF CONTENTS**

**Page(s)**

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 3

I.     THERE IS NO GENUINE DISPUTE THAT THE MEDYTOX-ALLERGAN AGREEMENT IS A BONA FIDE LICENSE AND NOT A SHAM OR SECRET AGREEMENT TO "DELAY" COMPETITION (COUNTS I–III) ...................................................... 4

    A.    At the Time of the September 2013 Agreement (and Even Now), the License Agreement Was (and Is) Vertical, Not Horizontal ........................................................................................ 5

        1.    Undisputed Evidence Confirms That the License Agreement Constitutes a Vertical Relationship with Medytox as Licensor and Allergan as Licensee ...................... 6

        2.    As of September 2013, Medytox Had No Ability to Sell an MT10109L Product in the U.S. ........................................ 8

    B.    Plaintiffs Do Not and Cannot Dispute That the License Agreement Is a Bona Fide Development License ................................. 9

II.    ████████████████████████████████████████████████████ ████████████████████████████████████████████ NG OR CAUSATION (COUNTS I–III) ...................................................................................... 11

    A.    ████████████████████████████████████████████████████ ██████████████████████████████ ............. 12

        1.    Medytox's Hypothetical MT10109L Product Was Not Approvable in the U.S. at the Time of the 2013 License Agreement ..................................................................... 12

        2.    ████████████████████████████████████████████████ ████████████████████████████████████████ ............. 13

    B.    No Evidence Establishes That Medytox Could Have Launched a U.S. Product Based on MT10109L More Quickly Alone than It Could with Allergan's Help under the License Agreement ............. 14

        1.    ████████████████████████████████████████████████ ............. 15

        2.    ████████████████████████████████████████████

1
2
3
4
5
6
7 ........................................................................20

3.   It Is Undisputed Medytox Has Not Delivered the
MT10109L Product for Clinical Trials—a Prerequisite
for FDA Approval.................................................22

C.   Even if Plaintiffs Are Permitted to Amend Their Complaint to
Allege a New "Hypothetical Partner" Theory, Plaintiffs Can
Cite No Evidence That Medytox Could Have Launched a U.S.
MT10109L Product Earlier with a Different Partner .........................22

D.   Plaintiffs Lack Standing to Sue...........................................23

E.   Plaintiffs Cannot Prove Causation under the Sherman Act................25

III.   THERE IS NO GENUINE DISPUTE THAT THE LICENSE
AGREEMENT ACCELERATED THE U.S.
COMMERCIALIZATION OF MT10109L, AND THUS
PLAINTIFFS CANNOT PROVE ANY ANTICOMPETITIVE
EFFECTS (COUNTS I–III) .................................................26

A.   The Undisputed Evidence Overwhelmingly Shows That the
License Agreement Is Facilitating Entry .................................27

B.   The Undisputed Evidence Overwhelmingly Shows That Shows
the License Agreement Is a Response to Next-Generation
Competition...............................................................28

C.   The Undisputed Evidence Overwhelmingly Shows That the
License Agreement Is Output-Enhancing.................................30

D.   Medytox's Exclusive License of Its IP Is Ancillary to the
Legitimate Purpose of Commercializing a New Product ..................31

IV.   PLAINTIFFS' ILLEGAL USE OF BOTOX® COSMETIC
DEPRIVES THEM OF STANDING.......................................32

V.   PLAINTIFFS' NEUROTOXINS-ONLY PRODUCT MARKET IS
WRONG AS A MATTER OF LAW (COUNTS I–III)......................33

VI.   THIS COURT SHOULD DISMISS PLAINTIFFS' CALIFORNIA
STATE LAW CLAIMS (COUNTS IV–V) .................................34

- ii -

VII.   THIS COURT SHOULD DISMISS PLAINTIFFS' INJUNCTIVE
       RELIEF CLAIM......................................................................................34

CONCLUSION.............................................................................................35

- iii -

DEFENDANT ALLERGAN, INC.'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Adobe Sys. v. Canus Prods.*,
   173 F. Supp. 2d 1044 (C.D. Cal. 2001)................................................................35

*Aguilar v. Atlantic Richfield*,
   25 Cal. 4th 826 (Cal. 2001) ................................................................................34

*Airweld, Inc. v. Airco, Inc.*,
   742 F.2d 1184 (9th Cir. 1984)..............................................................................30

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ...............................................................................................4

*Arminak & Assocs. v. Saint-Gobain Calmar, Inc.*,
   789 F. Supp. 2d 1201 (C.D. Cal. 2011)................................................................31

*Assoc. Gen. Contractors v. Cal. State Counc. Carpenters*,
   459 U.S. 519 (1983) .............................................................................................33

*Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.*,
   784 F.2d 1325 (7th Cir. 1986)..............................................................................35

*Ball Memorial Hosp., Inc. v. Mutual Hospital Ins., Inc.*,
   603 F. Supp. 1077 (S.D. Ind. 1985) .....................................................................35

*Barry v. Blue Cross of Cal.*,
   805 F.2d 866 (9th Cir. 1986)................................................................................26

*Berkey Photo v. Eastman Kodak*,
   603 F.2d 263 (2d Cir. 1979)...................................................................................2

*Bhan v. NME Hosps., Inc.*,
   929 F.2d 1404 (9th Cir. 1991)..........................................................................4, 26

*Bourns Inc. v. Raychem Corp.*,
   331 F.3d 704 (9th Cir. 2003).......................................................................6, 9, 25

