BRYAN A. MERRYMAN (SBN 134357)
bmerryman@whitecase.com
WHITE & CASE LLP
555 S. Flower Street, Suite 2700
Los Angeles, CA 90071-2433
Telephone: (213) 620-7700
Facsimile: (213) 452-2329

J. MARK GIDLEY (pro hac vice)
mgidley@whitecase.com
WHITE & CASE LLP
701 13th Street NW
Washington, DC 20005
Telephone: (202) 626-3600
Facsimile: (202) 639-9355

JACK E. PACE III (pro hac vice)
jpace@whitecase.com
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113

Attorneys for Defendant
ALLERGAN, INC.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

ADEL TAWFILIS, DDS d/b/a CARMEL VALLEY CENTER FOR ORAL AND MAXILLOFACIAL SURGERY, individually and on behalf of all others similarly situated,

Plaintiff,

v.

ALLERGAN, INC.,

Defendant.

No. 8:15-cv-00307-JLS-JCG

Hon. Josephine L. Staton

Magistrate Judge Jay C. Gandhi

**DEFENDANT ALLERGAN, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Hearing Date: October 27, 2017
Time: 2:30 p.m.
Courtroom: 10A
Judge: Hon. Josephine L. Staton
Trial Date: February 20, 2018

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ..... 1

ARGUMENT ..... 2

I. PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PRODUCT MARKET DEFINITION (AND FAIL TO MEET THEIR OWN BURDEN) (PLS. MEM. SECTIONS II–IV) ..... 3

A. Plaintiffs' Neurotoxin-Only Market Ignores That Many Other Cosmetic Products Are Used to Treat Facial Wrinkles ..... 3

1. This Record Confirms that Plaintiffs' Neurotoxin-Only Market Is Improperly Narrow ..... 5

2. Plaintiffs' Reliance on Types of Wrinkles and "Mechanisms of Action" Is Improper and Contradicted by the Record ..... 9

3. Plaintiffs Performed No Quantitative Analysis in Support of Their Narrow Market Definition ..... 12

B. Plaintiffs' Reliance on a Distinction Between "Complementary" and Substitutable Products Is Misplaced ..... 14

C. Plaintiffs' Neurotoxin-Only Submarket Fails Under the Requisite *Brown Shoe* "Practical Indicia" ..... 16

D. Plaintiffs Fail to Establish Allergan Has Market Power as a Matter of Law ..... 18

II. PLAINTIFFS CANNOT ESTABLISH ILLEGAL CONCERTED ACTION AS A MATTER OF LAW (PLS. MEM. SECTION V) ..... 18

A. Plaintiffs Fail to Establish Illegal Concerted Action ..... 19

B. Plaintiffs Fail to Establish Illegal Concerted Action Beginning in October 2012 as a Matter of Law ..... 20

III. PLAINTIFFS' "PROXIMATE CAUSE" ARGUMENT CANNOT AVOID UNDISPUTED FACTS CONFIRMING THAT PLAINTIFFS CANNOT PROVE CAUSATION (PLS. MEM. SECTION VI) ..... 22

A. Plaintiffs Inappropriately Seek to Avoid Their Burden to Prove Causation ..... 23

B. Pre-Due Diligence Optimism Does Not Prove That Medytox Was a Ready U.S. Competitor ..... 23

C. Plaintiffs' But-For Pricing Theory Does Not Establish or Even Support Causation ..... 24

D. Plaintiffs' But-For Timing Theory Does Not Establish or Even Support Causation .......... 25

E. Plaintiffs' Speculation That MT10109L Should Have Become the World's First Botulinum Toxin Biosimilar Does Not Establish or Even Support Causation .......... 27

F. Plaintiffs Cannot Avoid Their Burden to Prove Causation by Objecting to Allergan's Affirmative Defense .......... 29

G. Dr. Geigert's But-For Timeline Ignores the Requirements and Conclusions of the Korean Government .......... 32

IV. PLAINTIFFS' "SCOPE OF THE PATENT" ARGUMENT ONLY CONFIRMS THE VALIDITY OF THE MEDYTOX-ALLERGAN LICENSE AGREEMENT (PLS. MEM. SECTION VII) .......... 33

CONCLUSION .......... 35

- ii -

Americas 93525716

DEFENDANT ALLERGAN, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A.&E. Plastik Pak Co. v. Monsanto, Co.*, 396 F.2d 710 (9th Cir. 1968) ........ 34

*AFMS, LLC v. United Parcel Service Co.*, 105 F. Supp. 3d 1061 (C.D. Cal. 2015) ........ 13, 14

*Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569 (S.D.N.Y. 2011) ........ 10

*Bhan v. NME Hosps., Inc.*, 669 F. Supp. 998 (E.D. Cal. 1987) ........ 13

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ........ 17

*Cal. CNG, Inc. v. S. Cal. Gas Co.*, 19 Fed. App'x 500 (9th Cir. 2001) ........ 23

*Cataphote Corp. v. DeSoto Chem. Coatings*, 450 F.2d 769 (9th Cir. 1971) ........ 19

*Catlin v. Washington Energy Co.*, 791 F.2d 1343 (9th Cir. 1986) ........ 23

*Compton v. Metal Products*, 453 F.2d 38 (4th Cir. 1971) ........ 35

*Conroy v. 3M Corp.*, 2003 U.S. Dist. LEXIS 26271 (N.D. Cal. Apr. 22, 2003) ........ 18

*Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148 (9th Cir. 2001) ........ 20

*Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176 (1980) ........ 35

*Eastman Kodak Co. v. Image Tech. Servs.*,
504 U.S. 451 (1992) .......... 13

*Energex Lighting Indus., Inc. v. North Am. Phillips Lighting Corp.*,
1989 U.S. Dist. LEXIS 611 (S.D.N.Y. Jan, 25, 1989) .......... 13

*Ethypharm S.A. France v. Abbott Laboratories*,
707 F.3d 223 (3d Cir. 2013) .......... 24, 29

*FTC v. Actavis, Inc.*,
133 S. Ct. 2223 (2013) .......... 35

*Gerlinger v. Amazon.com, Inc.*,
311 F. Supp. 2d 838 (N.D. Cal. 2004) .......... 20

*Golden Boy Promotions, LLC v. Haymon*,
2017 U.S. Dist. LEXIS 29782 (C.D. Cal. Jan. 26, 2017) .......... 18

*Hartzel v. United States*,
320 U.S. 680 (1944) .......... 35

*Hayden Pub. Co. v. Cox Broad. Corp.*,
730 F.2d 64 (2d Cir. 1984) .......... 13

*ILC Peripherals Leasing Corp. v. Int'l Bus. Mach. Corp.*,
458 F. Supp. 423 (N.D. Cal. 1978) .......... 10

*JBL Enterprises Inc. v. Jhirmack Enterprises Inc.*,
698 F.2d 1011 (9th Cir. 1983) .......... 14

*Lucas Auto. Eng'g, Inc. v. Bridgestone*,
275 F.3d 762 (9th Cir. 2001) .......... 12

*M.A.P. Oil v. Texaco*,
691 F.2d 1303 (9th Cir. 1982) .......... 16

*Malaney v. UAL*,
2010 U.S. Dist. LEXIS 106049 (N.D. Cal. Sept. 27, 2010) .......... 16

*Meijer, Inc. v. Biovail Corp.*,
533 F.3d 857 (D.C. Cir. 2008) .......... 29

*Merced Irrigation Dist. v. Barclays Bank PLC*,
165 F. Supp. 122 (S.D.N.Y. 2016) .......... 19

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984) .......... 20

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,
924 F.2d 1484 (9th Cir. 1991) .......... 16

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) .......... 20

*Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*,
838 F.3d 421 (3d Cir. 2016) .......... 13

*Newcal Indus. v. Ikon Office Solution*,
513 F.3d 1038 (9th Cir. 2008) .......... 4

*Olin Corp. v. FTC*,
986 F.2d 1295 (9th Cir. 1993) .......... 4, 12

*Omnicare, Inc. v. UnitedHealth Group, Inc.*,
594 F. Supp. 2d 945 (N.D. Ill. 2009) .......... 20

*In re Petroleum Prods. Antitrust Litig.*,
906 F.2d 432 (9th Cir. 1990) .......... 20

*Pitt Amusement Co. v. Act III Theatres*,
1995 U.S. App. LEXIS 28163 (9th Cir. 1995) .......... 23

*Rebel Oil Co. v. Atlantic Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) .......... 6

*Rio Grande Royalty Co. v. Energy Transfer Partners*,
786 F. Supp. 2d 1190 (S.D. Tex. 2009) .......... 19

*In re Solodyn Antitrust Litig.*,
2015 U.S. Dist. LEXIS 125999 (D. Mass. Aug. 16, 2015) .......... 29

*Thurman Industries v. Pay 'N Pak Stores*,
875 F.2d 1369 (9th Cir. 1989) .......... 4

*United States v. E. I. Du Pont de Nemours & Co.*, 351 U.S. 377 (1956) .......... 9

*United States v. Grinnell Corp.*, 384 U.S. 563 (1963) .......... 4, 6

*United States v. Hughes Tool Co.*, 415 F. Supp. 637 (C.D. Cal. 1976) .......... 10

