UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADEL TAWFILIS, DDS d/b/a CARMEL VALLEY CENTER FOR ORAL AND MAXILLOFACIAL SURGERY and HAMID A. TOWHIDIAN, M.D., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ALLERGAN, INC.,<br><br>Defendant. | CASE NO. 8:15-cv-00307-JLS-JCG<br><br>**ORDER GRANTING PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT (Doc. 385) AND SETTING A FINAL FAIRNESS HEARING DATE FOR AUGUST 24, 2018, AT 2:30 P.M.** |

1

Before the Court is an Unopposed Motion filed by Plaintiffs Adel Tawfilis, D.D.S. d/b/a Carmel Valley Center for Oral and Maxillofacial Surgery and Hamid A. Towhidian, M.D., seeking preliminary approval of a proposed class action settlement of claims that Defendant Allergan, Inc. overcharged class members who purchased its product Botox® Cosmetic.  (Mem. at 2, Doc. 385.)  Plaintiffs ask the Court to (1) certify the proposed Settlement Class; (2) preliminarily approve the terms of the proposed settlement; (3) approve the Long- and Short-Form Class Notices and authorize distribution of the Notices by KCC Class Action Services; and (4) schedule a final fairness hearing date.  (*See id*.) Having read and considered the papers on file, the Court GRANTS Plaintiffs' Motion and sets a final fairness hearing date for August 24, 2018, at 2:30 p.m.

## I.    <u>BACKGROUND</u>

Plaintiffs Tawfilis and Towhidian were direct purchasers of Allergan's product, Botox Cosmetic, a botulinum toxin-based neuromodulator.  (FAC ¶ 1, Doc. 28.)  Plaintiffs allege that Allergan entered into an anticompetitive agreement with Medytox, Inc., a Korean company that had developed a less-expensive neuromodulator, by which Allergan was able to delay the availability of Medytox's product in the U.S. market.  (*Id*.)  Thus, Plaintiffs allege, the agreement forestalled competition between Allergan and Medytox, allowing Allergan to cement its monopoly market power "free from any pricing constraints that would be posed by potential competition in the U.S. by Medytox's entry."  (*Id*.)

On February 24, 2015, Plaintiffs filed a class lawsuit against Defendants.  (*See* Compl., Doc. 1.)  On May 29, 2015, Plaintiffs filed their first amended complaint in which they alleged the following claims: (1) unlawful market allocation in violation of section 1 of the Sherman Act, 15 U.S.C. § 1; (2) agreement in restraint of trade in violation of 15 U.S.C. § 1; (3) unlawful maintenance of monopoly market power in violation of section 2 of the Sherman Act, 15 U.S.C. § 2; (4) violations of California's Cartwright Act, Cal. Bus.

& Prof. Code §§ 16700, *et seq.*; and (5) violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* (FAC ¶¶ 76–113.)

On June 29, 2015, Allergan moved to dismiss the FAC.  (MTD, Doc. 32.)  The Court denied Allergan's Motion to Dismiss as to all claims.[1]  (Order Denying MTD, Doc. 45.)  Allergan filed an Answer to the FAC on November 3, 2015.  (Answer, Doc. 48.)

On January 11, 2016, Plaintiffs moved for judgment on the pleadings or, in the alternative, partial summary judgment as to their claim for unlawful market allocation. (MJP, Doc. 62.)  The Court denied Plaintiffs' Motion on May 31, 2016.[2]  (Order Denying MJP, Doc. 113.)

On June 26, 2017, the Court granted in part and denied in part Allergan's *Daubert* Motion to exclude the methodologies of Plaintiffs' expert economist Robert Mangum; the Court also denied without prejudice Plaintiffs' *Daubert* Motion to exclude the declaration of Allergan's expert Dr. Susan Walker.  (Order re: *Daubert* Motions and Motion for Class Cert. at 29, Doc. 263.)  In the same order, the Court granted Plaintiffs' Motion for Class Certification.  (*Id.*)  The Court certified the following class under Rule 23(b)(3): "All purchasers within the United States who purchased Botox Cosmetic directly from Defendant Allergan, Inc. during the Class Period for a price that was based on Allergan's list price."  (*Id.*)  The Class Period was defined as April 1, 2015 through June 26, 2017. (*Id.* at 4.)  According to Plaintiffs, April 1, 2015 was the date that Medytox's competitive product would have entered the market if not for the Allergan-Medytox agreement.[3]  (*Id.* at 4.)