- iv -

*Brown Shoe v. United States,*

    370 U.S. 294 (1962) ........................................................................ 34

*Brownell v. Ketcham Wire & Mfg. Co.,*

    211 F.2d 121 (9th Cir. 1954) ......................................................... 10

*Bubar v. Ampco Foods, Inc.,*

    752 F.2d 445 (9th Cir. 1985) .............................................. 5, 24, 25

*Cascades Computer Innovation LLC v. RPX Corp.,*

    2013 U.S. Dist. LEXIS 10526 (N.D. Cal. Jan. 24, 2013) .................. 34

*Cataphote Corp. v. DeSoto Chem. Coatings,*

    450 F.2d 769 (9th Cir. 1971) ......................................................... 10

*Cnty. of Tuolumne v. Sonora Cmty. Hosp.,*

    236 F.3d 1148 (9th Cir. 2001) ....................................................... 34

*Cyntegra, Inc. v. Idexx Labs., Inc.,*

    322 F. App'x. 569 (9th Cir. 2009) .................................................. 12

*Dagher v. Saudi Ref., Inc.,*

    369 F.3d 1108 (9th Cir. 2004) ....................................................... 31

*Edwin K. Williams & Co. v. Edwin K. Williams & Co. East,*

    377 F. Supp. 418 (C.D. Cal. June 18, 1974) ..................................... 6

*Edwin K. Williams, Co. v. Edwin K. Williams, Co.-East,*

    542 F.2d 1053 (9th Cir. 1976) ....................................................... 31

*Ethypharm S.A. Fr. v. Abbott Labs.,*

    707 F.3d 223 (3d Cir. 2013) .......................................................... 11

*Freeman v. San Diego Ass'n of Realtors,*

    2003 U.S. App. LEXIS 7731 (9th Cir. 2003) .................................. 31

*Gerlinger v. Amazon.com Inc., Borders Grp., Inc.,*

    526 F.3d 1253 (9th Cir. 2008) ....................................................... 23

*Glen Holly Entm't, Inc. v. Tektronix, Inc.,*

    352 F.3d 367 (9th Cir. 2003) ......................................................... 24

- v -

*Gough v. Rossmoor,*

    585 F.2d 381 (9th Cir. 1978) ................................................................... 6

*In re Air Passenger Comp. Reservations Sys. Antitrust Litig.,*

    694 F. Supp. 1443 (C.D. Cal. 1988) ...................................................... 30

*In re Online DVD Rental Antitrust Litig.,*

    2011 U.S. Dist. LEXIS 150312 (N.D. Cal. Nov. 22, 2011) ................... 31

*In re Oracle Corp. Sec. Litig.,*

    627 F.3d 376 (9th Cir. 2010) ................................................................ 22

*In re Packaged Seafood Prods. Antitrust Litig.,*

    2017 U.S. Dist. LEXIS 1279 (S.D. Cal. Jan. 3, 2017) ........................... 6

*In re Solodyn Antitrust Litig.,*

    2015 U.S. Dist. LEXIS 125999 (D. Mass. Aug. 16, 2015) ................... 26

*In re Wellbutrin XL Antitrust Litig.,*

    2017 U.S. App. LEXIS 15533 (3d Cir. Aug. 9, 2017) .................... 4, 25

*Ingels v. Westwood One Broad. Servs., Inc.,*

    129 Cal. App. 4th 1050 (2005) ............................................................... 3

*Krehl v. Baskin-Robbins Ice Cream Co.,*

    1979 U.S. Dist. LEXIS 10530 (C.D. Cal. 1979) .................................... 6

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*

    134 S. Ct. 1387 (2014) ........................................................................ 32

*Lucas Auto. Eng'g v. Bridgestone/Firestone,*

    140 F.3d 1228 (9th Cir. 1997) .............................................................. 23

*Metro Indus. v. Sammi Corp.,*

    82 F.3d 839 (9th Cir. 1996) .................................................................. 30

*Myers v. Allstate Indem. Co.,*

    109 F. Supp. 3d 1331 (C.D. Cal. 2015) ................................................ 23

*Mylan Pharms. v. Warner Chilcott Pub. Ltd.,*

    838 F.3d 421 (3d Cir. 2016) .......................................................... 29, 34

- vi -

*Northrop v. McDonnell Douglas*,

    705 F.2d 1030 (9th Cir. 1983) ................................................................ 2, 31

*Paladin Assocs. v. Montana Power Co.*,

    328 F.3d 1145 (9th Cir. 2003) ....................................................................... 30

*Perfect 10, Inc. v. Google, Inc.*,

    653 F.3d 976 (9th Cir. 2011) ......................................................................... 35

*Pimentel v. Dreyfus*,

    670 F.3d 1096 (9th Cir. 2012) ....................................................................... 33

*Pinter v. Dahl*,

    486 U.S. 622 (1988) ....................................................................................... 33

*Princo Corp. v. ITC*,

    616 F.3d 1318 (Fed. Cir. 2010) ................................................................. 8, 10

*Retrophin, Inc. v. Questcor Pharm., Inc.*,

    41 F. Supp. 3d 906 (C.D. Cal. 2014) ............................................................ 25

*Ron Tonkin Gran Turismo v. Fiat Distribs.*,

    637 F.2d 1376 (9th Cir. 1981) ....................................................................... 34

*Rosebrock v. Beither*,

    788 F. Supp. 2d 1127 (C.D. Cal. 2011) ........................................................ 35

*SCM Corp. v. Xerox Corp.*,

    645 F.2d 1195 (2d. Cir. 1981) ........................................................................ 2

*Smith v. City of Berkeley*,

    2015 U.S. Dist. LEXIS 170862 (C.D. Cal. Dec. 21, 2015) ........................... 33

*Snake River Valley Elec. Ass'n v. PacifiCorp*,

    357 F.3d 1042 (9th Cir. 2004) ....................................................................... 25

*Space Exploration Techs. Corp. v. Boeing Co.*,

    2006 WL 7136649, (C.D. Cal. May 12, 2006) .............................................. 12

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,

    809 F.2d 626 (9th Cir. 1987) ........................................................................... 4

- vii -

*Thurman Industries v. Pay 'N Pak Stores,*

    875 F.2d 1369 (9th Cir. 1989) ...........................................................................33

*Tomac, Inc. v. Coca-Cola Co.,*

    418 F. Supp. 359 (C.D. Cal. 1976) ...................................................................6

*Transamerica Comp v. Int'l Bus. Mach.,*

    698 F.2d 1377 (9th Cir. 1983) ...........................................................................30

*Transource Int'l  v. Trinity Indus.,*

    725 F.2d 274 (5th Cir. 1984) ..............................................................................6

*United States v. Studiengesellschaft Kohle, m.b.H.,*

    670 F.2d 1122 (D.C. Cir. 1981) .......................................................................10

*United States v. Topco,*

    405 U.S. 596 (1972) ........................................................................................5, 6

*United States v. Westinghouse Elec. Corp.,*

    648 F.2d 642 (9th Cir. 1981) ............................................................................7, 9

*W. Geophysical Co. of Am. v. Bolt Assocs.,*

    305 F. Supp. 1251 (D. Conn. 1969) .................................................................27

*Xechem, Inc. v. Bristol-Myers Squibb Co.,*

    372 F.3d 899 (7th Cir. 2004) ............................................................................12

**STATUTES AND RULES**

21 CFR §§ 210, 211, 600 ....................................................................................16

15 U.S.C. § 15(a) ................................................................................................25

Fed. R. Civ. P. 56(a) ............................................................................................3

U.S. Patent Act, 35 U.S.C. § 261 .........................................................................9

Cal. Bus. & Prof. Code, § 1638.1 .......................................................................32

Cal. Bus. & Prof. Code, § 17200 ........................................................................34

Americas 93315095

DEFENDANT ALLERGAN, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

There is no genuine issue of material fact that the Medytox-Allergan License
Agreement is a bona fide IP license, that is not anticompetitive under the Sherman
Act or California law, and that did not cause any delay in competition, where:

- The License Agreement's *undisputed terms* require collaboration to
  accelerate development and commercialization of an MT10109L product in
  the United States; to "delay" entry into the U.S., as Plaintiffs allege (FAC ¶
  1), would be to *breach* the Agreement;

- No evidence establishes or suggests that the License Agreement, which on its
  face is an IP license to develop a new product, is a *sham*;

- The *new product* being developed was one that *Allergan did not have*;

- *"Exclusive" licenses* (FAC ¶ 1) are vital to commercializing neurotoxin
  products in the U.S. (*see, e.g.,* Dysport and Nabota);

- No evidence establishes or suggests that the *patent rights* Medytox owns and
  is licensing were obtained by fraud or otherwise are invalid;

- No evidence establishes or suggests that Medytox could commercialize an
  MT10109L product in the U.S. from scratch *on its own* at any relevant time;

- In fact, undisputed facts, including Medytox's own words, show that
  Medytox had *no intent* to attempt to commercialize a product in the U.S. on
  its own, and that Medytox is *incapable* of doing so;

- No evidence establishes or suggests that Medytox (which had no FDA
  experience) could commercialize an MT10109L product in the U.S. more
  quickly with an *alternative hypothetical partner* than with Allergan—the
  ideal partner for Medytox; and

- ████████████████████████████████████████████

The undisputed facts show that the License Agreement is precisely the type
of early development license that is essential to pharmaceutical innovation.  In the
market for facial aesthetics, consumers already have three established botulinum
toxin options (Botox® Cosmetic, Dysport, and Xeomin) and fourth, smaller
competitor (Myobloc).  Allergan, Inc.'s Statement of Undisputed Facts, Fact Nos.
172–73; Maas ¶¶ 26, 38.  At the time of the 2013 License Agreement, as many as 6
additional companies/alliances were working on new botulinum toxin products to

- 1 -

be marketed in the U.S.  Fact Nos. 243–51.  Allergan entered into a collaboration

with one of the smallest companies, to develop a brand-new product ████████

███████████████, yet Plaintiffs argue that it should trigger treble damages.  If

Plaintiffs have a case for a jury, then all pharmaceutical licensing is suspect—an

alarming development where nearly 40% of all drugs are the result of

collaborations.  Cremieux ¶ 15.  There is no genuine dispute that the License

Agreement is anything but a bona fide, procompetitive, early-development license.

Certainly, a market leader, even a monopolist, can collaborate to innovate:

> We hasten to add that we do not hold that joint development agreements
> between a monopolist and a firm in a complementary market are Per se
> violations of § 1.  It may be, for example, that the market structure is such
> that only a dominant firm will have the resources necessary to exploit the
> complementary technology being offered.  If such were the case, the
> alternative to joint development could be no development at all.