*United States v. LSL Biotechnologies*, 379 F.3d 672 (9th Cir. 2004) .......... 12

*United States v. Oracle Corp.*, 331 F. Supp. 2d 1098 (N.D. Cal. 2004) .......... 16, 18

*In re Wellbutrin XL Antitrust Litig.*, 2017 U.S. App. LEXIS 15533 (3d Cir. Aug. 9, 2017) .......... 23

*Xechem, Inc. v. Bristol-Myers Squibb*, 372 F.3d 899 (7th Cir. 2004) .......... 29

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969) .......... 23

**FEDERAL RULES**

Fed. R. Civ. P. 44.1 .......... 32

**TREATISES**

PHILLIP E. AREEDA & HERBERT HOVENKAMP, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 565 (3rd and 4th Editions 2010-2017) .......... 14

Plaintiffs' summary judgment motion relies on the same unprecedented factual and legal arguments that require summary judgment for Allergan. Most of Plaintiffs' summary judgment memorandum addresses market definition—indeed a necessary test for all of Plaintiffs' claims, which Plaintiffs cannot pass. Regardless of how the Court defines the relevant product market, Plaintiffs' claims cannot survive. Plaintiffs request judgment as a matter of law on liability and causation while relying on overlapping impossibilities (the allegedly "delayed" competition could not have existed on the timeline Plaintiffs rely on, and a nonexistent product). Plaintiffs attack an industry-standard development license that has been approved [REDACTED] and Korean government. Mahan Decl. ¶ 5; Yun Decl. ¶ 21.

***Market Definition and Market Power.*** The Supreme Court requires that antitrust product markets be defined by "reasonable interchangeability of use." Here, a use-based market must include more than simply the three products Plaintiffs include. So Plaintiffs ask the Court to create a "submarket" without doing the analysis required under *Brown Shoe* and without any quantitative analysis.

***Concerted Action.*** Plaintiffs cite no authority supporting their request that the Court find concerted action to "delay" competition based solely on an agreement that includes no terms of a conspiracy to "delay." FAC ¶ 1, Doc. 28. And the documents Plaintiffs cite to support shifting the start of the alleged conspiracy back in time to August 2012—an admission that Plaintiffs' earlier but-for commercialization timelines (FAC ¶ 65) do not work—confirm that no agreement was formed before the deal closed in January 2014. Yun Decl. ¶¶ 5, 10, 12, 15. No agreement to "delay" competition was ever formed. Def. SJ Mem. § I.

***Causation.*** Plaintiffs' case is premised on an impossible scenario for the timing of U.S. approval of MT10109L without Allergan's help. Robbins Opp. Decl. ¶ 11. Where established companies need 6, 10, or 15 years for their neurotoxin products to be FDA-approved (*id.* ¶ 11, Apps. A.1–A.7, F), Plaintiffs allege Korean start-up Medytox—on its own, against its announced plans—could

obtain FDA approval "in less than two years following its obtaining regulatory approval abroad," starting in December 2013. FAC ¶ 65. Plaintiffs' expert, Dr. Geigert, now argues that Medytox could obtain approval in 36–42 months from August 2012, which is over a year ***before*** the License Agreement was signed and before Allergan and Medytox had even met. Katriel Ex. 4 at ¶ 222.

But no precedent for Plaintiffs' hypothetical causation timeline exists. Johnson & Johnson's PurTox project lasted 11 years, but failed. Robbins Opp. Decl. App. A.5. Dysport was approved in the U.S. 18 years after UK approval. *Id.* App. A.2. [REDACTED] *Id.* App. A.1. Xeomin took at least 6 or 7 years for approval, 5 years after approval abroad, *id.* at App. A.4, and [REDACTED] *Id.* Apps. A.6, A.7. Daewoong entered into an exclusive license in September 2013, but, despite cGMP-ready facilities (unlike Medytox), is still not FDA-approved. *Id.* App. A.3. It is simply ***impossible*** for MT10109L to have been developed and approved in the ***19 months*** from the September 2013 License Agreement to April 2015, the start of the damages period.

***Scope of Medytox's IP Rights.*** Admitting that a bona fide license is lawful, Plaintiffs now argue that the inclusion of "know-how" goes beyond the scope of Medytox's IP. (No such claim appears in the Complaint.) But Medytox's know-how is necessary to and squarely within the scope of its valid patent rights. Undisputed terms of the License Agreement define the challenged know-how as [REDACTED] Pace SJ Ex. 26 at § 1.56. Of course, know-how can be licensed exclusively.

**ARGUMENT**

The burden of proving a properly-defined relevant market rests with Plaintiffs, as Plaintiffs' claims must be judged under the antitrust Rule of Reason. Def. SJ. Mem. § III. Plaintiffs never ask the Court to apply the *per se* rule in their summary judgment motion, noting in passing only that *per se* treatment is

something Plaintiffs once "urged."  Pls. SJ Mem. 17.  And courts overwhelmingly
have held that the Rule of Reason applies to exclusive licenses—and that such
licenses are procompetitive.  Def. Opp. to Pls. Mot. for Partial J. at 9–11 (Doc. 84).

## I.    PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PRODUCT MARKET DEFINITION (AND FAIL TO MEET THEIR OWN BURDEN) (PLS. MEM. SECTIONS II–IV)

Despite testimony from doctors (including Plaintiffs), Allergan executives,
economists, and competitors, as well as thousands of Allergan, competitor, and
public documents, confirming time and time again that Botox Cosmetic® competes
head-to-head with other products in the facial aesthetics market, Plaintiffs ask this
Court to conclude that the relevant antitrust product market is limited only to three
injectable neurotoxins for cosmetic use.  Plaintiffs' request must be rejected.

Plaintiffs ignore the market realities of competition between Botox
Cosmetic® and other facial aesthetic products and procedures, including dermal
fillers, lasers, medical devices, facial surgery, creams, chemical peels, and
dermabrasion procedures—all of which are used by doctors and patients to treat
facial wrinkles.  Plaintiffs exclude these other anti-wrinkle products by arguing that
the three injectable neurotoxins treat a different "type" of facial wrinkles, by means
of a different "mechanism of action."  But Plaintiffs ignore record evidence of
products other than neurotoxins being used to treat "dynamic" wrinkles, and
neurotoxins being administered off-label for cosmetic uses beyond just "dynamic"
wrinkles.  *See* Section I.A.2.  This record is full of evidence of Botox® Cosmetic
competing head-to-head with other facial aesthetic products and procedures.  *See*
Section I.A.1.  Plaintiffs' economist never engaged in any quantitative analysis to
assess elasticities of demand or evaluate competition.  *See* Section I.A.3.

### A.    Plaintiffs' Neurotoxin-Only Market Ignores That Many Other Cosmetic Products Are Used to Treat Facial Wrinkles

Supreme Court and Ninth Circuit precedent confirms that the "outer

boundaries" of a relevant product market are "determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)); *Olin Corp. v. FTC*, 986 F.2d 1295, 1298 (9th Cir. 1993). A properly defined market must include "the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business." *Thurman Industries v. Pay 'N Pak Stores*, 875 F.2d 1369, 1374 (9th Cir. 1989); *see also United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1963) (relevant market must "reflect[] commercial realities").

A patient walking into his or her doctor's office in hopes of minimizing facial wrinkles is certainly not going to care about the differences between "dynamic" and "static" wrinkles (Pls. SJ Mem 1, 4, 6, 11), or the mechanisms of action of treatments (Pls. SJ Mem. 4–6, 11). Opp. Facts 13–16, 18, 24. Wrinkle patients differ when it comes to, among other things, how much they are willing to spend, how invasive of a procedure they are willing to endure, how permanent or temporary of a solution they are seeking, and how often they want to visit the doctor to improve their appearance. Opp. Facts 16, 23–24, 27–30; Kane Decl. at ¶¶ 32, 36–37, 39, 41; Maas Decl. at ¶¶ 17–22. Doctors offer patients a variety of treatments for facial wrinkles. Kane Decl. ¶¶ 32, 36, 38, 39–46; Maas Decl. ¶¶ 16–17, 19, 23, 25; Cremieux Opp. Decl. App. 4. Yet Plaintiffs' proposed neurotoxin-only market definition does not include all the products that the doctors and patients have to choose from and that have the "actual or potential ability to deprive each other of significant levels of business." *Thurman*, 875 F.2d at 1374. Indeed, even Plaintiffs' own economist, Dr. Mangum, explained that "[s]ince cosmetic botulinum toxin is used for facial wrinkles, other options for cosmetic facial products or procedures may be candidates for products to be included in the relevant market. Cosmetic facial treatments include, other than botulinum toxin,

fillers, creams, surgery (e.g. face lift), laser treatment, and chemical peels." Katriel. Ex. 1, Mangum Decl. ¶ 41; *see also* Katriel Ex. 5, Gilbert Decl. ¶ 47.