---

[1] Allergan later filed a Motion for Reconsideration.  The Court also denied this Motion. (Order Denying Def.'s Motion for Reconsideration, Doc. 55.)

[2] Plaintiffs later filed a Motion for Reconsideration, which the Court also denied.  (Order Denying Pls.' Motion for Reconsideration, Doc. 128.)

[3] The Plaintiffs also moved for certification of an injunctive relief class under Rule 23(b)(2), which sought rescission of the Allergan-Medytox agreement due to its anticompetitive effects. (MCC, Doc. 116-1.)  The proposed injunctive class had an identical definition to the (b)(3) class but the injunctive period would extend back to September 25, 2013, the date of the agreement. However, the Court did not ultimately certify the proposed injunctive relief class.  (Order re: Daubert Motions and Motion for Class Cert. at 29.)

1    On July 25, 2017, the Court approved the parties' joint proposed notice plan and

2  approved retention of either Dahl Administration, LLC ("Dahl") or Kurtzman Carson

3  Consultants LLC ("KCC") as the class action administrator; the parties ultimately retained

4  KCC.  (Order Approving Class Notice, Doc. 271; Katriel Decl. ¶ 14, Doc. 385-1.)

5  Specifically, the Court found that the parties' proposal to disseminate class notice by

6  means of a postcard mailing of a short-form notice along with publication of a long-form

7  notice on the administrator's website was consistent with the constitutional requirements

8  of due process and the statutory requirements of Rule 23 of the Federal Rules of Civil

9  Procedure.  (*Id.* at 2.)

10    On September 1, 2017, the parties filed cross-motions for summary judgment.

11  (Docs. 280, 286.)  Following a hearing on the motions, the Court ordered supplemental

12  briefing on the issue of causation.  (Order for Supplemental Briefing, Doc. 371.)  On

13  December 12, 2017, the parties reached a settlement.  (Mem. at 1.)

14    The Settlement Agreement proposes a Settlement Class that tracks the definition of

15  the certified class: "All purchasers within the United States who purchased Botox

16  Cosmetic directly from Defendant Allergan, Inc. during the Class Period for a price that

17  was based on Allergan's list price."  (Settlement Agreement, Ex. 1 to Katriel Decl., Doc.

18  385-2.)  The Class Period tracks the class period of the certified damages class, April 1,

19  2015 through June 26, 2017.  (*Id.* § 9(b).)

20    The Settlement Agreement provides for a full-distribution, non-reversionary

21  Settlement Fund of $13,450,000.  (*Id.* § 5(a).)  After deducting attorneys' fees, litigation

22  costs, Plaintiffs' incentive payments, and the costs of administering the settlement fund,

23  the net settlement amount will be used to provide settlement payments to each class

24  member.  (*Id.* § 9(a).)  The remaining fund will be distributed to class members on a pro

25  rata basis, based on the number of vials of Botox Cosmetic purchased by each class

26  member.  (*Id.* § 9(b).)  No later than ten days after the deadline set by the Court for the

27  submission of requests for exclusion, Allergan will provide the Administrator and Class

28

4

Counsel records identifying the name and mailing address of Settlement Class members who made purchases of Botox Cosmetic within the Class Period, as well as the number of units purchased by each member.  (Settlement Agreement § 9(b).)  Within thirty days of receiving this information, the Administrator will calculate each member's pro rata distribution and mail a check to each Settlement Class member.  (*Id.* § 9(c).)  Class members may dispute the calculation of their distribution within twenty-one days of the date of issuance the check.  (*Id.* § 9(e).)  To the extent there are any uncashed settlement checks following the checks' expiration date, the remaining funds will be distributed to one of several potential *cy pres* recipients, all of which are charitable organizations devoted to addressing facial or skin medical conditions. (*Id.* § 16; Cy Pres Recipients List, Ex. 4 to Katriel Decl., Doc. 385-5.)  The parties do not state how long Class members will have to cash their settlement checks prior to expiration.