*Berkey Photo v. Eastman Kodak*, 603 F.2d 263, 302 (2d Cir. 1979); *see also*

*Northrop v. McDonnell Douglas*, 705 F.2d 1030, 1052–53 (9th Cir. 1983) ("but for

the teaming effort, General Dynamics and other manufacturers . . . would have had

neither F-18 variant to compete against"); *SCM Corp. v. Xerox Corp.*, 645 F.2d

1195, 1206 n.9 (2d. Cir. 1981) (rejecting antitrust challenge to exclusive license;

"contribution of the investor in both the funding of research that leads to inventions

and the promotion that necessarily must follow to achieve successful

commercialization is of comparable value").

Moreover, there is no genuine dispute over the cause of the absence of an

MT10109L product in the United States.  The undisputed evidence shows that

████████████████████████████████████

██████████████████████████████

██████████████████████████████

████████████████████████████████████

███████████████████████████████████████

- 2 -

████████████████████████████

Yet Plaintiffs speculate that Allergan is the cause of the absence of an MT10109L product in the U.S.  Plaintiffs propose asking a jury to award treble damages and dissolve the License Agreement based on a conspiracy theory that the ███████████ of hours spent by Allergan's employees, the ████████████ Allergan has invested, and ███████████████████████████ ███████████████████████, were all a charade—designed to block a product Allergan wants to launch to respond to its competitors.  This Court should reject Plaintiffs' unsupported speculation and grant summary judgment for Allergan.

## ARGUMENT

To justify holding a jury trial and subjecting Allergan to treble damages and dissolution of the License Agreement, Plaintiffs must establish genuine disputes of material fact regarding the following necessary elements of Plaintiffs' claims:

***Drug development exclusive license agreement as a sham:***  For Plaintiffs' claims to succeed, the License Agreement must be a sham serially breached by Allergan and Medytox, *see* Section I;

***Standing/causation***:  Plaintiffs have the burden to prove that the License Agreement, and not Medytox's lack of FDA approval, inability to manufacture a drug substance or drug product to be submitted for FDA approval, and lack of intent or preparedness to commercialize an MT10109L product in the U.S., caused a delay in the sale of an MT10109L product in the U.S., *see* Section II; and

***Liability***:  Plaintiffs have the burden to prove that the License Agreement created anticompetitive effects that outweigh the procompetitive benefits of the License Agreement, *see* Section III; First Am. Compl. ("FAC") Counts I–V.

Discovery has confirmed there are no genuine disputes over any of these issues.  A motion for summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a); *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991) ("Since [*Matsushita*], this

- 3 -

1   court has shown on numerous occasions that summary judgment on an antitrust

2   claim may be appropriate.") (citing *Matsushita Elec. Indus. Co. v. Zenith Radio*

3   *Corp.*, 475 U.S. 574, 585–88 (1986)).  A fact is "material" only if it affects the

4   outcome of the case, and a dispute is "genuine" only if the evidence supporting the

5   nonmoving party's position is so strong that a reasonable jury could return a verdict

6   in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  If the

7   moving party satisfies its initial burden, then the opposing party must present

8   specific, admissible evidence establishing a genuine dispute.  *See In re Wellbutrin*

9   *XL Antitrust Litig.*, 2017 U.S. App. LEXIS 15533, at *55 (3d Cir. Aug. 9, 2017);

10  *T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).

11  A motion for summary judgment cannot be overcome by the kind of speculation

12  underlying Drs. Tawfilis and Towhidian's claims, as a "plaintiff cannot satisfy the

13  summary judgment burden based on speculation alone."  *Wellbutrin*, 2017 U.S.

14  App. LEXIS 15533, at *55; *see also Bhan*, 929 F.2d at 1409 ("more than . . . some

15  metaphysical doubt as to the material facts") (quoting *Matsushita*, 475 U.S. at 586).

16  **I.    THERE IS NO GENUINE DISPUTE THAT THE MEDYTOX-**

17  **ALLERGAN AGREEMENT IS A BONA FIDE LICENSE AND NOT A**

18  **SHAM OR SECRET AGREEMENT TO "DELAY" COMPETITION**

19  **(COUNTS I–III)**

20          The only "evidence" Plaintiffs claim to have of any illegal conduct is the

21  License Agreement between Medytox and Allergan dated September 25, 2013 and

22  attached as Exhibit 26 to this summary judgment submission.  The terms of the

23  joint venture are not in dispute.  They include ███████████████████████

24  ████████████████████████████████████████████

25  ████████████████████████████████████████████████

26  ████████████████████████████████████

27  ████████████████████████████████████████

28  ███████████████████████████████████████████

- 4 -

1       █████████ Fact Nos. 1–14; Cremieux ¶¶ 39–45.

2       But Plaintiffs argue that the undisputed evidence should not be trusted, that

3 the License Agreement will have the opposite effect of what its undisputed terms

4 require.  Plaintiffs, however, have no evidence that Medytox does not have valid IP,

5 no evidence that Medytox's license of its IP rights is a sham, and no evidence of

6 any side agreement between Medytox and Allergan to torpedo the new liquid

7 product (and let other U.S. manufacturers beat them to market).

8       Why is it illegal for Medytox to seek out the strongest possible partner when

9 it is trying to develop a new product?  It is not.  As discussed below, the undisputed

10 facts confirm that the License Agreement is a vertical agreement between a

11 company ████████████████████████████████████████

12 ███████ and the leading expert in obtaining FDA approval of and marketing

13 botulinum toxins in the U.S. (Allergan).

14     **A.**    **At the Time of the September 2013 Agreement (and Even Now),**

15            **the License Agreement Was (and Is) Vertical, Not Horizontal**

16       Plaintiffs argue that the License Agreement, despite its undisputed terms,

17 should be deemed "horizontal" because, hypothetically, Medytox someday could

18 gain the ability to perform a paradigm-shifting commercial launch of a neurotoxin

19 in the U.S.  But the "potential competitor" hypothetical underlying Plaintiffs' case

20 is true of every vertical relationship.  Every supplier of intellectual property or

21 technology might someday commercialize its invention instead of working with its

22 marketing partner.  *Topco* teaches that, "[t]heoretically, all manufacturers,

23 distributors, merchants, sellers, and buyers could be considered as ***potential***

24 ***competitors*** of each other.  Were § 1 to be read in the narrowest possible way, any

25 commercial contract could be deemed to violate it."  *United States v. Topco*, 405

26 U.S. 596, 606 (1972) (emphasis added).

27       A court must judge "potential competition" based on the parties' positions ***at***

28 ***the time of the agreement***.  *Bubar v. Ampco Foods, Inc.*, 752 F.2d 445, 450, 452

DEFENDANT ALLERGAN, INC.'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

1    (9th Cir. 1985) ("It is the fact that they were not existing competitors at the time [of

2    the challenged agreement] that creates the standing problem."); *Bourns Inc. v.*

3    *Raychem Corp.*, 331 F.3d 704, 711–12 (9th Cir. 2003) (at time of challenged

4    conduct, plaintiff was not "ready to be a competitor"; "'nascent' business—one that

5    is merely a gleam in the eye and a hope in the heart of its promoters—does not

6    possess the property to which antitrust injury can be done"); *Transource Int'l v.*

7    *Trinity Indus.*, 725 F.2d 274, 280 (5th Cir. 1984) ("[W]e consider the question

8    whether Transource could have been viewed as a potential competitor at the time of

9    the contract . . . .  Transource lacked the financial ability to enter the market at the

10    same level as Trinity and could not have been considered a potential competitor.").

11        An agreement is "horizontal" if both parties are "at the ***same level*** of the

12    market structure."  *Topco*, 405 U.S. at 608 (emphasis added); *see also, e.g.*, *Gough*

13    *v. Rossmoor*, 585 F.2d 381, 387 (9th Cir. 1978); *In re Packaged Seafood Prods.*

14    *Antitrust Litig.*, 2017 U.S. Dist. LEXIS 1279, at *92–93 (S.D. Cal. Jan. 3, 2017).