### 1. This Record Confirms that Plaintiffs' Neurotoxin-Only Market Is Improperly Narrow

Plaintiffs are wrong that "virtually all sources" support Plaintiffs' product market definition. Pls. SJ Mem. 2.[1] Allergan documents and testimony, competitor documents and testimony, public materials, medical literature, expert witnesses, and even documents and testimony from Plaintiffs themselves confirm that neurotoxins are just one of a number of products and procedures that patients and doctors choose from to address facial wrinkles.

***Allergan Testimony and Documents.*** While Plaintiffs cherry-pick certain Allergan documents, other Allergan documents confirm that the company viewed neurotoxins as only one product in the "facial aesthetics market." Opp. Facts 13, 15, 18, 20, 23–24, 31–33. *See, e.g.*, Pace SJ Ex. 259, AGN-00126347, at 53, 57, 98 [REDACTED] Pace Opp. Ex. 6, AGN-00169774, at 30 ([REDACTED]; Pace SJ Ex. 204, AGN-00169026, at 34 ([REDACTED]); Pace Opp. Ex. 8, AGN-00054789, at 9–10, 12, 39 ([REDACTED] Pace Opp. Ex. 9, AGN-00136349, at 56 [REDACTED] Pace Opp. Ex. 10, AGN-00216053, at 504, 543 [REDACTED]

Many Allergan documents also detail real-world competition between Botox Cosmetic® and dermal fillers, laser treatments, chemical peels, creams, and plastic

[1] Plaintiffs rely on plaintiff FTC's proposed market definition from a 2005 merger challenge to support their proposed market. Pls. SJ Mem. 12; Mangum Decl. ¶¶ 53–55. But no court [REDACTED] is [REDACTED]

surgery (Opp. Facts 13, 15, 18, 20, 23–24, 31–33):

- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]

So while Plaintiffs contend that Botox® Cosmetic always had greater than [redacted] market share of neurotoxins (Pls. SJ Mem. 18), that is simply not true. Opp. Fact 41; *see also* Opp. Facts 42–43. In any event, benchmarking calculations are relevant, if at all, only when the market is defined appropriately. *See Grinnell Corp.*, 384 U.S. at 572 ("We see no barrier to combining in a single market a number of different products or services where that combination reflects commercial realities."); *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) ("Market definition is crucial. Without a definition of the relevant market, it is impossible to determine market share."). When assessed in the context of a properly defined market, Allergan documents confirm that the share for Botox® Cosmetic is well below the threshold for monopoly power. *See* Cremieux SJ Decl. Ex. 6a [redacted] [redacted] [redacted]; *see also* Pace SJ Ex. 259, AGN-00126347, at 12 ([redacted]

[redacted]). In fact, despite Plaintiffs' representation to the Court that "***all*** [of Allergan's] documents showed Botox Cosmetic's share relative only to Xeomin and Dysport," (Pls. SJ Mem. 9) (emphasis added), [redacted]. Opp. Facts 38, 42.

***Competitor Documents and Testimony.*** Plaintiffs rely on excerpts of Merz and Galderma testimony, (Pls. SJ Mem. 9–13), but Galderma documents and testimony [redacted]. Opp. Facts 13–14; *see, e.g.*, Pace Opp. Ex. 2, Lango Tr. 76:5–77:1; Pace Opp. Ex. 40, Lango Dep. Ex. 6 (Galderma website listing neurotoxins and fillers in therapeutic category of "skin senescence"); Pace Opp. Ex. 41, Lango Dep. Ex. 4 (Galderma website: "[s]urgery is not the only option for those who wish to improve their appearance. Today, far less expensive and minimally invasive procedures are also available to help tackle the signs of ageing and /or improve the condition of your skin. . . . the most popular procedures include": "dermal fillers," "chemical peels," "botulinum toxins," and "laser treatments"). Similarly, Merz documents and testimony confirm that [redacted] Opp. Facts 15, 16, 18, 19; Pace Opp. Ex. 4, Hartman Tr. 75:12–76:10, 83:25–84:4 [redacted]; *see also* Pace Opp. Ex. 5, MERZ1514 ([redacted]).

***Other Public Sources.*** Plaintiffs also overlook publicly available evidence of direct competition between neurotoxins and dermal fillers, laser treatments, chemical peels, creams, and surgical procedures. *See* Cremieux SJ Decl. ¶¶ 82, 84

& n.194. Certainly, targeting Botox Cosmetic® customers through various marketing tactics is a common practice for competing products. *See, e.g.*, Pace Opp. Ex. 60 (advertisements by other facial aesthetic products claiming, "Better than Botox," "Forget Botox! Discover the Secret to Injection Free Wrinkle Reduction"); Cremieux Opp. Decl. App. 4 (100+ clinic websites).

***Medical Literature.*** Medical studies also confirm that neurotoxins and dermal fillers share the same diagnosis codes. *See* Pace Opp. Ex. 58, Laura F. Sandoval et al., *Trends in the Use of Neurotoxins and Dermal Fillers by US Physicians*, J. CLINICAL AESTHETIC DERMATOLOGY, Vol. 7(9):14-19 Figure 3, Figure 3 (2014) (listing "other specified hypertroponic and atrophic conditions of skin" and "other plastic surgery for unacceptable cosmetic appearance" as the "[t]op diagnoses for cosmetic dermal filler and neurotoxin visits").

***Expert Testimony.*** Expert testimony also confirms that Botox® Cosmetic and other neurotoxin products are just one available option for doctors and patients, and that patients often switch from one product to another. Opp. Fact 14; Maas Decl. ¶¶ 15–21 ("Patients who are new to aesthetic treatments often sample a variety of different options, including but not limited to neurotoxins. After gaining some personal experience with different treatments, patients then decide which option best suits their needs."); Kane Decl. ¶¶ 31–41, 52 ("Eventually, the patients tire of the mounting expense, the periodic visits, and gradually decreasing results of these less invasive procedures [Botox, fillers, skincare products, and lasers] and opt for surgery."); Cremieux SJ Decl. ¶¶ 82–83; Mangum Decl. ¶ 41; Katriel Ex. 5, Gilbert Decl. ¶ 47.

***Plaintiffs' Documents and Testimony.*** Plaintiffs' own evidence and testimony confirms that, in practice, neurotoxins are just one option available to doctors and patients to treat facial wrinkles. *See, e.g.*, Pace Opp. Ex. 3., Towhidian Tr. 78:25–79:19, 30:4–19 (Dr. Towhidian offers a procedure using a CO2 laser that treats wrinkles); 121:16–122:2 (Q. [T]he question is if you can describe some

circumstances when a dermal filler might be appropriate for a dynamic facial line or wrinkle? A. Usually we don't use dermal filler for dynamic, but on some occasions we do."); Pace SJ Ex. 243, Towhidian Dep. Ex. 6 (Dr. Towhidian's patient intake form shows facial wrinkles can be treated with "Botox," "Fraxel lasers," or a "photofacial"); Pace Opp. Ex. 11, Towhidian Resp. to Defs. First Set of Interrogs. at 4–5 (Dr. Towhidian has used dermal fillers, Xeomin, and lasers to treat wrinkles in his practice); *see also* Opp. Facts 13, 14, 16, 18, 23, 24.

**2. Plaintiffs' Reliance on Types of Wrinkles and "Mechanisms of Action" Is Improper and Contradicted by the Record**

Plaintiffs contend their neurotoxin-only market is appropriate because neurotoxins allegedly are used only to treat "dynamic," not "static," wrinkles, and thus neurotoxins are "not reasonably interchangeable" because they treat different indications through "different means." Pls. SJ Mem. 4, 7. But patients do not walk into doctors' offices with any understanding of "dynamic" or "static" wrinkles, and thus Plaintiffs' proposed definition does not comport with commercial realities of the market. *See* Section I.A.1. Moreover, the record confirms that Plaintiffs' argument fails even on its own terms: (1) Botox Cosmetic® is not used only to treat "dynamic" wrinkles, and (2) other facial aesthetic products and procedures are not used only to treat "static" wrinkles. Opp. Facts 13–14, 23–24.

***Plaintiffs' Reference to the "Mechanism of Action" Does Not Justify a Three-Product Neurotoxin-Only Market.*** Plaintiffs' "mechanism of action" point does not support Plaintiffs' narrow neurotoxin-only market. Pls. SJ Mem. 4–5. The pertinent inquiry for market definition is the purpose for which the product is used, not the *mechanism* for achieving results. *See, e.g.*, *United States v. E. I. Du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956) ("In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers ***for the same purposes*** make up that part of the trade or commerce."

(emphasis added)); *ILC Peripherals Leasing Corp. v. Int'l Bus. Mach. Corp.*, 458 F. Supp. 423, 429 (N.D. Cal. 1978) ("While there may be situations where disk storage is the only practicable medium, there are many other situations where either tape or memory are reasonable alternatives."); *United States v. Hughes Tool Co.*, 415 F. Supp. 637, 640 (C.D. Cal. 1976) ("Once the relevant function is determined, the court must then determine the tools which operate as a group in the performance of that function. . . . The major problem with the government's product market definition is that it is underinclusive since it does not set forth all the tools necessary to perform the relevant function."); *see also Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 577–78 (S.D.N.Y. 2011) (rejecting plaintiff's proposed market because it failed to include other drugs and two-drug combinations used to treat the same symptoms).