In return for net Settlement Fund payments, Settlement Class members fully release and discharge Allergan and affiliated persons and entities from claims "related to the allegations in the First Amended Complaint, prior to the Effective Date, (a) alleged, or which could reasonably have been alleged, in the Class Action, (b) concerning the Medytox-Allergan License Agreement, or (c) purchases of Botox Cosmetic and arising under the Sherman Act, 15 U.S.C. §§ 1 & 2, *et seq.*, or any other federal or state statute or common law doctrine relating to antitrust or unfair competition, unjust enrichment, or consumer protection."  (Settlement Agreement § 11(a).)

The Settlement Agreement provides that Class Counsel will request an award of attorneys' fees of up to 33.33% of the Settlement Fund.  (*Id.* § 10.)  Further, Plaintiffs may each apply for a $5,000 incentive award.  (*See* Long-Form Notice at Question 14, Ex. 3 to Katriel Decl., Doc. 385-4.)  The Administrator will also be paid from the settlement fund for the reasonable costs of administering this settlement; Court approval "shall not be required for disbursements or distribution of Administrative Expenses for amounts … of less than $75,000."  (Settlement Agreement § 5(b).)  Defendants agree not to take a

position on applications seeking the above attorneys' fees, costs, and incentive payments. (*Id.*)  The parties have proposed to retain KCC as the Settlement Administrator.  (Mem. at 5 n.3.)

The Motion also enumerates the process for class notice.  Upon the Court's approval of the settlement, the Settlement Administrator will send a Short-Form Notice by first-class mail to all Allergan Botox Cosmetic customers of record who form part of the class definition.  (Mem. at 5.)  The Administrator will also publish a Long-Form Notice online on its website and a toll-free telephone number that Settlement Class members may call to ask questions or request additional information.  (Katriel Decl. ¶ 4.)   Class members need not take any action in response to the Notices in order to receive their distributions.  (Settlement Agreement § 9(b).)

Plaintiffs now move for preliminary approval of the proposed settlement.  (Mot.) The parties contend that the proposed settlement is fair, reasonable, adequate, and in the best interest of the proposed class.  (Mem. at 6–17.)


## II.   CONDITIONAL CERTIFICATION OF THE CLASS

Plaintiffs assert that certification is proper for the same reasons the Court previously granted class certification.[4]  (*See* Mem. at 4; Order re: *Daubert* Motions and Motion for Class Cert.)  Because no intervening circumstances have arisen since the Court's prior grant of certification, and for the same reasons identified in the Court's certification order, the Court finds that the Settlement Class satisfies adequacy, typicality, numerosity, commonality, and preferability of class versus individual litigation under Rule 23(a) and Rule 23(b)(1).  (*Id.* at 14–29.)

---

[4] The Court notes that the definition of the Class Period from April 1, 2015 to June 26, 2017, which tracks the period for the certified damages class rather than the proposed injunctive relief class, is appropriate because mid-2015 is the date that, according to Plaintiffs, Medytox's product could have first entered the U.S. market.  Therefore, April 1, 2015 is the earliest date on which Settlement Class members could have recovered damages for the agreement's alleged antitrust impact.

6

1

2    **III.    <u>PRELIMINARY APPROVAL OF CLASS SETTLEMENT</u>**

3           To preliminarily approve a proposed class-action settlement, Rule 23(e)(2) requires

4    the Court to determine whether the proposed settlement is fair, reasonable, and adequate.

5    Fed. R. Civ. P. 23(e)(2).  In turn, review of a proposed settlement typically proceeds in two

6    stages, with preliminary approval followed by a final fairness hearing.  Federal Judicial

7    Center, *Manual for Complex Litigation*, § 21.632 (4th ed. 2004).

8           "To determine whether a settlement agreement meets these standards, a district

9    court must consider a number of factors, including: the strength of plaintiffs' case; the risk,

10   expense, complexity, and likely duration of further litigation; the risk of maintaining class

11   action status throughout the trial; the amount offered in settlement; the extent of discovery

12   completed, and the stage of the proceedings; the experience and views of counsel; the

13   presence of a governmental participant;[5] and the reaction of the class members to the

14   proposed settlement."  *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003) (internal

15   citation and quotation marks omitted).  "The relative degree of importance to be attached

16   to any particular factor will depend upon and be dictated by the nature of the claim(s)

17   advanced, the type(s) of relief sought, and the unique facts and circumstances presented by

18   each individual case."  *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of S.F.*,

19   688 F.2d 615, 625 (9th Cir. 1982).  "'It is the settlement taken as a whole, rather than the

20   individual component parts, that must be examined for overall fairness,' and 'the

21   settlement must stand or fall in its entirety.'"  *Staton*, 327 F.3d at 960 (quoting *Hanlon*,

22   150 F.3d at 1026) (alterations omitted).