15    An agreement is "vertical" if the contracting parties, such as Medytox and Allergan

16    here, are "at ***different levels*** of the market structure."  *Topco*, 405 U.S. at 608

17    (emphasis added); *Krehl v. Baskin-Robbins Ice Cream*, 1979 U.S. Dist. LEXIS

18    10530 (C.D. Cal. 1979) (exclusive territorial allocations between manufacturer and

19    licensees were "vertical" because manufacturer was "acting not as a competitor to

20    the new area franchisor"); *Edwin K. Williams & Co. v. Edwin K. Williams & Co.*

21    *East,* 377 F. Supp. 418 (C.D. Cal. June 18, 1974) (Territorially exclusive IP license

22    was a "vertical rather than a horizontal arrangement and [its] territorial restrictions .

23    . . [were] justified as reasonable steps taken to implement a valid copyright

24    licensing system."); *Tomac, Inc. v. Coca-Cola Co.*, 418 F. Supp. 359 (C.D. Cal.

25    1976) (rejecting antitrust challenge to territorial allocations in exclusive licenses).

26       **1.**      **Undisputed Evidence Confirms That the License Agreement**

27             **Constitutes a Vertical Relationship with Medytox as Licensor and**

28             **Allergan as Licensee**

- 6 -

1    It is undisputed that ████████████████████████████████████

2    ████████████, at the time of the September 2013 agreement.  Fact Nos. 15–18.

3    Medytox had patent rights that potentially could be developed into a liquid product

4    for the U.S.  Fact Nos. 29–32; *United States v. Westinghouse Elec.*, 648 F.2d 642,

5    647–48 (9th Cir. 1981) ("The right to license that patent, exclusively or otherwise,

6    or to refuse to license at all, is 'the untrammeled right' of the patentee.").  But with

7    ████████████████████████████████████████████████

8    ████████████████████████, Medytox sought a partner to commercialize a

9    product based on Medytox's IP.  Fact Nos. 18–21.  Allergan not only was the most

10   experienced U.S. partner possible.████████████████████████████

11   ████████████████████████████████████████████

12   ████████████████████████████████████████████

13   ████████████████████████████████████████████

14   ████████████████████████ *See* Section II.C; Cremieux ¶¶ 39–42.

15   Thus Medytox and Allergan entered into the License Agreement.  As the

16   License Agreement provides in undisputed terms:

17   • ██████████████████████████████████████████
18   ████████████████████████████████████████████
19   ████████████████████████████████████████████
20   ████████████████████████████████

21   • ██████████████████████████████████████
22   ████████████████████████

23   • ██████████████████████████████████████████
24   ████████████████████████████████████████████
25   ████████████████████████████████████████

26   • ██████████████████████████████████████████
27   ████████████████████████████████████████

28   • ██████████████████████████████████████████

- 7 -

Fact Nos. 4–14.  The Medytox-Allergan License Agreement is the type of development collaboration treated as vertical and encouraged by courts and commentators, as it facilitates the launch of products in early development.  *See, e.g., Princo Corp. v. ITC*, 616 F.3d 1318, 1335 (Fed. Cir. 2010) ("Collaboration for the purpose of developing and commercializing new technology can result in economies of scale and integrations of complementary capacities . . . ."); Fact Nos. 15–18; Cremieux § IV; Robbins §§ III, VI.D.

Innovative ideas often originate in small start-ups and companies overseas, but FDA approval is very expensive and difficult to obtain.  Fact No. 24.  Obtaining FDA approval often requires the assistance of a collaborator with experience and resources, as in J&J's acquisition of IP owner Mentor to develop the PurTox neurotoxin—though even the mighty J&J failed to obtain FDA approval for the new product.  Fact Nos. 24–25, 68.  If, as Plaintiffs propose, all development licenses between companies that have products anywhere in the world treating a common condition (wrinkles, cardiovascular disease, or cancer) are to be considered "horizontal" agreements between "potential competitors," then scores of development licenses are illegal, or at least must be subjected to a jury trial.  The Sherman Act should not be applied to have such a chilling effect on innovation and medical advances.  Cremieux § III.A.

## 2. As of September 2013, Medytox Had No Ability to Sell an MT10109L Product in the U.S.

The License Agreement is vertical not only based on its undisputed terms, but also because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Section II (standing/causation); Cremieux § V.A.

Plaintiffs bear the burden to prove that Medytox was "ready to be a

competitor" in the United States with an MT10109L product in September 2013, but Plaintiffs failed to elicit any evidence to carry this burden. *See Bourns*, 331 F.3d at 711. ████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

Plaintiffs and Allergan did obtain deposition testimony from 10 party and non-party witnesses who worked directly with Medytox on the MT10109L project, including working on location in Medytox's manufacturing facilities. ████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

**B.    Plaintiffs Do Not and Cannot Dispute That the License Agreement Is a Bona Fide Development License**

Plaintiffs do not dispute that Medytox has valid U.S. patent rights, explicitly relied upon in the License Agreement, which Medytox is free to license in whole, in part, on an exclusive basis, or not at all. *See, e.g.,* U.S. Patent Act, 35 U.S.C. § 261 (applicant or patentee may "grant and convey an *exclusive* right under his application for patent, or patents, to the *whole or any specified part of the United States*.") (emphasis added); *Westinghouse*, 648 F.2d at 647–48 ("The right to

- 9 -

1   license that patent, exclusively or otherwise, or to refuse to license at all, is 'the

2   untrammeled right' of the patentee.") (quoting *Dunlop Co. v. Kelsey-Hayes Co.*,

3   484 F.2d 407, 417 (6th Cir. 1973)).

4        Plaintiffs also do not dispute that exclusive development licenses are

5   essential to medical innovation.  Fact Nos. 33–42; Cremieux ¶ 33; Robbins § II.B;

6   *Brownell v. Ketcham Wire & Mfg. Co.*, 211 F.2d 121, 129 (9th Cir. 1954)

7   ("Exclusive territorial licenses granted under patents are old in the law.") (license

8   agreement with German patentee); *Cataphote Corp. v. DeSoto Chem. Coatings*, 450

9   F.2d 769, 774 (9th Cir. 1971) ("That [a] license [is] exclusive is neither unusual nor

10  sinister."); *Princo*, 616 F.3d at 1339 ("[A]n agreement among joint venturers not to

11  compete against the joint venture is not a naked restraint, because it provides

12  assurance that the resources invested by one joint venturer will not be undermined

13  or competitively exploited to the sole benefit of the other."); *United States v.*

14  *Studiengesellschaft Kohle, m.b.H.*, 670 F.2d 1122, 1135 (D.C. Cir. 1981) ("An

15  exclusive license . . . serves the interests of both the patentee and the public by

16  facilitating more rapid and widespread use of new inventions.").

17       ***No evidence of sham.***  Plaintiffs uncovered no evidence to support an

18  argument that the License is a sham or anything other than a bona fide agreement

19  for Allergan and Medytox to work to commercialize a product.  *See* Section I.A.1.

20  Plaintiffs pled their aspiration that the License Agreement represented a payment of

21  $300 million to prevent a product from being launched.  FAC ¶ 54.  But the

22  Agreement itself refutes that baseless claim.  ███████████████████████████

23  ████████████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████████

25  ████████████████████████████████████  Fact No. 8; Cremieux ¶¶ 43–45.

26       ***No side agreement not to launch.***  Nor have Plaintiffs unearthed a secret side

27  agreement between Allergan and Medytox to delay or prevent the launch of

28  MT10109L in the U.S.  Instead, the voluminous evidentiary record is full of

- 10 -

DEFENDANT ALLERGAN, INC.'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

1   documents showing collaboration between Allergan and Medytox to develop and

2   manufacture MT10109L, with Allergan expending significant time and resources to

3   speed up entry of MT10109L.  Fact Nos. 192–228.