Moreover, even if the Court defined the relevant market based on "mechanisms of action," Plaintiffs' proposed neurotoxin-only market would still be too narrow. Many other procedures paralyze muscle activity in order to treat facial wrinkles and are currently available to patients. Opp. Facts 18, 24; Kane Decl. ¶ 38 (identifying ThermiRase, Neubelle, and iovera as devices that have the same mechanism as, and compete with, neurotoxins); Maas Decl. ¶¶ 19, 25 (identifying corrugator myotomy, platysma myotomy, and medical devices that have the same mechanism as, and competes with, neurotoxins). Minimally invasive surgical options, such as the corrugator myotomy or the platysma myotomy, for example, also treat wrinkles by disabling the muscles that cause frown lines or neck lines. Maas Decl. ¶ 19. A number of medical devices also target muscle contraction to treat wrinkles. Opp. Fact 24.

***Doctors Administer Botox Cosmetic® for Various Cosmetic Uses.*** Plaintiffs argue that the "indication" for Botox Cosmetic is for "facial wrinkles caused by muscle contraction." Pls. SJ Mem. 4–5. Even Plaintiffs' proposed market definition is not so limited; their market is "injectable botulinum

neurotoxins ***for cosmetic use***." Pls. SJ Mem. 2; FAC ¶ 9 (emphasis added). Plaintiffs' class includes all purchasers of Botox® Cosmetic for ***any*** reason—and not just one type of wrinkles. FAC ¶ 68.

Doctors administer Botox® Cosmetic off-label for many cosmetic uses other than wrinkles caused by muscle contraction. Opp. Fact 18; Pace Opp. Ex. 42 at AGN-00175791, 08 [REDACTED] ; Pace Opp. Ex. 27, AGN-00305024, at 41 ( [REDACTED] ); Pace Opp. Ex. 48, Woffles T.L. Wu, "Non Surgical Facial Rejuvenation with the 4R Principle" (use of Botox® Cosmetic unrelated to muscle contraction such as a brow lift, MicroBotox, chin rejuvenation, facial sculpting). Even Dr. Towhidian testified that he administers Botox Cosmetic® for many cosmetic uses, not just "dynamic" wrinkles caused by muscle contraction. *See* Pace Opp. Ex. 3, Towhidian Tr. 161:23–162:13 ("Q. Other than glabellar lines and lateral canthal lines, what other reasons would you administer Botox Cosmetic? A. Forehead lines. Smile lines down here. Because some patients, their mouth, they will look like a sad mouth, it goes down at the corners. . . . Some patient start—the nose start going down. We inject them right here to keep the nose up. Gummy lines, when they smile, the gum shows, and that looks ugly for women. . . . Chin, we call it orange peeling. When they smile . . . they have whole bunch of little dimples here on the chin. We give them Botox . . . .").

***Other Cosmetic Products Are Used to Treat Dynamic Wrinkles.*** Other cosmetic products treat facial wrinkles caused by muscle contraction. Opp. Facts 13, 18, 20, 23; Kane Decl. ¶ 43; Pace Opp. Ex. 28, AGN-00095858, at 60 (Juvederm indicated for frown lines, crow's feet); Ex. 245, AGN-00015827, at 46, 51 ( [REDACTED]

[REDACTED]); Pace Opp. Ex. 24, Kane Tr. 138:13–141:1; Pace Opp. Ex. 2, Lango Tr. 76:20–77:1; Pace Opp. Ex. 4, Hartman Tr. 21:23–22:3; 76:20–81:14. While some of these products do not paralyze the muscles, they all combat wrinkles. *Id.* Plaintiffs do not explain why surgical procedures are not a reasonable substitute for neurotoxins for the treatment of wrinkles. Kane Decl. ¶¶ 32, 36, 37, 42, 52; Maas Decl. ¶¶ 17–19; Pace Opp. Ex. 24, Kane Tr. 138:13–141:1 ("if you were to price it out over 12 or 15 years, your injectables and/or laser or whatever you're doing typically would be significantly more expensive than actually having surgery"); Cremieux Opp. Decl. ¶¶ 82–86, Table 7.

### 3. Plaintiffs Performed No Quantitative Analysis in Support of Their Narrow Market Definition

Quantifying the cross elasticity of demand between the product or service at issue and its potential substitutes is essential to market definition. *See Lucas Auto. Eng'g, Inc. v. Bridgestone*, 275 F.3d 762, 767 (9th Cir. 2001) ("The determination of what constitutes the relevant product market hinges, therefore, on a determination of those products to which consumers will turn, given reasonable variations in price."); *Olin Corp.*, 986 F.2d at 1298 ("Where an increase in the price of one product leads to an increase in demand for another, both products should be included in the relevant product market."). Dr. Mangum acknowledges that "the outer boundaries of a relevant product market are determined by the reasonable interchangeability of use ***or the cross-elasticity of demand between the product itself and substitutes for it***. . . . A product is construed to be a 'reasonable substitute' for another when the demand for it increases in response to an increase in the price for the other." Mangum Decl. ¶ 33 (emphasis added).

Here, a cross-elasticity analysis would have entailed reviewing the pricing and demand for injectable neurotoxins, along with the other cosmetic products and procedures, and measuring the extent to which prices and demand for one product or procedure affected the pricing or demand for others. *See, e.g.*, *United States v.*

*LSL Biotechnologies*, 379 F.3d 672, 697 (9th Cir. 2004) ("Elasticity of demand is a concept used to signify the relationship between changes in price and responsive changes in demand."); *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 469 (1992). Yet Dr. Mangum never tested Plaintiffs' proposed neurotoxin-only market by means of a cross-elasticity analysis—or any quantitative analysis at all. *See* Pls. SJ Mem. § II; Mangum Decl. § III.

Plaintiffs' failure to do any quantitative analysis undermines the reliability of their proposed market and is a further indication of why Plaintiffs do not carry their burden of proof. *See Hayden Pub. Co. v. Cox Broad. Corp.*, 730 F.2d 64, 71 (2d Cir. 1984) ("[A]s a general rule, the process of defining the relevant product market requires consideration of cross-elasticity of demand"); *AFMS*, 105 F. Supp. 3d at 1078 ; *Bhan v. NME Hosps., Inc.*, 669 F. Supp. 998, 1018 (E.D. Cal. 1987), *aff'd*, 929 F.2d 1404 (9th Cir. 1991); *see also Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 437 (3d Cir. 2016) (affirming summary judgment in favor of defendants where plaintiff failed to conduct cross-elasticity analysis in support of any overly narrow market definition); *Energex Lighting Indus., Inc. v. North Am. Phillips Lighting Corp.*, 1989 U.S. Dist. LEXIS 611, at *4 (S.D.N.Y. Jan, 25, 1989) ("Proper legal analysis of product market requires economic evidence of the functional interchangeability of the product at issue and other similar products, as well as their cross-elasticity of demand.").

The *AFMS* court granted defendants' summary judgment motion on product market because, "[d]espite a requirement to do so, Plaintiff has not produced 'market data, figures or other relevant material adequately describing the nature, cost, usage, or other features of competing products' to determine the bounds of the relevant market." *AFMS*, 105 F. Supp. 3d at 1078 (quoting *Bhan*, 669 F. Supp. at 1018). "Plaintiff has not demonstrated that there is a market for this marginal subset of Plaintiff's services or that there are any other participants in this market, let alone that there is a 'relationship between changes in price and responsive

changes in demand,'" and thus "Plaintiff's failure to produce such evidence prevents it from defining the relevant service market and precludes it, as a matter of law, from establishing its claims." *AFMS*, 105 F. Supp. 3d at 1078 (quoting *LSL Biotechnologies*, 379 F.3d at 697 ). Plaintiffs here have failed to produce any sort of cross-elasticity or quantitative analysis in support of their proposed neurotoxin-only market definition,[2] citing nothing more than the testimony of Galderma and Merz witnesses regarding their pricing practices for Dysport and Xeomin, respectively, neither of which testimony was supported by any quantitative work. *See* Pls. SJ Mem. 11, 13; *see also, e.g.*, Pace Opp. Ex. 2, Lango Tr. 89:7–11.