23          At this preliminary stage and because Settlement Class members will receive an

24   opportunity to be heard on the settlement, "a full fairness analysis is unnecessary . . . ."

25   *Munday v. Navy Fed. Credit Union*, No. SACV-15:1629-JLS (KESx), 2016 WL 7655807,

26   at *7 (C.D. Cal. Sept. 15, 2016).  Instead, preliminary approval and notice of the settlement

27   _____

28          [5] This factor does not apply in this case.

terms to the proposed class are appropriate where "[1] the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, [2] has no obvious deficiencies, [3] does not improperly grant preferential treatment to class representatives or segments of the class, and [4] falls within the range of *possible* approval   . . . ." *In re Tableware Antitrust Litig*., 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007) (internal quotation marks and citation omitted) (emphasis added); *see also Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 386 (C.D. Cal. 2007) ("To determine whether preliminary approval is appropriate, the settlement need only be *potentially* fair, as the Court will make a final determination of its adequacy at the hearing on the Final Approval, after such time as any party has had a chance to object and/or opt out.") (emphasis in original).

In evaluating all applicable factors below, the Court finds that the proposed Settlement Agreement should be preliminarily approved.

### A.  <u>Strength of Plaintiffs' Case</u>

The principal claims at issue here involve the impact of Allergan's alleged anticompetitive conduct on the market price of Botox Cosmetic.  While Plaintiffs believe there is strong legal and factual support for their claims, there is inherent risk in continued litigation.  (*See* Mem. at 11.)  The parties filed cross-motions for summary judgment, and because of complicated, contentious issues regarding damages and causation, the outcome of these motions was "very much uncertain."  (*Id*. at 11–12.)  The Court finds that given these potential obstacles, this factor weighs in favor of granting preliminary approval.

### B.  <u>Risk, Complexity, and Likely Duration of Further Litigation</u>

Plaintiffs argue that continued litigation would be expensive and time-consuming.  (*Id*. at 12–14.)  Additionally, because antitrust law is complex and many areas are relatively unsettled in the Ninth Circuit, "the uncertainty of ongoing litigation was particularly acute."  (*Id*. at 13.)  A trial itself would have been complex and lengthy, and

1   the parties anticipate that any outcome would be "vigorously challenged on appeal."  (*Id.*

2   at 13–14.)  Although Plaintiffs emphasize the meritorious nature of the class claims, they

3   observe that settlement allows Settlement Class members to avoid potential dispositive

4   findings such as a lack of causation and the "significant and meaningful delay in obtaining

5   any redress."  (*Id.* at 14.)   *See Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221

6   F.R.D. 523, 526 (C.D. Cal. 2004) ("In most situations, unless the settlement is clearly

7   inadequate, its acceptance and approval are preferable to lengthy and expensive litigation

8   with uncertain results." (citation omitted)).

9

10         **C.  Risk of Maintaining Class Certification**

11        Although the Court previously certified the proposed Settlement Class, the parties

12   point out that Plaintiffs still face a risk of decertification because the parties' arguments on

13   certification would inevitably be revisited on appeal.  (Mem. at 14.)  The Court finds the

14   risk of decertification "not so minimal" as to preclude the Court from granting preliminary

15   approval of the Settlement Agreement.  *See Rodriguez v. West Publ'g Corp.*, 563 F.3d 948,

16   966 (9th Cir. 2009).

17

18         **D.  Amount Offered in Settlement**

19        The Court finds that the amount offered in settlement is reasonable.  The proposed

20   settlement provides for a settlement fund of $13,450,000, which is a substantial benefit to

21   the Settlement Class.  (Mem. at 15.)  The proposed Settlement Fund represents

22   approximately 8.36% of the overcharge damages as calculated by Plaintiffs' expert

23   economist Russell Mangum.  (Mangum Report ¶ 115, Doc. 281-3.)  A "settlement

24   amounting to only a fraction of the potential recovery does not per se render the settlement

25   inadequate or unfair."  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000)

26   (internal quotation marks and citation omitted).  This percentage of recovery is consistent

27   with prior approved settlements in complex antitrust class actions.  *Mylan Pharms., Inc. v.*