4   **II.**   ████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████

7   ███████████████████   **AND   THUS   PLAINTIFFS   CANNOT   PROVE**

8   **STANDING OR CAUSATION (COUNTS I–III)**

9         At the outset, Plaintiffs' claimed that discovery would establish that, without

10   the License Agreement, Medytox could have completed all the steps necessary for

11   successful U.S. commercialization of MT10109L not only from scratch by itself,

12   but more quickly than Medytox and Allergan have been capable of completing

13   those steps in the real world.  FAC ¶¶ 1, 33, 34, 40.  But after 18 months of

14   discovery, hundreds of thousands of pages produced, and 22 depositions, no

15   evidence supports a genuine dispute over Medytox's ability to commercialize

16   MT10109L in the U.S. more quickly alone than in the real world.  ████████████

17   ██████████████████████████████, Plaintiffs' hypothetical regulatory approval

18   timeline is impossible, and therefore Plaintiffs cannot identify a genuine issue of

19   material fact regarding their standing to sue or ability to prove causation.

20         Several courts have held that a hypothetical competitor that was significantly

21   *more prepared* to compete in the relevant market than ████████████████████

22   ████   nonetheless was *not* sufficiently prepared to compete to confer standing or

23   satisfy the plaintiff's causation burden.  For example, in *Ethypharm*, the Third

24   Circuit held that, even though Ethypharm (a European manufacturer) had obtained

25   a U.S. patent for its drug and, ██████████████, already was manufacturing the drug

26   at issue in a form ***approved by the FDA***, the manufacturer lacked standing.

27   *Ethypharm S.A. Fr. v. Abbott Labs.*, 707 F.3d 223, 236 (3d Cir. 2013).  Just like

28   Medytox, *Ethypharm* "sought a business partner who would . . . license

- 11 -

1   Ethypharm's underlying patent and intellectual property rights; obtain U.S.

2   regulatory approval for the product; and market the product in the U.S." *Id*.  The

3   court rejected Ethypharm's claim because, as here, in the absence of the challenged

4   conduct, Ethypharm still needed a U.S. partner to navigate the FDA and

5   commercialize a product in the U.S.  *Id.* (noting "legal barriers particular to the

6   pharmaceutical market, barriers that Ethypharm chose not to surmount").

7        Similarly, in *Space Exploration*, the Ninth Circuit affirmed a dismissal on

8   standing grounds where the hypothetical competitor, Elon Musk's SpaceX, had

9   ████████████████████████████████████████.  SpaceX already had

10  "entered into launch vehicle contracts worth more than $200 million," already had

11  begun offering Falcon launches, and was one month away from NASA

12  certification.  *Space Exploration Techs. Corp. v. Boeing Co.*, 2006 WL 7136649, at

13  *4–5 (C.D. Cal. May 12, 2006), *aff'g*, 281 Fed. Appx. 769 (9th Cir. 2008).  Despite

14  this readiness, the court concluded that, ██████████, SpaceX did "not yet have the

15  capability to launch an EELV-class vehicle" and "simply did not have the capacity

16  and experience required to compete."  2006 WL 7136649, at *17, 22; *see also*

17  *Cyntegra, Inc. v. Idexx Labs., Inc.*, 322 F. App'x. 569, 572–73 (9th Cir. 2009)

18  (rejecting antitrust challenge to an exclusive contract on standing grounds because

19  alleged competitor "had taken only preliminary steps to engage in its proposed

20  business"); *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 902 (7th Cir.

21  2004) ("That Xechem *still* has not filed an ANDA for paclitaxel . . . is a hurdle that

22  it must vault to establish [antitrust] injury.").

23       **A.**   ████████████████████████████████████████████████████

24       ██████████████████████████████████████████████

25       The undisputed facts confirm that █████████████████████████████

26  ████████████████████████████████████

27            **1.    Medytox's Hypothetical MT10109L Product Was Not**

28                 **Approvable in the U.S. at the Time of the 2013 License**

- 12 -

1       **Agreement**

2       No one disputes that, at the time of the License Agreement in September

3   2013, ███████████████████████████████████████████

4   ██████████████████████████████████████

5   ████████████████████████████████████████████

6   ██████████████████████████████████████████

7   ███████████████████████████████████████████

8   █████████████████████████████████████████

9   ████████████████████████████████████████████

10  ██████████████████████ This Court should grant summary

11  judgment for lack of standing and causation on this basis alone.

12       **2.** ████████████████████████████████

13       ███████████████████████████████████████

14       ██████████████████████████████████████

15       ████████████████████████

16       Plaintiffs cannot identify a genuine dispute for trial that the U.S. FDA would

17  approve any injectable neurotoxin product based on Medytox's MT10109L. ████

18  ████████████████████████████████████████████

19  ███████████████████████████████████████

20  ████████████████████████████████████████████

21  ████████████████████████████████████

22     ██████████████████████████████████████

23  ████████████████████████████████████████████

24  ██████████████████████████████████████

25  ███████████████████████████████████████████

26  █████████████████████████████████████████

27  ████████████████████████████████████████████

28  ███████████████████████████████████████████

- 13 -



**B.**

23   Plaintiffs are barred from pursuing any theory of standing or causation other

24   than that Medytox could have commercialized a U.S. product by April 2015 ***on its***

25   ***own***, and no evidence supports that outlandish claim.  Plaintiffs never alleged

26   Medytox could have found another U.S. partner (*see* FAC), and this Court relied on

27   Plaintiffs' Medytox do-it-yourself theory in denying Allergan's motion to dismiss;

28   in response to Allergan's argument for dismissal because Plaintiffs failed to allege

that Medytox could have found a better partner, this Court held that:

> Medytox does not need a U.S.-based partner because U.S. providers of
> injectable neurotoxins "may and do have these neurotoxins manufactured
> abroad at foreign plants" (FAC ¶ 17), and Medytox could, conceivably at
> least, have created its own U.S.-based sales force.

Doc. 55 at 4.

**1.** ██████████████████████████████████████████

██████████████████████████████████

Medytox has stated repeatedly that, to expand from a company selling

products only in Asia, Eastern Europe, and Latin America into a company selling

products in the far more rigorous U.S. and EU markets, it needed a development

and commercialization partner.  Fact No. 80 (Medytox CEO stating "In 2014, we

will have completed ***our search for a partner*** and plan to commercialize in Europe

and the US with the partner.") (emphasis added); Fact No. 80 ("the company plans

to ***pursue a licensing out deal*** with multinational pharmas based in the US and

Europe") (emphasis added); Fact No. 80 ("our strategy is to expand our global sales

by ***forming alliances and joint ventures with foreign partner companies***").

Medytox's business model—even in South Korea—is to get the help of a local

distribution partner to sell its products.  Fact No. 81.

**2.** ██████████████████████████████████████████

████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

Botox® Cosmetic and MT10109L are derived from a "high[ly] lethal" toxin

designated as a "Class A (highest level) bio-terror threat by the United States

government"—the botulinum toxin.  FAC ¶ 21; Fact No. 62.  Botulinum toxins are

- 15 -

1   highly regulated, and manufacturers who develop them for U.S. cosmetic use are

2   subject to some of the strictest scrutiny by multiple U.S. agencies, including the

3   FDA, CDC, and DHS.  Fact No. 63.  Botulinum toxin is lethal in quantities of

4   nanograms, so all testing must be performed on extremely small quantities; the

5   toxin is one of the most challenging pharmaceutical substances to develop for use in

6   humans.  Fact Nos. 64–65.  This challenge is not merely theoretical:  ███████

7   ████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████

9   ████████████████████████████████████████

10  ████████████████████████████████████████████

11  ████████████████████████████████████████████████████████

12  █████████████████████████████████████████████████████████████

13  █████████████████████████████████████████████████████████████

14      ████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████

16  ████████████████████████████████████████████

17  ████████████████████████████████████████████████

18  ███████████████████████████████████████████████████

19  ████████████████████████████████████████████████████

20  ██████████████████████████████████████████████████████████

21  ███████████████████████████████████████████

22  **a.**  ████████████████████████████████████████

23      ███████████████████████████████████████████

24  █████████████████████████████████████████████████████████████

25  ████████████████████████████████████████

26  ████████████████████████████████████████████████████

27  █████████████████████████████████████████████████████████████

28  █████████████████████████████████████████████████████

- 16 -



- 17 -





**c.**

- 19 -

1 ██████████████████████████████████████████████

2 ████████████████████████████████████████

3 ██████████████████████████████████████████████

4 ████████████████████████████████████████████

5 ██████████████████████████

6    **d.**   █████████████████████████████████

7      Plaintiffs allege that, in the absence of the License Agreement, Medytox

8 could have received FDA approval by "April 2015." Pls.' Mot. Class Cert. at 25.