**B. Plaintiffs' Reliance on a Distinction Between "Complementary" and Substitutable Products Is Misplaced**

Plaintiffs contend that, "[b]y definition," because Botox® Cosmetic can be used with other products, then, as a matter of law, those products can *never* be in the same market as Botox Cosmetic®. *See* Pls. SJ Mem. 8, 11, 14–15. But case law and economics confirm that products used together sometimes may be direct competitors at other times—thus both must be assessed to define a relevant market. *See, e.g.*, *JBL Enterprises Inc. v. Jhirmack Enterprises Inc.*, 698 F.2d 1011, 1016–17 (9th Cir. 1983) (affirming district court's product market to be "the sale of beauty products, including but not limited to shampoos and conditioners"). Plaintiffs cite only references to dermal fillers being used with neurotoxins (Pls. SJ Mem. 11, 14–16), but the products at issue are all options for treating facial wrinkles; while one may be used at the same time as another, they are not complements in the economic sense. *See* PHILLIP E. AREEDA & HERBERT HOVENKAMP, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 565 (3rd and 4th Editions 2010-2017) ("Substitutes are goods that can replace one another and thus 'compete' for the user's purchase. . . . By contrast,

[2] Only Allergan has cited quantitative analysis of cross elasticity. *See* Pace SJ Ex. 185, Cremieux SJ Decl. ¶ 84 (review of neurotoxins and dermal fillers supported positive cross-price elasticity between the two categories of products).

complements are goods that are most efficiently made or used together. For example, gasoline and automobiles are complements, as are computer hardware and software, toasters and bread, or beef and leather."). Economic literature confirms that complementary products can be potential substitutes. *See, e.g.*, Pace Opp. Ex. 61, Shocker et al., *Product Complements and Substitutes in the Real World: The Relevance of 'Other Products*,' 64 J. MARKETING 28–40 (2004) ("Static relationships may offer similar performance/price ratios . . . and they may include products that can be simultaneous complements and substitutes"); Pace Opp. Ex. 62, NICHOLOSON & SNYDER, INTERMEDIATE MICROECONOMICS AND ITS APPLICATIONS 94 (12th ed., 2015) ("[I]t is theoretically possible for X to be a complement for Y, and for Y to be a substitute of X.").

Plaintiffs quote a portion of Dr. Kane's article to argue that complementary products can never be substitutes. Pls. SJ. Mem. 15; Katriel Ex. 24, Kane Dep. Ex. 2 at 18. But, just outside Plaintiffs' block quote, Dr. Kane explains how patients may choose a neurotoxin, filler injection, or one of each, all for the same procedure:

> No one method [in terms of injections of fillers and toxins] provides an advantage over another . . . . [I]n a patient desiring upper facial rejuvenation with both BoNTA and a filler, it would be reasonable to inject BoNTA at one visit and have the patient return in a week. ***If the patient is satisfied with the look, s/he may decide to forego injection with the filler. Similarly, in the lower face, the effects achieved with filler may cause the patient to decide to forego BoNTA co-treatment***.

*See* Katriel Ex. 24, Kane Dep. Ex. 2 at 18 (emphasis added); Opp. Facts 14, 27–30; Kane ¶ 52 ("most patients try to put off surgery by using Botox, fillers, topical skincare products, and laser treatments. Eventually the patients tire of the mounting expense, the periodic visits, and gradually decreasing results . . . and opt for surgery"); Maas Decl. ¶ 21 ("After gaining some personal experience with different treatments, patients then decide which option best suits their needs").

### C. Plaintiffs' Neurotoxin-Only Submarket Fails Under the Requisite *Brown Shoe* "Practical Indicia"

Plaintiffs acknowledge that their proposed neurotoxin-only market is a "submarket" of the broader facial aesthetic market under *Brown Shoe*. *See* Pls. SJ Mem. 3; Mangum Decl. ¶ 37. The Ninth Circuit has been clear, however, that a submarket exists only "if it is sufficiently insulated from the larger market so that supply and demand are inelastic with the larger market." *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir. 1991).

Plaintiffs have made no showing that supply and demand between neurotoxins and other cosmetic products and procedures are inelastic. *See* Section I.A.3. Further, the record supports the existence of price elasticity between neurotoxins and dermal fillers. *See* Cremieux SJ Decl. ¶ 84 ("A facial aesthetics global market analysis examines the relationship between neurotoxins and dermal fillers and finds evidence consistent with a positive cross-price elasticity between the two categories of products."). Courts are wary of drawing too narrow a proposed submarket, like Plaintiffs propose here. *See, e.g.*, *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1119 (N.D. Cal. 2004) ("Defining a narrow 'submarket' tends to require a relatively long laundry list of factors, which creates the danger of narrowing the market by factors that have little economic basis."); *Malaney v. UAL*, 2010 U.S. Dist. LEXIS 106049, at *21 (N.D. Cal. Sept. 27, 2010); *see also M.A.P. Oil v. Texaco*, 691 F.2d 1303, 1308 (9th Cir. 1982) ("Whether or not a court is justified in carving out a submarket depends ultimately on whether the factors which distinguish one purported submarket from another are 'economically significant' in terms of the alleged anticompetitive effect." (quoting *Int'l Tel. and Tele. Corp. v. Gen. Tel. & Elec. Corp.*, 518 F.2d 913, 932 (9th Cir. 1975)).

Plaintiffs acknowledge the existence of the Supreme Court's seminal decision in *Brown Shoe* (Pls. SJ Mem. 3), but make no effort to relate the evidence to the *Brown Shoe* "practical indicia" factors:

> The boundaries of such a submarket may be determined by examining such practical indicia as ***industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors***.

370 U.S. at 325 (emphasis added). Plaintiffs here have made no mention of how this record supports a neurotoxin-only submarket with the *Brown Shoe* factors, many of which weigh in favor of Allergan. For example, ***both doctors and patients (customers, public) recognize*** and ***use*** neurotoxins and other cosmetic products and procedures as options for the treatment of facial wrinkles, regardless of indications or mechanisms of action. *See* Section I.A.2. Additionally, there are ***no specialized vendors*** for neurotoxins compared to other aesthetic products and procedures. *See* Cremieux Opp. Decl. ¶¶ 6–7, App. 4 (100+ clinics). Neurotoxins are part of a larger portfolio of cosmetic products doctors purchase and sell in clinics. Opp. Fact 16; Kane ¶ 24; Pace Opp. Ex. 25, Chu Tr. 84:2–85:6; Pace Opp. Ex. 2, Lango Tr. 128:7–131:11; Pace Opp. Ex. 4, Hartman Tr. 21:23–22:3; Cremieux Opp. Decl. App. 4. Nor are there ***distinct customers*** for neurotoxins as compared to other cosmetic products—doctors and cosmetic surgeons purchase and administer a variety of cosmetic products. Opp. Fact 16; Maas Decl. ¶ 16; Kane Decl. ¶ 24; Cremieux Opp. Decl. App. 4. While Plaintiffs have done no analysis of neurotoxin ***prices or price changes*** as compared to the prices of other cosmetic products, the record shows that neurotoxins are similarly priced to dermal fillers and other cosmetic procedures. Kane Decl. ¶ 36 (cumulative cost of neurotoxins may be more than the cost of surgery), ¶¶ 42, 53 (creams may cost patients thousands of dollars a year); Opp. Fact 16, 21; Maas Decl. ¶ 18–19 (surgery may be less expensive than neurotoxin injections); Pace SJ Ex. 259, AGN-00126347, at 62 ([redacted] [redacted]); Cremieux Opp. Decl. ¶ 86 (comparably priced over time).

**D. Plaintiffs Fail to Establish Allergan Has Market Power as a Matter of Law**

Plaintiffs admit "[s]ome counts of the First Amended Complaint require a showing that Allergan had sufficient market power to reduce output or raise prices and thereby restrict competition." Pls. SJ Mem. 17. All Counts do. As for "direct" evidence (Pls. SJ Mem. 18), it is undisputed that Allergan never restricted output of Botox® Cosmetic. *See* Cremieux Opp. Decl. ¶¶ 2–5, Apps. 1–3; *see also Oracle Corp.*, 331 F. Supp. 2d at 1114 ("It is this reduction in output and elevation of price that has been the historic concern of antitrust."). Indeed, Allergan's economist, Dr. Cremieux, charted the total [REDACTED] both before and after the Medytox-Allergan License Agreement. Cremieux Opp. Decl. ¶¶ 2–5, Apps. 1–3. As to price, [REDACTED] s. Def. SJ Fact 39; Cremieux SJ Decl. ¶ 13. A price increase by one firm when others raise price is not proof of market power.

This Court should deny Plaintiffs' motion on product market and market power and grant Allergan summary judgment. Plaintiffs "have the burden of proving that their market definition is correct." *Conroy v. 3M Corp.*, 2003 U.S. Dist. LEXIS 26271, at *15 n.3 (N.D. Cal. Apr. 22, 2003) (citing *Rebel Oil Co.*, 51 F.3d at 1435 ); *see also Golden Boy Promotions, LLC v. Haymon*, 2017 U.S. Dist. LEXIS 29782, at *27 (C.D. Cal. Jan. 26, 2017) ("summary judgment is appropriate if Plaintiffs' evidence is insufficient").

**II. PLAINTIFFS CANNOT ESTABLISH ILLEGAL CONCERTED ACTION AS A MATTER OF LAW (PLS. MEM. SECTION V)**

Plaintiffs argue that the License Agreement relieves them of their burden to (1) show concerted action under Section 1 of the Sherman Act, and (2) that the Court should find concerted action as a matter of law as of October 2012—***11 months before*** the License Agreement was signed in September 2013, and [REDACTED]

[REDACTED] ***15 months before*** the deal closed in January 2014. Pls. SJ Mem. 19–21. This Court must reject both arguments.