28

9

*Warner Chilcott Pub. Ltd. Co.*, 2:12-cv-03824, ECF No. 665 at 9 (E.D. Pa. Sept. 15, 2014) (approving settlement in complex antitrust pharmaceutical action where "[t]he Settlement amount—$15 million—is reasonable in light of the damages estimates, which were between $23 million and $1 billion"); *Nichols v. SmithKline Beecham Corp.*, No. CIV.A.00-6222, 2005 WL 950616, at *16 (E.D. Pa. Apr. 22, 2005) (approving a settlement in complex antitrust action where the settlement amount was between 9.3% and 13.9% of total potential damages).   Accordingly, in considering the difficulties of potential recovery, the Court finds that the amount offered in settlement weighs in favor of preliminary approval.

The allocation of settlement funds also appears fair, adequate, and reasonable.  Each Class Member will receive a pro rata share of the settlement based on the number of vials of Botox Cosmetic that he or she purchased.  (Settlement Agreement § 9(b).)  To the extent that there remain any unused settlement funds, *i.e.* from uncashed settlement checks after the checks' expiration date, these funds will be distributed to one of the parties' proposed *cy pres* recipients, all of which are charitable organizations that treat facial and skin medical conditions.  (*Id.* § 16.)  Thus, these recipients bear a sufficient nexus to the Settlement Class.  *See Dennis v. Kellog Co.*, 697 F.3d 858, 865 (9th Cir. 2012) ("[W]e require that there be "a driving nexus between the plaintiff class and the *cy pres* beneficiaries.").  Because the parties do not state how long the period is before the settlement checks expire, the Court orders that Class Members are to have no less than 180 calendar days from the postmarked date of mailing to cash their checks prior to expiration.  Accordingly, subject to the 180-day period for cashing, the plan of distribution weighs in favor of preliminary approval.

Finally, the amount of the settlement also appears fair, adequate, and reasonable in light of the claims released by Plaintiffs and Settlement Class members.  The release is properly tailored to cover only claims related to the factual allegations in the FAC. (Settlement Agreement § 11(a).)  The scope of this release thus weighs in favor of

preliminary approval.  *See Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) ("A
settlement agreement may preclude a party from bringing a related claim in the future even
though the claim was not presented and might not have been presentable in the class
action, but only where the released claim is based on the identical factual predicate as that
underlying the claims in the settled class action.") (internal quotation marks and citation
omitted).

### 1.   *The Court's Concerns*

Although the Court does not approve the proposed amount of attorneys' fees,
administrative costs, and incentive payments at this stage, the Court notes that Class
Counsel intends to seek attorneys' fees in the amount of 33.33% of the Settlement Fund.
(Settlement Agreement §10.)  In the Ninth Circuit, the benchmark for fees is 25% of the
common fund.  *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th
Cir. 2011).  Before final approval, the court will "scrutinize closely the relationship
between attorneys' fees and benefit to the class" and will not "award[] unreasonably high
fees simply because they are uncontested."  *Id.* at 948 (internal quotation marks and
citation omitted).   Additionally, Plaintiffs intend to seek $5,000 each as representative
incentive awards, and the parties estimate that administrative costs will total $75,000.  (*See*
Long-Form Notice, Question 14; Settlement Agreement § 5(b).)  In their Application for
fees, incentive, and cost awards, Plaintiffs must justify why the amounts requested are
reasonable and justified in light of the circumstances of the case.

### E.  Stage of the Proceedings and Extent of Discovery Completed

This factor requires the Court to evaluate whether "the parties have sufficient
information to make an informed decision about settlement."  *Linney v. Cellular Alaska
P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998).  Discovery can be both formal and informal.
*See Clesceri v. Beach City Investigations & Protective Servs., Inc.*, No. CV-10-3873-JLS
(RZx), 2011 WL 320998, at *9 (C.D. Cal. Jan. 27, 2011).  By the time settlement was

1   reached in this case, fact and expert discovery had concluded.  Allergan had produced and

2   Plaintiffs' Counsel had reviewed approximately one million pages of documents as part of

3   written discovery.  (Katriel Decl. ¶ 5.)  Additionally, the parties had taken over two dozen

4   depositions, including several in international locations, and propounded multiple expert

5   reports regarding issues such as antitrust damages, FDA regulatory timelines, and

6   pharmaceutical licensing agreements.  (*Id.* ¶¶ 5–6.)  Given these facts, the Court concludes

7   that the parties possess more than sufficient information to make an informed settlement

8   decision.  *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 459 (finding plaintiffs had

9   "sufficient information to make an informed decision about the [s]ettlement" where class

10  counsel had "conducted significant investigation, discovery and research, and presented

11  the court with documentation supporting those services.").  Accordingly, this factor weighs

12  in favor of granting preliminary approval.