9 Plaintiffs' hypothetical regulatory timeline not only would be unprecedented and

10 extremely unlikely, but it would be impossible given the ██████████████████

11 ████████████████████████████████████████

12 ███████████████████████ Cremieux § V.A.

13 ██████████████████████████████████

14 ██████████████████████████████████████████████

15 ██████████████████████████████████████████

16 ██████████████████████████████████████████████

17 ████████████████████████████████████████████

18 ████████████████████████████████████████████

19 ████████████████████████████████████████████

20 ██████████████████████████████████████████

21 ██████████████████████████████████████████████

22 ████████████████████████████████████████████

23 ████████████████████████████████████████████

24 ████████████████████████████████████████████

25 ██████████████████████████████████████████████

26 ██████████████████████████████████████████████

27 ████████████████████████████████████████████

28 [2] ████████████████████████████████████████



- 20 -

1　████████████████████████████

2　　█████████████████████████████████████████████

3　████████████████████████████████████████████████

4　███████████████████████████████████████

5　██████████████████████████████████████████████

6　██████████████████████████████████████████████

7　████████████████████████████████████████████████

8　███████████████████████████████████████████████

9　███████████████████████████████████████████████

10　████████████████████████████████████████████████████

11　█████████████████████████████████████████████████████

12　████████████████████████████████████████████████████

13　███████████████████████████████████████████████

14　　　　Johnson & Johnson, a multinational corporation with extensive experience

15　launching U.S. drug products, acquired the rights to neurotoxin PurTox in 2009.

16　But PurTox development was terminated after completion of Phase III trials and

17　eleven years of investment.  John Carroll, *J&J axes a late-stage Botox rival,*

18　*chopping project staffers*, FierceBiotech (Apr. 14, 2014), *available at*

19　http://bit.ly/2vLEHWV; Cremieux ¶¶ 19–20, 48, Table 1, Ex. 2a.

20　　　　The experience of the existing U.S. botulinum toxin competitors also

21　disproves Plaintiffs' speculative FDA approval timeline.  Plaintiffs speculate that

22　MT10109L could be approved in 2015 because the Korean government approved a

23　different MT10109L product in December 2013, but Dysport was first approved

24　outside the U.S. in 1990 (United Kingdom) and was not approved by the FDA until

25　2009, 19 years later.  Fact No. 172.  Similarly, Xeomin was first approved outside

26　the U.S. in 2005 (Germany) and was not approved by the FDA until 2010, 5 years

27　later.  Fact No. 173.  Those benchmarks confirm that no reasonable juror could

28　accept Plaintiffs' proposed unprecedented FDA approval timeline.

- 21 -



*See In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) ("non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor.").

- 22 -

1 ████████████████████████████████████████

2 █████████████████████████████████████████████

3 █████████████████████████████████████████████

4 ███████████████████████████████████████████

5 ████████████████████████████████████████████

6 █████████████████████████████████████████████

7 ██████████████████████████ Plaintiffs cannot simply rely only on

8 "conclusory allegations" or "mere speculation" to support their "hypothetical

9 partner" theory to escape summary judgment. *See Myers v. Allstate Indem. Co.*,

10 109 F. Supp. 3d 1331, 1334–35 (C.D. Cal. 2015) (citing *Rogers v. Giurbino*, No.

11 11cv0560, 2013 WL 692961, at *14 (S.D. Cal. Feb. 26, 2013)).

12 **D.     Plaintiffs Lack Standing to Sue**

13 In light of the undisputed evidence summarized above and in Allergan's

14 Statement of Undisputed Facts, Plaintiffs lack both Article III standing and antitrust

15 standing.  "For Article III purposes, an antitrust plaintiff establishes injury-in-fact

16 when he has suffered an injury which bears a causal connection to the alleged

17 antitrust violation." *Gerlinger v. Amazon.com Inc., Borders Grp., Inc.*, 526

18 F.3d 1253, 1255 (9th Cir. 2008).  "If the plaintiff meets the requirements for

19 standing under Article III, the court must then determine whether the plaintiff also

20 meets 'the more demanding standard for antitrust standing.'" *Lucas Auto. Eng'g v.*

21 *Bridgestone/Firestone*, 140 F.3d 1228, 1232 (9th Cir. 1997).  "In deciding whether

22 antitrust standing has been established, courts are to consider:  (1) the nature of the

23 plaintiff's alleged injury; that is, whether it was the type the antitrust laws were

24 intended to forestall; (2) the directness of the injury; (3) the speculative measure of

25 the harm; (4) the risk of duplicative recovery; and (5) the complexity in

26 apportioning damages." *Id.* at 1232.

27 The causation requirement—*i.e.,* can the plaintiff prove the defendant's

28 conduct, and not something else (here, Medytox's inability to compete), caused the

- 23 -

1    alleged harm (here, the absence of a Medytox product and a Botox® Cosmetic

2    price reduction)?—pervades the standing analysis.  The first element of antitrust

3    standing, "antitrust injury," also demands causation proof.  "Antitrust injury is

4    made up of four elements:  (1) unlawful conduct, (2) causing an injury to the

5    plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is

6    of the type the antitrust laws were intended to prevent."  *Glen Holly Entm't, Inc. v.*

7    *Tektronix, Inc*., 352 F.3d 367, 372 (9th Cir. 2003).

8

9

10

11

12

13

14            ***Intent and Preparedness.***  For the same reasons, there is no genuine dispute

15    that Medytox lacked the "intent" and "preparedness" Plaintiffs must prove to

16    establish standing.  *Bubar*, 752 F.2d at 450.  To determine whether a hypothetical

17    competitor has the necessary intent and preparedness to enter the relevant market,

18    the Ninth Circuit considers "varying combinations" of the following factors:  "1.

19    The background and experience of [the hypothetical competitor] in his prospective

20    business"; "2.  Affirmative action on the part of the [hypothetical competitor] to

21    engage in the proposed business"; "3.  The ability of [the hypothetical competitor]

22    to finance the business"; and "4.  The consummation of contracts by [the

23    hypothetical competitor]."  *See id.* at 451–52.

24            But not just any "experience" or "affirmative action" will do.  Buying

25    sneakers and running a mile a week are affirmative steps toward running a

26    marathon, but the runner is not "ready to be a competitor."  *Bourns*, 331 F.3d at

27    711.  In *Bubar*, the alleged potential competitor was significantly closer to

28    competing in the relevant market than Medytox is here, but it nonetheless failed the

- 24 -

1  "preparedness" test.  752 F.2d at 452.  There, the plaintiff management group

2  needed only to raise $3.5 million to compete, yet the Ninth Circuit affirmed

3  summary judgment because there was "no genuine issue of fact as to the state of

4  their preparedness at the time of the alleged antitrust violation.  *Id.*[3]

5  ███████████████████████████████████████████

6  ██████████████████████████████████████████████

7  ███████████████████████████████████████████████

8  ████████████████████████████████████████

9  ██████████████████████████████████████████

10 ████████████████

11       **E.     Plaintiffs Cannot Prove Causation under the Sherman Act**

12       Plaintiffs' antitrust claims require that Plaintiff prove that the License

13 Agreement caused Plaintiffs' alleged harm.  15 U.S.C. § 15(a); *Snake River Valley*

14 *Elec. Ass'n v. PacifiCorp*, 357 F.3d 1042, 1050 n.8 (9th Cir. 2004) (affirming

15 judgment for antitrust defendant; "another way to view this might be to say that the

16 statute in question precludes the element of causal antitrust injury"); *Wellbutrin*,