**A. Plaintiffs Fail to Establish Illegal Concerted Action**

Plaintiffs cannot satisfy their burden to prove concerted action under the Sherman Act by relying on an agreement that is lawful on its face. The terms of the License Agreement are undisputed and lawful; to deep-six the new liquid product would breach the Agreement. Def. SJ Fact 4–14; Opp. Fact 60–62. Plaintiffs have no evidence to suggest (1) that Medytox's IP rights are a sham, (2) that Medytox's license is a sham, or (3) that Medytox and Allergan entered into any side agreement to delay MT10109L. Def. SJ Mem. § I. Plaintiffs object only to the Agreement's exclusivity. Pls. MTD Opp. at 18, Doc. 39 (License illegal "because it grants those rights exclusively"); FAC ¶ 1. But the Ninth Circuit and courts around the country have made clear that exclusivity is not illegal; the ability to license one's patent exclusively is intrinsic to owning a patent. Def. SJ Mem. § I.B; *Cataphote Corp. v. DeSoto Chem. Coatings*, 450 F.2d 769, 774 (9th Cir. 1971) (exclusive licenses "neither unusual nor sinister"); Robbins Opp. Decl. App. C.

Plaintiffs cite no cases suggesting that the concerted action requirement can be satisfied by an agreement lawful on its face. That a party "accepts the terms of a contract does not, without more, generate the type of concerted action necessary to violate *Section 1*." *Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 122, 138–39 (S.D.N.Y. 2016) (rejecting plaintiffs' claim that it "need only allege the existence of a contract which resulted in an unreasonable restraint of trade"; contract did not, "by its terms, create[] an anticompetitive effect"); *Rio Grande Royalty Co. v. Energy Transfer Partners*, 786 F. Supp. 2d 1190, 1199 (S.D. Tex. 2009) ("It seems illogical to conclude that those on the buying side of the fixed-price natural gas market, without more, must have acted in concert with Defendants because they entered into contracts with them."). Plaintiffs must prove a "conscious commitment to a common scheme designed to achieve an unlawful

objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).

Where, as here, the challenged agreement does not contain the terms of the allegedly illegal scheme, plaintiffs must prove an illegal agreement separately. *See Omnicare, Inc. v. UnitedHealth Group, Inc.*, 594 F. Supp. 2d 945, 964 (N.D. Ill. 2009) (merger agreement "cannot provide the basis to conclude that a conspiracy in restraint of trade existed"). In *Gerlinger v. Amazon.com, Inc.*, where the plaintiffs, represented by Plaintiffs' counsel here, argued that a collaboration between Amazon and Borders was *per se* illegal, the court rejected the plaintiffs' argument that the agreement alone satisfied the Sherman Act. 311 F. Supp. 2d 838, 851–52 (N.D. Cal. 2004) ("***The existence of an agreement is not in dispute.*** . . . [P]roof of a conspiracy requires proof of a specific intent to monopolize . . . . [P]laintiff's motion for judgment on the pleadings on this cause of action is denied." (emphasis added)), *aff'd* 526 F.3d 1253 (9th Cir. 2008).

**B. Plaintiffs Fail to Establish Illegal Concerted Action Beginning in October 2012 as a Matter of Law**

Plaintiffs also cannot show that the parties entered into any agreement to "delay" competition, FAC ¶¶ 1, 55, beginning in October 2012. Dr. Geigert goes even further: his hypothetical FDA approval timeline begins in ***August 2012***— even though [REDACTED] [REDACTED]. Katriel Ex. 4, Geigert Decl. ¶ 222. Plaintiffs must prove that "a defendant 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1155 (9th Cir. 2001) (quoting *Monsanto*, 465 U.S. at 764); *In re Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 455 (9th Cir. 1990). Plaintiffs fail when allegations "could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 & n.6 (9th Cir. 2015); *see also Gerlinger*, 311 F. Supp. 2d at 840–41, 851–52.

Plaintiffs claim that the early discussions between Allergan and Medytox constitute an illegal conspiracy to delay competition, Pls. SJ Mem. 20, but no document cited by Plaintiffs says anything like that. Opp. Fact 67–68.

[redacted] Dr. Geigert proposes a hypothetical FDA approval timeline beginning in August 2012. Geigert Decl. ¶ 222. But the [redacted] Katriel Ex. 29, AGN-00317922. [redacted] *Id.*

[redacted] (Def. SJ Mem. § II.B.1). Katriel Ex. 30. [redacted] Medytox had neither the intent nor preparedness to commercialize a product in the U.S. by itself.

[redacted] FAC ¶¶ 1, 55; Opp. Fact 58:

- [redacted].
- [redacted]
- [redacted]
- [redacted] Def. SJ Mem. § II.
- [redacted]

Katriel Ex. 31, AGN-00058192 (emphasis added).

## III. PLAINTIFFS' "PROXIMATE CAUSE" ARGUMENT CANNOT AVOID UNDISPUTED FACTS CONFIRMING THAT PLAINTIFFS CANNOT PROVE CAUSATION (PLS. MEM. SECTION VI)

Plaintiffs' causation summary judgment request ignores the overwhelming, undisputed evidence of [redacted] . Def. SJ Mem. § II. Plaintiffs argue that causation is satisfied as a matter of law because Medytox's "grant of exclusivity" for its hypothetical product gave Allergan the "right to price that product" and "control the timing" of launch. Pls. SJ Mem. 24. Plaintiffs ignore that Medytox needed a partner, that Allergan [redacted], and that milestone payments push Medytox to develop the product successfully. Def. SJ Mem. 7–8, 10; Def. SJ Facts 7–11; Opp. Facts 60, 62.

More fundamentally, Plaintiffs' argument would render all exclusive drug development licenses not only *per se* illegal, but also deemed to cause *damage* automatically. That an agreement grants exclusive rights to market and position a product says nothing about causation or a plaintiff's injury. The key question for standing and causation is whether, but for the License Agreement, Medytox could have gone solo and succeeded with no FDA experience and only a $3 million R&D budget—more effectively than with Allergan's help. The undisputed facts confirm that the answer to this question is no. Def. SJ Mem. § II–III. Nor do Plaintiffs come anywhere near proving that Allergan tied up the entire neurotoxin field, with at least six other players—PurTox, Revance, Hugel, Alphaeon, Dysport, and Xeomin—developing new products as of January 2014. Robbins Opp. Decl. ¶ 11,

Apps. A1–A.7; Robbins SJ Decl. ¶ 39.

**A. Plaintiffs Inappropriately Seek to Avoid Their Burden to Prove Causation**

Plaintiffs argue that under *Zenith Radio* they can establish causation as a matter of law with a "minimal" showing. Pls. SJ Mem. 21–22. But *Zenith Radio* made clear that Plaintiffs must prove "***some damage*** flowing from the ***unlawful conspiracy***" and that the defendant's conduct must be a "***material cause*** of the injury." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969) (emphasis added); *see also Cal. CNG, Inc. v. S. Cal. Gas Co.*, 19 Fed. App'x 500, 502 (9th Cir. 2001) (plaintiffs failed to meet burden where alleged competitor "was at no point a viable competitor in the market"); *Pitt Amusement Co. v. Act III Theatres*, 1995 U.S. App. LEXIS 28163, at *3 (9th Cir. 1995); *Catlin v. Washington Energy Co.*, 791 F.2d 1343, 1347 (9th Cir. 1986); *In re Wellbutrin XL Antitrust Litig.*, 2017 U.S. App. LEXIS 15533, at *53–55, 69 n.57 (3d Cir. Aug. 9, 2017) ("[T]he [plaintiffs] have the burden of proving that they have been injured. . . . to withstand summary judgment, they must point to evidence affirmatively showing that [the hypothetical competitor] could have launched. It is no good saying that the defendants have failed to disprove causation.").

**B. Pre-Due Diligence Optimism Does Not Prove That Medytox Was a Ready U.S. Competitor**

Plaintiffs argue for summary judgment based on selected documents describing Medytox in a positive light. Pls. SJ Mem. 22–23; Katriel Exs. 32–35. But such documents fail to prove causation as a matter of law. Plaintiffs' Exhibits 32 and 33, drafted by [REDACTED] Def. SJ Facts 119, 171; Opp. Facts 52–53; Walker Decl. ¶ 36 ("This demonstrates the more stringent standards of US FDA, given the same clinical drug products found to be sufficient by the MFDS [of Korea] was found to

be insufficient for the US FDA"); *see also, e.g.*, *Ethypharm S.A. France v. Abbott Laboratories*, 707 F.3d 223, 226 (3d Cir. 2013).

Plaintiffs misleadingly omit language from [REDACTED] Opp. Fact 54. On the page immediately following the page cited, [REDACTED] (Katriel Ex. 34, AGN-00179937, at 37), refuting Plaintiffs' do-it-yourself speculation. Def. SJ Mem. 24–25. Plaintiffs' selective citation also ignores extensive testimony from [REDACTED] me. *See* Pace Opp. Ex. 36, Barborka Tr. 232:16–25, 233:18–22, 278:13–22. Opp. Fact 54.

Similarly, a presentation by [REDACTED]

- [REDACTED]
- [REDACTED]
- [REDACTED]

Katriel Ex. 35 (emphasis added).