13

14      **F.  Experience and Views of Counsel**

15      "The recommendations of plaintiffs' counsel should be given a presumption of

16  reasonableness."  *Munday*, 2016 WL 7655807, at *9 (citations omitted).  This presumption

17  may be warranted "based on Class Counsel's expertise in complex litigation, familiarity

18  with the relevant facts and law, and significant experience negotiating other class and

19  collective action settlements."  *Ford v. CEC Entm't, Inc.*, No. 14-CV-677 JLS (JLB), 2015

20  WL 11439033, at *4 (S.D. Cal. Dec. 14, 2015).  Roy Katriel, who was previously

21  appointed as Class Counsel in light of his expertise and experience, has endorsed the

22  Settlement Agreement as fair, reasonable, and adequate.  (Katriel Decl. ¶ 16.)  Thus, this

23  factor favors preliminary approval.

24

25      **G.  Reaction of Class Members to Proposed Settlement**

26      Plaintiffs have not provided evidence of the Class members' reactions to the

27  proposed settlement.  However, the Court recognizes that the lack of such evidence is not

28

1   uncommon at the preliminary approval stage.  Before the final fairness hearing, Class

2   Counsel shall submit a sufficient number of declarations from Class members discussing

3   their reactions to the proposed settlement.  In addition, a small number of objections at the

4   time of the fairness hearing may raise a presumption that the settlement is favorable to the

5   class.  *See In re Omnivision Techs., Inc.*, 559 F. Supp. 2d at 1043.

6

7        **H. <u>Signs of Collusion</u>**

8        The Court notes that the parties have negotiated a "clear-sailing" agreement

9   regarding attorneys' fees and class representative incentive awards.  (Settlement

10   Agreement § 10.)  However, this alone is not enough to find that the parties have colluded,

11   as both payments will come from the capped settlement fund.  *See Rodriguez*, 563 F.3d at

12   961 n.5 (noting that where payments are to be made from a capped settlement fund, clear

13   sailing provisions do not signal collusion).  Aside from this, the Court finds no sign,

14   explicit or subtle, of collusion between the parties.  Of course, before final approval, the

15   court will "scrutinize closely the relationship between attorneys' fees and benefit to the

16   class" and will not "award[] unreasonably high fees simply because they are uncontested."

17   *In re Bluetooth*, 654 F.3d at 948 (internal quotation marks and citation omitted).  The

18   Court will also ultimately determine whether the requested service payment amounts are

19   justified by the circumstances of this case.

20        Considering all of the factors together, the Court preliminarily concludes that the

21   settlement is fair, reasonable, and adequate.

22

23   **IV.   <u>APPROVAL OF THE PROPOSED CLAIMS ADMINISTRATOR</u>**

24        The Court previously approved the proposed claims administrator, KCC, to

25   distribute class notices following the Court's class certification order.  (Katriel Decl. ¶ 14.)

26   The Court finds no reason not to approve KCC as the Settlement Administrator,

27   particularly in light of KCC's familiarity with the subject-matter of this litigation.  (*Id.*)

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## V.    PRELIMINARY APPROVAL OF CLASS NOTICE FORM AND METHOD

Because the damages class was certified under Rule 23(b)(3), Plaintiffs were required to provide notice to class members.  As discussed above, the Court approved a method of notice by which class members received by mail a short-form notice and KCC published a long-form notice on its website.  (Order Approving Class Notice.)