17 2017 U.S. App. LEXIS 15533, at *69 n.57 (affirming summary judgment on

18 causation grounds and holding "[t]he fact that juries may predict the outcome of

19 hypothetical scenarios says nothing about the type or amount of evidence that is

20 needed for a plaintiff to withstand summary judgment on a claim involving a

21 counterfactual scenario"); *In re Solodyn Antitrust Litig.*, 2015 U.S. Dist. LEXIS

22 125999, at *40–41 (D. Mass. Aug. 16, 2015) ("The FDA's approval**,** not [the

23 challenged] agreement with Medicis, was the limiting factor in Lupin's ability to

---

[3] This Court's decision in *Retrophin, Inc. v. Questcor Pharm., Inc.*, does not suggest a different result.  There, at the pleading stage, the Court was required to assume as true the plaintiffs' allegations that the alleged potential competitor was "on the verge of" competing in the relevant market when the defendant "swept in" to prevent the plaintiff from competing.  41 F. Supp. 3d 906, 910, 915 (C.D. Cal. 2014).  Here, the evidentiary record confirms definitively that Medytox was nowhere near being "on the verge of" competing, has no intention of competing by itself, has no other partner options, and in any event is prevented by its CMC failures from competing for the foreseeable future.  *See* Section II.A–C.

DEFENDANT ALLERGAN, INC.'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

1    bring generic Solodyn in Legacy Strengths to market.").  For the same reasons

2    Plaintiffs lack standing to sue, they cannot carry their burden to prove causation.

3    **III.    THERE IS NO GENUINE DISPUTE THAT THE LICENSE**

4    **AGREEMENT ACCELERATED THE U.S. COMMERCIALIZATION**

5    **OF MT10109L, AND THUS PLAINTIFFS CANNOT PROVE ANY**

6    **ANTICOMPETITIVE EFFECTS (COUNTS I–III)**

7         As discussed in Allergan's opposition to Plaintiffs' earlier motion for partial

8    summary judgment, Plaintiffs' challenge to the vertical IP license agreement

9    between Allergan and Medytox is subject to the antitrust Rule of Reason.  Doc. 85.

10   The Rule of Reason requires Plaintiffs to prove that the License Agreement caused

11   anticompetitive effects that are so substantial that they outweigh the procompetitive

12   benefits of the agreement.  *See, e.g., Bhan*, 929 F.2d at 1412–13.  When it is clear

13   that a plaintiff will not be able to carry its burden under the Rule of Reason,

14   summary judgment is appropriate.  *Id.* at 1414 (affirming summary judgment where

15   plaintiff "failed to meet his initial burden of showing that the hospital's policy

16   substantially restrained competition in a relevant market"); *Barry v. Blue Cross of*

17   *Cal.*, 805 F.2d 866, 871 (9th Cir. 1986) (affirming summary judgment where

18   "[c]lose examination of the vertical agreements in this case reveals that they have

19   no impermissible anticompetitive consequences").

20        As discussed below, no evidence shows any intent by Allergan to "delay" the

21   launch of a hypothetical MT10109L product, and no evidence shows a delay in fact.

22   Plaintiffs' theory is backwards.  The License Agreement calls for the

23   commercialization of the product, so, for Plaintiffs to be correct, Allergan would

24   have had to ***breach the agreement***.  Such a hypothetical claim does not create a

25   genuine dispute for trial.  *See, e.g., W. Geophysical Co. of Am. v. Bolt Assocs.*, 305

26   F. Supp. 1251, 1255 (D. Conn. 1969) ("The alleged anticompetitive effect stems

27   then, not from the *acquisition* of the exclusive license, which by its very terms

28   would tend to *promote* competition, but from a misuse (breach of the agreement to

- 26 -

sublicense) of the asset once acquired.").

**A.    The Undisputed Evidence Overwhelmingly Shows That the
License Agreement Is Facilitating Entry**

Because the undisputed evidence overwhelmingly shows that the purpose
and effect of the License Agreement is to speed up entry of MT10109L into the
U.S., and because Plaintiffs elicited no evidence—only speculation—that the
agreement is actually delaying competition, this Court should grant summary
judgment on the lack of anticompetitive effects.  Cremieux §§ IV.B-C, V.C.

*First*, as discussed above, the terms of the License Agreement require
collaboration to facilitate development, regulatory approval, and commercialization
of MT10109L in the U.S.  Fact Nos. 85–91.

*Second*, all evidence regarding Allergan's intent for the Agreement shows—
and no evidence contradicts this evidence—that █████████████████████

*Third*, the undisputed evidence overwhelmingly shows that the effect of the
License Agreement has been to facilitate and accelerate the ultimate
commercialization of MT10109L in the United States.  Cremieux §§ III, IV.B-C.

- 27 -



**B.** **The Undisputed Evidence Overwhelmingly Shows That Shows the License Agreement Is a Response to Next-Generation Competition**

Allergan did not have a liquid botulinum toxin product anywhere near ready to be marketed in the United States at the time of the License Agreement.  It is also

DEFENDANT ALLERGAN, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

1  undisputed that, at the time of License Agreement, ██████████████

2  ████████████████████████████████████████████████████████████

3  ███████████  Fact Nos. 243–51; Cremieux ¶¶ 37–39.

4  ████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████

11 ██████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████

13 ████████████████████████████████████

14 ████████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████████

19 Fact No. 251 (Barborka Tr. 154: 1–24). Conduct responding to competition is

20 procompetitive. *See, e.g.*, *Mylan Pharms. v. Warner Chilcott Pub. Ltd.*, 838 F.3d

21 421, 439 (3d Cir. 2016) (defendant's product changes were "largely in response to

22 the actions of [its] competitors"); *Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184, 1194

23 (9th Cir. 1984) (conduct was "most reasonably understood as a response to market

24 conditions" and not anticompetitive); *Transamerica Comp v. Int'l Bus. Mach.*, 698

25 F.2d 1377, 1389 (9th Cir. 1983) (pricing movement was not "unusual in the face of

26 competition"); *In re Air Passenger Comp. Reservations Sys. Antitrust Litig.*, 694 F.

27 Supp. 1443, 1463 (C.D. Cal. 1988) ("Price reductions that constitute a legitimate,

28

- 29 -

1    'competitive response' to market conditions are competitive, not predatory.").

2        **C.**    **The Undisputed Evidence Overwhelmingly Shows That the**

3                **License Agreement Is Output-Enhancing**

4        There is no genuine dispute that the License Agreement is output-enhancing

5    and thus procompetitive for this additional reason. ████████████████

6    ██████████████████████████████████████████

7    ████████████████████████████████████

8    ████████████████████████████████

9    ██████████████████████████████████████████

10    ████████████████████████████████████████

11    ██████████████████████████████████

12    ██████████████████████████████████████████

13    ████████████████████████████████████

14    ██████████████████████████████████████

15    ██████████████████████████████████████

16        Conduct that creates new products or otherwise increases output is

17    procompetitive. *See, e.g., Paladin Assocs. v. Montana Power Co.*, 328 F.3d 1145,

18    1157 (9th Cir. 2003) (affirming summary judgment; reselling fifteen-year

19    assignment of gas transportation capacity as five-year assignments was lawful in

20    part because "five-year assignments were a new 'product' that filled a need");

21    *Metro Indus. v. Sammi Corp.*, 82 F.3d 839, 844 (9th Cir. 1996) (affirming summary

22    judgment; "the record . . . reveal[ed] the output increasing potential of the

23    registration system"); *Northrop*, 705 F.2d at 1052–53 (reversing summary

24    judgment for plaintiff; agreements led to entry of "two variants of . . . the F-18 . . . ,

25    a surprising procompetitive occurrence in an industry typified by single-source

26    products"); *Arminak & Assocs. v. Saint-Gobain Calmar, Inc.*, 789 F. Supp. 2d

27    1201, 1208 (C.D. Cal. 2011) (granting summary judgment; defendant's

28    development of new "VTS trigger sprayers promoted competition"); *In re Online*

- 30 -

1  *DVD Rental Antitrust Litig.*, 2011 U.S. Dist. LEXIS 150312, at \*59–60 (N.D. Cal.