**C. Plaintiffs' But-For Pricing Theory Does Not Establish or Even Support Causation**

Plaintiffs rely on an Excel worksheet full of estimates proving the author's crystal ball wrong. Opp. Fact 55. It estimates a [REDACTED]

[redacted] *Id.* The worksheet estimated that [redacted] Pace Opp. Ex. 37, Mangum Dep. Ex. 3; Pace Opp. Ex. 38, Robbins Tr. 206:19–208:15. The likely response to the entry of another neurotoxin in the U.S. would be for Allergan to ***raise*** the price of Botox® Cosmetic, making up for any lost sales by charging premium prices to brand loyalists (*see* Cremieux SJ Decl. ¶ 56), and thus the License Agreement caused ***negative*** damages.

Other documents relied on by Plaintiffs confirm that Medytox would be successful only if its potential product were sold in partnership with Allergan:

- [redacted] Katriel Ex. 37, AGN-00305211, at slide 7.
- [redacted] *Id.* at slide 10; *see also* slide 12.

Katriel Ex. 37 (emphasis added). [redacted] Katriel Ex. 38, at AGN-00053288.

### D. Plaintiffs' But-For Timing Theory Does Not Establish or Even Support Causation

Plaintiffs assert that they have proven causation as a matter of law because they believe the License Agreement "allowed" Allergan to delay commercialization of MT10109L. Pls. SJ Mem. 25. *First*, Plaintiffs ignore the overwhelming evidence showing that Allergan's goal throughout has been to [redacted] Pace SJ Ex. 93, AGN-00036073;

Def. SJ Facts 192–200. Allergan had a strong profit motive to launch MT10109L as soon as possible. Cremieux SJ Decl. ¶ 45 Fig. 4, 5; Def. SJ Fact 193. [REDACTED] Opp. Fact 75; *see also* Katriel Ex. 39, AGN-00317922 [REDACTED] Pace Opp. Ex. 47, AGN-00312713, at slide 2.

*Second*, any "delays" in the commercialization of an MT10109L product in the U.S. are the result of [REDACTED] Patel Decl. ¶¶ 63–64; Def. SJ Fact Nos. 51, 139, 239.

Plaintiffs' documents support summary judgment for Allergan. [REDACTED]

[REDACTED] Katriel Ex. 40, AGN-0005741; Opp. Fact 64. [REDACTED]

[redacted] SJ Fact No. 73.

### E. Plaintiffs' Speculation That MT10109L Should Have Become the World's First Botulinum Toxin Biosimilar Does Not Establish or Even Support Causation

Plaintiffs' various hypothetical FDA commercialization timelines are impossible in a world where neurotoxin approvals take 5, 10, or more years. *See* Section III.F; Robbins Opp. Decl. ¶ 11, Apps. A.1–A.7, F; Def. SJ Mem. II.B.2.d. So Plaintiffs make a desperate request for a ruling of causation-as-a-matter-of-law based on the unsupported assumption that, instead of seeking approval through a Biologics License Application (BLA), MT10109 (liquid) somehow could have obtained FDA approval more quickly as the *first-ever botulinum toxin biosimilar*—to Botox® Cosmetic (solid). Pls. SJ Mem. 26–28, 30–31.

*First*, no company had received U.S. biosimilar approval in 2012 or 2013—tiny Medytox would have been the first in the world. Robbins Opp. Decl. App. B; Pace Opp. Ex. 38; Robbins Tr. 50:7–51:4 (Medytox "would have been the very first biosimilar"). *Second*, there is no record evidence—no public statement, no anything—that Medytox ever considered the U.S. biosimilar pathway. *Third*, it is undisputed that biosimilar approvals cost 100 times what generic U.S. FDA approvals cost—on the order of $100–$250 million. Robbins Opp. Decl. ¶ 13. *Fourth*, companies that obtain U.S. biosimilar approval (only 7 in all history) are ***billion-dollar*** companies. Robbins Opp. Decl. ¶¶ 15-16 App. B. By contrast to the billions spent on R&D by these companies—Medytox spent only $3 million a year. Robbins Opp. Decl. App. D.3. Successful biosimilar companies outspent Medytox by more than 1,000 times. Robbins Opp. Decl. App. D.2.

*Fifth*, [redacted]

A. . . . [redacted]

Pace Opp. Ex. 36, Barborka Tr. 252:15–253:9 (emphasis added); *see also* Opp. Fact 66. Plaintiffs rely on [redacted]" Pls. SJ Mem. 27. But two bullets down in this very document, he estimated that: [redacted] Katriel Ex. 41 at slide 3 (emphasis added); Opp. Fact 64. *Sixth*, Dr. Susan Walker, who helped draft the FDA's guidance on biosimilar approvals of botulinum toxins, testifies that an MT10109L product could not be approved as a biosimilar to Botox® Cosmetic, so pursuing a biosimilar pathway would have *delayed* FDA approval. Walker SJ Decl. ¶¶ 58–61; *see also* Robbins SJ Decl. § V. To date, no botulinum toxins have been approved as biosimilars. Walker SJ Decl.¶ 63; Robbins SJ Decl. ¶¶ 59–63. Empirically, neither Merz, Galderma, Johnson & Johnson, Alphaeon-Daewoong, nor any of the more recent actual or would-be U.S. neurotoxin manufacturers has pursued a U.S. biosimilar path. Opp. Fact 76; Robbins Opp. Decl. App. B.

In any event, seeking a biosimilar pathway still would require that Allergan and Medytox conduct Phase III clinical trials (Walker ¶ 65; Robbins ¶ 67), [redacted]. Def. SJ Fact No. 164. *Finally*, Plaintiffs rely on Exhibit 42, a [redacted]. Pls. SJ Mem. 27. As explained by [redacted]. Chu Opp. Decl. ¶ 7; Pace Opp. Ex. 38 Robbins Tr. 201:17–205:11.

### F. Plaintiffs Cannot Avoid Their Burden to Prove Causation by Objecting to Allergan's Affirmative Defense

Allergan's affirmative defense on Medytox's lack of FDA approval does not relieve Plaintiffs of their burden to prove causation and standing. *See* Pls. SJ Mem. 28–33; *see Ethypharm*, 707 F.3d at 236 (rejecting hypothetical competitor's antitrust claim because it "sought a business partner who would . . . obtain U.S. regulatory approval for the product" and, without challenged conduct, still would have required partner); *Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 868 (D.C. Cir. 2008) (no standing; "no reasonable juror could find that, but for [the challenged conduct,] the FDA would have granted Andrx final approval" in relevant period); *Xechem, Inc. v. Bristol-Myers Squibb*, 372 F.3d 899, 902 (7th Cir. 2004) ("Xechem *still* has not filed an ANDA for paclitaxel . . . a hurdle that it must vault to establish [antitrust] injury."); *In re Solodyn Antitrust Litig.*, 2015 U.S. Dist. LEXIS 125999, at *41 (D. Mass. Aug. 16, 2015) ("The FDA's approval**,** not [the challenged] agreement with Medicis, was the limiting factor in Lupin's ability to bring generic Solodyn . . . to market"). Even if Plaintiffs succeeded in shifting the burden of production to Allergan—which Plaintiffs cannot do on this record—Allergan already has established that "plaintiff's injury was caused by factors other than [defendant's alleged] antitrust violation." Pls. SJ Mem. 29–30; Def. SJ Mem. § II (undisputed facts of Medytox's inability to commercialize MT10109 in U.S.).

Whether the Court considers the causation question in the context of Plaintiffs' burden to prove their Sherman Act claims or Allergan's Second Affirmative Defense, the undisputed facts show that Plaintiffs' hypothetical approval timelines are not only unprecedented but impossible. Robbins Opp. Decl. ¶¶ 21–27. Dr. Geigert relies on a hypothetical FDA approval timeline starting in August 2012. Katriel Ex. 4, Geigert ¶ 222. But, as Plaintiffs' acknowledge, the [redacted]

[redacted]. Katriel Ex. 29; AGN-00317922; Opp. Facts 56–58.

Dr. Geigert blithely declares that Medytox—on its own, contrary to its public statements, and historical course of dealing only with commercialization partners (Def. SJ Fact 18)—could have obtained approval of its BLA just 15 months after the first non-U.S. sale (in January 2014) of an MT10109 product. Katriel Ex. 4, Geigert Decl. ¶ 220. Dr. Geigert ignores the undisputed evidence of [REDACTED] Def. SJ Facts 45–54, 75–79, 86–147, 148–71; Opp. Fact 68. Dr. Geigert never explains why his speculation about the hypothetical MT10109L approval is possible when established manufacturer Galderma's launched Dysport in the U.S. 18 years after its first non-U.S. approval (UK), and Merz launched Xeomin in the U.S. 5 years after its first non-U.S. approval (Germany). Robbins Opp. Decl. Apps. A.2, A.4; Pace Opp. Ex. 38, Robbins Tr. 209:13-21; Opp. Fact. 78.