The parties seek to adhere to the same notice methodology.  (Mem. at 5.) Following the Court's approval of the Settlement Agreement, the Administrator will send a Short-Form Notice to all Allergan Botox Cosmetic customers of record who form part of the class definition.  (*Id.* at 5; Katriel Decl. ¶ 4.)  The Administrator will also publish a website that includes a Long-Form Notice, a toll-free telephone number that Settlement Class members may call to ask questions or request additional information, and links to pertinent case documents.  (Katriel Decl. ¶¶ 3–4.)  Because the parties have not specified a date by which the Short-Form Notices will be mailed and the Long-Form Notice will be published, the Court orders mailing and publication within ten (10) days of the Court's approval of the Notice forms, which is subject to the changes delineated below.   The parties have also requested that the Court set the response deadline for members who wish to be excluded from the settlement or who wish to object to its terms.  (Settlement Agreement § 9(b).)  Accordingly, the Court determines that Settlement Class members shall have forty-five days from the mailing of the Short-Form Notices to seek exclusion or state their objections.

The Supreme Court has found notice by mail to be sufficient if the notice is "reasonably calculated . . . to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *accord Sullivan v. Am. Express Publ'g Corp.*, No. SACV 09-142-JLS (ANx), 2011 WL 2600702 at *8 (C.D. Cal. June 30, 2011) (quoting

*Mullane*).  The Court finds that the proposed procedure for class notice, along with the forty-five day response deadline, satisfies these standards.

Plaintiffs have provided the Court with a copy of the proposed Long-Form and Short-Form Class Notices.  (Class Notices, Exs. 2 and 3 to Katriel Decl., Docs. 385-3 and 385-4.)  Under Rule 23, the notice must include, in a manner that is understandable to potential class members: "(i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)."  Fed. R. Civ. P. 23(c)(2)(B).  The proposed Notices includes this necessary information.  (*See* Class Notices.)

The Court, however, requires the Notices to be modified as follows:

- The "Additional Information" of the Short-Form Notice should state that all papers filed in this action will also be available for review via the Public Access to Court Electronic Resources System (PACER), available online at http://www.pacer.gov.  The answer to Question 25 ("How do I get more information?") of the Long-Form Notice should also provide the PACER web address.

- The answers to Question 8 ("What does the settlement provide?") and Question 14 ("How will the lawyers be paid?") of the Long-Form Notice must disclose that a copy of the application for fees and costs will be available for review on the Administrator's website and through PACER.

- The "Your Options" section of the Short-Form Notice and the answer to Question 18 ("How do I tell the Court I do not like the settlement?") of the Long-Form Notice should omit any reference to filing objections with the Court. Moreover, the answer to Question 18 of the Long-Form Notice requires that

15

1    objectors send their objections/requests for exclusion to four different addresses,

2    including two for Class Counsel and two for Allergan's Counsel.  This should be

3    revised to require responses to be sent to the Administrator and to **one** Counsel

4    address.  Designated counsel will then be responsible for disseminating the

5    objections/requests to other counsel and the Court.

6    Subject to the changes discussed above, the Court approves the form and method of

7    class notice.  The Court ORDERS the parties to file a revised version of the Notices within

8    **ten (10) days** of this Order.  Moreover, the Court ORDERS mailing of Short-Form Notices

9    and publication of Long-Form Notice within **ten (10) days** of the Court's approval of the

10   revised Notices.

11   The Court requires that any motion for attorneys' fees, costs, and service payments

12   be filed with the Court **no later than fifteen (15) days before** the response deadline as set

13   by the Court.  Plaintiffs shall file their motion for final approval no later than **July 27,**

14   **2018**, including a brief responding to any submitted objections and otherwise summarizing

15   Class members' participation in the settlement and the settlement administration to date.

16

17   **VI.    CONCLUSION**

18   For the reasons discussed above, the Court (1) preliminarily approves the terms of

19   the class action settlement; (2) certifies the proposed Settlement Class; and (3) approves

20   the form and method of class notice, subject to the changes discussed above.  The Court

21   ORDERS the parties to file a revised version of both Notices within **ten (10) days** of this

22   Order.  Notices are to be distributed within **ten (10) days** of the Court's Order approving

23   the revised forms.

24   The Court sets a final fairness hearing for **August 24, 2018, at 2:30 p.m.**, to

25   determine whether the settlement should be finally approved as fair, reasonable, and

26   adequate to Class Members.  Plaintiffs shall file their motion for final approval no later

27   than **July 27, 2018**.  Class Counsel shall file Applications for fees and representative

28

1  enhancement awards **no later than 15 days before** the exclusion deadline.  The Court

2  reserves the right to continue the date of the final fairness hearing without further notice to

3  class members.

4

5

6  DATED:  March 08, 2018

                                       JOSEPHINE L. STATON

7                                    UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28