2  Nov. 22, 2011), *aff'd*, 779 F.3d 914 (9th Cir. 2015).

3      **D.**    **Medytox's Exclusive License of Its IP Is Ancillary to the**

4              **Legitimate Purpose of Commercializing a New Product**

5      In light of the undisputed procompetitive benefits discussed above, the

6  exclusivity of Medytox's license of its IP is ancillary to the License Agreement's

7  core purpose of commercializing MT10109L in the United States.  When a

8  legitimate primary purpose is identified, courts permit restraints that are reasonably

9  ancillary to that purpose.  *Dagher v. Saudi Ref., Inc.*, 369 F.3d 1108, 1120–21 (9th

10  Cir. 2004) (analyzing whether a restraint is "sufficiently important" to attaining

11  lawful objectives), *reversed on other grounds*, 543 U.S. 1143 (2006); *Edwin K.*

12  *Williams, Co. v. Edwin K. Williams, Co.-East*, 542 F.2d 1053, 1061 (9th Cir. 1976)

13  (territorial restrictions not to violate antitrust laws because they were "reasonable

14  restraints ancillary to [defendant's] primary, legitimate purpose of protecting its

15  tradenames and copyrights"); *Freeman v. San Diego Ass'n of Realtors*, 2003 U.S.

16  App. LEXIS 7731, at \*37 (9th Cir. 2003) (the restraint "need not itself by essential,

17  but it must still be reasonably ancillary to the legitimate cooperative aspects of the

18  venture").

19      Here, the exclusive IP license is not only reasonably related but necessary to

20  achieve the core purpose of the License Agreement.  Cremieux ¶¶ 15–21.

21  Exclusive license agreements are standard in the pharmaceutical industry for

22  developing products, as they give the licensee an incentive to invest.  Fact No. 26.

23  Joint ventures that involve the early-stage development of products present a large

24  degree of risk for companies investing resources to commercialize technology.

25  Fact No. 27–31.  Accordingly, █████████████████████████

26  ████████████████████████████████████████

27  ████████████████████████████████████████

28  ████████████████████████████████

- 31 -

**IV.**



1

2

3

4

5

6

7

8

9

10

11

12

13    In the alternative, if the Court elects to dismiss only the class representatives'

14  claims, then the Court should decertify the class on adequacy grounds.

15  **V.    PLAINTIFFS' NEUROTOXINS-ONLY PRODUCT MARKET IS**

16  **WRONG AS A MATTER OF LAW (COUNTS I–III)**

17    Plaintiffs propose that the relevant market be limited to "injectable

18  neurotoxins for cosmetic use" (FAC ¶ 9), but it is well established that proposed

19  relevant markets that do not include "the group or groups of sellers or producers

20  who have actual or potential ability to deprive each other of significant levels of

21  business" fail as a matter of law. *Thurman Industries v. Pay 'N Pak Stores*, 875

22  F.2d 1369, 1374 (9th Cir. 1989) ("defining the product market involves

23  identification of the field of competition"); *Ron Tonkin Gran Turismo v. Fiat*

24  *Distribs.*, 637 F.2d 1376, 1379–80 (9th Cir. 1981); *see also Mylan*, 838 F.3d at 436.

25    Here, the factual record and expert testimony from experienced physicians

26  confirm that consumers who would like to enhance their appearances can and do

27  choose from a wide variety of facial aesthetic products and procedures. Kane §§ 7–

28  8; Maas ¶¶ 23–28; Cremieux § VII.

- 33 -

1 ███████████████████████████████████████████████████████

2 ████████████████████████████████████████ Fact No. 273.  There is no

3 genuine dispute that fillers, lasers, carbon dioxide machines, creams, and plastic

4 surgery are all "reasonably interchangeable in use" substitutes for Botox®

5 Cosmetic.  *See Brown Shoe v. United States*, 370 U.S. 294, 325 (1962).

6 **VI.     THIS COURT SHOULD DISMISS PLAINTIFFS' CALIFORNIA**

7 **STATE LAW CLAIMS (COUNTS IV–V)**

8     *Cartwright Act (Count IV).*  Plaintiffs' claims under the Cartwright Act must

9 be dismissed for the same reasons Plaintiffs' Sherman Act claims must be

10 dismissed.  *See Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160

11 (9th Cir. 2001) (affirming grant of summary judgment to defendants under

12 Cartwright Act because "[t]he analysis under California's antitrust law mirrors the

13 analysis under . . . the Sherman Act").

14     *Unfair Competition Law, Section 17200 (Count V).*  Plaintiffs' Section

15 17200 claim is derivative of Plaintiffs' antitrust claims and therefore should be

16 dismissed for the reasons discussed above.  *See Aguilar v. Atlantic Richfield*, 25

17 Cal. 4th 826, 866 (Cal. 2001); *Cascades Computer Innovation LLC v. RPX Corp.*,

18 2013 U.S. Dist. LEXIS 10526, at *51 (N.D. Cal. Jan. 24, 2013) ("[B]ecause

19 [plaintiff's] UCL claim is not materially different than its federal and state antitrust

20 claims, its UCL claim necessarily fails as well."); *Ingels v. Westwood One Broad.*

21 *Servs., Inc.*, 129 Cal. App. 4th 1050, 1060 (2005).

22 **VII.    THIS COURT SHOULD DISMISS PLAINTIFFS' INJUNCTIVE**

23 **RELIEF CLAIM**

24     Plaintiffs ask the Court to dissolve the Medytox-Allergan License

25 Agreement.  FAC ¶¶ 85, 94, 102, 107, 113, Prayer for Relief H.  The Court should

26 reject that request for two reasons.  *First*, Plaintiffs have elicited no evidence to

27 support any of the requirements for a permanent injunction; a plaintiff "must

28 establish that:  (1) he actually succeeds on the merits; (2) he is likely to suffer

1  irreparable harm in the absence of preliminary relief; (3) the balance of equities tips

2  in his favor; and (4) an injunction is in the public interest." *Rosebrock v. Beither*,

3  788 F. Supp. 2d 1127, 1145 (C.D. Cal. 2011); *Adobe Sys. v. Canus Prods.*, 173 F.

4  Supp. 2d 1044, 1056–57 (C.D. Cal. 2001).  An injunction is an "extraordinary and

5  drastic remedy."  *Perfect 10. v. Google*, 653 F.3d 976, 980 (9th Cir. 2011).  In light

6  of the undisputed facts above, Plaintiffs cannot satisfy any of the four requirements

7  for a permanent injunction.

8        *Second*, Plaintiffs' requested relief would have anticompetitive effects.

9  Because injunctions are equitable remedies, courts have "always stressed the

10  importance of ensuring that . . . injunctions not injure the public at the same time as

11  they assist the plaintiff."  *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784

12  F.2d 1325, 1334 (7th Cir. 1986).  "The pro or anti-competitive effects [of the

13  injunction] on the market at large should be an important factor in the district

14  court's analysis."  *Id.*  Plaintiffs' requested relief would leave Medytox without a

15  partner.  In light of Medytox's repeated statements that it needed a U.S. partner to

16  launch its toxin product, Fact No. 80, Plaintiffs' injunction would eliminate the

17  entry of a new product in the United States.  Courts deny injunctions that have the

18  effect of eliminating a product or service from the market, finding that these

19  injunctions inflict harms on the public that outweigh the harms, if any, that

20  Plaintiffs suffer from the denial of the injunction.  *See, e.g.*, *Ball Memorial Hosp.,*

21  *Inc. v. Mutual Hospital Ins., Inc.*, 603 F. Supp. 1077, 1084–85 (S.D. Ind. 1985).

22                                  **CONCLUSION**

23        This Court should grant summary judgment and dismiss Plaintiffs' claims.

24  Dated:  August 31, 2017                  WHITE & CASE LLP

25

26                                  By:  ____*/s/ J. Mark Gidley*____
                                              J. Mark Gidley

27                                  Attorneys for Defendant
                                    ALLERGAN, INC.

28