Dr. Geigert's theory relies heavily on the unprecedented assumption that the Sherman Act *micromanages* the decision to [REDACTED]. Pls. SJ Mem. 32. Plaintiffs' causation-as-a-matter-of-law argument is based on Dr. Geigert's sight-unseen guess that [REDACTED]. *Id.* But [REDACTED]. Def. SJ Facts 46, 125–27; Patel Decl. ¶¶ 34–46; Walker Decl. ¶¶ 33–34; Robbins Tr. 43:25–36:9; Opp. Facts 69–70. The [REDACTED] Opp. Facts 69–70; Def. SJ Facts 125–27, 229–233; Patel Decl. ¶¶ 34–46.

[REDACTED]

[redacted] Pace SJ Ex. 75. [redacted] Def. SJ Fact 161; Walker Decl. ¶¶ 32, 20.

And multiple witnesses, including [redacted] Opp. Facts 69–70; Pace SJ Ex. 13, Neervannan Tr. 109:22–110:6 [redacted]); Pace SJ Ex. 2, Nardo Tr. 67:16–25 [redacted]); Pace Opp. Ex. 35, O'Neill Tr. 156:19–157:17, Ex. 4. These undisputed facts overcome Plaintiffs' speculation that Medytox had the necessary "intent and preparedness" to enter the U.S. market on its own absent the License Agreement. *See, e.g.*, Def. SJ Facts 46, 125–27.

Plaintiffs and Dr. Geigert also make the irresponsible suggestion that a QP (Qualified Person) audit—[redacted]—"has no application to an FDA submission." Pls. SJ Mem. 32. But the FDA's standards are "equivalent to, if not more stringent, than the EU GMP standards which were used to evaluate the Osong facility." Patel Decl. ¶ 58; Pace SJ Ex. 16, Roberts Tr. 198:22–199:20, 204:24–205:18 [redacted]).

Finally, in discussing market power, Plaintiffs admit that "[t]he prior failed attempts at market entry by large companies like Johnson & Johnson and Revance Therapeutics confirm the high challenges that even seasoned players face when seeking to enter the [U.S.] market." Pls. SJ Mem. 19. Plaintiffs cannot have it both ways; they cannot cite the failed efforts of seasoned players with neurotoxins, while claiming those "high challenges" do not apply to Medytox.

**G. Dr. Geigert's But-For Timeline Ignores the Requirements and Conclusions of the Korean Government**

Dr. Geigert argues that development of MT10109L improperly was delayed during the three months from the September 25, 2013 signing of the License until closing on January 3, 2014—a period Dr. Geigert terms as "nearly half a year." Katriel Ex. 4, Geigert ¶ 208. Dr. Geigert asserts, with no evidence, that, "[b]ecause the Agreement entailed two entities *that competed in Korea* (i.e., Allergan and Medytox)," Korean "regulatory clearance" was required. *Id.* That is false.

As set forth in the declaration of Sinsung Yun, a partner at Yoon & Yang, the approval of Korea's Ministry of Trade, Industry, and Energy ("MOTIE") was required because Medytox was proposing to export a botulinum toxin. Yun Decl. ¶¶ 5, 12, 15; *see* Fed. R. Civ. P. 44.1. Specifically, MOTIE approval was required ***prior to closing*** of the License Agreement pursuant to Korea's Act on Prevention of Divulgence and Protection of Industrial Technology ("ITA") and Korea's Foreign Trade Act ("FTA"). Yun Decl. ¶¶ 5, 10, 12. Pursuant to the ITA, technology designated as a "National Core Technolog[y]" must obtain MOTIE approval before the technology can be exported outside of Korea. Yun Decl. Ex. B, at 1 (MOTIE press release); *see* Yun Decl. ¶¶ 8–9. MOTIE's Public Notice No. 2012-13 lists "[b]otulinum toxin production technology" as a "National Core Technolog[y]" subject to the ITA. Yun Decl. ¶ 11, Ex. D.

The FTA also regulates the export of botulinum toxin production technology developed in Korea and requires MOTIE approval prior to the export of the

botulinum toxin; any export of a "Strategic Item" must obtain a permit from MOTIE. MOTIE's Public Notice No. 2013-39 on the Export/Import of Strategic Items lists "[b]otulinum neurotoxin producing strains of Clostridium species" as a Strategic Item. Yun Decl. ¶ 14, Ex. E.

To comply with Korean law, Medytox and Allergan could not close the License Agreement until the Korean government approved. Pace SJ Ex. 26, at 100 ([redacted]); Yun Decl. ¶¶ 5, 15. An application for approval of the Agreement was submitted to MOTIE in September 2013. Yun Decl. Ex. B, at 4. MOTIE reached its decision in early January, 2014 (*id.* ¶ 13) and notified Allergan and Medytox of the approval that day; the parties immediately closed the transaction without delay. Pace Opp. Ex. 46, AGN-00324324, at 26. MOTIE issued its written approval and press release on January 7, 2014. Yun Decl. Ex. B, at 1, 4.

MOTIE's approval press release confirms the pro-competitive benefits here. MOTIE reported that Korea's biomedical industry was made up of "small- to medium-sized companies . . . lacking in overseas technology market information and professional manpower." Yun Decl. Ex. B, at 3. The License would be the "gateway deal for invigorating global market entry by domestic biomedical industry of Korea in the future, by establishing global commercialization experience." *Id.* MOTIE noted that "to partner with large international pharmaceutical companies" like Allergan, pursuant to licenses, was "essential" "to access global clinical tests and wide distribution channels which required extensive capital and networks." *Id.* MOTIE also evaluated Allergan's "***exclusive license*** to conduct clinical trials and sell the product," and approved the transaction. Yun Decl. Ex. B, at 4.

## IV. PLAINTIFFS' "SCOPE OF THE PATENT" ARGUMENT ONLY CONFIRMS THE VALIDITY OF THE MEDYTOX-ALLERGAN LICENSE AGREEMENT (PLS. MEM. SECTION VII)

Plaintiffs novelly argue the License is illegal because it includes [redacted]

of Medytox "know-how" in addition to rights under Medytox's patents—and that the inclusion of know-how somehow converts the License into an exclusion beyond the scope of the patent, violating *Mercoid*. Pls. SJ Mem. 33–35.

*First*, even if Medytox's know-how grant of access contained any exclusion, it would be protected by the lawful monopoly—co-extensive with the patent monopoly—that extends to owners of know-how. *See A.&E. Plastik Pak Co. v. Monsanto, Co.*, 396 F.2d 710, 715 (9th Cir. 1968) ("[k]now-how . . . confers upon its possessor the exclusive, although perhaps temporary, right to utilize it," and a know-how license, "like a patent license, is a partial release of [a] monopoly position rather than the imposition of an additional restraint upon trade and commerce"). The ability to license know-how exclusively is consistent with the federal government's longstanding acknowledgement of the procompetitive, efficiency-enhancing nature of "package licensing," *i.e.*, patent licenses covering an invention combined with know-how licenses to facilitate the commercialization of that invention, when such licenses "are needed to use any single item of intellectual property." ANTITRUST GUIDELINES FOR THE LICENSING OF INTELLECTUAL PROPERTY, ISSUED BY DOJ AND FTC, January 2017 § 5.3. Prohibiting the exclusive licensing of know-how would have an enormous chilling effect.

*Second*, the know-how shared by Medytox is not some independent feature separate from the patented technology, as in *Mercoid*, but instead is

*Third*, Medytox's sharing of know-how with Allergan ***is not an exclusion at***

***all***. Therefore all three cases relied upon by Plaintiffs—which involved ***restrictions*** on the licensee's sale of unpatented elements—are irrelevant. *Id.* at 33–34. *Mercoid* involved a patentee who used an unpatented aspect of its product to pursue infringement litigation and ***block the plaintiff from competing***—or to pay license fees. 320 U.S. 680, 681, 683–84 (1944). *Actavis* addressed agreements that "***exclude[d] products or processes***" outside the scope of a pharmaceutical company's patent. 133 S. Ct. 2223, 2237 (2013). And *Compton v. Metal Products* discussed a patentee "***requir[ing] non-competition*** . . . as to items not covered by patents." 453 F.2d 38, 44–45 (4th Cir. 1971). Here, Medytox's sharing of know-how with Allergan (in exchange for Allergan's sharing of know-how) does not exclude Allergan from doing anything. The know-how facilitates the use of Medytox's patent rights to commercialize a new product. Pace SJ Ex. 26 at § 1.56.

*Finally*, to the extent Plaintiffs object to the License Agreement's inclusion of "Licensed Compounds" in the definition of "Licensed Product," *id.* at 35, Plaintiffs' objection is meritless. Medytox's "Licensed Compounds" are "nonstaple goods" encompassed within the patent monopoly, a category the Supreme Court explicitly immunized from antitrust liability under the *Mercoid* framework. *Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 200 (1980) ("[T]he provisions of [35 U.S.C.] §271(d) effectively confer upon the patentee, as a lawful adjunct of his patent rights, a limited power to exclude others from competition in nonstaple goods. A patentee may sell a non-staple article himself while enjoining others from marketing that same good without his authorization.").

## CONCLUSION

This Court should deny Plaintiffs' motion for summary judgment.

Dated: September 29, 2017

WHITE & CASE LLP

By: */s/ J. Mark Gidley*
J. Mark Gidley

Attorneys for Defendant
ALLERGAN, INC.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28